JOHN DOE, Pro Se
Protected Party Proceeding Under Pseudonym
P.O. Box 1679, MS 5892
Sacramento, California 95812
Email: JohnDoeCA2025@gmail.com
Plaintiff in Pro Per



FILED

CLERK, U.S. DISTRICT COURT

4/20/26

CENTRAL DISTRICT OF CALIFORNIA

BY_____CS_____DEPUTY

DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| JOHN DOE, individually and in his official capacity as Councilmember of the City of West Covina,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF WEST COVINA,<br><br>Defendant. | Case No. 2:26-cv-03659-MEMF-MBKx<br><br>**THIRD AMENDED COMPLAINT FOR DAMAGES, DECLARATORY RELIEF, AND INJUNCTIVE RELIEF**<br><br>Judge: Hon. Maame Ewusi-Mensah Frimpong<br>Courtroom: 8B<br><br>[42 U.S.C. § 1983; First Amendment; Fourteenth Amendment; ADA Title II; ADA Retaliation/Interference; Monell; Supplemental State-Law Claims]<br><br>REQUEST FOR COURT TRIAL |

## THIRD AMENDED COMPLAINT FOR DAMAGES, DECLARATORY RELIEF, AND INJUNCTIVE RELIEF

### I. INTRODUCTION AND CORE THEORY

1. This civil-rights action concerns a public entity's use of government power against an autistic elected Councilmember after he engaged in protected oversight, disability-rights advocacy, and reports concerning suspected misuse of public resources. Plaintiff alleges that the City of West Covina, through policymakers, employees, retained counsel, retained investigators, and police personnel, converted protected speech into alleged misconduct, obstructed approved disability accommodations, publicly disclosed disability-related information, and used censure, police authority, access restrictions, and retaliatory litigation to chill oversight activity.

2. Plaintiff brings this action individually and in his official capacity as Councilmember of the City of West Covina. He seeks damages for constitutional and statutory violations, emotional distress, reputational harm, and impairment of his ability to serve the residents who elected him. He also seeks declaratory and injunctive relief, including invalidation or vacatur of the challenged censure vote and resolution to the extent they were based on the allegedly biased, incomplete, disability-disclosing investigative report and retaliatory process described below.

3. Plaintiff is autistic. His disability affects real-time processing, auditory integration, sensory tolerance, light sensitivity, and communication. These are not matters of preference. Plaintiff provided medical documentation, participated in the City's interactive process, and obtained written accommodations. The City approved structured communication, verbal clarification, additional processing time, advocacy support, stable seating and lighting, equipment access, and related supports. Those accommodations were essential to meaningful participation in City government.

4. After Plaintiff questioned event finances, nonprofit relationships, public-fund expenditures, possible conflicts of interest, and use of City resources, the City did not respond neutrally. Plaintiff alleges the City and its agents used an investigation, censure, disability disclosures, police enforcement threats, and a separate public-records lawsuit to undermine his credibility, burden his disability, and deter continued oversight.

5. This case is not about asking the Court to choose sides in a political disagreement. It is about whether a City may use official power, retained investigators, police authority, City Hall access controls, disability disclosures, and litigation to punish an elected official for protected speech and to obstruct disability accommodations necessary for meaningful participation.

6. Plaintiff respectfully alleges that the Court should see both the legal record and the human record. Plaintiff survived childhood in foster care, physical and emotional abuse, and the isolation that often comes with autism. He did not allow those experiences to defeat him. He became a disability advocate, public servant, appointed commissioner, and elected Councilmember. He worked on autism awareness and disability inclusion at local, state, and federal levels, including advocacy connected to national and state public-service efforts. These facts are not offered for special treatment. They explain why the City's alleged disability-based humiliation, obstruction, and retaliation caused profound harm.

7. Plaintiff's advocacy and oversight were concrete. He reported suspected misuse of public funds, event-finance irregularities, conflicts involving nonprofits and City-connected vendors, and concerns over a purported or proposed health-department funding structure. The exhibits include public records, communications, spreadsheets, law-enforcement-related notices, investigative materials, and transcripts demonstrating that Plaintiff's concerns involved matters of public concern, not personal harassment.

8. Plaintiff alleges a recurring municipal pattern: when he raised corruption, public-fund, and ADA concerns, the City framed him as the problem; when he sought clarification required by his disability, officials and counsel treated clarification as obstruction; when he objected to public disclosure of disability information, the City argued the bell had already been rung; and when he asked for neutral process, the City relied on a report that Plaintiff alleges was shaped by conflicts, selective omissions, and litigation strategy designed to protect the City and certain officials rather than the public entity.

## II. PARTIES, CAPACITY, AND PLEADING POSTURE

9. Plaintiff John Doe is a California resident, a protected party proceeding under pseudonym, and a Councilmember of the City of West Covina. Plaintiff sues individually for personal injuries and in his official capacity to protect his ability to perform public duties and obtain prospective relief necessary for effective service.

10. Defendant City of West Covina is a California municipal corporation and a public entity subject to Title II of the Americans with Disabilities Act, 42 U.S.C. section 12132, and to 42 U.S.C. section 1983 when its policies, customs, practices, ratifications, or final-policymaker decisions cause constitutional injuries.

11. The only named Defendant in this Third Amended Complaint is the City of West Covina. Individual officials, attorneys, investigators, and police personnel described below are alleged as City policymakers, agents, employees, retained counsel, retained investigators, ratified actors, witnesses, or persons whose conduct reflects the City's customs, practices, or municipal liability. Plaintiff does not add them as individual defendants in this pleading.

12. Plaintiff requests a court trial, not a jury trial. Plaintiff believes a bench trial is appropriate because the case involves municipal policy, disability access, public records, censure, legislative-process issues, and equitable remedies.

## III. JURISDICTION AND VENUE

13. This Court has federal-question jurisdiction under 28 U.S.C. section 1331 because this action arises under the First Amendment, the Fourteenth Amendment, 42 U.S.C. section 1983, Title II of the ADA, and 42 U.S.C. section 12203.

