# EXHIBIT A

**Facebook screenshots of William Elliott expense post, expense list, comments, and GoPro comment**

Purpose / relevance:

Public circulation of Plaintiff's ADA-related costs, public targeting of the GoPro accommodation, apparent numerical irregularities, and selective omissions.



# WEST COVINA TODAY · …

**William Elliott** · 6h · 🌐

# Expenses submitted for reimbursement with taxpayer funds by each member of the West Covina City Council

**Mayor Letty Lope-Viado**

| Date | Description | Amount |
|---|---|---|
| 1/8/2026 | C.A.T Specialties Inc. (Mayor Wardrobe) | $713.91 |
| 1/26/2026 | SGV SGV Tribune | $34.83 |
| 1/15/2026 | T-Mobile Jan-April | $103.19 |
| 2/18/2026 | City Event Couples Connect | |
| | Supplies Amazon | $226.14 |
| | Signage Signs | $193.81 |
| | | **$1271.8** |

**Mayor Pro Tem Ollie Cantos**

| Date | Description | Amount |
|---|---|---|
| 1/8/2026 | C.A.T. Specialties Inc (Wardrobe) | $561.31 |
| 1/15/2026 | Trophy Center | $44.45 |
| 1/15/2026 | T-Mobile Jan-April | $128.98 |
| 1/21/2026 | ESGJCC 2026 Installation Dinner | $54.50 |
| 3/10/2026 | Rotary Club Event 3/8 | $100.00 |
| 3/31/206 | District 4 Meeting Smart & Final | $75.73 |
| 3/31/2026 | District 4 Meeting Smart & Final | $30.55 |
| 3/31/2026 | District 4 Meeting Amazon | $20.84 |
| | | **$1016.3** |

**Councilwoman Rosario Diaz**

**No expense**

**Councilman Tony Wu**

**No expense**

**[Councilma]n Brian Gutierrez**

| Description | Amount |
|---|---|
| ADA Lamp for Council Dias | $15 |
| Amazon Polo Shirts | $53 |
| Columbia Jackets | $29 |
| Private Screen Reimbursement | $76 |
| ESGVJCC 2026 Installation Dinner | $54 |
| Black folding table | $20 |
| Team Logo Company Logo Patch | $82 |
| Portos Cookies District 1 Meeting | $77 |
| Rotary Club Event | $10 |
| Certificate Frame Autism Month | $55. |
| Printer Toner/Paper | $98 |
| Dunkin Donuts Fire Stations | $20 |
| Amazon All in One Printer | $70 |
| Go Pro Camera | $62 |
| T-Mobil Jan-April | $16 |
| Donuts for Fire reimbursement | $20 |
| | $58 |

**Mayor Letty Lope-Viado**

| Date | Description | Amount |
|---|---|---|
| 1/8/2026 | C.A.T Specialties Inc. (Mayor Wardrobe) | $713.91 |
| 1/26/2026 | SGV SGV Tribune | $34.83 |
| 1/15/2026 | T-Mobile Jan-April | $103.19 |
| 2/18/2026 | City Event Couples Connect | |
| | Supplies Amazon | $226.14 |
| | Signage Signs | $193.81 |
| | | **$1271.88** |

**Mayor Pro Tem Ollie Cantos**

| Date | Description | Amount |
|---|---|---|
| 1/8/2026 | C.A.T. Specialties Inc (Wardrobe) | $561.31 |
| 1/15/2026 | Trophy Center | $44.45 |
| 1/15/2026 | T-Mobile Jan-April | $128.98 |
| 1/21/2026 | ESGJCC 2026 Installation Dinner | $54.50 |
| 3/10/2026 | Rotary Club Event 3/8 | $100.00 |
| 3/31/206 | District 4 Meeting Smart & Final | $75.73 |
| 3/31/2026 | District 4 Meeting Smart & Final | $30.55 |
| 3/31/2026 | District 4 Meeting Amazon | $20.84 |
| | | **$1016.36** |

**Councilwoman Rosario Diaz**

**No expense**

**Councilman Tony Wu**

**No expense**

1:32

facebook.com ✕

facebook    Open app    Log in

## 2 of 2

**Councilman Brian Gutierrez**

| Date | Item | Amount |
|---|---|---|
| 1/5/2026 | ADA Lamp for Council Dias | $159.48 |
| 1/12/2026 | Amazon Polo Shirts | $536.35 |
| 1/13/2026 | Columbia Jackets | $291.94 |
| 1/20/2026 | Private Screen Reimbursement | $76.81 |
| 1/22/2026 | ESGVJCC 2026 Installation Dinner | $54.50 |
| 1/22/2026 | Black folding table | $20.00 |
| 1/25/2026 | Team Logo Company Logo Patch | $820.16 |
| 2/17/2026 | Portos Cookies District 1 Meeting | $770.00 |
| 3/31/206 | Rotary Club Event | $100.00 |
| 4/10/2026 | Certificate Frame Autism Month | $55.25 |
| 4/15/2026 | Printer Toner/Paper | $985.58 |
| 4/27/2026 | Dunkin Donuts Fire Stations | $209.90 |
| 1/20/2026 | Amazon All in One Printer | $701.19 |
| 5/7/2026 | Go Pro Camera | $627.87 |
| 4/15/2026 | T-Mobil Jan-April | $160.46 |
| 4/23/2026 | Donuts for Fire reimbursement | $209.90 |
| | | **$5856.20** |

**William Elliott**
3 hours ago · 🌐
Photos from William Elliott's post in WEST COVINA TODAY

Recent Posts





**2 of 2**

**Councilman Brian Gutierrez**

| Date | Item | Amount |
|------|------|--------|
| 1/5/2026 | ADA Lamp for Council Dias | $159.48 |
| 1/12/2026 | Amazon Polo Shirts | $536.35 |
| 1/13/2026 | Columbia Jackets | $291.94 |
| 1/20/2026 | Private Screen Reimbursement | $76.81 |
| 1/22/2026 | ESGVJCC 2026 Installation Dinner | $54.50 |
| 1/22/2026 | Black folding table | $20.00 |
| 1/25/2026 | Team Logo Company Logo Patch | $820.16 |
| 2/17/2026 | Portos Cookies District 1 Meeting | $770.00 |
| 3/31/206 | Rotary Club Event | $100.00 |
| 4/10/2026 | Certificate Frame Autism Month | $55.25 |
| 4/15/2026 | Printer Toner/Paper | $985.58 |
| 4/27/2026 | Dunkin Donuts Fire Stations | $209.90 |
| 1/20/2026 | Amazon All in One Printer | $701.19 |
| 5/7/2026 | Go Pro Camera | $627.87 |
| 4/15/2026 | T-Mobil Jan-April | $160.46 |
| 4/23/2026 | Donuts for Fire reimbursement | $209.90 |
| | | **$5856.20** |



**William Elliott**
3 hours ago · 🌐
Photos from William Elliott's post in WEST COVINA TODAY



Recent Posts

## All comments ⌄



**Javier Chavez** · 5h
Why do we pay for their clothes? And the printer and toner, does the city get to keep them?

**Reply**



**William Elliott** · 5h · ✎ Author
**Javier Chavez**
What about the $600 GoPro camera?

**Reply**



**Brian McDonald** · 4h
Where are we able to access this?

**Reply**



**William Elliott** · 4h · ✎ Author
**Brian McDonald**
This is it.
This was a public records request and it originated with

 **William Elliott** · 4h · ✎ Author

**Brian McDonald**

This is it.
This was a public records request and it originated with the city of West Covina.

**Reply**    👍 1    👍  👎

 **William Elliott** · 37m · ✎ Author

**Brian McDonald**

You can also call the city clerk's office yourself and they can tell you how to submit a PRR (public records request) for anything regarding the city.

**Reply**    👍 1    👍  👎

 **Brian McDonald** · 27m

Thanks!

**Reply**    👍  👎

# EXHIBIT B

## Jerri Potras PRR 447-2026 request and City extension/delay materials

Purpose / relevance:

Underlying request sought January-April 2026 reimbursement/expense records; production appears delayed while the list circulated online.

← **FW: PRR 447-2026 Potras Extension**

Best,

**OSCAR HERRERA – Administrative Assistant**

City of West Covina | City Clerk's Office

1444 W. Garvey Avenue South | West Covina, CA 91790

Office (626) 939-8433 | Direct (626) 939-8431

[oherrera@westcovina.org](mailto:oherrera@westcovina.org)

City Website: [www.westcovina.org](http://www.westcovina.org)



[@WestCovinaCity](https://twitter.com/WestCovinaCity)

**Confidentiality Notice**

*This e-mail, including all attachments, may contain CONFIDENTIAL information and is meant solely for the*

---

Reply

🗑 Delete    ↩ Reply    ↪ Forward    ⤴ Move    ••• More

← **FW: PRR 447-2026 Potras Extension**

Hello,

The City Clerk's Office in West Covina is in receipt of your public records request, for copies of documents. The City is in the process of gathering information responsive to your request. You are hereby notified that the deadline to provide a response will be extended by fourteen (14) days to 5/25/2026, for the following reason(s):

The need to search for, collect and appropriately examine a voluminous amount of separate and distinct records (Gov. Code § 7922.535(c)(2)).

Best,

**OSCAR HERRERA – Administrative Assistant**

City of West Covina | City Clerk's Office

1444 W. Garvey Avenue South | West Covina, CA 91790

## FW: PRR 447-2026 Potras Extension

 **Jerri Potras**
To: Me ⌄

@ 4:36 PM ★ ···

This is the reply I received for the Public Records Request I submitting requesting council member expense/reimbursement information for January, February, March, and April.

--- jerri

**From:** Oscar Herrera <OHerrera@westcovina.org>
**Sent:** Tuesday, May 12, 2026 2:44 PM
**To:** jlpotras@outlook.com
**Cc:** City Clerk <City_Clerk@westcovina.org>
**Subject:** PRR 447-2026 Potras Extension

Hello,

The City Clerk's Office in West Covina is in receipt of your public records request, for copies of documents. The City is in the process of gathering information responsive to your request. You are hereby notified that the deadline to provide a response will be extended by

Reply

**From:** sherrie Berillon
sherrieberillon@rocketmail.com
**Subject:** FW: Public Records Request  | Council Account Expenditure Reports/Requests for Reimbursement
**Date:** May 16, 2026 at 7:59:29 PM
**To:** brian@brian4change.com

[Yahoo Mail: Search, Organize, Conquer](#)

----- Forwarded Message -----
**From:** "Jerri Potras" <[jlpotras@outlook.com](mailto:jlpotras@outlook.com)>
**To:** "Sherrie Berillon ([sherrieberillon@rocketmail.com](mailto:sherrieberillon@rocketmail.com))" <[sherrieberillon@rocketmail.com](mailto:sherrieberillon@rocketmail.com)>
**Sent:** Sat, May 16, 2026 at 7:45 PM
**Subject:** FW: Public Records Request  | Council Account Expenditure Reports/Requests for Reimbursement

**From:** Jerri Potras
**Sent:** Thursday, April 30, 2026 10:46 AM
**To:** City of West Covina ([City_Clerk@westcovina.org](mailto:City_Clerk@westcovina.org)) <[City_Clerk@westcovina.org](mailto:City_Clerk@westcovina.org)>
**Subject:** Public Records Request | Council Account Expenditure Reports/Requests for Reimbursement

The following request is made in accordance with the California Public Records Act.

Please provide a copy of expense report and/or requests for reimbursement for January, February, March, and April 2026 for Mayor Letty Lopez-Viado; Mayor Pro Tem Ollie Cantos, Councilwoman Rosario Diaz, Councilman Brian Gutierrez, and Councilman Tony Wu.

Please direct documents to me at this email address:  jlpotras@outlook.com

Thank you.

Jerri Potras
1055 E. Eckerman Ave.
West Covina, CA 91790

(626) 331-1295

# EXHIBIT C

## May 16, 2026 email to LCW re ADA denial, USB agenda access, GoPro accommodation, and LCW advice

Purpose / relevance:

Shows no USB was provided, GoPro remained denied/delayed, and Plaintiff objected to YouTube equivalency and cost shifting.

 **Gmail**                                          **Brian Gutierrez <briangutierrez1990@gmail.com>**

---

## Fwd: Immediate Supervisory Intervention Required re ADA Denial, USB Agenda Access, GoPro Accommodation, and LCW Advice

---

**John Doe** <johndoeca2025@gmail.com>                                          Sat, May 16 at 8:24 PM
To: <brian@brian4change.com>

**From:** Brian Gutierrez <Brian.Gutierrez@westcovina.org>

**Date:** May 16, 2026 at 9:35:44 AM PDT
**To:** mchaney@lcwlegal.com, bwalter@lcwlegal.com, sberliner@lcwlegal.com, stiedemann@lcwlegal.com, mmeyerhoff@lcwlegal.com, pbrown@lcwlegal.com, mblacher@lcwlegal.com, earce@lcwlegal.com, hdeblanc@lcwlegal.com, btrainer@lcwlegal.com, clewis@lcwlegal.com, "Roxanne E. Lerma" <RLerma@westcovina.org>, Carmelita Underwood <CUnderwood@westcovina.org>
**Cc:** rob.bonta@doj.ca.gov, Michael.Newman@doj.ca.gov, kelly.gerner@calbar.ca.gov
**Subject: Immediate Supervisory Intervention Required re ADA Denial, USB Agenda Access, GoPro Accommodation, and LCW Advice**


Melanie,

I am requesting your immediate intervention as a supervising attorney at LCW regarding the City of West Covina's continued denial, delay, and reclassification of my medically supported ADA / Section 504 accommodations.

Today I picked up my agenda materials, and there was no USB or equivalent physical storage device included. I specifically requested a USB / physical storage accommodation. That request has not been honored. According to ADA Coordinator Roxanne Lerma, the USB / storage accommodation and GoPro / 360-degree recording accommodation are being denied or limited based on advice from LCW attorneys, including Ms. Corrigan Lewis and/or Ms. Brittany Trainer.

If Roxanne's description of LCW's advice is inaccurate, please correct it in writing immediately. If it is accurate, LCW's advice is wrong and needs to be corrected immediately.

Your firm should not disregard California Attorney General Rob Bonta's June 14, 2022 letter to all cities and counties regarding disability access to public meetings. Attorney General Bonta made clear that local agencies must review their "policies, practices, and technology" to ensure public meetings are accessible to people with disabilities. His letter also explains that meeting access is not only physical access — it includes access to the information communicated at the meeting. He specifically addressed agenda and meeting materials, effective communication, and accessible formats, including "screen-readable files loaded on a USB flash drive." He also stated that these materials "must be provided free of charge" and

provided when the agenda is posted or when the legislative body receives them.

That is directly relevant here.

This is not about what the City prefers. This is not about what LCW finds administratively convenient. This is about what federal disability law requires and what actually provides meaningful access to me based on my documented disability.

I requested a USB / physical storage device because online platforms such as Microsoft OneDrive, SharePoint, or other cloud-only systems are not equally effective for me. They add unnecessary steps, logins, syncing issues, folder navigation, permissions, and executive-functioning burdens. A USB thumb drive or simple physical storage device is different. It is direct, predictable, and accessible. The City cannot substitute a complicated online platform for a simple physical storage accommodation and then call that equal access.

I picked up my agenda today. There was no USB. That is a denial of the accommodation I requested.

The same problem exists with the GoPro MAX 2 / equivalent 360-degree recording device. Roxanne informed me that LCW's position is that the GoPro is being denied because the City's YouTube / chamber recording allegedly provides the same access, and that LCW believes the GoPro does not provide meaningful access.

That position is medically and legally wrong.

Dr. Chang's medical letter specifically identifies the GoPro MAX 2 / equivalent 360-degree camera as an assistive recording accommodation. The medical purpose is not general recording. The purpose is whole-room, visual-spatial replay from my actual Council desk position so I can process complex, multi-speaker Council meetings after the fact due to autism-related auditory-processing, working-memory, sensory-integration, and executive-functioning limitations.

The City's YouTube recording is not equivalent. It is a public broadcast controlled by the City's camera angles, microphone activation, operator choices, and broadcast framing. It does not record from my seat. It does not continuously capture the whole room from my perspective. It does not preserve the full visual-spatial context my doctor identified as medically necessary.

A public broadcast is not the same thing as an individualized assistive accommodation.

I am also objecting again to any attempt to charge my ADA accommodations to my Council allocation. If the GoPro, USB / physical storage, chair, or other equipment is needed because of my disability, then it is an ADA / Section 504 accommodation. It is not a discretionary

Council expense. Charging disability access to my Council allocation penalizes me and my district because I am disabled.

As of today, the City still has not provided:

The GoPro MAX 2 / equivalent 360-degree recording device with the necessary mount, memory, power, and transfer accessories;
The USB / physical storage accommodation or simple secure equivalent;
The ergonomic chair / seating accommodation;
The teleconferencing accommodation;
A written individualized ADA determination identifying the medical evidence relied on, the legal basis for denial, the decisionmaker, and any equally effective alternative.

I am also concerned that associate-level attorneys appear to be making or relaying final ADA accommodation positions without meaningful supervising-attorney review. Ms. Lewis is an LCW associate. Ms. Trainer is also listed by LCW as an associate, while her public State Bar profile appears to list Children's Law Center of California rather than LCW. California attorneys are required to maintain accurate State Bar record information. I am raising this because I need to know who is actually supervising and approving the ADA advice being used to deny federally protected accommodations.

I am requesting your personal written response confirming:

Whether LCW advised the City to deny the GoPro / 360-degree recording accommodation;
Whether LCW advised the City that YouTube / chamber video is equally effective for my documented disability-related needs;
Whether LCW advised the City to deny or withhold my USB / physical storage accommodation;
Whether LCW advised the City that OneDrive, SharePoint, or another cloud platform is an adequate substitute for the USB / physical storage accommodation I requested;
Whether LCW advised the City to charge ADA accommodation equipment to my Council allocation;
Whether you personally reviewed Dr. Chang's medical letter, Attorney General Bonta's June 14, 2022 letter, Title II, Section 504, and the effective-communication requirements before LCW's advice was communicated to me;
Whether LCW is now correcting its advice and directing the City to engage in a real individualized interactive process.

The advice being relayed to me is not legally sufficient. The City cannot deny a medically supported accommodation by pointing to a generic public broadcast. The City cannot ignore my physician's medical nexus. The City cannot replace a requested physical storage accommodation with a cloud platform that does not work for my disability. The City cannot shift disability-access costs to my Council allocation. The City cannot continue delaying all

pending accommodations while requiring me to participate in Council meetings without the supports my doctor identified.

I am asking LCW to correct this immediately.

If LCW continues to advise, approve, ratify, or participate in the denial, delay, reclassification, or cost-shifting of my ADA accommodations, I will pursue all available remedies, including claims under the Americans with Disabilities Act, Section 504, and retaliation/interference provisions. I will also evaluate whether LCW, individual attorneys, City officials, and the ADA Coordinator should be included in the federal litigation or other appropriate proceedings.

Please treat this as urgent. I need written confirmation Monday that LCW is intervening and correcting the City's ADA accommodation handling.

Sincerely,
**_Brian Gutierrez_**
Councilmember, 1st District
City of West Covina
<Image.jpeg>

<AG Letter.pdf>

# EXHIBIT D

## May 16, 2026 immediate request to Roxanne Lerma for LCW emails

Purpose / relevance:

Shows Plaintiff requested actual LCW emails and written basis for change from prior approval to denial.

**From: Brian Gutierrez** councildistrict1@icloud.com
**Subject: Immediate Request for LCW Emails**
**Date: May 16, 2026 at 8:00:00 AM**
**To: Roxanne E. Lerma** RLerma@westcovina.org
**Cc: Carmelita Underwood**
CUnderwood@westcovina.org

Roxanne,

Yesterday you referenced emails from Ms. Brittany Trainer and Ms. Corrigan Lewis regarding my ADA accommodations.

I am requesting that you please forward me those emails immediately, including all attachments and the full email chain. Please do not summarize them orally or paraphrase LCW's position. I want the actual emails you referenced.

This is especially concerning because Ms. Underwood previously told me she was approving my GoPro MAX 2 / 360-degree recording accommodation before she was removed from the ADA Coordinator role. Now I am being told that LCW, through Ms. Lewis, is recommending denial, claiming the City's YouTube recording is equivalent and that the GoPro does not provide meaningful access.

That is a major change in position, and I am requesting the written record showing how and why the City went from approval to denial.

As of today, the City still has not provided me:

1. the GoPro MAX 2 / equivalent 360-degree recording device with the necessary parts to function;
2. the ergonomic chair / seating accommodation;
3. the USB / physical storage accommodation or secure equivalent;
4. the teleconferencing accommodation; or
5. any equally effective alternative.

I am also being told the City may use my Council allocation to fund the GoPro. I object to that. If the device is needed because of my disability, then it is an ADA accommodation, not a discretionary Council expense.

If the City is relying on LCW's emails or legal advice to deny, delay, limit, reverse, or reclassify my accommodations, then I am requesting the actual written communications today.

I am weighing my legal options and determining who participated in the denial, delay, reversal, or interference with my ADA rights. That includes LCW, City management, and you in your role as ADA Coordinator.

As ADA Coordinator, your responsibility is to coordinate ADA compliance and ensure the City engages in a real interactive process. It is not acceptable to tell me verbally that outside counsel recommended denial and then withhold the emails or written basis for the decision.

Please forward the emails from Ms. Trainer and Ms. Lewis today, including any communications discussing Ms. Underwood's prior approval or the change from approval to denial.

If the City is refusing to provide them, state that directly in writing.


Brian Gutierrez
Councilmember, 1st District
City of West Covina

# EXHIBIT E

## Dr. Henry Chang January 26, 2026 medical accommodation letter

Purpose / relevance:

Medical nexus for GoPro/360-degree recording device, ergonomic seating, advance agenda access, processing time, and disability-comparison restrictions.

**STAR HEALTH**

2707 E. Valley Blvd, Suite 208

West Covina, CA 91792-3197

Phone: (626) 581-0486

Dr. Henry Chang, D.O.
Osteopathic Physician & Surgeon
License No. 20A10516 —
Date: January 26, 2026

To: Reasonable Accommodation Team
City of West Covina
Carmelita Underwood
H.R. Director

Dear Ms. Underwood,

I am a licensed osteopathic physician currently serving as the primary treating medical provider for Brian Gutierrez. This letter is issued for the purpose of documenting medically necessary reasonable accommodations pursuant to the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., and the California Fair Employment and Housing Act (FEHA), Gov. Code §  .  12940 et seq.

Mr. Gutierrez has permanent neurological and medical conditions that substantially limit multiple major life activities, including but not limited to: learning, reading, concentrating, processing information, executive functioning, auditory integration, sensory regulation, emotional regulation, sleep, and physiological stress response. These limitations are clinically significant and directly affect his functional capacity in high-demand public environments such as City Council meetings and related official duties.

This letter constitutes a formal medical opinion regarding the necessity of specific accommodations and the medical nexus between each accommodation and Mr. Gutierrez's underlying disabilities.

**STAR HEALTH**

2707 E. Valley Blvd, Suite 208

West Covina, CA 91792-3197

Phone: (626) 581-0486

## I. Longstanding Clinical History of Autism Diagnosis

Mr. Gutierrez's diagnosis of Autism Spectrum Disorder (ASD – Asperger's profile) was established through formal clinical evaluations conducted by licensed medical and psychological professionals during middle school, high school, and again in young adulthood. These assessments were based on standardized diagnostic criteria consistent with DSM frameworks applicable at the time.

From a neurodevelopment standpoint, this establishes that Mr. Gutierrez's Autism is:

- Congenital and lifelong

- Clinically verified (not self-diagnosed)

- Supported by repeated professional evaluations

- Associated with persistent neurological functional limitations

This history confirms that his accommodation needs are medically legitimate, longstanding, and neurologically based, not situational, behavioral, or discretionary.

## II. Diagnoses / Medical Conditions (ICD-10-CM)

### 1. Autism Spectrum Disorder – Asperger's profile

ICD-10: F84.0

Autism Spectrum Disorder is a neurodevelopment condition characterized by atypical neural connectivity affecting sensory processing, executive functioning, working memory, and auditory integration.

**STAR HEALTH**

2707 E. Valley Blvd, Suite 208

West Covina, CA 91792-3197

Phone: (626) 581-0486

Clinically relevant functional manifestations include:

- Reduced efficiency of real-time auditory processing

- Slower information-processing speed under cognitive load

- Executive dysfunction in time-pressured environments

- Sensory hypersensitivity to lighting, sound, and movement

- Cognitive fatigue and neurological overload with prolonged public interaction

Although Mr. Gutierrez is high-functioning and intellectually capable, his Asperger's profile results in neurologically based impairments in how information is encoded, integrated, and retrieved. These impairments are not reflective of intelligence, motivation, or effort, but of central nervous system differences.

## 2. Type 2 Diabetes Mellitus (without complications)

ICD-10: E11.9

Mr. Gutierrez also has Type 2 Diabetes Mellitus, a chronic metabolic condition requiring regular monitoring, predictable access to medication, stable routines, and the ability to manage physiological stress. Psychological stress and sleep disruption worsen glycemic control, increase fatigue, and exacerbate both cognitive and physical symptoms.

## 3. Chronic musculoskeletal pain / low back pain

ICD-10: M54.50

This condition causes postural intolerance and pain with prolonged sitting or standing, which directly interferes with concentration, endurance, and executive functioning.

**STAR HEALTH**

2707 E. Valley Blvd, Suite 208

West Covina, CA 91792-3197

Phone: (626) 581-0486

## 4. Insomnia / Sleep disturbance

ICD-10: G47.00

Sleep disturbance results in impaired cognitive stamina, increased sensory sensitivity, emotional dysregulation, and reduced stress tolerance.