14. This Court has jurisdiction under 28 U.S.C. section 1343 because Plaintiff seeks redress for deprivations of constitutional and federal statutory rights under color of state law.

15. This Court has supplemental jurisdiction under 28 U.S.C. section 1367 over related state-law theories because they arise from the same nucleus of operative facts.

16. Venue is proper under 28 U.S.C. section 1391 because Defendant resides in this District for venue purposes and the events occurred in Los Angeles County, California.

## IV. LEGAL FRAMEWORK

17. Section 1983 creates a remedy when a person acting under color of state law deprives a plaintiff of rights secured by the Constitution or federal law. A municipality is liable when an official policy, custom, practice, final-policymaker decision, ratification, or failure to train or supervise causes the injury. Monell v. Department of Social Services, 436 U.S. 658 (1978); Pembaur v. City of Cincinnati, 475 U.S. 469 (1986); City of Canton v. Harris, 489 U.S. 378 (1989).

18. The First Amendment protects an elected official's speech on matters of public concern, including oversight of public funds, criticism of government, reporting suspected misconduct, petitioning law enforcement, and speaking about disability access. Bond v. Floyd, 385 U.S. 116 (1966), confirms that elected officials do not lose speech rights by holding office.

19. Houston Community College System v. Wilson, 595 U.S. 468 (2022), does not bar this case because Plaintiff does not seek damages merely because other officials criticized him. Plaintiff alleges a course of adverse governmental conduct beyond verbal censure: ADA obstruction, disability disclosure, police threats, City Hall and staff access restrictions, retaliatory litigation, a biased investigative report, and a censure vote allegedly built on selective and false premises.

20. Title II of the ADA provides that no qualified individual with a disability shall, by reason of disability, be excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or subjected to discrimination by such entity. 42 U.S.C. section 12132. City Council meetings, Council communications, staff inquiry processes, public meetings, agenda review, public-records compliance, and official participation are governmental services, programs, or activities.

21. ADA regulations require reasonable modifications in policies, practices, or procedures when necessary to avoid discrimination, unless the public entity demonstrates fundamental alteration. 28 C.F.R. section 35.130(b)(7). ADA regulations also require effective communication and primary consideration of requested auxiliary aids and services. 28 C.F.R. section 35.160.

22. The Ninth Circuit recognizes that public entities must make individualized inquiries into disability-related needs and may be liable for deliberate indifference when they fail to investigate or provide effective accommodations after notice. Duvall v. County of Kitsap, 260 F.3d 1124 (9th Cir. 2001); Updike v. Multnomah County, 870 F.3d 939 (9th Cir. 2017).

23. ADA retaliation and interference are prohibited by 42 U.S.C. section 12203 and 28 C.F.R. section 35.134. A public entity may not retaliate, coerce, intimidate, threaten, interfere with, or burden a person because the person asserted ADA rights, requested accommodations, opposed disability discrimination, or participated in ADA processes.

## V. PLAINTIFF'S LIFE STORY: FROM FOSTER CARE, AUTISM, AND ABUSE TO PUBLIC SERVICE

24. Plaintiff grew up as a child with autism in the foster-care system in Los Angeles County. He experienced instability, physical abuse, emotional mistreatment, and the painful feeling of being treated as less worthy because he was different. Those experiences shaped his life. They taught him what it means when institutions fail vulnerable people, and they made him determined to serve others rather than be defined by trauma.

25. Plaintiff's autism is not a political label or litigation tactic. It is part of how he processes the world. He relies on structure, clarity, additional processing time, stable sensory conditions, visual context, and direct communication. These are the same needs the City recognized when it approved accommodations in writing.

26. Despite the barriers he faced, Plaintiff built a life of public service and disability advocacy. He worked to create awareness for the autism community, expand understanding of disability access, and promote dignity for people who are often mocked, misunderstood, or excluded. He served in appointed public roles and later became an elected Councilmember.

27. Plaintiff's story matters because public service by a person with a disability often requires courage before it ever requires law. Plaintiff disclosed sensitive disability information to the City, trusted the City to follow the law, and tried to serve while relying on accommodations the City had approved. When the City allegedly mocked, exposed, restricted, and police-enforced around those accommodations, the harm was not technical. It struck at dignity, equal citizenship, and the promise that government must be open to people with disabilities.

28. The City's alleged conduct reopened the deepest wounds from Plaintiff's childhood. Being publicly exposed, threatened with police removal, accused of misconduct for needing clarification, and told through litigation conduct that his disability requests were burdensome made Plaintiff feel the same institutional helplessness he felt as a child. Plaintiff alleges this because emotional-distress damages are real, disability discrimination is not abstract, and the Court should understand the human impact of a public entity attacking the supports that allow an autistic person to serve.

## VI. PROTECTED OVERSIGHT ACTIVITY CONCERNING PUBLIC FUNDS, CONFLICTS, AND ALLEGED CORRUPTION

29. Plaintiff engaged in protected speech and petitioning activity by questioning City-supported events, nonprofit relationships, vendor payments, public-fund allocations, event-fee structures, possible Government Code section 1090 conflicts, and alleged misuse of public resources.

30. Plaintiff's concerns included public resources allegedly spent on the Moon Festival; revenue and sponsorship structures involving Film It West Covina; vendor-fee discrepancies involving CAAWC-related events; contracts involving persons connected to nonprofit boards; payments to outside counsel without clear public budget constraints; and City support for private or nonprofit event structures with unclear accounting.

31. Plaintiff also investigated and reported concerns regarding a purported or proposed health-department project or accounting structure involving TransTech and health-related vendors. Spreadsheets attached to the exhibit set show a project/accounting structure labeled as health-department or health-services work, with agreement amounts and expenditures that Plaintiff alleges require scrutiny.

32. Plaintiff reported concerns to outside oversight and law-enforcement bodies. An FBI communication attached as an exhibit states that the FBI was aware of some activities and was investigating those and similar allegations. Plaintiff does not plead that this confirms any person is guilty of a crime. Plaintiff pleads it to show that his reports were serious, externally received, and related to matters of public concern.