## 5. Stress-related somatic symptoms

Including chest pain (ICD-10: R07.9) and anxiety features (ICD-10: F41.1, where clinically applicable).

## III. Neuropsychological Functional Impairments

From a clinical neuropsychological perspective, Mr. Gutierrez exhibits the following functional impairments:

A. Auditory Processing Deficit – reduced auditory working memory and slower auditory encoding in multi-speaker environments.

B. Executive Functioning Impairment – slower planning, prioritization, working memory, and decision-making under pressure.

C. Sensory Integration Dysfunction – bright lighting, sound, and visual movement cause sensory overload and neurological fatigue.

D. Stress-Induced Physiological Dysregulation – psychological stress worsens insomnia, anxiety, chest pain, and cognitive stamina.

## IV. Requested Accommodations and Explicit Medical Nexus

The following accommodations are medically necessary to mitigate the functional limitations caused by Mr. Gutierrez's documented neurological and medical conditions. Each accommodation is directly linked to a specific clinical impairment and is required to prevent foreseeable medical harm and functional decompensation.

**STAR HEALTH**

2707 E. Valley Blvd, Suite 208
West Covina, CA 91792-3197
Phone: (626) 581-0486

These accommodations are not discretionary or preferential; they represent standard compensatory supports used in disability medicine to restore functional capacity and ensure equal access to participation.

## 1. Assistive Recording Device – GoPro MAX 2 (360-Degree Camera)

Accommodation Requested:

Permit Mr. Gutierrez to utilize a GoPro MAX 2 or equivalent 360-degree recording device at his Council desk for the purpose of recording meetings and reviewing them afterward.

Explicit Medical Nexus:

Mr. Gutierrez has Autism Spectrum Disorder (Asperger's profile), which is associated with clinically documented deficits in auditory processing, working memory, and real-time information encoding. In environments with multiple speakers and rapid dialogue, his brain is neurologically unable to reliably encode complex verbal information in real time.

The use of a 360-degree recording device allows Mr. Gutierrez to later engage in visual-spatial replay, activating alternative neural pathways associated with visual processing. This allows him to reconstruct conversational context, associate verbal content with visual cues, and reprocess material at a neurologically sustainable speed.

This visual replay method has been beneficial since elementary school and is a medically recognized compensatory strategy for individuals with ASD. Without this accommodation, Mr. Gutierrez is placed at a structural neurological disadvantage compared to non-disabled peers.

## 2. Ergonomic Seating – Herman Miller

Accommodation Requested:

High-quality ergonomic chair or stool (e.g., Herman Miller).

**STAR HEALTH**

2707 E. Valley Blvd, Suite 208

West Covina, CA 91792-3197

Phone: (626) 581-0486

Explicit Medical Nexus:

Chronic musculoskeletal pain causes persistent nociceptive signaling that competes with cognitive resources. This results in reduced attention, increased fatigue, and lower executive functioning. Ergonomic seating reduces pain input, preserves cognitive bandwidth, and prevents secondary neurological exhaustion.

## 3. Advance Access to Agenda Materials

Accommodation Requested:

Provide agenda materials and attachments as far in advance as reasonably possible.

Explicit Medical Nexus:

ASD significantly affects processing speed and information integration. Pre-exposure allows gradual encoding, reduces neurological overload, and supports equal participation.

## 4. Processing Time During Meetings

Accommodation Requested:

Do not require immediate responses or force Mr. Gutierrez to vote first.

Explicit Medical Nexus:

Time pressure worsens executive dysfunction, increases error risk, and causes neurological overload. Processing time allows proper cognitive integration and prevents stress-induced impairment.

**STAR HEALTH**

2707 E. Valley Blvd, Suite 208

West Covina, CA 91792-3197

Phone: (626) 581-0486

## 5. Prohibition on Disability Comparisons

Accommodation Requested:

No public comparisons of Mr. Gutierrez's disability with other disabilities.

Explicit Medical Nexus:

Autism involves central nervous system processing differences, while blindness involves peripheral sensory impairment. These conditions are neurologically incomparable. Comparative stereotyping is medically invalid and clinically harmful.

## V. Disability-Based Harassment and Clinical Harm (Patient Report)

Mr. Gutierrez reported that during public City Council proceedings, the Mayor and at least one Councilmember publicly questioned whether he actually has Autism and implied exaggeration of his condition.

Following this, he experienced acute insomnia, depressed mood, loss of appetite, heightened anxiety, and cognitive destabilization. These symptoms are clinically consistent with stress-induced exacerbation of neurodevelopmental vulnerability.

## VI. Improper Reliance on Past Functioning and Clinical Harm

Mr. Gutierrez reported that the Mayor and a Councilmember mocked his disability by stating that he was able to sit in a different seat in the past when he served as a Planning Commissioner, and therefore should be able to do so now.

From a medical standpoint, this reasoning is clinically invalid and dangerous. Disability-related functional capacity is not static and cannot be inferred from past roles or environments. The role of a City Councilmember involves substantially greater cognitive load and sensory exposure than

**STAR HEALTH**

2707 E. Valley Blvd, Suite 208

West Covina, CA 91792-3197

Phone: (626) 581-0486

the role of a Planning Commissioner. Using prior functioning to minimize current needs disregards current medical status and creates foreseeable neurological and psychological harm.

## VII. Medical Provider Statement Regarding City Noncompliance

In my professional medical career, I have never encountered a municipal employer disregard a treating physician's written accommodation recommendations and then compel a patient to operate in direct contradiction of medical guidance.

Such conduct is medically inappropriate and places Mr. Gutierrez at foreseeable risk of sustained neurological and psychological harm.

## VIII. Final Medical Opinion

It is my medical opinion, within reasonable medical certainty, that:

- The requested accommodations are medically necessary

- They are directly caused by documented neurological impairments

- They are reasonable and standard in disability medicine

- Failure to implement them creates foreseeable medical harm

No non-medical authority is clinically qualified to override these determinations.

Sincerely,

Star Health Medical
Henry Chang, DO, MS, FACOI
2707 E Valley Blvd, Suite 208
West Covina, CA 97192
Office: 626.581.0486 Fax: 626.581.0161

**Henry Chang, D.O.**

Osteopathic Physician & Surgeon

License No. 20A10516 — Osteopathic Medical Board of California

# EXHIBIT F

## Attorney General Rob Bonta June 14, 2022 letter re disability access to public meetings

Purpose / relevance:

Public-meeting accessibility includes effective communication, agenda materials, USB flash drive formats, and auxiliary aids/services.



## State of California
## Office of the Attorney General

### ROB BONTA
ATTORNEY GENERAL

June 14, 2022

To: All Cities and Counties in California

RE: Ensuring Access for People with Disabilities to Public Meetings of Local Agencies

Dear Colleague:

Equitable access to public meetings of local agencies and the opportunity to make public comment is critical to the inclusion of Californians with disabilities in governmental decision-making. As the Attorney General of the State of California, I have a strong interest in ensuring that the state's disability access laws and regulations are complied with and enforced so that persons with disabilities have access to public meetings held throughout the State. I encourage you to evaluate your meeting facilities and review your current policies, practices, and technology to ensure that public meetings, which are at the heart of our democratic process, are accessible to Californians with disabilities in compliance with disability access laws.

Conducting such an evaluation promptly and thoroughly is even more important in light of complaints that our office has recently received that several local agencies have failed to provide virtual or telephonic options to attend public meetings, and implemented restrictive in-person public comment policies that have prevented people with disabilities from participating. The harms caused by these restrictions have been especially acute during the COVID pandemic, effectively barring individuals with COVID risk factors from participating in public meetings.

The Ralph M. Brown Act (Brown Act), as amended by AB 3035, requires that local agencies hold meetings open to the public, subject to certain exceptions.[1] (Gov. Code, §§ 54950-54963). All public meetings must take place in locations that are accessible to persons with disabilities, and local agencies must provide reasonable accommodations where necessary for disability access. (See Gov. Code, §§ 54953.2 ["All meetings of a legislative body of a local agency that are open and public shall meet the protections and prohibitions contained in Section 202 of the Americans with Disabilities Act of 1990 (42 U.S.C. Sec. 12132), and the federal

---

[1] A "legislative body" covered under the Brown Act includes the governing body of a local agency or any other local body created by state or federal statute. (Gov. Code, § 54952, subd. (a).) The Brown Act also covers a commission, committee, board, or other body of a local agency. (*Id.,* subd. (b).)

All Cities and Counties in California
June 14, 2022
Page 2

rules and regulations adopted in implementation thereof"]; 54961, subd. (a) ["no legislative body of a local agency shall conduct any meeting in any facility…which is inaccessible to disabled persons"]; see also 28 C.F.R. § 35.130(b)(7) ["a public entity shall make reasonable modifications in policies, practices, or procedures when modifications are necessary to avoid discrimination on the basis of disability . . ."].) Holding public meetings in inaccessible facilities or otherwise making them inaccessible may deprive persons with disabilities of the opportunity to fully and meaningfully participate in the democratic process.[2] For example, a building where a meeting is being held may have architectural barriers, such as an inaccessible path of travel into or through the facility, inaccessible meeting areas, inaccessible restrooms, or inaccessible parking (if provided), which may prevent persons who use wheelchairs or other assistive devices from participating in the meeting.[3] If overnight stays are involved, conveniently located accessible lodging should also be a consideration.[4]

A facility is accessible for the purposes of the Brown Act if it fully satisfies state and federal accessibility requirements.[5] The California Building Standards Code sets scoping and technical requirements for all new construction and rehabilitation projects in the State, with particular focus on accessibility for people with disabilities in Chapters 11A and 11B.[6] The California Building Standards Code also requires at least the same level of accessibility as the federal Americans with Disabilities Act (ADA). (Gov. Code, § 4459.) These statutes and regulations mandate that newly constructed buildings and facilities that are publicly funded or part of government programs and activities (or pre-existing buildings and facilities under certain conditions) be accessible to, and usable by, persons with disabilities. Applicable federal accessibility requirements are set forth primarily in the ADA (42 U.S.C. § 12101 et seq.) and Section 504 of the Rehabilitation Act (Section 504, 29 U.S.C. § 794); these statutes'

---

[2] The California Department of Rehabilitation (DOR) provides several examples of how public meetings can be made accessible. (See DOR, *Planning Accessible Public Meetings* (Apr. 2009) <https://www.dor.ca.gov/Home/PlanningAccessiblePublicMeetings> [as of May 20, 2022].) The United States Department of Justice (U.S. DOJ) also provides guidance on meeting accessibility, including accessible meeting locations, arrangement of meeting room furniture, and how the meeting information is communicated. (See U.S. DOJ, *Accessible Information Exchange: Meeting on a Level Playing Field* <https://www.ada.gov/business/accessiblemtg.pdf> [as of May 20, 2022].)

[3] See footnote 2, *ante*, U.S. DOJ, at pp. 8-16.

[4] See footnote 2, *ante*, DOR.

[5] For further information regarding accessibility requirements for people with disabilities, please see "Accessible Design Standards for People with Disabilities," Attorney General Rob Bonta, letter to all city and county building officials in California, June 14, 2022.

[6] Further information on the California Building Standards Code's accessible design requirements, including the *State of California Access Compliance Advisory Manual*, is available at the Department of General Services, Division of the State Architect's website (see <https://www.dgs.ca.gov> and <https://www.dgs.ca.gov/DSA/Resources/Page-Content/Resources-List-Folder/Access-Compliance-Reference-Materials> [as of May 20, 2022]).

All Cities and Counties in California
June 14, 2022
Page 3

implementing regulations; and specific design standards, including the ADA Standards for Accessible Design[7] and the Uniform Federal Accessibility Guidelines.[8]

To make a public meeting truly accessible, the public entity must ensure not only physical access to the meeting facility, but access to the information communicated through the meeting. State and federal laws require that local agencies provide effective communication for people with disabilities. (28 C.F.R. § 35.160; see Civ. Code, § 54.) For example, written materials that are distributed to members of the public—such as the agenda and other materials distributed at a public meeting—are subject to the requirement that communication be equally effective for persons with disabilities.[9] Thus, upon receipt of a specific request, a local agency that provides information in written form must make that information available to individuals in a form that is usable by them. (*Ibid.*) Such alternative formats may include screen-readable files loaded on a USB flash drive, audio recordings, large print, or Braille.[10] The format necessary to ensure effective communication will vary with the individual's needs and the length and complexity of the communication involved.[11] These materials must be provided free of charge and sent when the agenda is posted or when a majority of the legislative body's members receive them. (Gov. Code, §§ 54957.5, subd. (d); 54954.1.) Requests for such materials must be honored and the materials delivered for each meeting that calendar year. (Gov. Code, § 54954.1.) Agendas must include information about how a request for accommodations may be made, including the proper recipient and timing of such requests. (Gov. Code, § 54954.2, subd. (a)(1).)

Upon receipt of a specific request, it may be necessary for a local agency to provide auxiliary aids and services to individuals with disabilities to allow full participation in the public meeting. (28 C.F.R. § 35.160(b).) These include, but are not limited to, sign language interpreters, audio recordings, assistive listening devices, real-time transcription, open or closed captioning, and caption decoders for videos. (28 C.F.R. § 35.104(1)-(2).)

Local agencies must also ensure that people with disabilities have access to the public comment process. The Brown Act provides that all members of the public, including people with disabilities, have the right to directly address local governmental bodies on any item of interest to the public that is within the subject matter jurisdiction of those bodies. (Gov. Code, § 54954.3, subd. (a).) The ADA also requires that public entities ensure meaningful access to their programs, services, and activities; make reasonable accommodations; and ensure effective

---

[7] U.S. DOJ, *ADA Standards for Accessible Design* (2010) <https://www.ada.gov/2010ADAstandards_index.htm> (as of May 20, 2022).

[8] U.S. Access Board, *Uniform Federal Accessibility Standards (UFAS)* (1984) <https://www.access-board.gov/aba/ufas.html> (as of May 20, 2022).

[9] U.S. DOJ, *ADA, Title II Technical Assistance Manual* (TAM) §7.1000 <https://www.ada.gov/taman2.html> (as of May 20, 2022); Gov. Code, §§ 54954.1; 54954.2; 54957.5, subd. (c).

[10] See footnote 9, *ante*, U.S. DOJ, § II-7.0000.

[11] *Ibid.*

All Cities and Counties in California
June 14, 2022
Page 4

communication. (28 C.F.R. §§ 35.130, 35.149-35.150, 35.160; *Crowder v. Kitagawa* (9th Cir. 1996) 81 F.3d 1480, 1484.) If a local agency provides an opportunity for the general public to comment at a public meeting in person, it should make reasonable accommodations to enable individuals with disabilities to comment through equivalent means. For example, if there is a raised platform for in-person public comment, the local agency must ensure that an accessible route, such as a ramp, is provided, as well as an accessible path of travel leading to it. (Cal. Code Regs., tit. 24, part 1, §11B-206.) Microphones should be adjustable in order to adapt to the height of the speaker.[12]

As discussed above, the COVID pandemic has highlighted the need to accommodate people with disabilities who cannot attend meetings in person because of their disability. This access is particularly important, for example, for individuals with disabilities that result in compromised immune system functioning, or those with mobility-based disabilities that prevent them from traveling to public meetings. Local agencies should provide telephonic or virtual conferencing as "auxiliary aids and services" to afford such individuals an opportunity to observe the meeting and give public comment unless doing so would result in an undue burden on the agency. (28 C.F.R. §§ 35.104(1), 35.160(b), 36.303(a).)

Failure to provide people with disabilities access to public meetings can result in serious consequences for local agencies. Penalties for violation of the Brown Act may include injunctive relief to stop or prevent actual or threatened violations; nullification of actions taken in violation of the Act; and/or criminal misdemeanor sanctions against public officials who knowingly participate in unlawful meetings in which action is taken with the intent to deprive persons of their rights under the Brown Act. (Gov. Code, §§ 54950, 54959, 54960.1.) Local agencies may also incur penalties or expose themselves to legal liability under state and federal disability rights laws for failure to provide people with disabilities access to public meetings. (See, e.g., Gov. Code, § 11137; Civ. Code, § 54.3; 42 U.S.C. § 12133.)

California has long been at the forefront of efforts to require that facilities are fully accessible to persons with disabilities. Moreover, the California Legislature, through the Brown Act, has required that all public meetings of local governmental bodies be accessible to persons with disabilities. Please join me in a renewed commitment to ensure that public meetings, which are central to our democracy, are accessible to all Californians. Again, if you have not done so already, I urge you to evaluate your facilities and review your current policies, practices, and technology with an eye to fulfilling your legal obligations in this regard.

---

[12] See footnote 2, *ante*, DOR.

All Cities and Counties in California
June 14, 2022
Page 5

       If you have any questions or comments, please feel free to contact Michael L. Newman, the Senior Assistant Attorney General for the Civil Rights Enforcement Section, which includes the Department of Justice's Disability Rights Bureau. Mr. Newman may be reached at Michael.Newman@doj.ca.gov.

                                     Sincerely,

                                     ROB BONTA
                                     Attorney General

# EXHIBIT G

**Official request for credit card statements and transaction records**

Purpose / relevance:

Shows Plaintiff sought City-issued credit card statements and transaction-level records for official oversight of taxpayer expenditures.

**From:** Brian Gutierrez councildistrict1@icloud.com

**Subject:** **Official Request for Credit Card Statements and Transaction Records – Acting City Manager and Code Enforcement Manager**

**Date:** May 7, 2026 at 7:43:02 AM

**To:** Karen Ogawa KOgawa@westcovina.org, Roxanne E. Lerma RLerma@westcovina.org, Milan Mrakich MMrakich@westcovina.org, Nilesh Mehta NMehta@westcovina.org, finance@westcovina.org, Brian Gutierrez Brian.Gutierrez@westcovina.org

**Cc:** rob.bonta@doj.ca.gov, Maria Ramirez maramire@da.lacounty.gov, Chun Hoon HChun@da.lacounty.gov, Elizabeth.Kim@doj.ca.gov, David.Eller@doj.ca.gov

---

Dear Finance Director Ms. Karen Ogawa,

I am again following up regarding my repeated requests for financial oversight documents, which to date have not been produced by you or the Acting City Manager.

At the Tuesday, May 5, 2026 City Council meeting, you stated on the record that I submitted this request the day before. However, the attached email chain reflects that my requests were made earlier than that statement indicated.

Please advise when these requested documents will be made available.

In addition, I have requested:

- A breakdown of the upcoming fiscal year budget allocations for special events;
- Documentation relating to the West Covina Community Services Foundation's decision to disburse funds from the charity's account;

- Copies of any board meeting minutes reflecting approval or discussion of those expenditures.

As a member of the Board of Directors, I have not been notified of any such meeting.

I have also received information alleging that Mr. Mrakich authorized purchases including cable television services, a 100-inch television for the downstairs chambers, and luxury lunches and dinners. However, I cannot properly assess these matters because the requested financial documents have not been produced.

I am fully aware of the long-standing personal relationship between you and Mr. Mrakich. I am not raising that relationship alone as the basis for concern regarding your actions not to produce financial oversight documents. Rather, I am noting that the continued refusal to produce the requested financial oversight documents creates the appearance of a lack of transparency regarding these matters.

Please also consider this correspondence to be an official inquiry regarding city financial oversight and governance matters, consistent with the protections and authority recognized in *Levy v. City of Santa Monica* concerning elected officials' rights to seek information necessary to perform their duties.

I again request that these public and financial oversight records be produced promptly and that you provide a timeline for compliance.

Respectfully,

**Brian Gutierrez**

Councilmember

City of West Covina

## On Apr 20, 2026, at 1:46 PM, Brian Gutierrez <Brian.Gutierrez@westcovina.org> wrote:

Karen,

I am writing in my official capacity as an elected Councilmember of the City of West Covina to request financial records necessary for lawful oversight of public expenditures and protection of taxpayer funds.

Please provide the following records:

1. All City-issued credit card statements, including the full transaction-level support, **for Acting City Manager Milan** Mrakich covering the last two years.

Because I am aware that Mr. Mrakich received a new City credit card after assuming the role of Acting City Manager, this request is intended to cover both cards and all associated accounts,

whether active, replaced, closed, reissued, or transferred. I expect production of all statements and all transaction histories for each card used during that period, not merely the currently active account.

2. All City-issued credit card statements and transaction-level records **for Code Enforcement Manager Matt** for the last one year.

For both requests, please include:

- monthly statements;

- transaction detail;

- merchant names;

- transaction dates;

- amounts;

- any available descriptions or coding fields;

- and any supporting documentation normally maintained by Finance reflecting the business

purpose of the expenditure.

This request is made for oversight purposes directly related to my duties as a Councilmember. Public-fund review, expenditure accountability, and inquiry into the use of municipal resources fall squarely within my official role. A councilmember does not lose the right to inquire into City expenditures simply because the records may relate to senior management or department operations. Oversight of public money is one of the most basic fiduciary responsibilities owed to the public.

As Finance Director, you likewise have a fiduciary obligation to safeguard taxpayer funds, maintain accurate financial controls, and ensure transparency in the handling of City money. That duty is not passive. It includes preserving complete expenditure records, facilitating lawful oversight, and ensuring that public resources are used only for legitimate governmental purposes. Where records involve City-issued cards, Finance has an obligation to ensure the expenditure trail is reviewable and that public funds are protected from misuse, waste, concealment, or irregular accounting practices.

I am requesting these records now because I need to review them before the performance review of the Acting City Manager. Accordingly, I need full production no later than April 28, 2026.

If any portion of these records is being withheld, delayed, or routed through the Acting City Manager's office for approval, please let me know immediately, in writing, and identify the specific basis being asserted. Financial oversight cannot be lawfully obstructed through administrative gatekeeping, delay, or interference by the subject of the review.

If the Acting City Manager attempts to block, delay, or interfere with this request, I ask that you notify me promptly so that I may address the obstruction through the appropriate oversight and reporting channels. That includes referral, where appropriate, to county, state, and federal law-enforcement or regulatory authorities.

Please confirm receipt of this request and advise when I should expect production.

Respectfully,
**Brian Gutierrez**
Councilmember, 1st District
City of West Covina

# EXHIBIT H

## Buchalter filings for Third Party Milan Mrakich's motion to quash or protective order

Purpose / relevance:

Shows Buchalter appeared for Third Party Milan Mrakich and sought to quash/limit subpoenaed records and testimony, and includes Mrakich declaration excerpts about Plaintiff's credit card request.

Buchalter LLP
ROGER L. SCOTT (SBN: 247165)
18400 Von Karman Avenue, Suite 800
Irvine, CA 92612-0514
Telephone: 949.760.1121
Fax: 949.720.0182
Email: rscott@buchalter.com

Attorney for Third Party
MILAN MRAKICH

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES—WHITTIER COURTHOUSE**

| | |
|---|---|
| JOHN DOE,<br><br>Petitioner,<br><br>vs.<br><br>JOHN SHEWMAKER,<br><br>Respondent. | CASE NO. 25PSRO01328<br><br>**THIRD PARTY WITNESS MILAN MRAKICH'S NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA OR FOR PROTECTIVE ORDER; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[Declarations of Milan Mrakich and Roger L. Scott, and Proposed Order filed concurrently herewith]<br><br>Date:<br>Time:<br>Dept: |

Buchalter LLP
Irvine

1

**THIRD PARTY MILAN MRAKICH'S MOTION TO QUASH SUBPOENA**

BUCHALTER 109979897v2

**TO THE COURT AND ALL PARTIES AND THEIR COUNSEL OF RECORD, IF ANY:**

**PLEASE TAKE NOTICE** that on _____, at _____ a.m. in Department _____ of the above-entitled Court, located at 7339 South Painter Ave. Whittier, CA 90602, Third-Party Witness Milan Mrakich will, and hereby does, move for:

(1)    an order quashing the subpoenas for personal appearance and production of business records issued by Petitioner John Doe to Milan Mrakich; or, in the alternative;

(2)    a protective order limiting the scope of any testimony or document production to the question of whether Mr. Shewmaker violated the restraining order on the dates alleged in Mr. Doe's motion to enforce.

This motion is made pursuant to Code of Civil Procedure section 1987.1 on the grounds that the requests are unreasonable and irrelevant to Petitioner's pending motion to enforce the restraining order against Mr. Shewmaker and are instead designed to harass a third-party witness, Mr. Mrakich.  Pursuant to Code of Civil Procedure section 1987.1 (b) (2), a non-party witness may move quash a subpoena that requires the attendance of the witness or the production of books, documents, electronically stored information, or other things before a court, or at the taking of a deposition.

The motion is based upon this notice, the accompanying Memorandum of Points and Authorities and Declarations Milan Mrakich and Roger L. Scott filed concurrently herewith, the pleadings in this action and such other evidence and argument as may properly be presented at the hearing on this matter.

DATED:  May 5, 2026                              BUCHALTER LLP


                                                 By:   /s/ Roger L. Scott
                                                       ROGER L. SCOTT
                                                    Attorney for MILAN MRAKICH

## MEMORANDUM OF POINTS & AUTHORITIES

**I.    INTRODUCTION**

Petitioner John Doe is a serial litigant that has been harassing the staff of the City of West Covina for months.  The problem is so severe that the City retained an independent investigator (something Mr. Doe voted to approve) who found that Mr. Doe intimidates and retaliates against City staff.  The City censured Mr. Doe for his misconduct.  A frequent target for Mr. Doe's ire is the City's Acting City Manager, Milan Mrakich.  Mr. Doe has sent process servers late at night to the home of Mr. Mrakich's elderly parents, he filed restraining order against Mr. Mrakich falsely accusing him of threats (only to withdraw it on the eve of hearing), and Mr. Doe has threatened Mr. Mrakich's job, accusing him of misconduct in prior positions and demanding his removal.  Against this backdrop, Mr. Doe's subpoena to Mr. Mrackich—addressed to him personally and not as City Manager—is nothing more than harassment.