33. Plaintiff alleges that after he raised these issues, City actors and retained counsel did not neutrally investigate the underlying public-fund questions. Instead, they turned the focus onto Plaintiff, reframing oversight as intimidation, alleging harassment based on official inquiries, and using legal process to burden his ability to continue investigating.

## VII. APPROVED ADA ACCOMMODATIONS AND THE CITY'S ACTUAL KNOWLEDGE

34. On or about May 13, 2025, the City approved accommodations for Plaintiff related to autism and communication needs, including context before questions during Council meetings, written documentation of concerns, extended time to review and respond, the right to an advocate or legal representative, and structured communication.

35. The May 13, 2025 accommodation documents were signed by Plaintiff, City Attorney Thomas Duarte, and Human Resources/Risk Manager Carmelita Underwood. This matters because the City Attorney and Human Resources had actual knowledge that Plaintiff required verbal clarification, structured communication, and additional processing time.

36. The City also approved equipment-related accommodations, including computer and home-office support, printer access, copying access, and other tools necessary for official duties. On January 6, 2026, the City documented implemented home-office and copy-access accommodations.

37. Plaintiff's physician documented autism spectrum disorder, photophobia/light sensitivity, and chronic back pain. The medical documentation stated that seating location and lighting conditions were medically necessary and that relocation or brighter lighting would worsen sensory overload, cognitive functioning, focus, pain, and Plaintiff's ability to participate in meetings.

38. On May 12, 2025, before the December 2025 seating incidents, Plaintiff requested reasonable accommodations connected to autism, hypertension, and diabetes. He specifically requested reserved seating near his Council seat because a consistent and predictable buffer zone helped manage sensory sensitivities and reduced stress. He warned that removing the accommodation could significantly affect his health and participation.

39. On December 2, 2025, Human Resources Director Carmelita Underwood sent the City Council an update summarizing advice from Liebert Cassidy Whitmore. The update informed the Council that the City was accommodating Plaintiff with specialized lighting for his current dais position, that any later dais seating change should receive the same accommodation as his current position, and that the City was advised against moving Plaintiff at that time until the lighting could be properly corrected.

40. On December 3, 2025, Human Resources forwarded to Plaintiff the email that had been sent to City Attorney Thomas Duarte the night before. The forwarded LCW advice stated that if lighting in Plaintiff's new position deviated from his current position and was inconsistent with Plaintiff's medical restrictions, the City was advised against moving Plaintiff until the lighting could be properly corrected.

41. The City therefore knew that Plaintiff's seating and lighting restrictions implicated disability access. The City knew counsel had cautioned against moving Plaintiff until the lighting issue could be corrected. Despite that knowledge, the City later reversed course and implemented the Mayor's seating arrangement.

## VIII. FAILURE TO IMPLEMENT AND CONSTRUCTIVE DENIAL OF ADA ACCOMMODATIONS

42. By February 2026, Plaintiff repeatedly notified the City that accommodations remained delayed or unimplemented. He stated that he had attended multiple Council meetings without medically supported accommodations in place and demanded written confirmation that the interactive process was complete, written approval of accommodations, and implementation before the next Council meeting.

43. The City acknowledged receipt but did not timely complete implementation. Plaintiff alleges this delay was not a minor administrative lapse. It occurred after medical documentation, repeated written notices, and prior approval of other accommodations. Under Title II and Ninth Circuit authority, prolonged delay after notice may constitute denial of meaningful access.

44. Plaintiff requested a 360-degree recording device because single-angle, operator-directed recordings do not preserve the visual-social cues Plaintiff needs to process multi-speaker discussions. Plaintiff explained that facial expressions, micro-expressions, spatial positioning, and body language are compensatory mechanisms for autism-related auditory-processing limitations. The City did not provide an equally effective alternative.

45. Plaintiff requested ergonomic seating support, advance access to agenda materials, processing time during meetings, and protection against public disability comparisons. Plaintiff alleges the City failed to conduct an individualized ADA analysis, failed to document a proper undue-burden or fundamental-alteration finding, and failed to provide effective alternative modifications.

46. On December 12, 2025, at approximately 10:56 p.m., Human Resources Director Underwood sent Plaintiff an email stating that staff had reviewed and addressed concerns related to the seating arrangement and that the Mayor's new seating arrangement would be implemented. Plaintiff immediately objected, stating that the City must follow federal and state disability law and that the decision contradicted prior accommodation guidance.

47. Plaintiff alleges the late-night reversal contradicted the LCW-backed warning and the City's own accommodation record. Plaintiff further alleges that the timing and content support the inference that City Attorney Thomas Duarte caused, directed, ratified, or materially influenced the reversal, and that the City substituted a political seating directive for the individualized ADA analysis required by Title II.

### IX. DECEMBER 2025 ADA-CHAIR INCIDENT, ADA MONITOR INTERFERENCE, AND POLICE ESCALATION

48. During the December 2, 2025 City Council meeting, Plaintiff alleges that a City IT employee physically reached over him and removed Plaintiff's assigned ADA accommodation monitor while Plaintiff was holding it. Plaintiff reported that the employee shoved his body into Plaintiff after Plaintiff told him multiple times to stop, causing neck pain and interfering with Plaintiff's disability accommodation. Plaintiff requested a police report for battery and preservation of CCTV, body-worn camera footage, radio traffic, emails, texts, instant messages, work orders, and communications involving the City Manager, Human Resources, City Attorney, and IT. Chief Cortina acknowledged receipt.

49. At the December 16, 2025 Council meeting, Plaintiff alleges that Mayor Leticia Lopez-Viado treated Plaintiff's refusal to abandon his known ADA seating accommodation as disruption and called upon the Sergeant-at-Arms/police function to force compliance. Plaintiff further alleges that City Attorney Thomas Duarte reinforced or ratified the Mayor's position by dismissing Plaintiff's Point of Order and reframing a lawful procedural objection as disruption.