Mr. Doe purportedly seeks Mr. Mrakich's testimony and document production in support of his motion to enforce an existing restraining order against Respondent John Shewmaker.  That motion alleges that Mr. Shewmaker violated the restraining order on February 3, 2026 during the public comment period of a City Council meeting, and again on March 7, 2026 and March 20, 2026 in Facebook posts.  The only conceivable relevance of Mr. Mrakich's testimony is that he was present at the February 3, 2026 meeting, but the meeting was recorded and can be watched online, so there is no dispute as to what Mr. Shewmaker said or did.

Mr. Doe cannot seek City documents by subpoenaing Mr. Mrakich in his personal capacity.  Even if he could, Mr. Doe's document requests are almost entirely for a time period that ends weeks *before* Mr. Shewmaker allegedly violated the restraining order, giving them no bearing on Mr. Doe's motion.  Mr. Doe also seeks Mr. Mrakich's private communications with City officials and City staff without any restriction on topic.  And, he seeks records for his own ADA accommodations, which are not relevant to this case, but are relevant to Mr. Doe's pending litigation against the City.

In sum, Mr. Doe seeks to burden and harass Mr. Mrakich with irrelevant and overbroad requests.  Accordingly, the Court should quash Mr. Doe's subpoena.

## II. STATEMENT OF FACTS

### A. Mr. Doe is a Serial Litigant Who Harasses City Staff

Mr. Doe is an elected City Councilmember in the City of West Covina. Declaration of Milan Mrakich ("Mrakich Decl") ¶ 4. The City Council publicly censured Mr. Doe for his ongoing intimidation and retaliation against City staff based on the report of an independent investigator, whom Mr. Doe, along with the rest of the City Council, voted to retain. *Id*. Decl. ¶ 4, Ex. 1, 2.

Mr. Doe has also sued the City twice. The first time, in an effort to stop a censure of him. *John Doe v. City of West Covina*, Case No. 25STCV26419. Declaration of Roger L. Scott ("Scott Decl.") ¶ 2. After the Court denied Mr. Doe's ex parte application to stop the censure, Mr. Doe dismissed the matter. *Id*.

In March 2026, Mr. Doe re-filed. *John Doe v. City of West Covina*, Case No. 26STCP00957. Scott Decl. ¶ 3. This new action named individual City staff members, including Mr. Mrakich. *Id*. After Mr. Doe lost two subsequent *ex parte* applications, he re-fashioned his case as one for alleged violation of his ADA rights, and the matter was removed to federal court, *John Doe v. City of West Covina*, United States District Court for the Central District of California Case No. 2:26-cv-03659-MEMF-MBK. *Id*. ¶ 4, 5. Mr. Doe then filed a fourth *ex parte* application, purporting to enforce his ADA rights. That application remains pending. *Id*.

### B. Mr. Doe Repeatedly Targets Mr. Mrakich for Harassment

In addition to the ongoing litigation, Mr. Doe routinely targets Mr. Mrakich, the City's Acting City Manager, for harassment and retaliation for whatever slight Mr. Doe perceives Mr. Mrakich has engaged in. Mrakich Decl. ¶ 5.

On or about January 17, 2026, Mr. Doe instructed a process server to serve a subpoena at the home of Mr. Mrakich's elderly parents, late in the evening, waking them up and frightening them. Mrakich Decl. ¶ 6. There was no legitimate purpose for this other than to harass Mr. Mrakich. *Id*. When asked why he did not simply serve Mr. Mrakich at City Hall, where Mr. Doe knows Mr. Mrakich works on a daily basis, his sole justification was because he had a "right" to serve Mr. Mrakich where and when he pleased. *Id*. ¶ 7.

On or about February 23, 2026, Mr. Doe filed a civil harassment restraining order against Mr. Mrakich, falsely claiming that Mr. Mrakich threatened to kill him.  Mrakich Decl. ¶ 8, Scott Decl. ¶ 6 (*John Doe v. Milan Mrakich*, Case No. 26PSRO0289).  On February 24, 2026, the Court denied Mr. Doe's request for a temporary restraining order.  Scott Decl. ¶ 6. *Doe v. Mrakich*, Feb. 24, 2026 Minute Order.  Before the matter could be heard on the merits, Mr. Doe dismissed the action.  *Id*. at Apr. 22, 2026 Request for Dismissal.  *Id*.

More recently, Mr. Doe has taken to targeting Mr. Mrakich's job.  On April 15, 2026, apparently in retaliation for Mr. Mrakich issuing a policy memorandum that Mr. Doe disagreed with, Mr. Doe sent an email to the entire West Covina City staff, of over 350 employees accusing Mr. Mrakich of "RICO and payroll fraud" in his prior role in a different City and also publicized a $10,616 stipulated judgment against Mr. Mrakich the resulted from a settlement in 12-year old sexual harassment matter.  Mrakich Decl. ¶ 9, Ex. 3.  The only purpose of this email was to attack and embarrass Mr. Mrakich for taking actions Mr. Doe did not like.  *Id*. ¶ 10.

On April 16, 2026, Mr. Doe wrote the City Attorney and demanded a "formal performance evaluation" of Mr. Mrakich including "Consideration of removal from the Acting City Manager position."  Mrakich Decl. ¶ 11, Ex. 4.  Again, this action appears to be in retaliation for taking actions Mr. Doe disagrees with rather than any legitimate complaint about Mr. Mrakich's performance.  *Id*.

On April 20, 2026, Mr. Doe wrote the City's Finance Director and demanded that she turn over all of Mr. Mrakich's credit card statements, apparently in support of a personal investigation into Mr. Mrakich.  Mrakich Decl. ¶ 12, Ex. 5.  When Mr. Mrakich replied to Mr. Doe, asked that he be treated "with the same respect and professionalism I show you," and explained that Mr. Doe's demand to the Finance Director was procedurally improper, Mr. Doe responded by reporting Mr. Mrakich to the California Department of Justice.  *Id*. (email copying Attorney General Rob Bonta and other officials).

///

///

///

### III.    <u>ARGUMENT</u>

Code of Civil Procedure 1987.1 provides a procedural remedy upon which an existing subpoena may be quashed entirely, modified or made subject to a protective order. (*Lee v. Swansboro Country Property Owners Assn.* (2007) 151 Cal.App.4th 575, citing *City of Los Angeles v. Superior Court* (2003) 111 Cal.App.4th 883, 888 [holding that a procedural remedy for a defective subpoena is generally a motion to quash under § 1987.1].)

Pursuant to section 1987.1, this Court has the authority either to quash the subpoenas, modify them, or order compliance with them upon terms set by the Court.  Section 1987.1(a) provides in pertinent part that "If a subpoena requires. . . the production of books, documents, or other things. . . at the taking of a deposition, the court, upon motion reasonably made . . . may make an order quashing the subpoena entirely, modifying it, or directing compliance with it upon those terms or conditions as the court shall declare, including protective orders.  In addition, the court may make any other order as may be appropriate to protect the person from unreasonable or oppressive demands, including unreasonable violations of the right of privacy of the person."

### A.    <u>Mr. Doe Demand for Mr. Mrakich's Testimony is Unreasonable and Irrelevant</u>

Mr. Doe's request to have Mr. Mrakich testify is simply to harass Mr. Mrakich.  It has no relevance to Mr. Doe's motion to enforce his subpoena against Mr. Shewmaker.

"Relevance" means the evidence has a "tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action[,]" including the credibility of a witness or hearsay declarant. [Ev.C. § 210 & Law Rev. Comm'n Comment thereto; *People v. Nelson* (2008) 43 C4th 1242, 1266, 78 CR3d 69, 88; *Donlen v. Ford Motor Co.* (2013) 217 CA4th 138, 148, 158 CR3d 180, 188; *D.Z. v. Los Angeles Unified School Dist.* (2019) 35 CA5th 210, 229, 247 CR3d 127, 142

Mr. Doe's motion for enforcement against Mr. Shewmaker relates solely to (i) statements Mr. Shewmaker allegedly made at a public City Council meeting on February 3, 2026, and (ii) posts Mr. Shewmaker allegedly made on Facebook on March 7, 2026 and March 20, 2026.  Mot.

at p.3 and Ex. B, C. ***The only evidence relevant to this hearing is what Mr. Shewmaker said or did on the alleged dates.***

West Covina's City Council meetings are all recorded, and videos of the meetings, in their entirety, are available online both through the City's website and its Youtube page. See https://www.westcovina.gov/193/Current-Meetings-Agendas and https://www.youtube.com/@WestCovinaCity. Mr. Shewmaker's Facebook posts are, presumably, available on Facebook. Indeed, Mr. Doe attaches those posts to his motion. Mot. at Ex. B, C.. None of the evidence required to demonstrate whether Mr. Shewmaker did nor did not violate the restraining order are within Mr. Mrakich's knowledge.

Mr. Doe' statement that Mr. Mrakich is a "proper…target" of his subpoena states only that Mr. Mrakich has a leadership role at the City. Such conclusory statements cannot support a subpoena. *Lee v. Superior Ct.* (2009) 177 Cal. App. 4th 1108, 1128–30 (insufficient statements of materiality barred enforcement of subpoena). Mr. Doe fails to explain how that role, or any of the knowledge related to it, holds any relevance to the question of whether Mr. Shewmaker violated the restraining order.

### B.    Mr. Doe Improperly Seeks City Records From Mr. Mrakich

While Mr. Mrakich is the Acting City Manager of West Covina, the Subpoena is not issued to him in his official capacity. Instead, it is directed to Mr. Mrakich personally, lists Mr. Mrakich's home address rather than the address of the City, and fails to mention Mr. Mrakich's position or title at all.

Almost none of the documents Mr. Doe seeks belong to Mr. Mrackich; they are City records. Mr. Mrakich, individually, has no legal right to them. Thus, they are not within his possession, custody, or control, and the subpoena is improperly directed to him. See, e.g. *Negro v. Superior Ct*. (2014) 230 Cal. App. 4th 879, 901 n7 (where subpoenaed party has no legal right to obtain information, they cannot be compelled to produce); *Soto v. City of Concord*, 162 F.R.D. 603, 620 (N.D. Cal. 1995) (party have legal right to obtain records sought); *In re Grand Jury Subpoena (Kent),* 646 F.2d 963, 969 (5th Cir.1981) ("The [employee's] subpoena, if upheld, would be illegal because it would direct her to produce documents not in her possession, custody,

or control. Because [employee] had mere access, her compliance with the subpoena would have required that she illegally *take* exclusive possession of [her employer's] documents and deliver them to the grand jury.") (emphasis in original)[1]

### C.    Mr. Doe's Document Requests Are Unreasonable and Irrelevant

None of the records Mr. Doe seeks are relevant to the hearing scheduled for May 7, 2026. Mr. Doe's subpoena seeks four categories of documents, each with multiple subparts.  None of them are remotely relevant to the motion set to be heard on May 7, 2026.

Two of Mr. Doe's are wholly improper, no matter the context.

Paragraph 14 of Mr. Doe's subpoena seeks all documents from December 1, 2025 through January 14, 2026 relating to *Mr. Doe's* ADA accommodations at City Hall.  Nothing relating to *Mr. Doe's* ADA accommodations is remotely relevant to the question of whether *Mr. Shewmaker* violated the restraining order, which is alleged to have occurred on February 3, 2026, March 7, 2026, and March 20, 2026, weeks after the time period specified in Mr. Doe's request.  Instead, Mr. Doe appears to be using this Court to engage in discovery for his pending litigation he filed against the City alleging that the City has violated his ADA rights.  This is improper and should not be countenanced.

Paragraph 10 seeks all of Mr. Mrakich's communications for a period of six weeks from December 1, 2025 to January 14, 2026 with multiple City officials and City staff *on any topic*. This request has no relevance to Mr. Doe's pending motion against Mr. Shewmaker to enforce the restraining order.  What Mr. Mrakich said or did weeks prior to the alleged violation is wholly untethered to the question of whether Mr. Shewmaker violated the restraining order.  This request is nothing more than an effort to obtain unfettered access to Mr. Mrakich's personal communications with these individuals including the West Covina Police Department, Mayor Leticia Lopez-Viado, Councilmember Tony Wu, and City staff unrelated to the present case.

---

[1] If, on the other hand, Mr. Doe intended to subpoena Mr. Mrakich in his official capacity, Mr. Doe failed to tender the required $275 fee required to obtain records relating to official duties.  Gov.C. §§ 68096.1.

BUCHALTER LLP
IRVINE

**SCOTT DECL. ISO MOTION TO QUASH SUBPOENA**

Mr. Doe's other two requests at least nod in the direction of relevance, referring to Mr. Shewmaker or the restraining order, but are nonetheless wholly irrelevant to the pending motion to enforce.

Paragraph 8 of the Subpoena requires Mr. Mrakich to produce all of his communication for a period of six weeks from December 1, 2025 to January 14, 2026—a period ending more than two weeks prior to the first alleged restraining order violation at issue in Mr. Doe's motion. The paragraph contains multiple subparts that include requests for City records that appear to relate to communications with Mr. Shewmaker and/or the City's knowledge of Mr. Doe's restraining order against him. What Mr. Mrakich said or did weeks prior to the alleged violation is wholly untethered to the question of whether Mr. Shewmaker violated the restraining order.

Paragraph 12 seeks all documents from December 1, 2025 through March 24, 2026 relating to the City's "planning," etc. relating to Mr. Shewmaker's presence at public meetings, apparently on the belief that the City is required to make some advanced plan. To be clear, the City is not a party to the restraining order against Mr. Shewmaker. It is Mr. Shewmaker, and Mr. Shewmaker alone, who is responsible for complying with the restraining order.

**D.      Mr. Doe's Conclusory Allegations of Relevance Cannot Support Production**

Throughout his subpoena, Mr. Doe inserts broad, conclusory, statements of why believes the documents are "relevant." But conclusory statements cannot support a subpoena. *Lee v. Superior Ct.*, 177 Cal. App. 4th at 1128–30.

For example, Mr. Doe alleges that the City's "planning" and other documents are relevant to "enforcement of a stay-away order in a fixed public space…" Subpoena ¶ 13. But, Mr. Doe's current motion does not allege that Mr. Shewmaker violated any "stay away" portion of the restraining order. The sole allegations are that Mr. Shewmaker made statements on February 3, 2026, and that he made Facebook postings on March 7, 2026 and March 20, 2026. Thus, Mr. Doe's conclusory statements cannot support his request.

While Mr. Doe makes various statements about the purported materiality of the documents he seeks, none of them relate to the issue of whether Mr. Shewmaker violated the

BUCHALTER LLP
IRVINE

BUCHALTER 109979897v2                                    7

**SCOTT DECL. ISO MOTION TO QUASH SUBPOENA**

restraining order through his comments on February 3, 2026, or his Facebook posts on March 7, 2026 and March 20, 2026.

Nor are there any steps or planning that could address the alleged breaches. Mr. Doe alleges that Mr. Shewmaker made certain oral statements on February 3, 2026 portion of the City Council meeting, and subsequently made two Facebook posts. The City cannot regulate Mr. Shewmaker's speech.

## IV.   CONCLUSION

For the foregoing reasons, Mr. Mrakich respectfully requests that the Court quash Mr. Doe's subpoena or, in the alternative, issue a protective order limiting the scope of any testimony or document production to the question of whether Mr. Shewmaker violated the restraining order on the dates alleged in Mr. Doe's motion to enforce.

DATED:  May 5, 2026                                    BUCHALTER LLP


By:  /s/ Roger L. Scott
                    ROGER L. SCOTT
                    Attorney for MILAN MRAKICH

Buchalter LLP
ROGER L. SCOTT (SBN: 247165)
18400 Von Karman Avenue, Suite 800
Irvine, CA 92612-0514
Telephone: 949.760.1121
Fax: 949.720.0182
Email: rscott@buchalter.com

Attorney for Third Party
MILAN MRAKICH

Electronically FILED by
Superior Court of California,
County of Los Angeles
5/4/2026 5:30 PM
David W. Slayton, Clerk of Court

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES—WHITTIER COURTHOUSE

| | |
|---|---|
| JOHN DOE,<br><br>    Petitioner,<br><br>  vs.<br><br>JOHN SHEWMAKER,<br><br>    Respondent. | CASE NO. 25PSR001328<br><br>**DECLARATION OF ROGER L. SCOTT IN SUPPORT OF THIRD PARTY MILAN MRAKICH'S NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA OR FOR PROTECTIVE ORDER**<br><br>[Notice of Motion and Motion, Memorandum of Points & Authorities, Declaration of Milan Mrakich, and Proposed Order filed concurrently herewith]<br><br>Date:<br>Time:<br>Dept: |

BUCHALTER 109994594v1

**SCOTT DECL. ISO MOTION TO QUASH SUBPOENA**

### DECLARATION OF ROGER L. SCOTT

I, Roger L. Scott, hereby declare as follows:

1.    I am an attorney licensed to practice law in the State of California and am a Partner at Buchalter, LLP, counsel of record for Third Party Milan Mrakich.  I am also litigation counsel for the City of West Covina in other pending matters filed by "John Doe" against the City and Mr. Mrakich.  I am readily familiar with the facts of these cases and, if called upon, could and would testify to the facts herein from my review of the case documents, or from my personal knowledge.

2.    On September 10, 2025, "John Doe" filed *John Doe v. The City of West Covina*, No. 25STCV26419 and sought emergency relief to stop the City Council from holding a censure vote and to seal records related to the case.  On September 10, 2025, the Court denied "John Doe's" *ex parte* application.  On September 12, 2025 "John Doe" sought reconsideration, and that too was denied.  After Mr. Doe's *ex parte* application was denied, he dismissed the matter.

3.    On or about March 10, 2026, "John Doe" filed a new action, *John Doe v. City of West Covina*, Case No. 26STCP00957.  This new action named individual City staff members, including Mr. Mrakich (Mr. Doe later dismissed the individual defendants).

4.    On March 13, 2026 and March 23, 2026, the Court heard two additional *ex parte* applications from Mr. Doe, seeking to stop a second censure vote, and to prevent the City from instituting policies to stop him from harassing City staff.  Both were denied.

5.    After Mr. Doe lost two subsequent ex parte applications, he re-fashioned his case as one for alleged violation of his ADA rights, and the matter was removed to federal court, *John Doe v. City of West Covina*, United States District Court for the Central District of California Case No. 2:26-cv-03659-MEMF-MBK.  Mr. Doe then filed a fourth *ex parte* application, purporting to enforce his ADA rights.  That application remains pending.

6.    In addition to his litigation against the City, on or about February 23, 2026, Mr. Doe filed a civil harassment restraining order against Mr. Mrakich, falsely claiming that Mr. Mrakich threatened to kill him.  *John Doe v. Milan Mrakich*, Case No. 26PSRO0289).  On February 24, 2026, the Court denied Mr. Doe's request for a temporary restraining order.  Before the matter could be heard on the merits, Mr. Doe dismissed the action.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**SCOTT DECL. ISO MOTION TO QUASH SUBPOENA**

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this 4th day of May, 2026 at Long Beach, California.


_____/s/ Roger L. Scott_____
Roger L. Scott

BUCHALTER 109994594v1                    2

**SCOTT DECL. ISO MOTION TO QUASH SUBPOENA**

Buchalter LLP
ROGER L. SCOTT (SBN: 247165)
18400 Von Karman Avenue, Suite 800
Irvine, CA 92612-0514
Telephone: 949.760.1121
Fax: 949.720.0182
Email: rscott@buchalter.com

Attorney for Third Party
MILAN MRAKICH

Electronically FILED by
Superior Court of California,
County of Los Angeles
5/4/2026 5:30 PM
David W. Slayton, Clerk of Court

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES—WHITTIER COURTHOUSE**

| | |
|---|---|
| JOHN DOE,<br><br>      Petitioner,<br><br>  vs.<br><br>JOHN SHEWMAKER,<br><br>      Respondent. | CASE NO. 25PSR001328<br><br>**DECLARATION OF MILAN MRAKICH IN SUPPORT OF THIRD PARTY MILAN MRAKICH'S NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA OR FOR PROTECTIVE ORDER**<br><br>[Notice of Motion and Motion, Memorandum of Points & Authorities, Declaration of Roger L. Scott, and Proposed Order filed concurrently herewith]<br><br>Date:<br>Time:<br>Dept: |

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BUCHALTER 109994593v1

**MRAKICH DECL. ISO MOTION TO QUASH SUBPOENA**

## DECLARATION OF MILAN MRAKICH

I, Milan Mrakich, declare as follows:

1.    I am employed by the City of West Covina as its Acting City Manager. I know the following facts to be true to my own personal knowledge and if sworn as a witness, I could and would testify competently to the truth thereof.

2.    I was duly appointed to the position of City Manager in May 2025. As City Manager, I serve as the Chief Executive and Administrative officer of the City of West Covina which entails the administration and daily operations of all City functions. In my role, I oversee the City's daily operations and departments, carry out the policy directives of the City Council, enforce municipal laws and regulations, and serve as the City's liaison to external agencies and organizations.

3.    In the course and scope of my duties, I attend all City Council meetings, absent any constraints or other extenuating circumstances. Through my attendance and participation in those meetings, I have personal knowledge of the proceedings of the City Council, including discussions, deliberations, and actions taken by the City Council.

4.    Mr. Doe is an elected City Councilmember in the City of West Covina.  Declaration The City Council publicly censured Mr. Doe for his ongoing threats and harassment against City staff based on the report of an independent investigator, whom Mr. Doe, along with the rest of the City Council, voted to retain.  A true and correct copy of the independent investigator's report is attached hereto as **Exhibit 1** (exhibits have been omitted because they are voluminous).  A true and correct copy of the City Council's Resolution of Censure against Mr. Doe is attached hereto as **Exhibit 2**.

5.    Mr. Doe has targeted me, personally, for harassment and retaliation.  Whenever I do anything Mr. Doe does not like—such as taking actions to protect City staff from his misconduct—he retaliates against me.

6.    On or about January 17, 2026, Mr. Doe instructed a process server to serve a subpoena at the home of my elderly parents waking them up and frightening them.  I am not aware of any legitimate purpose for this action other than to harass me.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BUCHALTER 109994593v1

1

**MRAKICH DECL. ISO MOTION TO QUASH SUBPOENA**

7.  When I later asked Mr. Doe why he did not simply serve me at City Hall, where he knows I work on a daily basis, Mr. Doe's sole justification was because he had a "right" to serve Mr. Mrakich where and when he pleased.

8.  On or about February 23, 2026, Mr. Doe filed a civil harassment restraining order against me, falsely claiming that I threatened to kill him.  See, *John Doe v. Milan Mrakich*, Case No. 26PSRO0289.  Before the matter could be heard on the merits, Mr. Doe dismissed the action.

9.  On April 15, 2026, I issued certain Communication Protocols that apply to all City Council regarding their communications with City Staff.  Apparently in retaliation, Mr. Doe sent an email to the entire West Covina City staff, of over 350 employees accusing me of "RICO and payroll fraud" in his prior role in a different City and also publicized a $10,616 stipulated judgment against Mr. Mrakich the resulted from a settlement in 12-year old sexual harassment matter.  A true and correct copy of Mr. Doe's April 15, 2026 email is attached hereto as **Exhibit 3**.

10.  I believe the purpose of this email was to attack and embarrass me for taking actions Mr. Doe did not like.

11.  On April 16, 2026, Mr. Doe wrote the City Attorney and demanded a "formal performance evaluation" of me including "Consideration of removal from the Acting City Manager position."  Again, this action appears to be in retaliation for taking actions Mr. Doe disagrees with rather than any legitimate complaint about my performance.  A true and correct copy of Mr. Doe's April 16, 2026 email is attached hereto as **Exhibit 4**.

12.  On April 20, 2026, Mr. Doe wrote the City's Finance Director and demanded that she turn over all of Mr. Mrakich's credit card statements.  When Mr. Mrakich replied to Mr. Doe, asked that he be treated "with the same respect and professionalism I show you," and explained that Mr. Doe's demand to the Finance Director was procedurally improper, Mr. Doe responded by reporting Mr. Mrakich to the California Department of Justice.  A true and correct copy of my April 20, 2026 through April 24, 2026 email chain with Mr. Doe is attached hereto as **Exhibit 5**.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on May 4, 2026, in West Covina, California.

_____

Milan Mrakich

BUCHALTER 109994593v1                                    3

**MRAKICH DECL. ISO MOTION TO QUASH SUBPOENA**

Buchalter LLP
ROGER L. SCOTT (SBN: 247165)
CLAIRE L. KATZ (SBN: 358999)
18400 Von Karman Avenue, Suite 800
Irvine, CA 92612-0514
Telephone: 949.760.1121
Fax: 949.720.0182
Email: rscott@buchalter.com
      ckatz@buchalter.com

Attorney for Third Party
MILAN MRAKICH

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES—WHITTIER COURTHOUSE

| | |
|---|---|
| JOHN DOE,<br><br>Petitioner,<br><br>vs.<br><br>JOHN SHEWMAKER,<br><br>Respondent. | CASE NO. 25PSRO01328<br><br>**[PROPOSED] ORDER GRANTING THIRD PARTY MILAN MRAKICH'S MOTION TO QUASH SUBPOENA OR FOR PROTECTIVE ORDER**<br><br>[Filed concurrently with Notice of Motion to Quash and Memorandum of Points and Authorities in support thereof; Declaration of Roger Scott; Declaration of Milan Mrakich] |

BUCHALTER LLP
IRVINE

1

**[PROPOSED] ORDER GRANTING MRAKICH'S MOTION TO QUASH SUBPOENA**

**TO THE COURT AND ALL PARTIES AND THEIR COUNSEL OF RECORD, IF ANY:**

The Motion to Quash pursuant to Code of Civil Procedure sections 1987.1 on the grounds that the requests are unreasonable and irrelevant filed by Third-Party Milan Mrakich ("Mrakich") came on regularly for hearing on _____, at _____ in Department ____ of the above-entitled Court, the Honorable Terrence Jones presiding. Counsel appeared for the parties.