50. Plaintiff alleges this was not a mere disagreement over where a Councilmember preferred to sit. It was the use of governmental power, including the Mayor's presiding authority, City Attorney advice, Human Resources communications, City staff action, and the Sergeant-at-Arms/police function, to override a known ADA accommodation.

51. Plaintiff alleges that a Mayor, City Attorney, Human Resources department, Acting City Manager, and police/Sergeant-at-Arms function combined to compel an elected official with known disabilities to surrender an approved or medically supported accommodation during an official meeting. The coercive use of police authority to resolve an ADA accommodation dispute is not a reasonable accommodation process. It is denial of meaningful access by force or threat of force.

52. The use or threatened use of police authority did not occur only once. Plaintiff later documented that at a subsequent meeting he was threatened with arrest and physical force if he did not surrender his approved ADA accommodation seating and go outside, even after he attempted to comply and de-escalate.

53. The Lieutenant Nelson transcript shows the same alleged pattern: the Sergeant-at-Arms/police function was used in a Council meeting to order Plaintiff to leave, while Plaintiff stated that he had finished his comment, was ready to proceed, and invoked his ADA accommodation requiring verbal clarification and communication.

54. Plaintiff alleges this repeated pattern supports Monell liability because the events were not isolated mistakes by a single employee. The alleged conduct involved policymaking officials and final decisionmakers, occurred in the core setting of the City's legislative body, and reflected a practice of converting disability accommodation disputes and protected speech into police-enforced decorum incidents.

55. Plaintiff also placed City Attorney Thomas Duarte and Jones & Mayer on formal notice that meeting rules were being selectively enforced, that Mayor Lopez-Viado attempted to curtail Plaintiff's questions while allowing Councilmember Tony Wu extended speaking time, and that viewpoint-based enforcement raises First Amendment concerns. Plaintiff also documented that the City Attorney mocked Plaintiff's pronunciation, which Plaintiff alleges was disability-based hostility in the exact governmental setting where Plaintiff must perform official duties.

## X. KELLY GEMELLI AND KATIE FOX: INVESTIGATIVE CONFLICT, FALSE FRAMING, AND SELECTIVE REPORT

56. Plaintiff alleges that the City's investigation was structurally conflicted from the beginning. Buchalter attorney Katie Fox was involved in the retention structure for Gemelli Employment Law. The retainer letter states that Gemelli would conduct an investigation as an attorney to facilitate legal advice to the client, that the report and work product would be privileged unless waived, and that Gemelli would not render legal determinations or advise on employment actions.

57. The same retainer letter also states that the Firm would exercise independent judgment and that the Client agreed not to influence or interfere with the outcome. Plaintiff alleges the facts demonstrate the opposite: the investigation was used to create a narrative supporting censure and retaliation while omitting or minimizing evidence favorable to Plaintiff and evidence concerning underlying public-fund issues.

58. Plaintiff alleges that professional-history exhibits for Kelly Gemelli and Katie Fox strengthen the appearance of conflict. Gemelli's professional history shows long-term experience as a Jackson Lewis Principal in San Diego County. Fox's professional-history exhibit shows work in the same San Diego employment-law market and Jackson Lewis employment-litigation background before and during the period relevant to the professional-overlap theory. Plaintiff alleges that the City's claim of independence is undermined by this professional pipeline and local employment-law overlap.

59. Plaintiff alleges that Kelly Gemelli's report was false or misleading in material respects because it framed protected oversight, cease-and-desist notices, regulatory complaints, and requests for clarification as intimidation or retaliation, while omitting the factual context that Plaintiff was investigating public-fund issues, event-finance inconsistencies, conflicts of interest, and disability-access violations.

60. Plaintiff alleges the report manipulated chronology. The report's timeline began with Plaintiff's June 4, 2025 communication while omitting earlier events that triggered Plaintiff's oversight, including the May 6, 2025 public statement regarding CAAWC-related expenses and later clarification that the public statement was inaccurate.

61. Plaintiff alleges the report selectively excerpted emails. Long email chains were reduced to one or two pages, omitting language showing that Plaintiff was acting in his official capacity, asking oversight questions, denying personal motives, and seeking clarification. Selective excerpting allowed the City to portray oversight as harassment.

62. Plaintiff alleges the report evaluated or referenced FPPC complaints, law-enforcement reports, protective-status issues, service of process, cease-and-desist communications, and corruption complaints beyond the authorized HR scope. Plaintiff repeatedly objected that the investigation was supposed to address limited personnel complaints and had become an open-ended political probe.

63. Plaintiff alleges that Gemelli and Fox's roles are central because the City and Buchalter publicly relied on the report while Buchalter simultaneously had litigation and reputational interests in defending the City, defending its own role, defending the City Attorney's office, and defeating Plaintiff's claims. Plaintiff alleges this created an appearance and reality of conflict: the investigator and counsel had every incentive to protect the City's narrative rather than fairly present Plaintiff's protected activity.

64. Plaintiff alleges that the report failed to analyze the ADA context. It discussed Plaintiff's disability and accommodations, but did not meaningfully determine whether the City failed to implement accommodations, delayed the interactive process, disclosed confidential disability information, or created the very conditions later used against Plaintiff.

65. Plaintiff alleges that the report disclosed confidential ADA and accommodation information, including Plaintiff's autism diagnosis, accommodation requests, lighting sensitivity, seating issues, and interactive-process history. Plaintiff had provided written notice that his disability and accommodation information was confidential and not authorized for public disclosure.

66. Plaintiff alleges that the City then used the report as a public weapon. A document labeled confidential and privileged became a public censure tool. The City waived or publicized it in a way that exposed Plaintiff's disability and allowed officials, media, and political opponents to treat medical accommodations as part of a misconduct narrative.

## XI. CITY ATTORNEY, BUCHALTER COUNSEL, AND THE CITY'S DEFENSE OF THE CHALLENGED CONDUCT

67. Plaintiff alleges that City Attorney Thomas Duarte had actual knowledge of Plaintiff's ADA accommodations because he signed the May 13, 2025 accommodation agreement. Despite that knowledge, Plaintiff alleges Duarte failed to ensure City compliance when CPRA issues, Council communications, seating disputes, and meeting disputes arose.