Having considered the moving papers, any opposition or reply briefs and any oral argument presented, the Court hereby GRANTS the Motion to Quash John Doe's Subpoena to Milan Mrakich.

Alternatively, Mrakich's Motion for Protective Order limiting the scope of any testimony or document production is GRANTED.

IT IS SO ORDERED.

DATED: _____                    JUDGE OF THE SUPERIOR COURT

By: _____
                    HON. TERRENCE JONES

BUCHALTER LLP
IRVINE

2

**[PROPOSED] ORDER GRANTING MRAKICH'S MOTION TO QUASH SUBPOENA**

# EXHIBIT I

**Public-hostility context: Land Acknowledgement investigation excerpts
and William Elliott / Rosario Diaz materials**

Purpose / relevance:

Background showing the foreseeable retaliatory and humiliating context in which ADA
expenses were circulated publicly.



# JL GROUP, LLC
## WORKPLACE SOLUTIONS

INVESTIGATION
REPORT OF FINDINGS

IN THE MATTER OF:

***Land Acknowledgement Incident at Centennial Event***

***City of West Covina***

INVESTIGATED BY:

*Jeff Love, Esq.*
*Attorney Fact Finder*

*Jason C. Kravetz*
*Special Investigator*

## SCOPE OF INVESTIGATION

The scope of this investigation was to determine the following:

- What are the facts surrounding the land acknowledgement incident on Saturday February 18, 2023, at the Centennial/Spring Festival Event?

- Who authorized the land acknowledgment to take place and how was it put onto the schedule?

- Was the City Council informed about the land acknowledgement in advance?

- Why didn't the acknowledgment take place?

## EXECUTIVE SUMMARY

Question #1: **What are the facts surrounding the land acknowledgement incident on Saturday February 18, 2023, at the Centennial/Spring Festival Event?**

Assistant City Manager Roxanne Lerma lead the efforts with organizing the Centennial Celebration/Spring Festival in February of 2023. The schedule and programs for the event were finalized and printed a week prior to the event.

The celebration started with a Centennial Dinner on Thursday February 16th, which was attended by 460 people. The following day, a three-day outdoor festival began in the downtown area. This festival included informational booths, non-profit organizations, food vendors, carnival rides and entertainment.

On the day the outdoor festival began, Councilmember Brian Tabatabai contacted Lerma to inquire about the inclusion of a local indigenous group in the Centennial/Spring Festival Event. Lerma asked clarifying questions about what he was proposing to which Tabatabai explained that local resident Jamie Rocha had reached out and offered to perform a land acknowledgement ceremony. He also stated Rocha was requesting booth space for her non-profit organization.

Although Rocha was not directed through proper channels to become a vendor or event participant, Lerma did what she could to accommodate Tabatabai's request.

Before moving forward, Lerma reached out to Rocha to ask about the ceremony and was told that it was a blessing by the Gabrielino Shoshone Tongva Kizh Native American Tribe to pay tribute to the native land and animals.

Later the same evening, Lerma reached out to Rocha and offered time for the ceremony on Saturday at 6:30 PM. She also followed up with an offer for booth space after one of the scheduled participants cancelled. Rocha accepted both offers.

4

On Saturday evening, Rocha arrived near the main stage at 6:00 PM and met up with Councilmember Tabatabai.

Shortly thereafter, other council members discussed the land acknowledgement, openly questioned, and expressed disapproval while debating the matter. Rocha overheard and participated in some of the discussions.

Eventually the Mayor gave the approval to move forward with the ceremony, but Rocha was uneasy about continuing and pulled out of the event entirely.

Question #2: **Who authorized the land acknowledgment to take place and how was it put onto the schedule?**

As the event organizer, Assistant City Manager Roxanne Lerma had the authorization to approve the participation of Jamie Rocha.

Jamie Rocha was not on any of the pre-printed schedules as those were produced a week prior.

Question #3: **Was the City Council informed about the land acknowledgement in advance?**

No. Councilmember Brian Tabatabai was aware the land acknowledgement ceremony was going to take place on Saturday evening as he was intending to participate. He showed up with his family and met with Ms. Rocha and her family prior to the event.

Councilmember Tabatabai did not inform any of the other council members as he didn't feel this was the type of situation where notifications needed to be made. He opined that councilmembers are not told in advance about specific religious denominations who perform invocations, and felt this was similar to that.

Assistant City Manager Lerma did not specifically notify councilmembers as she was tasked with running the Centennial/Spring Festival Event and minor details were not being pre-approved by councilmembers.

No other cultural, racial, ethnic, or religious portions of the event planning process had necessitated a pre-approval, so the inclusion of a Native American blessing wouldn't be any different.

Question #4: **Why didn't the acknowledgment take place?**

Unexpectedly, Assistant City Manager Roxanne Lerma could not be present for the Saturday evening kickoff. In her place, she had Recreation Services Supervisor Vanessa Ibanez run the events for the day. Lerma briefed Ibanez and was in constant contact throughout the day.

On Saturday evening at approximately 6:15 PM, Ibanez made her way towards the main stage area and met with Jamie Rocha and Councilmember Tabatabai. Councilmember Wu approached and asked, "W*hat was going on?*" and "W*hy was the council assembling near the stage?*" Ibanez

5

replied that "*Brian was doing a land acknowledgement ceremony.*" Councilmember Wu immediately stated this was not the time or place for a political statement. He asked Ibanez "W*ho approved this?*" and "W*hy wasn't the council told about this?*"

Ibanez immediately called Lerma and expressed that Councilmember Wu was upset. This caused Lerma to call the City Manager to explain what was going on.

This was the first time the City Manager heard about the land acknowledgement ceremony. He stated these were details purposely not being run through him, because he entrusted Lerma to put the event together. Because of this delegation of duties, he provided tacit approval to her event planning process and supported her decision to be inclusive with the land acknowledgement ceremony.

Over the next several minutes, the City Manager made calls to Councilmember Wu and to Mayor Diaz. Wu did not answer.

When Mayor Diaz answered, the City Manager inquired whether this was an event that he and his staff were supposed to be running. She agreed that it was a staff event, and said she would go over to the stage to see what was going on.

In the meantime, the City Manager texted all five councilmembers separately and said that he spoke with the Mayor, and that the land acknowledgement was approved by him and would be taking place.

When Mayor Diaz arrived near the stage, she met with Councilmembers Wu, Cantos and Tabatabai. All expressed their various opinions about the land acknowledgement and whether it should be taking place. Councilmember Wu said this was too political and shouldn't be occurring at a celebratory event. Wu told the Mayor it was "*her decision to make,*" before walking away from the group and not returning.

The Mayor then asked Councilmember Tabatabai to read the statement he intended to make during the ceremony. Diaz and Cantos inquired about softening a portion to which Tabatabai agreed.

Land Acknowledgement Statement:

> *The City of West Covina acknowledges the indigenous peoples as the original caretakers of the lands that we now reside on. We acknowledge that the City of West Covina is located on the traditional, ancestral and unceded territories of the Gabrielino Shoshone Tongva Kizh nations. We not only recognize the importance of acknowledging our ancestral history of the City, but to acknowledge that the indigenous communities still thrive here till this day. While the history might be painful and violent to recall, it is not only necessary, but vital, to acknowledge this history, so history will not repeat itself.*

6

At this point, Rocha and her mother had already been watching and listening from a distance. They heard most of the back and forth between Diaz, Cantos, Tabatabai and sometimes Wu. They were also observing the body language of the participants.

After the councilmembers finished speaking, Mayor Diaz approached Jamie Rocha to ask about the process involved with the land acknowledgement blessing.

Rocha explained the ceremony, but also said she was aware that Councilmember Wu opposed the ceremony. Rocha commented that she was personally offended the ceremony was being deemed a political statement as she felt it marginalized indigenous people.

Diaz then compared Rocha's inclusion as if "[*Rocha] was showing up at [Diaz's] quinceanera to celebrate her own 15th birthday.*"

Rocha became emotional from this comment, at which point Mayor Diaz told her to go ahead with the ceremony and that she approved of it. Rocha said she was too emotional to move forward as the ceremony is supposed to come from a place of peace and happiness and pulled herself from the event as well as from her booth.

Ninety minutes later, Rocha posted on Facebook. Within a day, the story had circulated through many other social media sites and a couple of the councilmembers were immediately branded as racists.





*Photos obtained from Facebook group "West Covina Forum."*

Comments:

This independent investigation found the following:

- Rocha was added at the very last minute after Councilmember Tabatabai requested an accommodation from Assistant City Manager Roxanne Lerma.

7

- Lerma was under no direction to obtain pre-approvals from the City Council for any of the performers, guests or vendors for the event.

- Prior to planning this event, she was tasked with being diverse and inclusive for all cultural, racial, religious, and ethnic groups within West Covina and had already brought Chinese Dragon Dancers, Folklorico Performers, Filipino-American and Latin groups into the event.

- Only Councilmember Tabatabai was aware of the land acknowledgement prior to the event.

- Nothing found during the investigation indicated that the other councilmembers were required to be told in advance, but Lerma had planned on being there to facilitate the ceremony.

- Councilmember Tabatabai agreed to alter the land acknowledgement statement after discussing it with Mayor Diaz and Councilmember Cantos.

- Ultimately, Jamie Rocha was given permission by the Mayor to perform the ceremony, but too much back and forth about her inclusion tainted her opinion about the invitation and she declined.

- Two councilmembers voiced concerns that the City Manager told them he approved of the ceremony, but then allegedly told them he was unaware of it during an agenda meeting the following Tuesday. The investigation determined this was a "play on words" as the City Manager "approved" because he gave direction to the Assistant City Manager to plan the event. He had the trust that Lerma would put together a great three-day festival. He "officially" became aware when Lerma called him on Saturday evening to tell him what was happening.

This independent investigation found no evidence that the discussions or decisions were based upon any implicit bias or overt discrimination against Jamie Rocha or her tribe.

**8**

## SOURCE OF THE COMPLAINT

    A.  Rosario Diaz
        Mayor
        City of West Covina

## ACCUSED/FOCUS EMPLOYEES

    Not applicable for this investigation.

## WITNESSES

    B.  Jamie Rocha
        Resident/Student/Non-Profit Employee
        City of West Covina

    C.  Eileen Rocha
        Jamie Rocha's Mother
        West Covina Resident

    D.  Phil Perez
        DJ for Centennial Event/Spring Festival
        West Covina Resident

    E.  Roxanne Lerma
        Assistant City Manager
        City of West Covina

    F.  Vanessa Ibanez
        Recreation Services Supervisor
        City of West Covina

    G.  David Carmany
        City Manager
        City of West Covina

    H.  Letty Lopez-Viado
        Councilmember
        City of West Covina

    I.  Ollie Cantos
        Councilmember
        City of West Covina

10

J.  Brian Tabatabai
Mayor Pro-Tem
City of West Covina

K.  Celenia Calderon
Councilmember Tabatabai's Spouse/Educator
West Covina Resident

L.  Tony Wu
Councilmember
City of West Covina

## CREDIBILITY OF THE WITNESSES

The analysis of the credibility of the witnesses is an important aspect of a fact-finding investigation. As an accepted rule of evidence, a fact finder can disregard the statements of a witness who has been found to have provided false or unreliable information during their testimony in a matter. Those witnesses' statements can be disregarded in their entirety and not believed unless there is compelling evidence to conclude that individual statements otherwise are true.[1]

Concerning the witnesses' statements, this fact finder considered:

A.  The witness' demeanor while providing a statement and the manner in which they provided the statement.

B.  The character of the witness' statement.

C.  The extent of the witness' capacity to perceive, to recollect, or to communicate any matter about which they gave a statement.

D.  The extent of the witness' opportunity to perceive any matter about which he/she gave a statement.

E.  The witness' character for honesty or veracity or their opposites.

F.  The existence or nonexistence of a bias, interest, or other motive.

G.  A statement previously made by the witness that is consistent with their statement during the fact-finding investigation.

H.  A statement made by the witness that is inconsistent with any part of their statement during the fact-finding investigation.

---

[1] See *California Civil Jury Instruction* Section 5003.

11

I.    The existence or nonexistence of any fact given in statements by the witness.

J.    The witness' attitude toward the fact-finding investigation in which they gave a statement or toward the giving of a statement.

## *Credibility Discussion*

### JAMIE ROCHA

Ms. Rocha was determined to be a credible witness in this matter. She asked to host a booth for her non-profit and to participate in a land acknowledgement ceremony. Ms. Rocha felt the Council and Staff were unaware of what a land acknowledgment entailed and attempted to explain it at the last moment. She was emotional in her recitation of events and appeared to be honest and credible.

### EILEEN ROCHA

Eileen Rocha is the mother of Jamie Rocha. She was interviewed over the phone and found to be credible and forthcoming. She was upset about the treatment her daughter received, and her statements were tempered with firsthand accounting, along with comments she has heard from other people since the February 18th event.

### PHIL PEREZ

Mr. Perez was found to be a very credible witness in this matter. He presented the facts as he knew them and wasn't involved in the decision making for whether Jamie Rocha was allowed to take the stage for the land acknowledgement ceremony.

### ROXANNE LERMA

Roxanne Lerma was a very credible witness in this matter. As the organizer for this event, it was expected that she would be more defensive about the public attacks on her team. Instead, she was methodical and organized with her thoughts and opinions about the event and what transpired. There was no part of the interview where she was misleading or overstating to the staff's benefit.

### VANESSA IBANEZ

Recreation Services Supervisor Vanessa Ibanez was a friendly person to interview and determined to be a credible witness. She appeared to be forthcoming, but a little hesitant and reserved at times. Ibanez kept a notebook which contained all her memorialized details from the incident, and she used it in her verbal testimony. At no time did she appear to be deviating from the truth as she knew it, but she gave the impression that some of her comments were tempered.

### DAVE CARMANY

City Manager Carmany was found to be a credible witness in this investigation. He assisted with providing text messages and phone records which showed his constant involvement in the attempt to keep the land acknowledgement ceremony moving forward. He said this was approved at

12

Roxanne Lerma's level and did not need Council support or approval since he and his team were the organizers of the event.

**LETTY LOPEZ-VIADO**

Councilmember Lopez-Viado was determined to be a credible witness in the investigation. While not present when the land acknowledgement ceremony was about to take place, she became aware of it when she received a call from Councilmember Tony Wu and a text from the City Manager.

**OLLIE CANTOS**

Councilmember Cantos was determined to be a credible witness in this investigation. He was present during the majority of this incident and provided his version of events. At no point in the interview did he appear to be downplaying or misconstruing anything which occurred.

**BRIAN TABATABAI**

Councilmember Tabatabai was found to be a credible witness in this investigation. He provided his version of how Jamie Rocha was invited to the Centennial Event and the aftermath of her interactions with the other councilmembers. He felt that the outcome of this event had less to do with the land acknowledgement and more to do with the fact that he was the person presenting it.

**CELENIA CALDERON**

Calderon was determined to be a credible witness in the matter. She is the spouse of Councilmember Tabatabai and witnessed some of the interactions between the councilmembers and Jamie Rocha on Saturday February 18th.

**TONY WU**

Councilmember Wu was a credible witness in this matter. He was not aware that a land acknowledgement was about to take place, and admittingly said he felt this was not the right time or place since they were celebrating the Centennial Celebration. His comments appeared to be truthful and forthright as he was upset that the Council had not approved this, nor been notified in advance by staff.

**ROSARIO DIAZ**

Mayor Diaz was also found to be a credible witness in this investigation. She gave an emotional accounting of the evening, and explained how she blindly walked into this, and eventually tried to resuscitate it near the end. She felt the fallout from the Jamie Rocha supporters was simply unfair and she desired an investigation to determine the facts.

## SUMMARY OF INTERVIEWS

### *Summary of Interview with Jamie Rocha*

On March 1, 2023, this investigator conducted an audio recorded interview with Jamie Rocha inside a conference room located in the Human Resources Department in the City of West Covina.

This investigator began the interview by requesting Rocha provide her version of events as it pertained to the Centennial Celebration and the Land Acknowledgement Ceremony which was added to the Saturday evening event.

Rocha explained that she has been a lifelong resident of West Covina and a member of the local tribal region called Gabrielino Shoshone. Part of her goal is to educate others about the native American ancestry, and she looks for events where she can talk about that, in conjunction with the non-profit that she works for called Native Ways 2 College. This is an organization which assists Native Americans teenagers with a pathway to college.

Rocha became aware that the City was hosting a three-day Centennial Celebration which included something similar to a street fair. She started looking through social media and came across an article from the Mt. Sac college paper. The article contained an interview with Councilmember Brian Tabatabai where he discussed West Covina and indigenous history. She was excited to see a councilmember talk about this.

Rocha went to Tabatabai's Facebook and left a message identifying herself and asking how she could get involved. He responded in a positive way, and they arranged to have a telephone call the following day at 1:00 PM.



*Facebook string provided by Councilmember Wu*

During this call, Rocha explained her heritage and attachments to West Covina as a member of the Gabrielino Shoshone tribe.

14

The below social media post on Facebook was made less than 90 minutes after the land acknowledgment was due to take place.



**Jamie Nicole Rocha**
18 February at 20:04 · 🌐

\*please excuse the typos. I wrote while in a very emotional state\*

I write this with a sad and upset heart. But I am also angry.

I was invited last minute to represent my nation by the wonderful Mayor Pro Tem / Councilmember Brian Tabatabai to the City of West Covina's 100th birthday celebration. Mr. Tabatabai not only was ecstatic to have me there but made it possible for me to table for Native Ways 2 College to outreach.

I was also invited to do a prayer and a traditional song right after a land acknowledgement. This was last minute but I thought this was welcomed since there were cultural performances as well as a pastor preaching and performing a prayer the night before.

When the time came for the land acknowledgement, I was ready to go with Mr. Tabatabai. Even did protocol by doing a blessing with sage for the both of us.

I was then introduced to Mayor Rosario Diaz and she questioned me what I was planning on doing. I told her about the acknowledgement and the rest. Pretty standard stuff.

Immediately, I knew something was going on. When Mr. Tabatabai went over to the rest of the council to discuss the plans, he was IMMEDIATELY met by resistance by Councilmember Tony Wu. I couldn't hear the discussion but by his mannerisms and facial expressions, he was NOT happy that a land acknowledgement was about to take place. He walked away angrily and even ranted to WC employees by the tent. He didn't even have the DECENCY to come and talk to me.

Apparently a land acknowledgement was "too political."

You read that right. Acknowledging the history and existence of a community is POLITICAL.

This was doubled down by West Covina mayor Rosario Diaz. She compared it to wanting to celebrate my sweet 16 during a quinceanera. I'm not kidding. She really said that. She also said that this was about West Covina and the 100 years of its history.

But she forgets that Indigenous history IS West Covina history. We didn't cease to exist once it became WC. Why are we not allowed to showcase our culture but it was okay for a church to come on and lead a Christian prayer?

Diaz wanted to compromise and let me do it after she saw that I was upset. But it was too late. You can't go into prayer mad. You can't go in with a negative heart and bad energies. I told her no.

I feel not only discriminated against but once again have my culture erased and ignored. The city that I have been a life long resident of has massively betrayed my trust.

I will write more later when I calm down.

19

The below social media posts were edited versions made by Rocha after posting her original comment above. Also attached to the social media post is a response from Councilmember Tabatabai.





Indigenous History Will Not Be Erased

**Jamie Nicole Rocha**
3h · 🌐

But she forgets that Indigenous history IS West Covina history. We didn't cease to exist once it became WC. Why are we not allowed to showcase our culture but it was okay for a church to come on and lead a Christian prayer?

Diaz wanted to compromise and let me do It after she saw that I was upset. But it was too late. You can't go into prayer mad. You can't go in with a negative heart and bad energies. I told her no.

I feel not only discriminated against but once again have my culture erased and ignored. The city that I have been a life long resident of has massively betrayed my trust.

I will write more later when I calm down.

But PROPS to Councilmember Brian Tabatabai and his wife for not only fighting for me to be there but also standing up to his colleagues for what was right. I will always have his back.

**Councilmember Brian Tabatabai West Covina District 1**
Posted by Brian Tabatabai
Just now · 🌐

Tonight we as a city failed. Prior to tonight's program, a member of the Gabrielino-Shoshone Tribal Council and a descendant of one of the original families was scheduled to give a land acknowledgment, a small blessing on the city and share some history. Due to the objection of a Council Member and some unfortunate discussion the ceremony did not occur. I extend my deepest apologies to the Gabrielino-Shoshone, Tongva and Kizh Nations and will continue to work to bring our communities together.

👏 👏 👏

## *Summary of Interview with Eileen Rocha*

This investigator conducted a recorded phone interview with Eileen Rocha on March 30, 2023.

Rocha was asked to provide a statement regarding what she witnessed on Saturday February 18th.

She explained that her daughter Jamie was at the festival all day and running her booth. Eileen and her mother arrived around 4:00 PM to watch Jamie do the land acknowledgement at 6:30 PM.

Near the beginning of the land acknowledgement ceremony, Jamie came over to her mother and said, "*Mom, he is really mad*," pointing towards Tony Wu. Eileen inquired why he might be mad, and Jamie told her he said it was "*too political*." She said it just "*got ugly*" at that point.

When Wu walked away, Jamie and her mother approached the remaining councilmembers, Diaz, Cantos and Tabatabai. There was a conversation about the land acknowledgement and Mayor Diaz was asking about the blessing. Eileen said her daughter was so upset at this point and began to cry. In the end, the Mayor told her she "*could go do her thing*."

Eileen was so upset herself that she left the area and started to look for Tony Wu. She was unable to find him and returned to the stage area.

```
Eileen Rocha:   As a mother, I was really mad…They were busy with the
                other things like the dragons, and I couldn't understand
                why Jamie couldn't do it…They were trying to bring Brian
                down with them and kept saying that "nobody told us what
                was going on."
```

Later in the interview, Eileen Rocha was asked to express why she felt Tony Wu was upset. She told this investigator that she could see him swinging his arms and hands around. She was unable to specifically hear what he was saying because she and Jamie didn't rejoin the remaining councilmembers until he left. When they did walk over, that's when the Mayor made a comment about Jamie trying to have her own 15th birthday during the Mayor's quinceanera.

Since the incident, Eileen said that the Mayor's husband, Bill Elliott, has been posting negative things about the Rocha's on social media and alleging that they are not a real tribe. She said she is thinking about obtaining a restraining order against him.

## *Summary of Interview with Phil Perez*

This investigator interviewed Phil Perez via phone on March 30, 2023. This call was recorded.

Perez explained that he had been hired by the City of West Covina to perform DJ and Master of Ceremony duties at the Centennial Event/Spring Festival. He was set up on the side of the stage and played music in between any of the various acts that were taking the stage. It was his job to run the flow of the program which had been provided to him on Tuesday February 14th by Vanessa Ibanez.

22

Lerma said that she was contacted by Mayor Pro-Tem Tabatabai on the afternoon of Friday February 17th, he said, "*I know this is super late notice, but do you have any booth space?*" She told the Mayor Pro-Tem that they were sold out, but "*what are you looking for?*"

He said he was reaching out on behalf of the Gabrielino Shoshone Nation on behalf of a local resident named Jamie who also has an associated non-profit.

```
Tabatabai:      I wanted to see if I could get her some booth space.

Lerma:          It's completely sold out.

Tabatabai:      I understand. This is completely last minute.
```

At this point Lerma told him that if someone does not show up, and it is a similar type of booth (information for information), then she can see about putting her in.

```
Tabatabai:      I understand Roxanne. I also wanted to ask about her doing
                a blessing.

Lerma:          What kind of a blessing?

Tabatabai:      A land acknowledgement. It's a type of blessing, like an
                invocation.
```

Lerma said that she told Tabatabai that she needed more information about this because land acknowledgements were not her expertise, and in her previous workings with indigenous groups, it was pretty specific and there are certain things that take place. He responded that he did not know all the ins and outs and said to give Rocha a call to find out. Tabatabai then provided Jamie Rocha's name and number to Roxanne Lerma.

Lerma followed up with a phone call to Rocha that Friday afternoon. She said that Rocha was very pleasant and walked her through the land acknowledgement and explained that it was a blessing for the land and animals and similar to an invocation. She said the acknowledgement was very positive and a good start for an event.

Lerma made no promises at this point and said the event was starting in a few hours. She told Rocha that she needed to speak with her staff about the land acknowledgment and only would be able to offer a booth if a "*like for like*" cancelled.

Later that evening, Lerma did receive a cancellation and she sent a text to Rocha indicating that she could come on Saturday. She also sent Rocha the staff contact information to get started.

After Lerma spoke with her staff, she said that she was mindful of the pre-scheduled activities, but also mindful that she was told this event was supposed to be about inclusivity. Thus, adding an indigenous group kept with this platform.