68. Plaintiff alleges Duarte's duty was to the City as an entity, not to protect individual officials, outside counsel, or a narrative. Plaintiff contends Duarte knew or should have known that Plaintiff's concerns involved possible public-fund misuse, conflicts of interest, City-supported nonprofit relationships, and disability-access violations. Plaintiff alleges Duarte nevertheless allowed the City's response to focus on silencing and discrediting Plaintiff rather than preserving neutrality and protecting the public entity.

69. Plaintiff alleges that Buchalter attorney Thomas O'Connell defended or advanced positions that minimized protective-status and disability concerns, denied the need for correction, and treated Plaintiff's protected complaints and legal notices as improper threats. Plaintiff alleges O'Connell's communications and public statements contributed to a narrative that Plaintiff's safety, disability, and accommodation concerns were obstacles to be managed rather than rights to be respected.

70. Plaintiff alleges that Buchalter attorney Roger Scott defended the City's challenged conduct in court and in communications. In the March 23, 2026 transcript, Scott argued that the City Manager could protect staff and that Plaintiff's reliance on Levy v. Santa Monica was wrong. Plaintiff alleges Scott's position overstated management authority and minimized a Councilmember's right to make inquiries for official oversight.

71. Plaintiff filed a State Bar complaint alleging that Scott told him to stop hiding behind his disability during a courthouse interaction. Plaintiff pleads this as an allegation of conduct and evidence of perceived animus; Defendant may contest it, but the allegation is part of the pattern of how City-retained counsel responded to Plaintiff's disability and requests for clarification.

72. Plaintiff alleges Duarte, O'Connell, and Scott did not merely provide ordinary defense advocacy. Plaintiff alleges they helped preserve and defend a municipal course of conduct that included an allegedly biased report, retaliatory censure process, ADA delay, public disability disclosure, staff-access restrictions, City Hall access restrictions, and a CPRA lawsuit filed against Plaintiff after protected oversight activity.

## XII. RETALIATORY CENSURE AND REQUEST TO INVALIDATE THE CENSURE VOTE

73. Plaintiff alleges the censure was not a neutral expression of legislative disagreement. It was based on a report that Plaintiff alleges was materially incomplete, false, misleading, disability-disclosing, and retaliatory. It labeled protected oversight and disability-related clarification requests as misconduct.

74. Plaintiff does not seek relief merely because Councilmembers criticized him. Plaintiff seeks invalidation or vacatur of the censure vote and resolution because the process allegedly relied on unlawful disability disclosures, a biased investigative report, retaliation for protected speech, and procedural unfairness that impaired Plaintiff's official capacity to serve.

75. Plaintiff alleges that the censure had practical consequences beyond speech. It was used to justify restrictions on communications with staff, restrictions on City Hall access, limitations on presentations, public reputational harm, and litigation narratives depicting Plaintiff as intimidating, retaliatory, or obstructive.

76. Plaintiff alleges that the censure must be invalidated because a public entity cannot build official discipline on confidential ADA information, protected speech, selective omissions, police coercion, and retaliation. At minimum, Plaintiff seeks a declaration that the report and censure cannot be used to restrict Plaintiff's access, accommodations, communications, City Hall presence, or official participation.

## XIII. POLICE INVOLVEMENT, COLOR-OF-LAW INTERFERENCE, AND TRAINING FAILURE

77. Plaintiff alleges that police authority was used or threatened in Council meetings despite known ADA accommodations. During one meeting, police personnel acting as Sergeant at Arms directed Plaintiff to leave, stated that refusal could become a criminal issue, and escalated toward removal even though Plaintiff stated he had finished his comments and invoked his accommodation requiring verbal clarification.

78. Plaintiff alleges that the City's police response failed to account for Title II obligations and known accommodations. Police authority cannot be used to override federal disability rights or force a person to abandon an approved accommodation absent a lawful, individualized, nondiscriminatory basis.

79. Plaintiff later made formal oversight inquiries to Chief Cortina regarding policies, training materials, and Department standards requiring respect for constitutional rights, impartiality, professionalism, dignity, and refusal to follow unlawful directives.

80. The WCPD response stated that the Department considered itself in full compliance, but also stated that no responsive documents existed beyond the provided attachments for implementation, enforcement, and disability-related training materials. Plaintiff alleges this supports Monell liability: the City had policies on paper but lacked documented implementation, training, and enforcement practices to prevent disability-rights violations and retaliatory enforcement.

81. Plaintiff requests injunctive relief prohibiting the City from using police officers, Sergeant-at-Arms authority, the City Attorney, the Mayor, the Acting City Manager, or any other City actor to override, suspend, or punish ADA accommodations absent an individualized, documented safety finding and ADA-compliant reasonable-modification analysis.

82. Plaintiff also requests that the Court require the City to adopt clear written protocols for Council-meeting ADA accommodations, police/Sergeant-at-Arms interaction with disabled participants or elected officials, and consultation with a qualified ADA coordinator before any accommodation is interrupted, except in a genuine emergency involving immediate physical danger.

## XIV. RETALIATORY CPRA LITIGATION AND DISCOVERY PRESSURE

83. Plaintiff alleges the City's separate CPRA lawsuit against him was filed as retaliation and selective enforcement after he reported suspected corruption and requested disability accommodations. Plaintiff alleges he produced responsive records and sought clarification where his disability required clear communication, but the City sued rather than accommodate communication needs or use a neutral administrative process.

84. Plaintiff alleges the City and Buchalter sought AI prompts, AI searches, AI chats, drafting materials, and personal-device-related information in a manner designed to burden his thought process, disability-support tools, and protected speech. Plaintiff contends this was not neutral public-records enforcement but an attempt to discover how he investigated and reported alleged corruption.

85. Plaintiff alleges this litigation strategy chilled speech, increased emotional distress, and created the false public impression that Plaintiff was hiding records rather than seeking disability-related clarification under approved accommodations.