Since the pre-planning for this event was centered around diversity and inclusivity, some of the entertainers and cultural groups consisted of:

25

- Ballet Folklorico
- Japanese American Group
- Filipino-American Group
- Belly Dancing
- Chinese American Dragon Dancers
- Various Latin Groups



*Photos from Tony Wu Facebook

In the end, Lerma made a last-minute decision to include the Gabrielino Shoshone group for the land acknowledgement at 6:30 PM on Saturday evening.

```
Investigator:   Did you take any action to remind the Council this might
                be happening?

Lerma:          On Thursday, I sent an email with the rundown for the
                times to be where, at the festival. Since I wasn't there
                on Saturday, I sent a text message to them telling them
                that if they are interested in being there, to be
                there…Normally when I am present, I go looking for them
                or I call them.

Investigator:   Do you put them all on a group text or do you do
                individuals?

Lerma:          I do individuals.

Investigator:   Did your staff member Vanessa, who was there, get back
                to you to tell you how many had made their way to the
                stage?

Lerma:          Yes…She and I had been communicating most of the day on
                Saturday…She texted me around the time the
```

> acknowledgement was going to take place…She told me how
> many staff members were present…

Lerma then read the text messages between she and Vanessa Ibanez:



| Ibanez | Lerma |
|---|---|
| 6:01 PM-We are just waiting for the Mayor Pro-Tem to do the land acknowledgement. | |
| | Cool |
| Then they will get introduced | |
| | Thanks |
| You're welcome. Will you be able to text the Council and have them come to the stage. I don't know where everyone went. | |
| | Yes |
| Thank you | |

Lerma:    Later on, I received a call from her, and she was upset
          because she said the councilmembers were yelling at her,
          that the Mayor Pro-Tem's wife was yelling at her, and
          that they were arguing. One group was saying to take
          away the microphone while another group was telling her
          to give her the microphone…She said she was concerned
          about her job, and I told her to remove herself from the
          situation.

Lerma ended up contacting her manager, David Carmany, to tell him what was going on. Carmany told Lerma that he ended up trying to call Councilmember Wu, but Wu didn't answer. Carmany said he also sent a text message to Mayor Diaz telling her that this had been approved.

In another set of text messaging with Vanessa Ibanez, Lerma relates this information, but Ibanez responds, "*They don't want to do it*." Her last text to Lerma was, "*OMG, they are so mad*."

During the earlier phone call, Ibanez had told Lerma that there was something on Tabatabai's phone which appeared to upset the group. She said it had to do with a statement that Tabatabai was showing the group.

27

```
Lerma:            When I had spoke to Jamie, she walked me through…She
                  talks about nature…She talks about nature and
                  individuals and how we are all together…A positive
                  blessing because of the City Centennial.
```

Lerma also said that Mayor Pro-Tem Tabatabai called her in the midst of this alleged disagreement and said, "*What is going on? Are we doing this or not*?" She said he was upset, and she told him to hold on as she was getting information from Vanessa and that she was caught in the middle. He agreed that she was being yelled at and caught in the middle. He then responded, "*What should I do?"* Lerma told him that she encouraged him to work this out with his colleagues and speak to them. His tone and demeanor changed at that point, and "*we got off the call*."

Another staff member named Steve Zaragosa also texted Lerma and said that Councilmember Wu was upset over "*something to do with politics*." Lerma said that something triggered Zaragosa to tell her about this as she wasn't in regular contact with him throughout the day.

```
Investigator:     Had any other councilmembers contacted you about this
                  three-day event to ask for any other waivers?

Lerma:            Yeah. Not so much as waivers as other accommodations.
                  Councilwoman Lopez-Viado had asked if she could have
                  additional booth space for her Film It West Covina
                  group, which is another non-profit organization…so we
                  get requests from City Councilmembers and as staff, we
                  try to accommodate those requests when we can…When you
                  honor one councilmembers request, it puts you in a tough
                  spot if you don't honor another councilmembers
                  request…Until distinctions are made, it puts staff in a
                  precarious position.

Investigator:     I can't imagine this is the first, or last time, you
                  have received councilmember requests for these events.

Lerma:            I'll give you an example…Whether it is for additional
                  booth space, or they recommend certain entertainment or
                  they make recommendations for certain groups to
                  contact…I'll give you another example; the Summer
                  Concerts. The Mayor has a friend in a band, and he will
                  contact us to see if there is any availability and
                  cc'ing the mayor on those emails.

Investigator:     In this process, nothing was done out of the ordinary?
                  If somebody had not cancelled, she wouldn't have been
                  given the booth space?

Lerma:            Exactly.
```

She went on to explain that Councilmember Wu had recommended a Chinese American Dragon Group which also entertained at the Centennial event and last years' spring festival.

```
Investigator:     Did any of these groups get vetted before the event?
```

28

Lerma:          Some of these groups have worked with the City before…If
                there is a group we haven't included before, we want all
                backgrounds represented. It makes the spring festival a
                little more special in that sense and to learn about the
                other cultures.

The interview concluded with Lerma explaining that she made it to the Saturday night event after the 6:30 PM land acknowledgment was due to take place. She found Councilmember Lopez-Viado and asked her if she had spoken to any of the other members. Lopez-Viado said she did speak with Councilmember Wu and Mayor Diaz. She expressed that they were upset because this was supposed to be a positive event and there was something in the statement that Tabatabai showed them which was negative. They felt it wasn't appropriate for a city celebration.

## *Summary of Interview with Vanessa Ibanez*

On Thursday March 9, 2023, this investigator conducted an audio recorded interview with Recreation Services Supervisor Vanessa Ibanez inside a conference room located in the Human Resources Department in the City of West Covina. Vanessa Ibanez was the only staff member present during the land acknowledgement which was due to take place on Saturday evening February 18th. She was also extremely familiar with the registration process for the booth vendors and the layout for the event.

The interview began with a request for Ibanez to explain the series of events which took place that day.

Ibanez said that Lerma had called her on Saturday morning to explain that Rocha would be showing up for booth space and that she would be doing a land acknowledgment at 6:30 PM. Ibanez greeted Rocha when she arrived and went through the program with her.

Prior to 6:30 PM, Rocha showed up near the stage, but Ibanez didn't see any of the councilmembers, so she asked Lerma to text them as a reminder.

Ibanez then noticed that Councilmembers Wu and Cantos made their way to the stage area just before Mayor Tabatabai arrived. Tabatabai knew Jamie Rocha so he walked over to greet her, and I saw "*some type of blessing*" taking place.

Ibanez said that Wu came over to her and said, "*what are we here for*?" Ibanez told him there was going to be a land acknowledgement and he instantly became upset. He started saying, "*What is going on. What is this land acknowledgement?"* Then the Mayor came up and started asking the same questions. Ibanez explained what it was, but didn't know what it consisted of.

Ibanez continued by saying that "*Tony was upset and said this is too political to be occurring at a City Centennial celebration.*"

Ibanez:         Ollie and Rosario agreed that it was too political for
                this celebration…I stepped away and called Roxanne to

**29**

> tell her they weren't happy and that they felt it was too political…She told me she was going to call the City Manager and have him contact them…I know it happened because Tony showed me his phone and said, "Look, the (expletive)City Manager is telling me this needs to go on."

Transcript of the text from City Manager Carmany to Councilmember Tony Wu:



| City Councilmember Tony Wu | City Manager David Carmany |
|---|---|
| | Good afternoon. There will not be a closed session meeting on February 21st. |
| | I talked to Mayor Diaz. Told her my decision is this:<br><br>The GABRIELINO-TONGVA INDIAN TRIBE is to proceed as part of the planned program. |
| None of you are here and put this thing without our approval. I have no part of this and you can do anything you want. I am going home. | |
| | Okay understand |
| Mayor overrode your decision. | |
| No political statement in our centennial celebration | |

*Text from City Manager to Councilmember Wu that was shown to Ibanez

Ibanez also became aware that Roxanne Lerma and Brian Tabatabai were having a side phone conversation about the position this was putting Roxanne's staff in. Ibanez felt caught in the middle and Roxanne Lerma was attempting to mediate the situation over the phone.

When the call ended, Ibanez saw Tabatabai walk over to his council colleagues and heard him read the land acknowledgement statement from his phone. She said the other members *were not happy.*" and that there were some statements about violence and stolen land. They began telling Tabatabai that they didn't feel this was appropriate for a celebration.

> Ibanez:    Tony then came to me and said this should be the Mayor's decision and the Mayor is the one that decides these things, if this is going to happen.

They all continued talking about this while in their group. She said Wu continued to be upset and then walked away from the group. He went over to the City employee tent and said a few words before leaving.

Ibanez removed herself from the situation, but noticed Jamie Rocha crying.

She said she was in between a "*rock and a hard place*" and it didn't get better when Councilmember Tabatabai's wife came over and started yelling at her. She was saying things like, "*Is this thing going to happen. Where is Roxanne.*"

Ibanez said the Mayor was calm throughout the situation. She felt as if the Mayor and Councilmember Cantos were trying to understand what the land acknowledgement was about. While against it, they asked questions of Jamie and Brian Tabatabai.

```
Investigator:    Did anyone come over and start yelling at you like this
                 was your fault?

Ibanez:          I didn't feel like they made me feel like that. Tony was
                 very expressive. It's just how he expresses himself. He
                 was yelling, "this is too political. The Mayor needs to
                 make these types of decisions." Like when he showed me
                 his phone and the text from the CM and said "f'ing CM,
                 look at what he is telling me." Just at that point, but
                 like I said, he ended up leaving.
```

### *Summary of Interview with David Carmany*

This investigator conducted an interview with City Manager David Carmany on April 3, 2023. Since the City Manager was aware of the nature of this investigation, he was asked to recite his version of events as he knew them.

Carmany explained that the staff, specifically Assistant City Manager Roxanne Lerma, was tasked with putting the three-day Centennial Celebration/Spring Festival together. Not only did it include an outdoor event with carnival rides, entertainers, and vendors, but it was also kicked off by a Thursday evening Centennial dinner which was attended by 460 people. From the onset of the planning, Carmany said it was Lerma's event to plan and he stayed out of the details. He had every faith that an exceptional event would come out of the planning process.

After the Thursday dinner and the Friday evening festival opening, Carmany had pre-arranged plans on Saturday evening in Pasadena. His intention was to go to the festival after his function.

A little after 6:00 PM on Saturday, he said his "*phone started blowing up*" and he had to remove himself from his dinner table on 4-5 occasions. The initial call came from Roxanne Lerma who told him that something was going on at the festival and that a councilmember was upset about a land acknowledgement prayer which was supposed to occur at 6:30 PM. Lerma told Carmany that

The text and transcription below are between City Manager Carmany and Councilmember Lopez-Viado regarding the Gabrielino-Shoshone tribe performing the land acknowledgement blessing on Saturday February 18th.

Transcript of Text:

| Councilmember Letty Lopez-Viado | City Manager David Carmany |
|---|---|



> I talked to Mayor Diaz. Told her my decision is this:
>
> The GABRIELINO-TONGVA INDIAN TRIBE is to proceed as part of the planned program.

> But no history speech right? And no talk from Tabatabai?

> We already got a taste of his speech on the first day when all council spoke. Even though we celebrated 100 years, he spoke about 1,000 years and this land belonging to them, etc. I don't want him to speak with them at all. We don't want any surprised talk.

> You have the historical society on site if Tabatabai wants to make a speech there, at least…

Lopez-Viado feels that the council should have been notified about this in advance so they could decide whether they wanted to attend. She feels that the lack of notification would have caused Councilmember Tabatabai to say that none of the other councilmembers cared enough to attend and he "*could turn it around on us.*"

While she acknowledged receiving the text from the City Manager, she said that this group should have gone through the same process everyone else had to go through, along with the application deadlines.

34

## *Summary of Interview with Ollie Cantos*

This investigator interviewed Councilmember Ollie Cantos on March 28, 2023. Cantos was aware of the nature of the investigation. He was asked to provide a detailed statement about his involvement and any of the things he might have witnessed prior to, and after, the event.

Cantos explained that Saturday February 18th was the second day of the outdoor festival. According to the Council schedule, they thought there was going to be some sort of Council comments near the stage area at 6:30 PM. With this in mind, Cantos made his way towards the stage around 6:10 PM. Upon arriving, he encountered Councilmember Wu.

```
Cantos:        Somehow, I walked up on this and there was some
               discussion about a land acknowledgement. Tony was not
               happy about this land acknowledgement...Tony, Rosario
               and Brian were there. There was a real intense
               exchange…Tony was essentially saying that we cannot have
               anything political. There shouldn't be any political
               statement about this land acknowledgement, stolen land,
               or anything like that. That's not what this festival is
               for. It's supposed to be for everybody no matter what
               their political affiliation is.
```

Cantos said that Mayor Diaz was telling the group that they are trying to keep this event positive while at the same time Mayor Pro-Tem Tabatabai was trying to explain to Councilmember Wu that this was not a political ceremony.

```
Cantos:        Tony was just vehemently upset about that. He just said,
               "we didn't know anything about this." "When was this
               added?" "Why are we just finding out 20 minutes before
               this is happening?"
```

At this point, Cantos picked up on the fact that the Rocha family was nearby and could possibly hear what was being said. Cantos and Diaz said that since Rocha was already there, they decided to see how this could work out so she could perform the ceremony.

Diaz then asked Tabatabai what he planned on saying. Amid this dialogue, Tony continued to protest and eventually said he was leaving.

Tabatabai then took out his phone and read the prepared land acknowledgement statement to Diaz and Cantos. When he was done, Cantos asked him if he could just remove the part about the violent past to keep the statement positive. Cantos suggested a replacement statement such as, "*No matter who we are, and no matter our backgrounds, including Native Americans, we all come together.*" He said that Tabatabai quickly agreed to make this change.

Cantos thought the matter was settled at that point and walked over to speak with a constituent.

When Cantos returned to the council group, he said the tone had changed. He heard the Mayor telling Rocha that this was similar to her showing up to celebrate her 15th birthday during someone else's quinceanera. Rocha responded, "*I'm not doing this. I am pulling out.*"

35

Diaz started explaining to Rocha that she didn't need to pull out, she just wanted to keep this positive. Cantos said that Diaz was very calm and was trying to be nurturing.

Jamie Rocha told the group this was supposed to be a peaceful blessing and she wasn't emotionally prepared to perform the ceremony, then walked away from the group.

Cantos said none of the councilmembers, outside of Tabatabai, knew this was added to the schedule. He was concerned that this particular tribe was not vetted in advance, and he was worried the City was sponsoring a group who was not recognized per California Assembly Bill 52.

Cantos strongly felt that there needs to be a policy in place about the planning of these events. He said that rules need to be followed as far as application dates so these "*ad-hoc additions don't take place.*" He said that if the current rules call for these situations to go through the City Manager, then this is the rule which should be followed.

```
Investigator:   Who do you think should have told the council? Either
                staff or Brian? Or a combination?

Cantos:         In a perfect world, what should have happened is, the
                City Manager should have said, "Mayor Pro-Tem, I'm
                really sorry. I know you want this in the program. We
                just don't have the time to go through our vetting
                procedures. I wish I had known this before, but under
                our procedures, we just don't have a way to go through
                our proper procedures. Not because of bureaucracy, we
                just don't have the time to go through our process of
                vetting. So, while this is a good idea, we just don't
                have the time to do our due diligence. So, therefore, we
                are just going to have to hold off on this one. By the
                way, the other councilmembers don't even know about this
                anyway. They should be part of the process. Since they
                don't know about it, we will just have to forego it this
                time, and next time, let's say during the summer, we can
                plan ahead."
```

Cantos felt that if the preceding statement was given to Tabatabai, then none of this would have happened.

Since the City Manager approved it, Tabatabai rested upon, "*staff approved it*." Cantos commented that if this was approved, why wasn't anything said to the other councilmembers. He surmised that the answer would be something similar to; "*we don't tell you about all the other minor details*."

Cantos said there is a difference between the technical and the practical because the councilmembers like to be told about anything which might be controversial. "*As a courtesy, we should be told.*"

36

Transcript of Text:



| Councilmember Ollie Cantos | City Manager David Carmany |
|---|---|

Hi Ollie. Let me check

Thanks

I talked to Mayor Diaz. Told her my decision is this.

The GABRIELINO-TONGVA INDIAN TRIBE is to proceed as part of the planned program.

## *Summary of Interview with Brian Tabatabai*

This investigator conducted an interview with Councilmember Brian Tabatabai on March 28, 2023. He was asked to provide his version of events beginning with his contact with Jamie Rocha.

Tabatabai explained that he has been trying to reach out to members of the Native American community to conduct a land acknowledgement ceremony, or to have indigenous representation at some of the city sponsored events such as the Centennial/Spring Festival. He had reached out to Jessa Calderon from the Gabrielino Shoshone tribe and tried to connect her with Assistant City Manager Roxanne Lerma. He said this ended up not taking place because Calderon was in Germany performing and was unavailable.

In the meantime, he participated in an interview with the Mount San Antonio College newspaper and provided details about wanting to be inclusive for indigenous groups. Jamie Rocha saw this article and reached out to him via Facebook. He felt it is common throughout California to have the ancestral peoples give a land acknowledgement.

He said that he had previous conversations with David Carmany and Roxanne Lerma about this.

On Thursday evening, Rocha reached out to him via Facebook, and he responded back to her with his phone number. They spoke on the phone, and Tabatabai obtained her information and put her in touch with Roxanne Lerma for two reasons; to obtain space for her Native Ways 2 College non-profit, and to provide cultural representation via the land acknowledgement.

Tabatabai said the following night, Jamie Rocha showed up at the opening event for the festival and introduced herself to Tabatabai and Roxanne Lerma.

37

Tabatabai couldn't remember if he was told on Friday night or Saturday that Rocha was approved for the land acknowledgement blessing to take place at 6:30 PM on Saturday. He said he was asked to do the land acknowledgement statement, because it isn't necessarily appropriate to have the tribe do it. He planned on the ceremony taking up approximately five minutes of stage time.

He and his family showed up on Saturday evening and he met with Rocha near the stage area around 6:15 PM. They talked briefly and Rocha provided him with a blessing.

After the blessing, both Rocha and Tabatabai were standing near the stage and waiting for the music to end. Then Tabatabai's wife came over with the cellphone and handed it to him. She told her husband that the City Manager was calling. When he picked up, the City Manager told him that "*Tony Wu was not to interfere, and that Jamie was allowed to be on stage.*" Carmany said it was the "*City Manager's call and she was to be on stage.*"

Tabatabai then looked over and saw Councilmembers Cantos, Wu and staff member Vanessa Ibanez standing nearby.

Diaz then approached Tabatabai and asked, "W*hat is this all about?*" He said he explained the ceremony, and she then walked towards the other councilmembers.

At this time, Roxanne Lerma called him and said, "*I am not going to put my staff in a position where they are feeling that their job is threatened. I need you to work this out with your colleagues.*"

Tabatabai then approached the other councilmembers and said Wu seemed upset. Wu told him "*this is too political.*"

```
Tabatabai:      He said he was worried how the white residents would
                react to this land acknowledgement and that this was too
                political… (He later clarified and said that Wu used the
                words European residents and not "white residents.")
```

Tabatabai said that Wu ended up leaving and he read the land acknowledgement statement to the two remaining members, Diaz and Cantos. He said that both had an issue with one section which mentioned violence. Tabatabai told them, "*we could get rid of that.*"

Tabatabai said he summoned Rocha over so they could talk about the rest of the ceremony, and this is when Diaz told her it was like her "*crashing her quinceanera.*" Rocha began to get emotional and cry and Diaz told her that she could "*just go do her thing.*"

Rocha told her that she couldn't do it at this point and "*Jamie said no. I am not going to do this to my ancestors. I am not going to go on.*" He said the band then took the stage because it was already 7:00 PM.

```
Tabatabai:      The entire event…I was never asked about anyone on the
                schedule; whether it was appropriate when we had the
                Chinese Dragon Dancers, Ballet Folklorico or when we had
                the Christian invocation on Friday. Staff did not run
```

38

```
                      through the agenda with us. We give staff direction to
                      have the festival and then they run the festival. Once
                      the City Manager called and said, "you are supposed to
                      be on stage," that's when the discussion should have
                      ended.

Investigator:         How do you think the City Manager knew to call you and
                      tell you that?

Tabatabai:            …From my understanding it was text messaging between
                      Councilmember Wu and him. We all received text messages
                      (from the City Manager).
```

Tabatabai said that he had provided his own land acknowledgement on the Friday evening opening ceremony for the Gabrielino-Shoshone Tribe, and he didn't know why this second land acknowledgement was stirring up controversy with the City Council.

```
Investigator:         Do you think the other councilmembers are more upset
                      that they didn't hear about this from you or staff?

Tabatabai:            I think they are more upset because this is connected to
                      me. If it hadn't been connected to me, there would have
                      been no problem.

Investigator:         Do you think the staff should have told them about this?

Tabatabai:            No. There was nothing controversial about this. It's not
                      something new. It's very common at these events. If
                      staff thought this was going to cause problems, this
                      doesn't make sense…Should they be telling us what
                      elementary schools are performing because they aren't in
                      a certain district?
```

The remaining portions of the interview asked for speculation on why Councilmember Cantos wasn't included with the "*call to action*" by the indigenous groups. Tabatabai gave his opinion but felt it was important to mention that this investigation was a "*one off*" when there has been an ongoing pattern of behavior by some members of the council.


## *Summary of Interview with Celenia Calderon*

This investigator interviewed Celenia Calderon on April 3, 2023. Calderon is the spouse of Brian Tabatabai and was present for a portion of the interaction between councilmembers and Jamie Rocha on February 18th. She was asked to provide a statement with her version of events for that evening.

Calderon said that she, her son, mother-in-law and Brian Tabatabai arrived near the stage area before the land acknowledgement was due to begin. Brian had given her his phone so she could record the event from the audience.

While she and the family got seated, Brian was speaking with Jamie Rocha and was receiving a blessing.

Calderon saw Mayor Diaz coming into the area looking flustered. She said that Diaz approached Rocha and asked, "*What's this all about?" "What do you want to do?"*

At the same time, Brian's phone rang, and Calderon could see that it was Carmany, the City Manager. Calderon picked up the call and got Brian, he took the phone and walked away from the group momentarily.

When Brian came back to the group, he said, "*What is this that you want me to remove*?" Brian, Rosario Diaz and Ollie Cantos then began to talk about the land acknowledgement statement and removing the final sentence.

Calderon was tending to her family and only witnessed portions of the councilmembers' interactions.

When Calderon reapproached the group, she heard Diaz telling Rocha that "*this is not about history." "This is a celebratory event."*

Calderon spoke up and told Diaz, "*This is about history."*

Rocha began to cry, and Diaz told her, "*you can go on*." Rocha told Diaz she was too upset and wasn't going to do it.

Calderon said the group broke apart at this point and Calderon approached Rocha and said that "*this is wrong and I apologize on behalf of West Covina*."

At the conclusion of the interview, Calderon said that while the councilmembers were discussing the land acknowledgement, Tony Wu left the area early, Rosario Diaz did most of the talking while Ollie Cantos did not say too much.

Calderon was concerned that the Assistant City Manager or City Manager were not there because she didn't know who was in charge as Vanessa Ibanez didn't seem to know what was going on.

### *Summary of Interview with Tony Wu*

This investigator interviewed Councilmember Tony Wu on Wednesday March 15, 2023, in his Temple City business office. Wu was aware of the investigation as he was supportive of an independent review of the matter.

Wu started the interview by commending the Thursday evening kick off dinner stating that it was a wonderful event attended by 500-600 people with the food being prepared by the staff. Wu said it was a great time and he was proud of the staff for putting it together.

The following day was the kickoff for the Centennial/Spring Festival. He said there were many vendors and performers to show the diversity of West Covina. Wu was present for the event all three days.

> Wu:             We are the hosts as the City Council. We try to entertain the people…Our role is to unite people together.

Wu continued by saying that there was a schedule that he was following for each of the day's events. Wu knew on Saturday there was a DJ playing near the stage from 6:00 PM to 7:00 PM and then a county band was taking the stage.

Wu commented that he didn't see the City Manager or Assistant City Manager in attendance but stated: "*Saturday night, I didn't see the staff, but everyone is doing their thing. You cannot expect to see them there all the time. There were other staff like Vanessa was there.*"

> Investigator:  What happened when you and the other councilmembers got near the stage around 6:30 PM?
>
> Wu:             I saw the country music people because they knew me…Because I am an Asian guy who is line dancing…They call me the "Dancing Mayor." …Vanessa came over to me and said there was an insert to the program. She said it was a land acknowledgement. I had no idea what a land acknowledgement was. I asked her, "Why is that?" and she told me it came from Mayor Pro-Tem Brian Tabatabai.
>
> Ibanez:         He wants to do it.
>
> Wu:             How can we do it? We did not approve this. It is not on the program. It is not approved. How can we have this surprise like this? The City Manager did not notify us…If we can do this, I could say, "Hey, tomorrow before the show starts, I'm going to read something." Other city council would not agree with this.

Wu and Vanessa were alone having this conversation, standing near the DJ booth, when Wu saw Councilmember Cantos and approached him to inquire about the land acknowledgement, but stated that Cantos was also unaware of it.

After asking Cantos, Wu saw Mayor Rosario Diaz speaking with Mayor Pro-Tem Tabatabai. Both Wu and Cantos walked over and joined them.

Diaz also saw them (Wu and Cantos) and started walking in their direction. As all three of them got together, Diaz asked Wu if he was aware of this land acknowledgement.