## XV. PATTERN EVIDENCE AND MUNICIPAL LIABILITY

86. Plaintiff alleges the City's conduct reflects a pattern, custom, or practice of retaliation and disability discrimination. Pattern evidence includes prior disability and retaliation litigation against the City, allegations by former senior officials of retaliation after reporting misconduct, the City's treatment of Plaintiff's ADA requests, and the City's failure to ensure that police personnel and retained counsel complied with disability-access obligations.

87. Plaintiff alleges municipal liability under Monell because final policymakers authorized, ratified, or knowingly tolerated the public use of the Gemelli report; the censure vote; the communication and access restrictions; the ADA coordinator reassignment; the refusal or delay in implementing accommodations; the CPRA litigation strategy; the failure to correct disability disclosures; and the use or threatened use of police authority to override disability accommodations.

88. Plaintiff further alleges deliberate indifference in training and supervision. The City knew Plaintiff had approved ADA accommodations. The City knew public meetings and Council duties required structured communication, seating, lighting, effective communication, and non-retaliatory access. The City knew police could be called into meeting disputes. Yet the City failed to train, supervise, or instruct officials and law enforcement to comply with ADA and First Amendment obligations.

89. The alleged violations involved final policymakers, official meeting practices, the presiding officer, the City Attorney, Human Resources, the Acting City Manager, IT staff, and the police/Sergeant-at-Arms function. This is not merely a rogue-employee theory; it is an alleged municipal course of action.

## XVI. EMOTIONAL DISTRESS, DIGNITARY HARM, AND INTERFERENCE WITH PUBLIC SERVICE

90. Plaintiff suffered severe emotional distress, anxiety, humiliation, fear, loss of sleep, physical stress, reputational injury, and loss of dignity. The City's conduct struck directly at Plaintiff's disability, history, safety, and identity as a public servant.

91. Plaintiff experienced the City's conduct as a return to the institutional abuse and helplessness he suffered as a child in foster care. The difference is that this time the harm came from public officials, attorneys, investigators, and police personnel acting under color of law while Plaintiff was trying to serve the public.

92. Plaintiff's harm includes more than personal feelings. The City's conduct impaired his ability to communicate with staff, attend meetings without fear, use accommodations, participate in censure defense, access City Hall, obtain agenda information, investigate public-fund concerns, and represent constituents.

93. The December ADA-chair incident caused profound emotional harm. Plaintiff had done what the law asks disabled people to do: he disclosed sensitive disability information, provided medical documentation, participated in the interactive process, obtained written accommodations, and tried to comply and de-escalate. The City then allegedly used the machinery of government against the same accommodations it had approved.

94. Plaintiff seeks monetary damages for emotional distress, mental anguish, reputational harm, disability-based humiliation, loss of equal access, and interference with official duties. Plaintiff also seeks nominal damages, compensatory damages, statutory and equitable relief, costs, fees where authorized, and any other relief the Court deems proper.

## XVII. CAUSES OF ACTION

**Count One - First Amendment Retaliation under 42 U.S.C. section 1983**

95. Plaintiff incorporates the preceding paragraphs. Plaintiff engaged in protected speech and petitioning on matters of public concern, including public-fund oversight, corruption reports, regulatory complaints, law-enforcement communications, ADA objections, and criticism of government practices.

96. Defendant, through policymakers and agents, took adverse actions that would chill a person of ordinary firmness: a biased investigation, censure, public disability disclosures, police involvement, staff-access restrictions, City Hall access restrictions, CPRA litigation, discovery burdens, and reputational smears.

97. Plaintiff's protected activity was a substantial or motivating factor in these adverse actions. The timing, selective evidence, false framing, public narrative, and escalation after Plaintiff's reports support causation.

98. Defendant's actions violated Plaintiff's First Amendment rights and caused damages.

**Count Two - ADA Title II Discrimination and Denial of Meaningful Access**

99. Plaintiff incorporates the preceding paragraphs. Plaintiff is a qualified individual with a disability. Defendant is a public entity. Plaintiff was entitled to meaningful access to City Council meetings, official communications, staff inquiry processes, public meetings, agenda review, City Hall access, and performance of elected duties.

100. Defendant denied meaningful access by delaying and obstructing accommodations, failing to provide effective communication, changing or threatening seating and access conditions, failing to provide visual-spatial review tools or equally effective alternatives, using disability-related conflicts against Plaintiff, and permitting police or Sergeant-at-Arms authority to override disability accommodations.

101. Defendant's conduct was by reason of disability because it targeted, ignored, or burdened the specific supports Plaintiff needs because of autism, sensory sensitivity, and communication-processing limitations.

102. Defendant acted with deliberate indifference after repeated notice and caused compensable harm.

**Count Three - ADA Retaliation and Interference, 42 U.S.C. section 12203**

103. Plaintiff incorporates the preceding paragraphs. Plaintiff engaged in protected ADA activity by requesting accommodations, filing ADA complaints, objecting to disability disclosures, demanding implementation, and opposing disability-based interference.

104. Defendant retaliated and interfered by delaying implementation, reassigning ADA coordination, restricting communication and access, using police threats, disclosing disability information, treating accommodation needs as misconduct, and contradicting prior accommodation records.

105. Defendant's conduct would deter a reasonable person from asserting ADA rights and caused Plaintiff damages.

**Count Four - Fourteenth Amendment Due Process and Stigma-Plus / Procedural Unfairness**

106. Plaintiff incorporates the preceding paragraphs. Defendant used an official report and censure process to publicly stigmatize Plaintiff as intimidating, retaliatory, dishonest, or obstructive while allegedly relying on false statements, selective omissions, confidential ADA information, and a conflicted investigative process.

107. Plaintiff alleges stigma-plus injury because the defamatory and disability-disclosing official narrative was accompanied by practical burdens on official functions, including staff access restrictions, City Hall access restrictions, censure consequences, CPRA litigation, and impaired ability to serve constituents.

108. Plaintiff further alleges procedural unfairness because the investigation expanded beyond its authorized scope, was influenced by conflicted counsel, omitted material evidence, failed to analyze ADA compliance, and was then used as the basis for public censure. Plaintiff's Points of Order and procedural objections were allegedly dismissed as disruption rather than neutrally ruled upon, and police enforcement was used before the City provided a lawful individualized ADA determination.