> Wu:             Rosario said, "what the heck is this?" She said she texted the City Manager, but had no response…Later I see a text from the City Manager saying he approved it, but he didn't tell us the day before…

**41**

```
Investigator:   How do you think the City Manager knew to text the City
                Council about this?

Wu:             I think it is possible that Rosario called him.
```

Wu continued by saying that councilmembers Cantos, Diaz and himself continued to discuss this in their group. Tabatabai approached, Wu said, and was very confrontational saying, "*What is the problem? What is the problem man?"*

```
Wu:             And I said, "Brian why didn't you tell us about this."
                He said it was approved by the City Manager.
```

Tabatabai told them that he wanted the Native Americans to do a prayer and he wanted to make a statement. Cantos and Diaz asked to see the statement. Tabatabai showed them the script and Wu said, "*I want no part of this. This is too political."*

Cantos and Diaz were asking him to soften the statement.

```
Wu:             I said goodnight and walked away. I'm leaving…I didn't
                scream. I didn't yell. I didn't rant.

Investigator:   It sounds like you never met Jamie Rocha.

Wu:             No. We never met. I don't know who she is.

Investigator:   It sounds like before you left, they were working with
                Brian to soften the statement?

Wu:             Yes, They were trying to accommodate and be very nice…I
                totally disagreed because this was not approved by the
                City Council, and we were hijacked.
```

Wu characterized the land acknowledgment as an illegitimate insert into the program and was confused why Rocha said she was "*cancelled,*" when the land acknowledgement wasn't on the program. He felt it was unfair to the councilmembers who were unaware of it and wanted to know how it got approved.

```
Investigator:   Let's switch places on this and say you contacted the
                City Manager on a Friday with something similar to this.
                Would you tell the Mayor?

Wu: Yes,        I would tell Rosario. I would absolutely tell the other
                city councilmembers, especially the Mayor.
```

Wu stated that the City talks about transparency, but it didn't occur in this instance. Wu was concerned that if they chose the wrong group to do this, they could be sued by the ones who should be doing it.

Wu then described a Tuesday pre-agenda meeting on February 21st, which was held with the City Manager, two Assistant City Managers, Mayor Diaz and himself. He said the Mayor began asking

42

the City Manager what happened on Saturday night. Wu said that Carmany responded with a lot of, "*I don't know. I was with my family and my phone was blowing up at 6:00 PM.*"

Wu's question is why would the City Manager say he pre-approved the land acknowledgement and then say at Tuesday's meeting that he didn't know about it.

```
Wu:             If he approved it the prior day, on Friday, why didn't
                he tell us?

Investigator:   Do you think he thought Brian told you?

Wu:             No. It is City Manager's responsibility. No surprises
                for the City Council…It is very uncalled for.

Investigator:   Does the Council ever get involved in other City events
                where they approve the planning?

Wu:             Yes. I helped last year with the Spring Festival, and I
                provided numbers for vendors.

Investigator:   Is there a rule that the council needs to approve these?

Wu:             No. There are no rules, but it is courtesy…You need to
                double check. You cannot walk into the trap…We felt we
                walked into a trap…We were supposed to be country line
                dancing.

Investigator:   Do you think Brian purposely didn't tell the council?

Wu:             I think so. I think he knew we would not agree due to
                this being political. It is purely political…There was a
                right way to do this, but this was not the time.
```

Wu felt that Tabatabai helped brand he and Diaz as racists for not wanting this to take place and wondered why Ollie Cantos was not included. Wu said it was even more confusing since he removed himself from the group before the issues came to any sort of resolution.

Within a couple days of the event, the following social media posts began to appear:



Wu admitted that he told Tabatabai his land acknowledgement statement was too political, but was also confused as to why the Mayor was not brought into this decision-making process by Tabatabai or City Management. Wu said the council had previously discussed similar issues and he knew this would cause conflict amongst them.

Wu:            Here's the issue, Brian…Why didn't he tell us…Why did he want to do this…He knows this thing, we are not going to approve it because it's so political and this shouldn't be in the celebration. Second, why did City Staff, or the City Manager, ok, approve this thing. They know we have issue with…we already argue at city council…Why he allow it, not only, didn't tell us.

Investigator:  Was he (David Carmany) the City Manager when this came up before?

Wu:            Yes, because a lot of time he (Tabatabai) talk about his ideology in the city council. He has his belief and I have my belief. (He switched to talking about Tabatabai.)

FW: Voting by Districts - Editorial

From:    Stephen Millard ~~[redacted]~~

To:    john_shewmaker~~[redacted]~~

Date:    Wednesday, April 28, 2021, 04:51 PM PDT

**From:** Rosario Elliott ~~[redacted]~~
**Sent:** Thursday, January 12, 2017 9:13 AM
**To:** JOHN SHEWMAKER; ~~[redacted]~~; 'Bill Elliott'; ~~[redacted]~~ Ginger Elliott; ~~[redacted]~~

**Cc:** ~~[redacted]~~
**Subject:** Re: Voting by Districts - Editorial

Well said Mr. Shewmaker.

As a Hispanic female I'm insulted by this ridiculous lawsuit. I guess I'm suppose to vote for Hispanics, even though I dont feel as they do. I'm so disgusted

Sent from Yahoo Mail on Android

On Thu, Jan 12, 2017 at 8:44 AM, JOHN SHEWMAKER

<john_shewmaker~~[redacted]~~ wrote:

> The writer of the editorial completely misses the point of our city not wanting districts.
>
> From a point of representation in our small community we end up with 1 one person, not 5, representing us. If I have a problem in my areas I have ONE person to approach, not FIVE.

 **William Elliott**
10h · 🌐

···

There was an party at Hurst Ranch last Saturday celebrating West Covina's Centennial. It was a competing event with the big bash held by the city at the Sportsplex last week. A non profit organization in the city hosted their 75th Anniversary. Both events were well attended, sold out, actually. The city event was focused more on the citys history, and the non profit focused on the work they do.

My wife and I attended both parties, and last week I posted several photos of the city event. Here are a few photos from the other one.

Tickets were $75 a head and we were met at the door with champagne. The band was really good, and lots of dignitaries were there who skipped the citys party the week before.

We recognized many nice folks, with lots of haters there as well. The program was long and boring and our food was *stone cold*. I noticed that several tables had 8 persons seated at them, but they crammed 10 place settings at our table; it was crowded & uncomfortable.

We were seated far to one side which was a dig on my wife Rosario Diaz, the Mayor of West Covina. This didn't surprise me much, since the host and founder of the non profit (Colleen Rozatti) was defeated by my wife in the last City Council election. In fact, had Rozatti prevailed in that election, she would have been Mayor herself that night instead of my wife. Ouch.

Rozatti came over and greeted someone seated at our table, and rubbed her ample backside against my jacket as she squeezed by, lacking in basic courtesy as she snubbed my wife, who she invited. You could tell that Rozatti is still very bitter over her landslide defeat, and I had a good laugh over that, it never gets old.

I never expected her to rise to the occasion and be gracious. There were some really beautiful people there, most were dressed to the 9's; but not Rozatti.

She looked like a female version of the Michelin Man, wrapped in a dingy dish towel, long in the tooth, tired & weary. Judge for yourself.



👍😆 5                                                          1 comment

👍 Like                    💬 Comment                    ➤ Share

Top comments ▾

Submit your first comment…                    😗 ☺ 📷 GIF 🏷

**Becky Othmer**
Good morning.

After reading through your post, I debated if I should reply. As a middle school teacher I work tirelessly to teach my students about respect; not only seeking it but giving it. While I understand we are all entitled to our opinions and… **See more**                    👍

Like    Reply    Share    2h

**William Elliott**
6h · 🌐                                                          •••







TREASURER
SECRETARY
APPS IN THE ASB OFFICE!

Friday, March 3rd
Located in the MPR Room
From 6:30 pm to 9:30 pm

## West Covina High School
1d · 🌐

This week's #BulldogCountryEvents!

👍 John Carson

👍 Like          💬 Comment          ↪ Share

Submit your first comment...

---

**William Elliott** commented on this photo.

## William Elliott
10h · 🌐                                                      ...

**WEST COVINA TODAY**          👥 Join group          🔍      ...

👍 Like          💬 Comment          ↪ Share

Top comments ▾

Submit your first comment...

**William Elliott** Author
Collen Rozatti 🌮, far right.
West Covina Mayor Rosario Diaz
3rd from right
Like    Reply    Share    9h    Edited



# 10. Calling DREAMERS Cockroaches

At City Council Meeting on April 3, 2018 angry Bill Elliott referred to DREAMERS as "Cockroaches"
and a drain on taxpayers.

Elliott Comments Dreamers and Immigrants

SAC Media - Elliott's Cockroach Comments & More



# EXHIBIT J

## May 2026 HR complaint status emails

Purpose / relevance:

Shows Plaintiff requested complaint status and HR referred Plaintiff to Roxanne rather than providing complaint status or grievance response.

 Gmail

## Re: HR COMPLAINTS

**Brian Gutierrez** <Brian.Gutierrez@westcovina.org>    Thu, May 14 at 11:10 AM
To: Carmelita Underwood <CUnderwood@westcovina.org>
Cc: Brian Gutierrez <Brian.Gutierrez@westcovina.org>

Dear Human Resources Director Carmelita Underwood,

I have not been given no update on the status of my complaints:



Sincerely,
### *Brian Gutierrez*
Councilmember, 1st District
City of West Covina

signatureImage



---

**From:** Brian Gutierrez
**Sent:** Wednesday, May 6, 2026 6:07:39 PM
**To:** Carmelita Underwood <CUnderwood@westcovina.org>
**Cc:** Brian Gutierrez <Brian.Gutierrez@westcovina.org>
**Subject:** HR COMPLAINTS

Dear Carmelita,

As a victim of discrimination I have the right to know the status of my complaints. Please update me.

Sincerely,
### *Brian Gutierrez*
Councilmember, 1st District
City of West Covina

signatureImage



**Image.jpeg**

# EXHIBIT K

## Teleconferencing accommodation correspondence

Purpose / relevance:

Shows prior request for teleconferencing accommodation and City acknowledgement of accommodation implementation issues.

# Automatic reply: Notice Regarding Delay in ADA Accommodation and Duty to Investigate Title II Compliance

From: Brian Gutierrez Brian.Gutierrez@westcovina.org

To: Carmelita Underwood CUnderwood@westcovina.org

Cc: Joung H. Yim JYIM@lcwlegal.com, Brittany Trainer btrainer@lcwlegal.com, Lewis Corrigan clewis@lcwlegal.com, mchaney@lcwlegal.com

Bcc: johndoeca2025@gmail.com

Date: Mon, Mar 9, 2026, 8:00 AM

To: LCW Legal
Cc: HUMAN RESOUCES

Dear Counsel,

I am writing regarding the continued delay and lack of meaningful resolution concerning my disability accommodation request and the related complaints I have raised regarding disability discrimination. The prolonged delay in addressing these issues is unacceptable and inconsistent with the City's obligations under federal disability law.

As you are aware, the City has already acknowledged my disability and initiated an interactive process to evaluate my accommodation request after receiving medical documentation from my treating physician. The documentation clearly explained the medical necessity of maintaining accommodations that address sensory processing and related medical limitations. Despite this, the City has failed to implement or consistently respect the accommodation and has instead allowed ongoing actions that undermine the accommodation and interfere with my ability to participate fully in City Council proceedings.

Under Title II of the Americans with Disabilities Act, public entities are required to ensure that qualified individuals with disabilities are not excluded from participation in, or denied the benefits of, government services, programs, or activities. City Council meetings and participation in the legislative process are unquestionably public governmental activities subject to these requirements.

Federal regulations implementing Title II require public entities to make reasonable modifications to policies and practices where necessary to avoid discrimination and to maintain procedures for addressing disability-related grievances. When a public entity receives notice of a disability accommodation request and allegations that the accommodation is not being honored, it has an obligation to promptly address those concerns and ensure compliance with federal law.

The continued delay in resolving the accommodation issue, along with the City's failure to adequately investigate and address the discrimination concerns that have been raised,

is deeply troubling. The City cannot simply disregard complaints implicating Title II obligations or allow actions to continue that interfere with the accommodation process.

Accordingly, I am requesting written clarification from your office regarding the following:

1.    What steps the City has taken to ensure compliance with Title II of the ADA with respect to my
 accommodation request.

2.    Whether the City intends to conduct a proper investigation into the discrimination concerns that have been raised.

3.    What corrective actions the City will take to ensure that the approved accommodation is honored moving forward.

The City has a legal obligation to comply with federal disability law, and delays in addressing these issues only compound the harm caused by the underlying conduct. I ask that this matter be addressed promptly and that I receive a written response outlining the City's intended course of action.


Sincerely,
*Brian Gutierrez*
Councilmember, 1st District
City of West Covina



---

From:   Joung H. Yim JYIM@lcwlegal.com
  To:   Brian Gutierrez Brian.Gutierrez@westcovina.org
Date:   Mon, Mar 9, 2026, 8:01 AM

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.


Thank you for your email. I will be in an all day deposition today. If you need immediate assistance please contact my assistant Hope at 310.981.2379 or hfleischman@lcwlegal.com.

This email message has been delivered safely and archived online by Mimecast.

From: **Brian Gutierrez** Brian.Gutierrez@westcovina.org
To: **Carmelita Underwood** CUnderwood@westcovina.org
Cc: **Joung H. Yim** JYIM@lcwlegal.com, **Brittany Trainer** btrainer@lcwlegal.com, **Lewis Corrigan** clewis@lcwlegal.com, **mchaney@lcwlegal.com**
Bcc: **johndoeca2025@gmail.com**
Date: **Wed, Mar 11, 2026, 11:00 AM**

Hi Carmelita, Any update? Also what's the status of my complaints? You got wrong legal advice last time, the City has a duty to investigate under Federal Law, the city receives federal Tax Dollars.

Under **28 CFR § 35.107**, public entities with 50 or more employees are required to designate a coordinator to handle compliance, including investigating complaints of discrimination. Additionally, these entities must establish and publish grievance procedures for prompt and equitable resolution of such complaints.

So please let me know if LCW and the City of West Covina intend to follow federal law. I'll bcc the EEOC in this email.

Sincerely,
*Brian Gutierrez*
Councilmember, 1st District
City of West Covina



From: **Joung H. Yim** JYIM@lcwlegal.com
To: **Brian Gutierrez** Brian.Gutierrez@westcovina.org
Date: **Wed, Mar 11, 2026, 11:01 AM**

**CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.**

**3 / 9**

Thank you for your email. I will be in meetings this morning and in a deposition this afternoon. If you need immediate assistance please contact my assistant Hope at 310.981.2379 or hfleischman@lcwlegal.com.

This email message has been delivered safely and archived online by Mimecast.

---

From:  **Brian Gutierrez** Brian.Gutierrez@westcovina.org
To:  **Carmelita Underwood** CUnderwood@westcovina.org
Cc:  **Joung H. Yim** JYIM@lcwlegal.com, **Brittany Trainer** btrainer@lcwlegal.com, **Lewis Corrigan** clewis@lcwlegal.com, **mchaney@lcwlegal.com**
Bcc:  **johndoeca2025@gmail.com**
Date:  **Wed, Mar 11, 2026, 6:00 PM**

Hi Carmelita, hope you having a great day, I have tried calling you today but you or Human Resources has not return my call.

Can you please call me: 1(626) 740-4904 .

Sincerely,

*Brian Gutierrez*

Councilmember, 1st District

City of West Covina



---

From:  **Carmelita Underwood** CUnderwood@westcovina.org
To:  **Brian Gutierrez** Brian.Gutierrez@westcovina.org
Cc:  **Joung H. Yim** JYIM@lcwlegal.com, **Brittany Trainer** btrainer@lcwlegal.com, **Lewis Corrigan** clewis@lcwlegal.com, **mchaney@lcwlegal.com**
Date:  **Thu, Mar 12, 2026, 12:29 PM**

Hello Councilmember Gutierrez,

I have sent an email to the attorney, I received an email indicating Thank you for your email. I will be in meetings this morning and in a mediation this afternoon. I will keep you updated.

Best

## Carmelita Underwood

Director Human Resources/Risk Management

City of West Covina | Human Resources/Risk Management Department

1444 W. Garvey Avenue South | West Covina, CA 91790

Cunderwood@westcovina.org (Email)

626.939.8450 (Main)

626.939.8476 (Direct)

626.510.4854 (Cell)

626.939.8606 (Fax)



---

**From:**  **Brian Gutierrez** Brian.Gutierrez@westcovina.org

**To:**  **Carmelita Underwood** CUnderwood@westcovina.org

**Cc:**  **Joung H. Yim** JYIM@lcwlegal.com, **Brittany Trainer** btrainer@lcwlegal.com, **Lewis Corrigan** clewis@lcwlegal.com, **mchaney@lcwlegal.com**

**Date:**  **Thu, Mar 12, 2026, 1:06 PM**

Ok thank you Carmelita.


Sincerely,

*Brian Gutierrez*

Councilmember, 1st District

City of West Covina



---

**From:**  **Joung H. Yim** JYIM@lcwlegal.com

**To:**  **Brian Gutierrez** Brian.Gutierrez@westcovina.org

**Date:**  **Thu, Mar 12, 2026, 1:06 PM**

**CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.**

Thank you for your email. I will be in meetings this morning and in a mediation this afternoon. If you need immediate assistance please contact my assistant Hope at 310.981.2379 or hfleischman@lcwlegal.com.

This email message has been delivered safely and archived online by Mimecast.

---

| | |
|---|---|
| From: | **Brian Gutierrez** Brian.Gutierrez@westcovina.org |
| To: | **Carmelita Underwood** CUnderwood@westcovina.org |
| Cc: | **Joung H. Yim** JYIM@lcwlegal.com, **Brittany Trainer** btrainer@lcwlegal.com, **Lewis Corrigan** clewis@lcwlegal.com, **mchaney@lcwlegal.com** |
| Date: | **Tue, Mar 17, 2026, 2:50 PM** |

What is the update please? Other meeting passes with no ACCOMMODATIONS implemented.

Sincerely,

*Brian Gutierrez*

Councilmember, 1st District

City of West Covina



---

| | |
|---|---|
| From: | **Joung H. Yim** JYIM@lcwlegal.com |
| To: | **Brian Gutierrez** Brian.Gutierrez@westcovina.org |
| Date: | **Tue, Mar 17, 2026, 2:52 PM** |

**CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.**

Thank you for your email. I will be in client meetings this afternoon. If you need immediate assistance please contact my assistant Hope at 310.981.2379 or hfleischman@lcwlegal.com.

This email message has been delivered safely and archived online by Mimecast.

**From:** Brian Gutierrez Brian.Gutierrez@westcovina.org

**To:** Brittany Trainer btrainer@lcwlegal.com, Lewis Corrigan clewis@lcwlegal.com, Joung H. Yim JYIM@lcwlegal.com, mchaney@lcwlegal.com , Carmelita Underwood CUnderwood@westcovina.org

**Bcc:** johndoeca2025@gmail.com

**Date:** Fri, Mar 27, 2026, 8:03 PM

Counsel,

I am following up again regarding my ADA accommodation request.

At this point, the City's failure to meaningfully engage in the interactive process is no longer a matter of delay—it raises serious concerns of noncompliance with federal law.

I have made repeated requests, provided supporting documentation, and clearly identified my accommodation needs. Despite this, I have not received confirmation that the interactive process has been completed or that my accommodations have been approved and implemented.

What is the current status of my accommodations?

In the meantime, I continue to be required to participate in Council activities without accommodations in place, while other trainings and meetings are being prioritized. This is directly impacting my ability to perform my duties and is not consistent with the City's obligations under the Americans with Disabilities Act.

As counsel for the City, you are obligated to ensure compliance with federal law. This includes ensuring that accommodation requests are handled promptly, in good faith, and without unnecessary delay.

At this point, continued failure to engage in the interactive process and implement accommodations is not acceptable.

I am requesting:
1. immediate confirmation of the status of my accommodations;

2. confirmation that the interactive process has been properly completed; and

3. a clear timeline for implementation, if not already in place.

This matter requires immediate attention. Please follow the law.

Sincerely,

*Brian Gutierrez*

**Councilmember, 1st District**

**City of West Covina**



On Mar 17, 2026, at 2:50 PM, Brian Gutierrez <Brian.Gutierrez@westcovina.org> wrote:

What is the update please? Other meeting passes with no ACCOMMODATIONS implemented.

Sincerely,

**Brian Gutierrez**

Councilmember, 1st District

City of West Covina

<Image.jpeg>

---

From:    **Joung H. Yim** JYIM@lcwlegal.com

To:    **Brian Gutierrez** Brian.Gutierrez@westcovina.org

Date:    **Fri, Mar 27, 2026, 8:04 PM**

**CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.**

Thank you for your email. I will be in meetings today. If you need immediate assistance please contact my assistant Hope at 310.981.2379 or hfleischman@lcwlegal.com.

---

From:    **Melanie L. Chaney** mchaney@lcwlegal.com

To:    **Brian Gutierrez** Brian.Gutierrez@westcovina.org

Date:    **Fri, Mar 27, 2026, 8:04 PM**

**CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.**

Thank you for your email. I am out of the office on vacation.  I will not be checking email regularly.  I will return on

If you need immediate assistance, please contact my assistant Janae Biers at jbiers@lcwlegal.com or  310 981-2027.   She will direct your inquiry to the appropriate person.

---

**13 Emails**

# EXHIBIT L

## PRR 070-2026 legal billing / CCTV / ADA accessible records correspondence

Purpose / relevance:

Shows Plaintiff requested printed unredacted billing records as an ADA accommodation; City restricted review and described CCTV extraction/blackout issues.

**From:** Brian Gutierrez Brian.Gutierrez@westcovina.org
**To:** Lisa Sherrick LSherrick@westcovina.org
**Cc:** Milan Mrakich MMrakich@westcovina.org, Thomas P. Duarte tpd@jones-mayer.com, Lona Laymon lnl@jones-mayer.com, Roxanne E. Lerma RLerma@westcovina.org, Richard D. Jones rdj@jones-mayer.com, Carmelita Underwood CUnderwood@westcovina.org
**Date:** Mon, Mar 30, 2026, 7:37 PM

Dear Ms. Sherrick,

Thank you for your response and for confirming that unredacted billing records are available.

1. Councilmember Oversight

These requests are made in connection with my fiduciary oversight responsibilities as a Councilmember, including review of legal expenditures and City operations.

This is not a routine public records request. It is part of my official duties as a member of the governing body.

2. CCTV Footage

I will narrow the CCTV request to footage capturing entry to and exit from City Hall, including the northwest camera and any additional cameras that capture ingress and egress of where Durate parks at.

The timeframe remains November 1, 2025 through February 29, 2026, and includes all responsive records as they exist at the time of production.

All responsive CCTV footage is to be preserved, including any footage subject to routine deletion or overwrite.

3. Billing Records – Production Format

I am requesting that printed copies of the unredacted billing records be produced.

Limiting access to scheduled, in-person inspection only is not reasonable and does not allow for meaningful review.

4. ADA Accommodation

Printed copies are required as a reasonable accommodation.

As previously communicated:

- I have a back condition limiting prolonged seating in uncomfortable environments;
- I have light sensitivity affecting in-office review; and
- I have autism, which requires that I review information at an appropriate pace without being rushed or placed under pressure.

Requiring extended in-person inspection interferes with my ability to meaningfully access these records.

Providing printed copies is a straightforward and necessary accommodation.

5. Final

Produce:

- the requested CCTV footage (as narrowed);
- confirmation of preservation; and
- printed copies of the unredacted billing records.

I am not agreeing to limitations that prevent meaningful access to records necessary for oversight.

Sincerely,
*Brian Gutierrez*
Councilmember, 1st District
City of West Covina

On Mar 12, 2026, at 9:06 PM, Lisa Sherrick <LSherrick@westcovina.org> wrote:

Good evening, Councilmember Gutierrez.

After reviewing your letter via email on March 10, 2026, the City is providing the following reasonable alternatives that may help narrow the scope of the request:

Regarding all available CCTV footage and security camera footage reflecting the entry to and exit from City Hall and any other City facilities by Thomas P. Duarte, for the entire period including but not limited to November 1, 2025, through February 29, 2026.

- A reasonable alternative to narrow the scope of this request would be to limit it to camera footage that would cover Mr. Duarte's activity entering and exiting City Hall. The camera on the northwest corner of City Hall overlooking the parking lot would accommodate this scope.
- The period of November 1, 2025, through February 29, 2026, applies to a time in the future, after the request was received. Therefore, the request is and will be processed as November 1, 2025, through the date the request was received, January 22, 2026. Can you please provide a narrowed down time frame?

Once we receive a clarified or narrowed request, the Clerk's Office will work with appropriate staff to process and provide a determination regarding the request.

Regarding all invoices, billing statements, time entries, time sheets, and supporting documentation submitted by Jones & Mayer and/or Thomas P. Duarte for the period November 1, 2025, through February 29, 2026, including itemized descriptions of services performed, dates, and hours billed.

- As previously provided, there are responsive records that are available under this portion of the request. Unredacted copies of these records can be made available for you to review at an agreed upon time and place during normal business hours. Please provide me with three possible dates and times. and I can facilitate the inspection of the records.
- As previously mentioned, the period of November 1, 2025, through February 29, 2026, applies to a time in the future, after the request was received. Therefore, the request is and will be processed as November 1, 2025, through the date the request was received, January 22, 2026.

When the dates and times are received, the Clerk's Office will work with appropriate staff to schedule a time and place for you to review the records.

Please let me know if you have any additional questions.

Kind Regards,

---

**From:** **Brian Gutierrez** Brian.Gutierrez@westcovina.org
**To:** **Lisa Sherrick** LSherrick@westcovina.org
**Cc:** **Milan Mrakich** MMrakich@westcovina.org, **Thomas P. Duarte** tpd@jones-mayer.com, **Lona Laymon** lnl@jones-mayer.com, **Roxanne E. Lerma** RLerma@westcovina.org, **Richard D. Jones** rdj@jones-mayer.com, **Carmelita Underwood** CUnderwood@westcovina.org
**Date:** **Tue, Apr 7, 2026, 3:04 PM**

Hi Lisa are my documents ready to pick up? Or is the City Attorney obstructing my right to review his billing records?