**Count Five - Monell Municipal Liability**

109. Plaintiff incorporates the preceding paragraphs. Defendant's policies, customs, practices, final-policymaker decisions, ratifications, and failures to train or supervise caused Plaintiff's injuries.

110. The City Council, Acting City Manager, City Attorney, Human Resources, Police Department, retained counsel, and retained investigator acted with municipal authority or ratification. The City approved and relied upon their conduct, failed to correct it, and continued to enforce or defend it.

111. Plaintiff alleges the City maintained customs of retaliating against those who report misconduct, treating ADA accommodations for elected officials as optional or inferior, failing to protect confidential disability information, failing to train police on ADA accommodation conflicts in public meetings, and using litigation to burden protected

oversight.

**Count Six - Declaratory, Injunctive, and Supplemental State-Law Relief**

112. Plaintiff incorporates the preceding paragraphs. An actual controversy exists regarding the legality of Defendant's censure vote, use of the Gemelli report, ADA accommodation delays, disability disclosures, communication restrictions, City Hall access restrictions, staff inquiry restrictions, police involvement, and CPRA litigation strategy.

113. Plaintiff seeks declarations that Defendant violated the First Amendment, Title II of the ADA, ADA retaliation/interference provisions, and the Fourteenth Amendment. Plaintiff also seeks related relief under California privacy and fair-procedure principles, including California Constitution article I, section 1, and any other supplemental state-law theory the Court deems available under 28 U.S.C. section 1367.

114. Plaintiff seeks injunctive relief requiring Defendant to implement approved ADA accommodations, provide an individualized ADA process, cease use of disability information as misconduct evidence, cease retaliatory communication restrictions, preserve records, remove or redact confidential disability information where legally possible, adopt ADA/police protocols, designate a qualified ADA coordinator independent of challenged officials, and vacate or invalidate the challenged censure vote and resolution.

## XVIII. PRAYER FOR RELIEF

115. WHEREFORE, Plaintiff requests that the Court enter judgment in his favor and against Defendant City of West Covina.

116. Declare that Defendant's conduct violated Plaintiff's rights under the First Amendment, Fourteenth Amendment, Title II of the ADA, and ADA retaliation/interference provisions.

117. Declare that the challenged censure vote and resolution are invalid, void, or unenforceable to the extent they were based on the allegedly biased investigative report, confidential ADA information, retaliation, procedural unfairness, and police-enforced interference with disability accommodations.

118. Issue injunctive relief requiring Defendant to implement Plaintiff's approved ADA accommodations and conduct any future accommodation process in good faith.

119. Issue injunctive relief prohibiting Defendant from using Plaintiff's disability, accommodations, protective status, or protected reports as a basis for adverse action.

120. Issue injunctive relief prohibiting enforcement of communication, seating, staff-access, or City Hall access restrictions that condition Plaintiff's official duties on discretionary approval inconsistent with ADA, First Amendment, and Councilmember inquiry rights.

121. Enjoin the City from using police, Sergeant-at-Arms authority, meeting-decorum rules, or City Attorney directives to override approved ADA accommodations absent an individualized ADA analysis and immediate safety necessity.

122. Require the City to provide ADA and constitutional-rights training to police personnel assigned to City Council meetings, including training that federal disability law cannot be superseded by political or decorum directives.

123. Award compensatory damages, including damages for emotional distress, mental anguish, reputational injury, humiliation, sensory overload, loss of equal access, impairment of public service, and other actual damages according to proof.

124. Award nominal damages for constitutional violations even if actual damages are difficult to quantify.

125. Award reasonable costs and attorneys' fees where authorized by law, including under 42 U.S.C. section 1988 and ADA fee provisions if applicable.

126. Award pre-judgment and post-judgment interest where authorized.

127. Grant any further legal or equitable relief the Court deems just and proper.

## XIX. REQUEST FOR COURT TRIAL

128. Plaintiff requests trial by the Court. Plaintiff does not demand a jury trial in this pleading.

## XX. SIGNATURE

129. Dated: April ___, 2026. Respectfully submitted by JOHN DOE, Plaintiff in Pro Per.

# EXHIBIT INDEX AND CONFIDENTIALITY NOTICE

Plaintiff attaches or references the following exhibits. Exhibits containing medical information, ADA interactive-process material, protective-status information, law-enforcement/FBI information, personal identifying information, or other protected information should be filed under seal or in redacted form unless the Court orders otherwise.

| Exhibit | Description |
| --- | --- |
| A | FBI notice confirming awareness/investigation (confidential; file under seal or redacted if required) |
| B | TransTech health department spreadsheet - project/accounting structure |
| C | TransTech health department spreadsheet - summary/supporting data |
| D | TransTech health department spreadsheet - supplementary rendered data |
| E | Second Amended Complaint / prior pleading record |
| F | City of West Covina CPRA complaint filed against Plaintiff |
| G | Confidential Gemelli investigative report publicly used for censure |
| H | May 6 CAAWC timeline omission and oversight context |
| I | Film It sponsors and expenses evidence |
| J | Film It 2025 sponsorship package |
| K | Omitted fiscal record, Council vote, and legal review |
| L | FPPC complaints mischaracterized and outside investigative scope |
| M | Protected speech notice mischaracterized as intimidation |
| N | Failure to analyze material regulatory and financial red flags |
| O | CAAWC 2025 records |
| P | Alleged invoice irregularities |
| Q | Alleged Zelle/payment irregularities |
| R | Fire permits waived / permit evidence |
| S | Government Code section 1090 contract evidence |
| T | Founding document and conflict evidence |
| U | Chamber Secretary of State governance records |
| V | Lopez-Viado loan information |
| W | District Attorney submission evidence set 3 |
| X | District Attorney submission evidence set 4 |
| Y | EEOC rebuttal packet |
| Z | City EEOC respondent response |
| AA | Approved ADA accommodation record |
| AB | Primary doctor note and medical accommodation materials (confidential) |