Sincerely,
*Brian Gutierrez*
Councilmember, 1st District
City of West Covina



---

**From:** **Brian Gutierrez** Brian.Gutierrez@westcovina.org
**To:** **Lisa Sherrick** LSherrick@westcovina.org
**Cc:** **Milan Mrakich** MMrakich@westcovina.org, **Thomas P. Duarte** tpd@jones-mayer.com, **Lona Laymon** lnl@jones-mayer.com, **Roxanne E. Lerma** RLerma@westcovina.org, **Carmelita Underwood** CUnderwood@westcovina.org
**Date:** **Thu, Apr 23, 2026, 4:19 PM**

Hi Lisa, I am following up on this.

Sincerely,

*Brian Gutierrez*
Councilmember, 1st District
City of West Covina



---

From: **Lisa Sherrick** LSherrick@westcovina.org
To: **Brian Gutierrez** Brian.Gutierrez@westcovina.org
Cc: **Milan Mrakich** MMrakich@westcovina.org, **Thomas P. Duarte** tpd@jones-mayer.com, **Lona Laymon** lnl@jones-mayer.com, **Roxanne E. Lerma** RLerma@westcovina.org, **Carmelita Underwood** CUnderwood@westcovina.org
Date: **Thu, Apr 23, 2026, 4:26 PM**

Good afternoon, Councilmember.

A response is being finalized.

Lisa Sherrick, CMC, CPMC
Assistant City Clerk
City of West Covina
626-939-8414



---

From: **Brian Gutierrez** Brian.Gutierrez@westcovina.org
To: **Lisa Sherrick** LSherrick@westcovina.org
Cc: **Milan Mrakich** MMrakich@westcovina.org, **Thomas P. Duarte** tpd@jones-mayer.com, **Lona Laymon** lnl@jones-mayer.com, **Roxanne E. Lerma** RLerma@westcovina.org, **Carmelita Underwood** CUnderwood@westcovina.org
Date: **Thu, Apr 23, 2026, 4:51 PM**

Thank you Lisa for the update.

Sincerely,

*Brian Gutierrez*
Councilmember, 1st District
City of West Covina



---

From: **Brian Gutierrez** Brian.Gutierrez@westcovina.org
To: **Richard Jones** rdj@jones-mayer.com, **Ryan Jones** rrj@jones-mayer.com
Cc: **Thomas P. Duarte** tpd@jones-mayer.com
Date: **Thu, May 7, 2026, 8:02 AM**

Richard, am I going to get a copy of the bills or is Tom going to continue to obstruct my access to review them?

Sincerely,

*Brian Gutierrez*
Councilmember, 1st District
City of West Covina



From: Brian Gutierrez Brian.Gutierrez@westcovina.org
To: Richard Jones rdj@jones-mayer.com, Thomas P. Duarte tpd@jones-mayer.com, Ryan Jones rrj@jones-mayer.com
Cc: kelly.gerner@calbar.ca.gov
Bcc: johndoeca2025@gmail.com
Date: Fri, May 8, 2026, 11:59 AM

Mr. Jones, as Managing Partner,

I am following up again and am still awaiting your response.

I have been informed that Mr. Durate instructed the City Manager not to produce billing records related to legal services after I discovered billing entries consisting of only a few words while taxpayers were being charged thousands of dollars. Including trips to Taiwan after it was publicly stated that the City Attorney didn't charge tax payers. As a duly elected council member, I believe access to these records falls within my oversight responsibilities on behalf of the public.

Accordingly, I am requesting that you, as Managing Partner, instruct your attorney to stop interfering with my council oversight responsibilities that I was elected by the people to carry out.

This is not the first time Mr. Durate has obstructed my oversight efforts. In my view, his actions continue to raise serious concerns regarding transparency and professional ethics.

Attached is the receipt regarding the concert tickets previously referenced.

Thank you for your prompt attention to this matter. I look forward to your response.

Zelle®                                    Close

‹            Payment Details                Cancel

JD

Payment received from JEANNETTE DUARTE

(626) 324-2136



# $200

⊘ COMPLETED

**06/23/2024: Payment Received**

**06/22/2024: Payment is in progress**

| Amount | $200 |
|---|---|

| Transaction ID | SFC0INI3BTO9 |
|---|---|

Sincerely,
**_Brian Gutierrez_**
**Councilmember, 1st District**
**City of West Covina**



On May 7, 2026, at 8:02 AM, Brian Gutierrez <Brian.Gutierrez@westcovina.org> wrote:

Richard, am I going to get a copy of the bills or is Tom going to continue to obstruct my access to review them?

Sincerely,
*Brian Gutierrez*
Councilmember, 1st District
City of West Covina

5 / 6

**From:** Lisa Sherrick LSherrick@westcovina.org
**To:** Brian Gutierrez Brian.Gutierrez@westcovina.org
**Cc:** Milan Mrakich MMrakich@westcovina.org, **Thomas P. Duarte** tpd@jones-mayer.com, **Lona Laymon** lnl@jones-mayer.com, **Roxanne E. Lerma** RLerma@westcovina.org
**Date:** Wed, May 13, 2026, 7:32 AM

Good morning, Councilmember Gutierrez.

With respect to your request for CCTV footage, we have continued to explore options through the City's PD for providing actual uploaded copies of the video. The PD has also contacted their service provider, Am-Tech, to get a better sense of what the data extraction would actually entail. In sum, Am-Tech provided the following information:

- Video extraction of the length and duration requested would require the installation of a new device or NAS drive to handle 4 to 6 terabytes. That device is a direct cost of about $600.00. Am-Tech also informed us that installation may cause City server crashes in the interim and there is no guarantee that this process would work.
- Am-Tech's service technicians charge $250.00 per hour, and they estimated server work, installations, software updates, and transition assistance to take about 48 hours.
- Notably, in the course of reviewing your request, the PD identified an approximate 30 day "blackout gap" in CCTV footage, during which time there was no camera recording in progress, and hence no video footage regardless of any work Am-Tech might perform.

Please note Government Code section 7922.575, relating to "the cost of programming and computer services." In the alternative, the City can try to avoid involving Am-Tech if your request is substantially further narrowed.

Regarding the legal bills, the City has provided you copies of redacted legal bills and has invited you to review the unredacted bills at City Hall. The clerk's We are not going to send unredacted records outside City Hall unless a full waiver to do so is authorized by the City Council.

Lisa Sherrick, CMC, CPMC
Assistant City Clerk
City of West Covina
626-939-8414



**8 Emails**

# EXHIBIT M

## May 18, 2026 Signed Statement of Jerri Potras with Attachments (Redacted for Public Filing)

Shows the scope and timing of PRR 447-2026, that the request was for January-April 2026 Council reimbursement/expense records, that production was extended to May 25, and that Ms. Potras did not have or provide the posted documents to William Elliott.

May 18, 2020


Honorable Brian Gutierrez
Councilmember
City of West Covina


**RE:   PUBLIC RECORDS REQUEST:**
**COUNCIL ACCOUNTS EXPENDITURES/REQUESTS FOR REIMBURSEMENT**


I submitted a Public Records Request on Thursday, April 30, 2026 requesting a copy of expense reports and/or requests for reimbursement for January, February, March, and April 2026 for Mayor Letty Lopez-Viado, Mayor Pro Tem Ollie Cantos, Councilwoman Rosario Diaz, Councilman Brian Gutierrez, and Councilman Tony Wu.  See Attachment 1.

On Tuesday, May 12, 2026, I received an email from the Oscar Herrera of the city of West Covina's City Clerk's Office notifying me the city was extending the deadline to respond to my request was being extended by fourteen (days).  The indicated deadline is now May 25, 2026. See Attachment 2.  The extension notice is all I have received from the city to date.

On Saturday, May 16, 2026, Sherri Berillon informed me that William "Bill" Elliott had posted council expense information on Facebook and that when you asked City Manager Milan Mrakich about the posted documents, Mr. Mrakich attributed it the public record request I had submitted with an apparent implication I gave the documents to Mr. Elliott.  See Attachment 3. Any implication that I gave Mr. Elliott these documents is wrong.  *As indicated above, I do not have these documents.  I would not have given Mr. Elliott the documents if I had them.  I do not interact with him.*

Sincerely,

Jerri Potras


Jerri Potras


Attachments:
1 - Email:  Jerri Potras Public Records Request Submission
2 - Email:  Oscar Herrera, City Clerk's Office, PRR 447-2026 Potras Extension
3 - Facebook Post:  William Elliott – West Covina City Council Expenses Submitted for
                    Reimbursement

**ATTACHMENT 1**

---

**From:**    Jerri Potras
**Sent:**    Thursday, April 30, 2026 10:46 AM
**To:**    City of West Covina (City_Clerk@westcovina.org)
**Subject:**    Public Records Request | Council Account Expenditure Reports/Requests for Reimbursement


The following request is made in accordance with the California Public Records Act.

Please provide a copy of expense report and/or requests for reimbursement for January, February, March, and April 2026 for Mayor Letty Lopez-Viado; Mayor Pro Tem Ollie Cantos, Councilwoman Rosario Diaz, Councilman Brian Gutierrez, and Councilman Tony Wu.

Please direct documents to me at this email address:

Thank you.

Jerri Potras

**ATTACHMENT 2**

| | |
|---|---|
| **Subject:** | PRR 447-2026 Potras Extension |
| **Date:** | Tuesday, May 12, 2026 2:44:37 PM |
| **Attachments:** | Outlook-Social Med.png |

Hello,

The City Clerk's Office in West Covina is in receipt of your public records request, for copies of documents. The City is in the process of gathering information responsive to your request. You are hereby notified that the deadline to provide a response will be extended by fourteen (14) days to 5/25/2026, for the following reason(s):

The need to search for, collect and appropriately examine a voluminous amount of separate and distinct records (Gov. Code § 7922.535(c)(2)).


Best,


**OSCAR HERRERA – Administrative Assistant**

City of West Covina | City Clerk's Office

1444 W. Garvey Avenue South |

Office (626) 939-8433 | Direct (626) 939-8431

oherrera@westcovina.org

City Website: www.westcovina.org



@WestCovinaCity


Confidentiality Notice
This e-mail, including all attachments, may contain CONFIDENTIAL information and is meant solely for the intended recipient. It may contain controlled, privileged, or proprietary information that is protected under applicable law and shall not be disclosed to any unauthorized third party. If you are not the intended recipient, you are hereby notified that any unauthorized review, action, disclosure, distribution, or reproduction of any information contained in this e-mail and any attachments is strictly PROHIBITED. If you received this e-mail in error, please reply to the sender immediately stating that this transmission was misdirected, and delete all electronic and paper copies of this e-mail and attachments without disclosing the contents.



Facebook Page
West Covina 2.0

Accessed
May 16, 2026







**Mayor Letty Lope-Viado**

| Date | Description | Amount |
|---|---|---|
| 1/8/2026 | C.A.T Specialties Inc. (Mayor Wardrobe) | $713.91 |
| 1/26/2026 | SGV SGV Tribune | $34.83 |
| 1/15/2026 | T-Mobile Jan-April | $103.19 |
| 2/18/2026 | City Event Couples Connect | |
| | Supplies Amazon | $226.14 |
| | Signage Signs | $193.81 |
| | | **$1271.88** |

**Mayor Pro Tem Ollie Cantos**

| Date | Description | Amount |
|---|---|---|
| 1/8/2026 | C.A.T. Specialties Inc (Wardrobe) | $561.31 |
| 1/15/2026 | Trophy Center | $44.45 |
| 1/15/2026 | T-Mobile Jan-April | $128.98 |
| 1/21/2026 | ESGJCC 2026 Installation Dinner | $54.50 |
| 3/10/2026 | Rotary Club Event 3/8 | $100.00 |
| 3/31/206 | District 4 Meeting Smart & Final | $75.73 |
| 3/31/2026 | District 4 Meeting Smart & Final | $30.55 |
| 3/31/2026 | District 4 Meeting Amazon | $20.84 |
| | | **$1016.36** |

**Councilwoman Rosario Diaz**

No expense

**Councilman Tony Wu**

William Elliott
3 hours ago

**ATTACHMENT 3**



Page 3 of 3

# EXHIBIT N

Supplemental Public Materials - Racially Charged Context and May 16 Public Circulation

Screenshots and public materials offered for the limited purpose of showing context, motive, chilling effect, retaliation/interference, and the foreseeable harm of public weaponization of disability accommodations.

**Screenshot - William Elliott Facebook post circulating Council expense/reimbursement list.**



# WEST COVINA TODAY · ⋯

⟨

**William Elliott** · 6h · 🌐

# Expenses submitted for reimbursement with taxpayer funds by each member of the West Covina City Council

**Mayor Letty Lope-Viado**

| Date | Description | Amount |
|---|---|---|
| /8/2026 | C.A.T Specialties Inc. (Mayor Wardrobe) | $713.91 |
| /26/2026 | SGV SGV Tribune | $34.83 |
| /15/2026 | T-Mobile Jan-April | $103.19 |
| 2/18/2026 | City Event Couples Connect | |
| | Supplies Amazon | $226.14 |
| | Signage Signs | $193.81 |
| | | $1271.8 |

**Mayor Pro Tem Ollie Cantos**

| Date | Description | Amount |
|---|---|---|
| 1/8/2026 | C.A.T. Specialties Inc (Wardrobe) | $561.31 |
| 1/15/2026 | Trophy Center | $44.45 |
| 1/15/2026 | T-Mobile Jan-April | $128.98 |
| 1/21/2026 | ESGJCC 2026 Installation Dinner | $54.50 |
| 3/10/2026 | Rotary Club Event 3/8 | $100.00 |
| 3/31/206 | District 4 Meeting Smart & Final | $75.73 |
| 3/31/2026 | District 4 Meeting Smart & Final | $30.55 |
| 3/31/2026 | District 4 Meeting Amazon | $20.84 |
| | | $1016.3 |

**Councilwoman Rosario Diaz**
**No expense**

**Councilman Tony Wu**
**No expense**

**...n Brian Gutierrez**

| Description | Amount |
|---|---|
| ADA Lamp for Council Dias | $15 |
| Amazon Polo Shirts | $53 |
| Columbia Jackets | $29 |
| Private Screen Reimbursement | $76 |
| ESGVJCC 2026 Installation Dinner | $54 |
| Black folding table | $20 |
| Team Logo Company Logo Patch | $82 |
| Portos Cookies District 1 Meeting | $77 |
| Rotary Club Event | $10 |
| Certificate Frame Autism Month | $55 |
| Printer Toner/Paper | $98 |
| Dunkin Donuts Fire Stations | $20 |
| Amazon All in One Printer | $70 |
| Go Pro Camera | $62 |
| T-Mobil Jan-April | $16 |
| Donuts for Fire reimbursement | $20 |
| | $58 |

**Screenshot - expense list showing Mayor/Councilmember sections, including Rosario Diaz and Tony Wu listed as "No expense."**

### Mayor Letty Lope-Viado

| Date | Description | Amount |
|---|---|---|
| 1/8/2026 | C.A.T Specialties Inc. (Mayor Wardrobe) | $713.91 |
| 1/26/2026 | SGV SGV Tribune | $34.83 |
| 1/15/2026 | T-Mobile Jan-April | $103.19 |
| 2/18/2026 | City Event Couples Connect | |
| | Supplies Amazon | $226.14 |
| | Signage Signs | $193.81 |
| | | **$1271.88** |

### Mayor Pro Tem Ollie Cantos

| Date | Description | Amount |
|---|---|---|
| 1/8/2026 | C.A.T. Specialties Inc (Wardrobe) | $561.31 |
| 1/15/2026 | Trophy Center | $44.45 |
| 1/15/2026 | T-Mobile Jan-April | $128.98 |
| 1/21/2026 | ESGJCC 2026 Installation Dinner | $54.50 |
| 3/10/2026 | Rotary Club Event 3/8 | $100.00 |
| 3/31/206 | District 4 Meeting Smart & Final | $75.73 |
| 3/31/2026 | District 4 Meeting Smart & Final | $30.55 |
| 3/31/2026 | District 4 Meeting Amazon | $20.84 |
| | | **$1016.36** |

### Councilwoman Rosario Diaz

**No expense**

### Councilman Tony Wu

**No expense**

**Screenshot - expense list under Plaintiff listing ADA Lamp and Go Pro Camera as ordinary spending items.**

## Councilman Brian Gutierrez

| | | |
|---|---|---|
| 1/5/2026 | ADA Lamp for Council Dias | $159.48 |
| 1/12/2026 | Amazon Polo Shirts | $536.35 |
| 1/13/2026 | Columbia Jackets | $291.94 |
| 1/20/2026 | Private Screen Reimbursement | $76.81 |
| 1/22/2026 | ESGVJCC 2026 Installation Dinner | $54.50 |
| 1/22/2026 | Black folding table | $20.00 |
| 1/25/2026 | Team Logo Company Logo Patch | $820.16 |
| 2/17/2026 | Portos Cookies District 1 Meeting | $770.00 |
| 3/31/206 | Rotary Club Event | $100.00 |
| 4/10/2026 | Certificate Frame Autism Month | $55.25 |
| 4/15/2026 | Printer Toner/Paper | $985.58 |
| 4/27/2026 | Dunkin Donuts Fire Stations | $209.90 |
| 1/20/2026 | Amazon All in One Printer | $701.19 |
| 5/7/2026 | Go Pro Camera | $627.87 |
| 4/15/2026 | T-Mobil Jan-April | $160.46 |
| 4/23/2026 | Donuts for Fire reimbursement | $209.90 |
| | | **$5856.20** |

Screenshot - public comments specifically targeting the GoPro item: "What about the $600 GoPro camera?"

## All comments ⌄



**Javier Chavez** · 5h

Why do we pay for their clothes? And the printer and toner, does the city get to keep them?

**Reply**



**William Elliott** · 5h · ✎ Author

Javier Chavez

What about the $600 GoPro camera?

**Reply**



**Brian McDonald** · 4h

Where are we able to access this?

**Reply**



**William Elliott** · 4h · ✎ Author

Brian McDonald

This is it.
This was a public records request and it originated with

**Screenshot - public comments stating the list was a public records request and originated with the City.**

 **William Elliott** · 4h · ✎ Author
**Brian McDonald**
This is it.
This was a public records request and it originated with the city of West Covina.

**Reply**     👍 1

 **William Elliott** · 37m · ✎ Author
**Brian McDonald**
You can also call the city clerk's office yourself and they can tell you how to submit a PRR (public records request) for anything regarding the city.

**Reply**     👍 1

 **Brian McDonald** · 27m
Thanks!

**Reply**

**Screenshot - public material referencing William Elliott calling DREAMERS/DACA recipients "cockroaches" and a drain on taxpayers.**



# 10. Calling DREAMERS Cockroaches

At City Council Meeting on April 3, 2018 angry Bill Elliott referred to DREAMERS as "Cockroaches" and a drain on taxpayers.

> Elliott Comments Dreamers and Immigrants

> SAC Media - Elliott's Cockroach Comments & More

**Screenshot - message involving "Happy Indigenous People Day" and edited image of Senator Elizabeth Warren in Native American attire.**



## FW: Voting by Districts - Editorial

From:  Stephen Millard ~~[redacted]~~

To:  john_shewmaker~~[redacted]~~

Date:  Wednesday, April 28, 2021, 04:51 PM PDT

---

**From:** Rosario Elliott ~~[redacted]~~
**Sent:** Thursday, January 12, 2017 9:13 AM
**To:** JOHN SHEWMAKER; ~~[redacted]~~ ; 'Bill Elliott'; ~~[redacted]~~ Ginger Elliott; ~~[redacted]~~

**Cc:** ~~[redacted]~~
**Subject:** Re: Voting by Districts - Editorial

Well said Mr. Shewmaker.

As a Hispanic female I'm insulted by this ridiculous lawsuit. I guess I'm suppose to vote for Hispanics, even though I dont feel as they do.  I'm so disgusted

Sent from Yahoo Mail on Android

On Thu, Jan 12, 2017 at 8:44 AM, JOHN SHEWMAKER

<john_shewmaker~~[redacted]~~ wrote:

> The writer of the editorial completely misses the point of our city not wanting districts.
>
> From a point of representation in our small community we end up with 1 one person, not 5, representing us.  If I have a problem in my areas I have ONE person to approach, not FIVE.

 **William Elliott**
10h · 🌐

                                                                    •••

There was an party at Hurst Ranch last Saturday celebrating West Covina's Centennial. It was a competing event with the big bash held by the city at the Sportsplex last week. A non profit organization in the city hosted their 75th Anniversary. Both events were well attended, sold out, actually. The city event was focused more on the citys history, and the non profit focused on the work they do.

My wife and I attended both parties, and last week I posted several photos of the city event. Here are a few photos from the other one.

Tickets were $75 a head and we were met at the door with champagne. The band was really good, and lots of dignitaries were there who skipped the citys party the week before.

We recognized many nice folks, with lots of haters there as well. The program was long and boring and our food was *stone cold*. I noticed that several tables had 8 persons seated at them, but they crammed 10 place settings at our table; it was crowded & uncomfortable.

We were seated far to one side which was a dig on my wife Rosario Diaz, the Mayor of West Covina. This didn't surprise me much, since the host and founder of the non profit (Colleen Rozatti) was defeated by my wife in the last City Council election. In fact, had Rozatti prevailed in that election, she would have been Mayor herself that night instead of my wife. Ouch.

Rozatti came over and greeted someone seated at our table, and rubbed her ample backside against my jacket as she squeezed by, lacking in basic courtesy as she snubbed my wife, who she invited. You could tell that Rozatti is still very bitter over her landslide defeat, and I had a good laugh over that, it never gets old.

I never expected her to rise to the occasion and be gracious. There were some really beautiful people there, most were dressed to the 9's; but not Rozatti.

She looked like a female version of the Michelin Man, wrapped in a dingy dish towel, long in the tooth, tired & weary. Judge for yourself.

👍😆 5                                                          1 comment

👍 Like                    💬 Comment                    ➤ Share

Top comments ▾

Submit your first comment...                    😄 ☺ 📷 GIF 🏷

**Becky Othmer**
Good morning.

After reading through your post, I debated if I should reply. As a middle school teacher I work tirelessly to teach my students about respect; not only seeking it but giving it. While I understand we are all entitled to our opinions and... **See more**

Like   Reply   Share   2h

**William Elliott**
6h · 🌐



**West Covina High School**
1d · 🌐

This week's #BulldogCountryEvents!

👍 John Carson

👍 Like        💬 Comment        ↪ Share

Submit your first comment...        😀 ☺ 📷 GIF 🙂

---

**William Elliott** commented on this photo.

**William Elliott**
10h · 🌐

**WEST COVINA TODAY**        👥 Join group    🔍    ...

👍 Like        💬 Comment        ↪ Share

Top comments ▾

Submit your first comment...        😀 ☺ 📷 GIF 🙂

**William Elliott**  Author
Collen Rozatti 🧡, far right.
West Covina Mayor Rosario Diaz
3rd from right
Like  Reply  Share  9h  Edited

# EXHIBIT O

**May 18, 2026 Supplemental Medical Clarification Letter of Dr. Henry Chang**

Shows updated medical necessity and non-equivalence opinions regarding
GoPro/360-degree recording, USB/physical storage, cloud-only platforms,
ergonomic seating, teleconferencing, processing time, advance agenda access, and
confidentiality.

**STAR HEALTH**
2707 E. Valley Blvd., Suite 208
West Covina, CA 91792-3197
Phone: (626) 581-0486

**Henry Chang, D.O.**
Osteopathic Physician & Surgeon
License No. 20A10516

May 18, 2026

**To:** City of West Covina
Human Resources / Risk Management
ADA Coordinator

**Re: Supplemental Medical Clarification Regarding Medically Necessary ADA/FEHA Accommodations for Brian Gutierrez**

Dear Accommodation Team:

I am the treating physician for Mr. Brian Gutierrez. I previously issued a medical accommodation letter dated January 26, 2026, identifying accommodations medically necessary for Mr. Gutierrez to perform his official duties while mitigating disability-related functional limitations.

This supplemental medical clarification is provided because Mr. Gutierrez reports that several medically supported accommodations remain delayed, denied, incomplete, or substituted with alternatives that do not provide equivalent medical function. He further reports that the City may be treating the City's existing YouTube/chamber recording as equivalent to the medically recommended GoPro MAX 2 or equivalent 360-degree recording device.

I am not providing legal advice. I am providing medical opinions within a reasonable degree of medical probability based on my treatment of Mr. Gutierrez, his documented diagnoses, his reported functional limitations, the medical records available to me, and the clinical nexus between his impairments and the requested accommodations.

It remains my medical opinion that the accommodations identified below are medically necessary and that the City's YouTube/chamber recording, cloud-only storage platforms, and incomplete equipment substitutions are not medically equivalent to the accommodations requested.

**I. Relevant Diagnoses and Functional Impairments**

Mr. Gutierrez has documented neurological and medical conditions that affect his functional capacity in high-demand public-meeting environments. These include:

**STAR HEALTH**
2707 E. Valley Blvd., Suite 208
West Covina, CA 91792-3197
Phone: (626) 581-0486

1. Autism Spectrum Disorder / Asperger's profile;
2. auditory-processing and auditory-working-memory limitations;
3. executive-functioning impairment under time pressure;
4. sensory-integration dysfunction involving light, sound, movement, crowded environments, and rapid multi-speaker interaction;
5. chronic musculoskeletal pain, including low back pain and postural intolerance;
6. sleep disturbance / insomnia;
7. stress-related physiological symptoms, including anxiety features and somatic exacerbation under hostile, overstimulating, or time-pressured conditions;
8. cognitive fatigue and reduced information-processing efficiency during prolonged public interaction.