| Exhibit | Description |
|---------|-------------|
| AC | Final notice - ADA violations, continued delay, and legal exposure |
| AD | Final notice - ADA interactive process delay and unlawful failure to implement accommodations |
| AE | LCW response to accommodation request |
| AF | Carmelita Underwood denial/clarification letter |
| AG | ADA violation / public disclosure record |
| AH | Notice - no authorization to discuss disability/accommodations |
| AI | Immediate action required - remove/redact public report disclosing disability information |
| AJ | Disclosure of ADA accommodation information |
| AK | Official transcript - March 13, 2026 hearing |
| AL | Doe v. West Covina transcript - March 23, 2026 hearing |
| AM | Lieutenant Nelson meeting-removal transcript |
| AN | Chief Cortina oversight email / AG policy inquiry |
| AO | WCPD response admitting no additional implementation/training documents |
| AP | WCPD records/policy packet |
| AQ | WCPD AG policies |
| AR | WCPD field training manual |
| AS | Cortina police policy |
| AT | Milan Mrakich stipulated judgment |
| AU | Milan Mrakich stipulation signed |
| AV | Underlying civil complaint against Milan Mrakich |
| AW | Text messages involving Acting City Manager |
| AX | Text to Tony / closed-session and safety communications |
| AY | O'Connell communications / counsel conduct |
| AZ | O'Connell denial / public-disclosure position |
| BA | Bass/Buchalter State Bar complaint concerning O'Connell |
| BB | State Bar complaint concerning Roger Scott |
| BC | Capelle lawsuit pattern evidence |
| BD | Larry Whithorn disability-retaliation record |

*Clean Integrated Third Amended Complaint* 15

| Exhibit | Description |
|---------|-------------|
| BE | Fire Chief Capelle termination article |
| BF | Buchalter AI-related order/fine |
| BG | Buchalter response to OSC |
| BH | Buchalter AI reporting article |
| BI | Buchalter order |
| BJ | City discovery RFPs |
| BK | City discovery form interrogatories |
| BL | City discovery RFAs |
| BM | City discovery special interrogatories |
| BN | Original Tabatabai request |
| BO | April 2 clarification chain |
| BP | Protective-status notice |
| BQ | Senior/disability victimization checklist |
| BR | Senior/disability victimization guide |
| BS | Senior and Disability Victimization policy |
| BT | EKG ER medical record (confidential) |
| BU | Council dais/chair photograph showing accommodation setting |
| BV | Brown Act violation evidence |
| BW | Levy v. Santa Monica authority |
| BX | Personnel rules / hours and acting-manager limits |
| BY | Milan ADA memo / communication restrictions |
| BZ | Misleading press release evidence |
| CA | Formal notice - ADA compliance, unlawful orders, color-of-law concerns |
| CB | Federal ex parte motion and prior emergency ADA record |
| CC | TransTech spreadsheet rendered summaries |
| CD | Native-file checksum manifest |
| CE | Kelly Gemelli conflict/objection materials |
| CF | Katie Fox / Buchalter investigator-retention conflict materials |

| Exhibit | Description |
| --- | --- |
| CG | Gemelli investigation retainer letter showing retained-investigator structure |
| CH | Response to emails regarding workplace investigation report and scope/control concerns |
| CI | O'Connell communications / alleged manipulation and counsel-conduct concerns |
| CJ | O'Connell denial / public-disclosure position |
| CK | Roger Scott State Bar complaint and disability-related counsel conduct allegation |
| CL | Bass/Buchalter State Bar complaint concerning O'Connell |
| CM | Public-service background photographs supplied by Plaintiff (context only) |
| CN | Confidential FBI notice / law-enforcement awareness communication (file under seal or redacted if required) |
| CO | December 3, 2025 ADA seating/lighting accommodation materials and medical support establishing that Plaintiff was to remain in his Council Chamber chair (confidential) |
| CP | March 31, 2026 police notice describing the December ADA-chair forced removal, later threat of arrest/physical force, and preservation demand |
| CQ | Lieutenant Nelson / Sergeant-at-Arms transcript of later removal incident and ADA clarification exchange |
| CR | Chief Cortina safety, escort, threat-report, and conflict-avoidance communications |
| CS | WCPD policy-compliance inquiry and WCPD response regarding implementation/training records |
| CT | HR/LCW accommodation delay and attorney-clarification correspondence showing reliance on counsel and delayed implementation |
| CU | May 12, 2025 reasonable-accommodation request regarding reserved seating / sensory buffer zone |
| CV | December 2, 2025 HR email to Council forwarding LCW position that any seating change must provide equivalent lighting and advising against moving Plaintiff until lighting is corrected |
| CW | December 3-4, 2025 HR-forwarded medical explanation / LCW email to City Attorney Duarte and Acting City Manager Mrakich regarding seating and lighting accommodation |
| CX | December 12, 2025 late-night HR email implementing Mayor's new seating arrangement despite prior accommodation concerns, with Plaintiff's immediate objection and EEOC communication |
| CY | December 4-5, 2025 request to WCPD for criminal report, LASD referral, and evidence preservation regarding alleged physical interference with ADA monitor/accommodation |
| CZ | December 20, 2025 managing-partner intervention notice documenting December 16 meeting conduct, Mayor-directed seating enforcement, Duarte advice, Point of Order issue, removal standard, and police-escalation concerns |
| DA | January 25, 2026 formal notice regarding disability discrimination, viewpoint-based silencing, mocking of pronunciation, and duty to correct unlawful conduct on the dais |
| DB | Federal ex parte record excerpts documenting December ADA-chair forced-removal allegations, later police/arrest threat, and preservation/color-of-law notice |
| DC | Richard D. Jones screenshot communications and attached images showing notice and refusal/deflection of managing-partner intervention issues |
| DD | Duplicate/backup source documents for December 2025 seating reversal and HR/LCW contradiction record, including source file identifiers 94894D6C, 5626DFC2, 44EB0482, and D65B6FEE |