These impairments are not matters of preference, convenience, political disagreement, or personality. They are medically recognized functional limitations that can substantially affect Mr. Gutierrez's ability to encode information, process speech, organize responses, sustain attention, tolerate prolonged sitting, regulate sensory input, and participate effectively in complex government meetings.

Mr. Gutierrez is cognitively capable and able to perform high-level public duties. However, high functioning does not eliminate disability. In individuals with Autism Spectrum Disorder, outward competence can mask substantial neurological effort, compensatory processing, sensory burden, and post-event cognitive fatigue.

## II. Clinical Explanation of the Functional Barrier

City Council meetings are unusually complex neurocognitive environments. They involve rapid verbal exchange, multiple speakers, staff reports, legal advice, public comment, procedural objections, interruptions, nonverbal reactions, audience noise, lighting demands, voting pressure, and social conflict.

For Mr. Gutierrez, this environment creates predictable disability-related barriers, including:

1. reduced real-time auditory encoding;
2. working-memory saturation;
3. delayed integration of verbal and visual information;
4. difficulty reconstructing sequence, timing, speaker identity, and context after rapid exchanges;
5. increased cognitive fatigue;
6. increased sensory overload;
7. increased physiological stress response;
8. reduced executive-functioning efficiency when forced to respond immediately;

**STAR HEALTH**
2707 E. Valley Blvd., Suite 208
West Covina, CA 91792-3197
Phone: (626) 581-0486

9.  worsened pain and reduced attention when seating is not ergonomically appropriate. Clinically, Mr. Gutierrez benefits from post-event visual-spatial reconstruction. This means he uses visual context after the event to reconstruct what occurred, associate verbal information with nonverbal cues, and process complex exchanges at a neurologically tolerable pace.

This is the medical basis for the 360-degree recording accommodation.

### III. GoPro MAX 2 / Equivalent 360-Degree Recording Device

**Accommodation Requested**

Mr. Gutierrez should be permitted to use a GoPro MAX 2 or equivalent 360-degree recording device at his Council desk during open public meetings, with all necessary mounting, storage, power, and transfer accessories needed to make the device functional.

**Medical Purpose**

The purpose of this accommodation is to provide Mr. Gutierrez with an individualized assistive recording tool that captures the meeting from his actual seated position and permits later review using whole-room visual-spatial replay.

This accommodation is medically necessary because Mr. Gutierrez's Autism Spectrum Disorder affects real-time auditory processing, working memory, information encoding, sensory integration, and executive functioning.

In a multi-speaker environment, Mr. Gutierrez may hear words but be unable to reliably encode the complete meaning, timing, source, sequence, nonverbal context, and procedural significance of the communication in real time. A 360-degree recording allows him to review the meeting after the fact, slow down the information, and reconstruct the event through visual-spatial cues.

This is not a technology preference. It is a disability-related compensatory strategy.

**Clinical Function**

A 360-degree recording device from Mr. Gutierrez's Council desk assists with:

1.  auditory-verbal reconstruction — reviewing what was said after the auditory-processing demand has decreased;
2.  visual-spatial anchoring — associating words with the location, movement, and physical position of speakers;

**STAR HEALTH**
2707 E. Valley Blvd., Suite 208
West Covina, CA 91792-3197
Phone: (626) 581-0486

3. nonverbal cue integration — reviewing facial expressions, body language, gestures, staff reactions, Councilmember reactions, audience reactions, and simultaneous events;

4. sequence reconstruction — identifying who spoke, when they spoke, who responded, and what was occurring outside the active microphone or camera frame;

5. working-memory compensation — allowing review of information that could not be retained in real time;

6. reduction of neurological overload — permitting processing at a slower and medically sustainable pace;

7. improved accuracy of participation — allowing Mr. Gutierrez to prepare questions, respond accurately, and perform official duties with less cognitive destabilization.

Without this accommodation, Mr. Gutierrez is placed at a neurological disadvantage compared to non-disabled peers who can more efficiently process multi-speaker public discussion in real time.

### IV. The City's YouTube / Chamber Recording Is Not Medically Equivalent

I understand Mr. Gutierrez has been informed that the City may deny the GoPro / 360-degree recording accommodation because the City's existing YouTube or chamber recording allegedly provides the same function.

From a medical standpoint, that conclusion is incorrect.

A public YouTube/chamber recording is not medically equivalent to an individualized 360-degree assistive recording device placed at Mr. Gutierrez's Council desk.

The City's YouTube/chamber video is a public broadcast record. It is controlled by the City's camera system, camera angles, microphone activation, operator choices, automated switching, meeting-production decisions, and broadcast framing. It is designed to create a public meeting record. It is not designed to meet Mr. Gutierrez's individualized disability-related processing needs.

The City's recording typically captures the active speaker, dais, podium, slide presentation, or selected camera feed. It does not continuously preserve the full environment from Mr. Gutierrez's actual vantage point.

That distinction is medically important.

For Mr. Gutierrez, the missing information is often not the words alone. The medically relevant information includes the entire context in which the words occurred.

The City's YouTube/chamber recording does not reliably capture:

**STAR HEALTH**
2707 E. Valley Blvd., Suite 208
West Covina, CA 91792-3197
Phone: (626) 581-0486

1. whole-room visual context;
2. the view from Mr. Gutierrez's seated position;
3. simultaneous nonverbal reactions;
4. off-camera conduct;
5. body language outside the active camera frame;
6. staff-table reactions;
7. City Attorney reactions;
8. Mayor and Councilmember conduct occurring while another person speaks;
9. side conversations;
10. audience reactions;
11. police or security positioning;
12. movement behind or around the dais;
13. visual cues occurring during microphone transitions;
14. timing between verbal exchange and nonverbal reaction;
15. the complete sensory environment experienced by Mr. Gutierrez.

A speaker-focused or operator-controlled video removes the broader visual field needed for Mr. Gutierrez's compensatory processing.

For a person without Mr. Gutierrez's disability, the public broadcast may be adequate. For Mr. Gutierrez, it is not equally effective.

A general meeting broadcast is therefore not a medical substitute for the requested 360-degree assistive recording accommodation.

**V. The 360-Degree Device Must Be Functional, Not Merely Purchased**

A camera alone is not a complete accommodation if Mr. Gutierrez cannot reliably use it.

The medically necessary accommodation should include the parts and accessories required for actual use, including:

1. GoPro MAX 2 or equivalent 360-degree recording device;
2. stable, non-obstructive desk mount, clamp, or tripod;
3. sufficient memory cards or approved storage media;
4. batteries, charging cable, power adapter, or external power solution adequate for long meetings;
5. card reader, secure USB, or City-approved transfer method;
6. protective case;
7. software or application access necessary to review the 360-degree footage;
8. a secure method for preserving, transferring, and reviewing the recording.

**STAR HEALTH**
2707 E. Valley Blvd., Suite 208
West Covina, CA 91792-3197
Phone: (626) 581-0486

If the City has data-security concerns, the City may provide a City-approved encrypted storage device or transfer process. However, the medical function must remain intact. Mr. Gutierrez must be able to review the recorded material after the meeting in a manner that allows visual-spatial replay from his meeting vantage point.

A nonfunctional or incomplete device does not provide meaningful accommodation.

## VI. City-Owned or City-Controlled Equipment Is Medically Acceptable

The accommodation does not require the device to be personally owned by Mr. Gutierrez.

From a medical standpoint, it is acceptable for the City to own, inventory, control, and maintain the device, provided Mr. Gutierrez has reliable functional access to it when needed for open public meetings and post-meeting review.

The medical requirement is not ownership. The medical requirement is functional access.

If the City wishes to maintain the equipment as City property, that is clinically acceptable so long as:

1. the device is available at each open public Council meeting;
2. it is placed at or near Mr. Gutierrez's Council desk in a manner that captures his visual-spatial perspective;
3. it has sufficient power and storage for the full meeting;
4. recordings can be reviewed by Mr. Gutierrez after the meeting;
5. the City does not use access-control or administrative procedures to defeat the accommodation;
6. any retention or public-record procedure preserves the accommodation's function.

## VII. Secure Physical Storage / USB / SD Card / External Storage Accommodation

**Accommodation Requested**

Mr. Gutierrez requires a simple, secure, City-approved method to store, transfer, and review disability-related meeting materials and accommodation-related recordings. This may include a secure USB thumb drive, encrypted portable storage device, SD/microSD card system, card reader, or other simple physical storage equivalent.

**STAR HEALTH**
2707 E. Valley Blvd., Suite 208
West Covina, CA 91792-3197
Phone: (626) 581-0486

**Medical Nexus**

Mr. Gutierrez's disability affects information organization, working memory, auditory processing, executive functioning, and post-event review. The ability to preserve and review information in an organized, predictable, accessible format is part of the accommodation.

A secure physical transfer/storage method helps Mr. Gutierrez:

1. review recordings at a medically tolerable pace;
2. organize agenda materials;
3. reduce cognitive load;
4. avoid repeated real-time review demands;
5. maintain continuity between meetings;
6. reduce working-memory burden;
7. process complex public information accurately.

If the City objects to a standard USB device for cybersecurity reasons, the medically appropriate response is not denial. The medically appropriate response is a secure City-approved equivalent that preserves the same function.

The medical function is secure, reliable, accessible review. The specific device may be adjusted, but the function must not be eliminated.

## VIII. Microsoft OneDrive, SharePoint, and Cloud-Only Platforms Are Not Medically Equivalent

I understand that the City may propose Microsoft OneDrive, SharePoint, cloud-based storage, online portals, or similar web-based platforms as an alternative to a USB thumb drive, SD card, external drive, or other direct physical storage device.

From a clinical standpoint, I do not recommend requiring Mr. Gutierrez to rely on Microsoft OneDrive, SharePoint, or similar cloud-based platforms as the sole or primary method for storing, transferring, organizing, or reviewing accommodation-related recordings and meeting materials.

This opinion is based on Mr. Gutierrez's Autism Spectrum Disorder / Asperger's profile, executive-functioning limitations, working-memory limitations, auditory-processing limitations, sensory-integration limitations, cognitive fatigue, and stress-related physiological symptoms.

A cloud-based platform is not medically equivalent to a simple physical storage device because it adds additional cognitive, sensory, and executive-functioning demands.

**STAR HEALTH**
2707 E. Valley Blvd., Suite 208
West Covina, CA 91792-3197
Phone: (626) 581-0486

These platforms often require multiple steps, including:

1. logging in;
2. navigating browser or application interfaces;
3. locating folders;
4. managing file permissions;
5. waiting for synchronization;
6. handling sync failures;
7. responding to error messages;
8. dealing with multi-factor authentication;
9. uploading files;
10. downloading files;
11. checking whether files transferred correctly;
12. managing links or access restrictions;
13. remembering file paths and folder locations;
14. tolerating interface changes or unexpected prompts.

For many individuals, these steps may appear routine. For Mr. Gutierrez, they create medically significant barriers because they increase executive load, working-memory burden, visual-scanning demand, cognitive fatigue, frustration tolerance demand, and risk of sensory/cognitive overload.

The purpose of the storage accommodation is to simplify access, reduce cognitive load, and allow reliable post-meeting review. A cloud-only system can defeat that purpose by making the patient manage a multi-step digital workflow before he can even begin reviewing the meeting materials.

Therefore, I recommend that Mr. Gutierrez be provided a simple, direct, predictable, and locally accessible storage method, such as:

1. a City-approved encrypted USB thumb drive;
2. a City-approved external storage device;
3. a City-approved SD/microSD card and card reader;
4. a City-controlled local transfer device;
5. another simple physical storage method that does not require complex cloud navigation as the primary access point.

If the City has cybersecurity concerns, it may provide an encrypted or City-managed physical storage device. From a medical standpoint, the exact brand or device is less important than the functional requirement: Mr. Gutierrez needs a simple, reliable, low-step method to store, transfer, and review accommodation-related recordings and materials.

**STAR HEALTH**
2707 E. Valley Blvd., Suite 208
West Covina, CA 91792-3197
Phone: (626) 581-0486

I do not object to cloud storage being used as a backup or secondary administrative tool if the City requires it for records management. However, cloud storage should not be the sole or primary accommodation method if it prevents Mr. Gutierrez from reliably and independently accessing the materials in a medically manageable way.

A medically effective storage accommodation should minimize unnecessary steps, reduce user-interface complexity, avoid avoidable online navigation, and allow Mr. Gutierrez to review meeting recordings and materials at a predictable pace without added cognitive overload.

Accordingly, Microsoft OneDrive, SharePoint, or similar online memory platforms are not medically equivalent to a USB thumb drive, SD card, external drive, or other direct physical storage device for Mr. Gutierrez's accommodation needs.

I specifically advise against requiring Mr. Gutierrez to use Microsoft OneDrive, SharePoint, or similar cloud-based platforms as the sole or primary method for storing, transferring, or reviewing accommodation-related recordings and meeting materials.

### IX. Ergonomic Seating / Chair Accommodation

**Accommodation Requested**

Mr. Gutierrez requires appropriate ergonomic seating, including a high-quality ergonomic chair or stool suitable for prolonged Council meetings and official work.

**Medical Nexus**

Mr. Gutierrez has chronic musculoskeletal pain and postural intolerance. Prolonged sitting in an inadequate chair increases nociceptive input, worsens lumbar and musculoskeletal symptoms, increases fatigue, and consumes cognitive resources needed for attention, executive functioning, and meeting participation.

Pain is not isolated from cognitive functioning. Persistent pain competes with concentration, worsens irritability, reduces endurance, and increases neurological fatigue.

Appropriate ergonomic seating is medically necessary to reduce pain escalation, preserve cognitive bandwidth, and allow Mr. Gutierrez to perform official duties during prolonged meetings, office work, and document review.

**Required Functional Features**

The seating accommodation should include, as medically appropriate:

**STAR HEALTH**
2707 E. Valley Blvd., Suite 208
West Covina, CA 91792-3197
Phone: (626) 581-0486

1. adequate lumbar support;
2. adjustable height;
3. stable base;
4. appropriate seat depth;
5. supportive cushioning;
6. ability to maintain neutral posture;
7. suitability for long meetings;
8. placement consistent with his visual and sensory needs.

Failure to provide ergonomic seating creates foreseeable risk of pain exacerbation, reduced concentration, fatigue, and functional decompensation.

## X. Teleconferencing / Remote Participation Accommodation

**Accommodation Requested**

Mr. Gutierrez requires the ability to participate remotely by teleconference when medically necessary because of disability-related symptoms, pain flares, sensory overload, stress-induced physiological symptoms, or other medically significant limitations.

**Medical Nexus**

In-person Council meetings can involve substantial sensory stimulation, bright lights, sound, crowding, hostile interaction, time pressure, prolonged sitting, and public conflict. These conditions may exacerbate Mr. Gutierrez's Autism Spectrum Disorder, anxiety features, insomnia, sensory overload, and musculoskeletal pain.

Remote participation is medically necessary as a contingency accommodation when in-person attendance would foreseeably worsen symptoms or prevent effective functioning.

Video access is medically important because Mr. Gutierrez relies on visual information to compensate for auditory-processing limitations. Audio-only access may be insufficient in many circumstances because it removes visual cues needed for comprehension, sequence, and context.

Therefore, remote participation should include both audio and visual access unless Mr. Gutierrez's disability prevents video use during a particular episode.

Remote participation is not requested as a convenience. It is a medically necessary accommodation to preserve continuity of elected participation during disability-related episodes.

**STAR HEALTH**
2707 E. Valley Blvd., Suite 208
West Covina, CA 91792-3197
Phone: (626) 581-0486

**XI. Advance Access to Agenda Materials**

**Accommodation Requested**

Mr. Gutierrez requires agenda materials, staff reports, attachments, and relevant documents as far in advance as reasonably possible.

**Medical Nexus**

Autism Spectrum Disorder can substantially affect information-processing speed, executive functioning, working memory, and real-time integration of complex written and verbal information.

Advance access permits:

1. pre-processing of complex material;
2. reduction of cognitive overload;
3. preparation of structured questions;
4. improved comprehension;
5. reduced anxiety;
6. improved meeting participation;
7. decreased risk of real-time functional decompensation.

Late, incomplete, or disorganized access to agenda materials increases neurological load and interferes with meaningful participation.

Advance access is medically necessary for effective participation.

**XII. Processing Time During Meetings**

**Accommodation Requested**

Mr. Gutierrez should not be forced to respond immediately, vote first, answer complex questions without adequate processing time, or be pressured to speak before he has neurologically integrated the information.

**Medical Nexus**

Time pressure worsens executive dysfunction, working-memory overload, sensory dysregulation, and anxiety. It increases the risk of inaccurate responses, emotional dysregulation, neurological fatigue, and avoidable stress response.

**STAR HEALTH**
2707 E. Valley Blvd., Suite 208
West Covina, CA 91792-3197
Phone: (626) 581-0486

Processing time allows Mr. Gutierrez to:

1. organize thoughts;
2. integrate verbal and written information;
3. reduce auditory-processing overload;
4. avoid forced impulsive response;
5. participate more accurately;
6. vote with adequate comprehension.

This accommodation is medically necessary because it addresses the actual functional limitation: reduced efficiency of real-time processing under high public pressure.

### XIII. Prohibition on Public Disability Comparisons and Public Medical Questioning

**Accommodation Requested**

Mr. Gutierrez should not be subjected to public disability comparisons, public questioning of whether he "really" needs accommodations, public disclosure or discussion of medical details, or comparisons between Autism Spectrum Disorder and unrelated disabilities.

**Medical Nexus**

Autism Spectrum Disorder is a neurodevelopmental condition involving central nervous system processing differences. It is not medically comparable to unrelated disabilities such as blindness, hearing loss, or mobility impairment.

Public comparison, ridicule, or minimization of Autism is medically inappropriate and clinically harmful.

Such conduct can worsen:

1. anxiety;
2. insomnia;
3. sensory overload;
4. autonomic arousal;
5. stress-related somatic symptoms;
6. cognitive destabilization;
7. avoidance of public participation;
8. loss of trust in the accommodation process.

Public questioning of a disability can also create a hostile medical environment and interfere with the patient's willingness to request or use medically necessary accommodations.

**STAR HEALTH**
2707 E. Valley Blvd., Suite 208
West Covina, CA 91792-3197
Phone: (626) 581-0486

From a medical standpoint, accommodation discussions should be handled confidentially and respectfully by personnel with a need to know.

## XIV. Cost-Shifting Creates Functional and Medical Harm

I understand Mr. Gutierrez has reported that the City may purchase the GoPro / 360-degree recording device or related accommodation equipment using his Council discretionary allocation.

From a clinical standpoint, treating a medically necessary accommodation as a discretionary political or district expense creates a barrier to access and increases stress.

It forces the patient to choose between disability access and other official duties or district-related uses of funds. That is medically significant because the resulting stress, uncertainty, stigma, and delay worsen the same functional impairments the accommodation is intended to mitigate.

A medically necessary disability accommodation should be treated as an accessibility accommodation, not as an optional technology upgrade, political request, or discretionary office expense.

## XV. Cumulative Harm From Denial of Multiple Accommodations

The accommodations identified in my January 26, 2026 letter should not be viewed in isolation.

They function together.

The 360-degree recording device helps with post-event processing. Physical storage/access reduces executive burden. Ergonomic seating reduces pain and preserves concentration. Advance agenda access reduces cognitive load before meetings. Processing time reduces real-time overload. Teleconferencing preserves participation when symptoms flare. Confidential handling prevents avoidable stress and medical destabilization.

Denying one accommodation increases reliance on the others. Denying multiple accommodations simultaneously creates cumulative functional harm.

The cumulative effect of denying or delaying these accommodations includes foreseeable risk of:

1. sensory overload;
2. cognitive fatigue;

**STAR HEALTH**
2707 E. Valley Blvd., Suite 208
West Covina, CA 91792-3197
Phone: (626) 581-0486

3.  impaired information processing;
4.  increased anxiety;
5.  insomnia;
6.  worsening musculoskeletal pain;
7.  stress-induced somatic symptoms;
8.  reduced meeting participation;
9.  reduced accuracy in public decision-making;
10. avoidance of official duties;
11. functional decompensation.

This risk is medically foreseeable.


## XVI. Medical Response to Reported Denial Based on YouTube Equivalency

I understand Mr. Gutierrez has reported that he was told the requested 360-degree recording device is being denied because the City's YouTube/chamber recording allegedly provides equivalent access.

From a medical standpoint, that conclusion is not clinically supported.

The question is not whether the City records meetings. The question is whether the City's recording provides the same disability-related function as the requested accommodation.

It does not.

The City's YouTube/chamber video does not provide:

1.  the patient's actual seat perspective;
2.  continuous panoramic field of view;
3.  whole-room visual-spatial context;
4.  simultaneous visual cue capture;
5.  reliable capture of off-camera conduct;
6.  individualized post-event sensory reconstruction;
7.  patient-controlled review from the neurologically relevant perspective.

Therefore, the YouTube/chamber video is not equally effective for Mr. Gutierrez's documented disability-related processing needs.

A non-medical reviewer may evaluate administrative or operational issues, but a non-medical reviewer is not clinically qualified to determine that a public broadcast video is medically equivalent to a patient-specific 360-degree visual-spatial replay accommodation for Autism

**STAR HEALTH**
2707 E. Valley Blvd., Suite 208
West Covina, CA 91792-3197
Phone: (626) 581-0486

Spectrum Disorder with auditory-processing, working-memory, and sensory-integration limitations.

## XVII. Medical Response to Reported Denial Based on "Meaningful Access"

I understand Mr. Gutierrez has also reported that he was told the GoPro / 360-degree recording device does not provide meaningful access.

From a clinical standpoint, I disagree.

The requested device provides meaningful access because it directly addresses the functional barrier created by Mr. Gutierrez's disability: impaired real-time encoding of complex, multi-speaker public discussion.

A 360-degree recording device provides meaningful access by allowing Mr. Gutierrez to:

1. reconstruct complex verbal exchanges;
2. use visual-spatial cues to compensate for auditory-processing deficits;
3. review material at a neurologically sustainable pace;
4. reduce cognitive overload;
5. improve accuracy of later participation;
6. preserve context not captured by speaker-focused public recordings;
7. meaningfully perform duties requiring comprehension, oversight, and response.

The accommodation is clinically matched to the impairment.

That is functional medical necessity.

## XVIII. Delay Itself Creates Medical Harm

Delay in implementation is not medically neutral.

When a patient repeatedly attends high-demand public meetings without medically necessary accommodations, the patient is exposed to predictable functional stressors without the compensatory supports required to mitigate them.

For Mr. Gutierrez, continued delay increases risk of:

1. sensory overload;
2. sleep disruption;
3. anxiety;

**STAR HEALTH**
2707 E. Valley Blvd., Suite 208
West Covina, CA 91792-3197
Phone: (626) 581-0486

4. cognitive fatigue;
5. stress-related physiological symptoms;
6. pain exacerbation;
7. reduced concentration;
8. impaired executive functioning;
9. avoidable medical deterioration.

The longer the accommodations remain unimplemented, the greater the risk of cumulative harm.

## XIX. Final Medical Opinion

It is my medical opinion, within reasonable medical probability, that the following accommodations remain medically necessary for Mr. Gutierrez:

1. GoPro MAX 2 or equivalent 360-degree recording device at his Council desk during open public meetings;
2. necessary accessories for the 360-degree device, including mount, storage media, power supply, transfer method, and software/access needed for review;
3. a simple City-approved physical storage or transfer device, such as an encrypted USB thumb drive, SD/microSD card and reader, external storage device, or equivalent local storage method;
4. avoidance of cloud-only platforms such as Microsoft OneDrive, SharePoint, or similar online systems as the sole or primary accommodation method because they impose unnecessary executive-functioning, working-memory, visual-navigation, and cognitive-load demands;
5. ergonomic seating appropriate for prolonged Council meetings and official work;
6. advance access to agenda materials and attachments;
7. processing time during meetings, including not requiring immediate responses or forcing him to vote first;
8. remote teleconference participation with audio and visual access when medically necessary;
9. confidential handling of disability and medical information;
10. prohibition on public disability comparisons, public medical questioning, or public minimization of accommodation needs.

The City's YouTube/chamber recording is not medically equivalent to a GoPro MAX 2 or equivalent 360-degree recording device from Mr. Gutierrez's Council desk.

Microsoft OneDrive, SharePoint, or similar cloud-only platforms are not medically equivalent to a simple USB thumb drive, SD card, external drive, or other direct physical storage device for Mr. Gutierrez's accommodation needs.

**STAR HEALTH**

2707 E. Valley Blvd., Suite 208

West Covina, CA 91792-3197

Phone: (626) 581-0486

A denial based on YouTube equivalency, cloud-storage substitution, or incomplete equipment implementation does not satisfy the medical purpose of the accommodation.

Failure to implement these accommodations creates foreseeable neurological, psychological, and physical harm.

No non-medical reviewer is clinically qualified to override these medical determinations without an individualized medical basis addressing the functional impairments described above.

Sincerely,

**Henry Chang, D.O.**

Osteopathic Physician & Surgeon

License No. 20A10516

Star Health Medical

**Star Health Medical**
Henry Chang, DO, MS, FACOI
2707 E Valley Blvd, Suite 208
West Covina, CA 97192
Office: 626.581.0486 Fax: 626.581.0161