# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| **JOHN DOE,** | **Case No. 2:26-cv-03659-MEMF-MBK** |
| Plaintiff, | |
| | District Judge: Hon. Maame Ewusi-Mensah Frimpong |
| v. | Magistrate Judge: Hon. Michael B. Kim |
| **CITY OF WEST COVINA; MILAN M. MRAKICH; LETICIA SALAZAR LOPEZ-VIADO; and DOES 1-50,** | **SECOND AMENDED COMPLAINT FOR DAMAGES, DECLARATORY RELIEF, INJUNCTIVE RELIEF, AND EQUITABLE RELIEF** |
| Defendants. | |
| | **JURY TRIAL DEMANDED** |

## PRELIMINARY STATEMENT AND ROADMAP

1. This Second Amended Complaint is deliberately more detailed because the Court previously required more than labels, conclusions, and political context. Plaintiff now pleads a concrete Title II map: disability, program, barrier, requested accommodation, City response, access injury, deliberate indifference, and ongoing harm. Each accommodation is connected to a specific Council function and each retaliatory act is connected to protected speech or protected ADA activity.

2. Plaintiff John Doe is autistic, a former foster youth, a public servant, and an elected Councilmember. He sought equal access to City Council meetings, agenda materials, deliberation, voting, records review, City Hall access, staff communications, public comment procedure, remote participation, City-issued ADA technology, and the City's ADA grievance process. These are not conveniences. They are the mechanics of democratic representation.

3. The City of West Covina did not merely misunderstand one request. It adopted an unlawful operating premise that elected officials are different and that no formal ADA investigation was required for an elected official's claim. Title II does not contain that exception. When a City opens municipal programs and public meetings, it must administer them without disability discrimination regardless of whether the disabled participant is a resident, speaker, volunteer, employee, contractor, appointee, or elected official.

4. The City's retaliation had a recognizable architecture: Milan Mrakich's communication protocol, Roxanne Lerma's nonresponsive ADA coordination, Thomas Duarte's legal posture, Buchalter's conflict-entangled defense, the Gemelli investigation, the censure narrative, the CPRA/AI lawsuit, public disclosure of ADA information, police-backed interference with an ADA chair, and viewpoint-based meeting control by Mayor Lopez-Viado.

5. The complaint also pleads corruption and public-integrity facts because they explain motive. Plaintiff reported suspected misuse of public funds, conflicts of interest, legal billing irregularities, nonprofit event finances, CAAWC/Moon Festival issues, City Boba Fest, Film It, Aurio, PBK/Fire Station 1, City Attorney travel, FPPC matters, deed/mortgage concerns, and

District Attorney or law-enforcement issues. Defendants retaliated because Plaintiff's oversight threatened the political and financial arrangement he was investigating.

6. This pleading uses the word "alleges" carefully. Plaintiff does not ask the Court at the pleading stage to adjudicate every corruption allegation as proven. Plaintiff asks the Court to recognize that he engaged in protected oversight, that his reports were grounded in records, and that Defendants responded by attacking his disability, his speech, his accommodations, and his public credibility.

7. The case is therefore a civil-rights case with a public-integrity backdrop. The backdrop matters because retaliation requires motive, and motive is shown by sequence, context, targeted action, and the City's decision to protect politically favored actors while disciplining the disabled Councilmember who asked questions.

**EXHIBIT USE, JUDGE FOCUS, AND REDACTION / SEALING REQUEST**

**JUDGE FOCUS: The final packet includes a matching appendix and exhibit index. The public exhibit volume uses black redaction placeholders for pages containing medical, ADA-accommodation, Safe at Home, EEOC, deed/mortgage, restraining-order, or safety-sensitive information. The unredacted highlighted sensitive-page excerpt is labeled for filing under seal only.**

8. Plaintiff submits a final packet with a public redacted exhibit volume, a proposed sealed unredacted sensitive-page excerpt, a sealing application, and a proposed sealing order. The public version uses black redactions or full-page

3

black placeholders where the material contains medical information, disability-accommodation details, Safe at Home or safety information, EEOC materials, deed/mortgage materials, or other private information that should not be filed publicly without leave of Court.

9. Plaintiff asks the Court to consider the public redacted volume and, if the Court needs the full content of any redacted page, to review the corresponding unredacted highlighted page under seal. The appendix identifies each exhibit group, the attachment where it appears, whether it is public or proposed sealed, and the reason for any redaction or sealing request.

10. Plaintiff does not intend the redactions to hide the basis of his claims. The redaction map is intended to do exactly what the Court has required in prior sealing practice: identify what is being withheld from the public record, explain why, and provide an unredacted highlighted version through the proper sealed-document process.

## JURISDICTION, VENUE, PARTIES, AND CAPACITIES

11. This Court has federal-question jurisdiction under 28 U.S.C. sections 1331 and 1343 because this action arises under Title II of the Americans with Disabilities Act, 42 U.S.C. section 12132; the ADA retaliation and interference provision, 42 U.S.C. section 12203; Section 504 of the Rehabilitation Act, 29 U.S.C. section 794; 42 U.S.C. section 1983; and the First and Fourteenth Amendments.

12. Supplemental jurisdiction exists under 28 U.S.C. section 1367 over California claims including the Bane Act, California Civil Code section 52.1, the Confidentiality of Medical Information Act, and California constitutional privacy. Venue is proper because the relevant conduct occurred in West Covina, California, within this District.

13. Plaintiff is a qualified individual with disabilities. His autism and related conditions substantially limit major life activities including communication, concentration, sensory regulation, information processing, working memory, sleep, and neurological functioning. Plaintiff is eligible to participate in the City programs at issue because he is a duly elected Councilmember and participant in public municipal activities.

14. The City of West Covina is a public entity and municipal corporation. Defendant Milan M. Mrakich is sued individually for retaliation, selective enforcement, ADA interference, First Amendment retaliation, and Bane Act coercion, and in his official capacity for prospective relief invalidating or enjoining the Communication Protocol as applied. Defendant Leticia Salazar Lopez-Viado is sued individually for viewpoint discrimination, color-of-law speech suppression, retaliation, and police-backed interference with disability access.

15. Doe Defendants include City officials, City Manager Office personnel, ADA and HR personnel, police or security personnel, Finance and IT personnel, the City Attorney and related municipal counsel, outside counsel, investigators, contractors, and private recipients or republishers who participated in the disclosure or weaponization of ADA information.

## PLAINTIFF'S PUBLIC SERVICE AND THE DIGNITARY HARM

16. Plaintiff grew up in Los Angeles County foster care while living with autism. He endured instability and abuse. He remembers hiding outside, watching police helicopters overhead, and hoping that public authority would see him and remove him from danger. Around age ten, government did what government is supposed to do: it intervened and protected him.

17. That experience made public service personal. Plaintiff became a disability advocate, emergency-management and public-affairs professional, crisis communicator, and elected official. His life became a bridge from a child waiting for government protection to a public servant demanding that government protect others.

18. Plaintiff worked with federal leaders and initiatives during the Biden-Harris Administration on disability, public affairs, community engagement, emergency preparedness, and accessible communication. He has participated in spaces where national leadership treated disability as a civic asset rather than a liability.

19. Plaintiff has been appointed twice by California Governors to disability-related public service roles. He does not name those bodies here because the legal point is not title collection. The point is that state and federal leaders recognized his disability expertise before West Covina attempted to frame his autism as instability.

20. Plaintiff received national White House correspondence in April 2026 recognizing autism advocacy and public service. Plaintiff intentionally does not name the sender in this pleading because this fact is not offered as partisan influence. It is offered to show dignitary harm: national leadership recognized the value of autistic service while the City refused autism recognition and weaponized Plaintiff's accommodations.

21. Defendants attacked Plaintiff's reputation by rebranding autism-related communication as harassment, written processing as obstruction, ADA technology as waste, and disability access as political theater. These attacks were designed to make law enforcement, FPPC, the public, and this Court question Plaintiff instead of the corruption he reported.

**WHAT THE COURT ASKED FOR AND HOW PLAINTIFF PLEADS IT**

22. The Court previously required specific facts. Plaintiff pleads them. For each ADA claim, the Court can identify the disability barrier, requested accommodation, City response, affected municipal function, and concrete injury. This complaint is organized so the Court does not have to guess.

23. Plaintiff is disabled and qualified. The City functions are identified: Council meetings, agenda review, voting, deliberation, staff communication, City Hall access, records review, public comment administration, City-issued technology, security/police actions inside public meetings, and ADA grievance procedures.

7

24. The denials are identified: failure to provide a GoPro MAX 2 or equivalent 360-degree recording accommodation; failure to provide USB or physical-storage agenda packets; failure to implement teleconference access under SB 707; interference with an ADA chair; failure to provide ADA lighting, written communication, processing time, accessible records review, and confidentiality.

25. The access injuries are identified: inability to review meetings from Plaintiff's vantage point, inability to process agenda materials without cloud barriers, inability to attend remotely when symptoms prevent effective attendance, pain and humiliation from chair removal, impaired legal-billing oversight, and chilling of future ADA requests after the leak.

26. The deliberate indifference is identified: Milan, Roxanne Lerma, HR, counsel, and final policymakers received written requests, medical letters, EEOC materials, public notices, complaints, and federal filings. They knew the accommodations were needed and failed to act, or acted in a way that made access worse.

27. The ongoing harm is identified: Plaintiff still serves as an elected official. Every agenda packet, Council meeting, public comment period, staff inquiry, legal-billing review, ADA request, and public disclosure risk continues. A missed meeting, silenced speech, leaked accommodation, or public censure cannot be repaired by later promises.

**TITLE II AND SECTION 504 LEGAL STANDARDS**

28. Title II requires proof that Plaintiff is a qualified individual with a disability; that he was eligible to participate in or receive the benefit of a City service, program, or activity; that he was excluded from participation, denied benefits, or otherwise discriminated against; and that the exclusion or denial was by reason of disability. 42 U.S.C. section 12132; Tennessee v. Lane, 541 U.S. 509 (2004); Alexander v. Choate, 469 U.S. 287 (1985).

29. The Ninth Circuit construes public-entity programs broadly. Barden v. City of Sacramento, 292 F.3d 1073 (9th Cir. 2002), confirms that municipal services and public infrastructure are covered. Council meetings, agenda systems, public records, staff communication, and public meeting administration are no less public services than sidewalks or courthouses.

30. The City must make reasonable modifications unless it proves fundamental alteration. 28 C.F.R. section 35.130(b)(7). It must provide effective communication and appropriate auxiliary aids, giving primary consideration to the requested aid and protecting privacy and independence. 28 C.F.R. section

31. 160. It must designate an ADA coordinator and provide prompt equitable grievance procedures. 28 C.F.R. section 35.107.

32. Damages under Title II and Section 504 require deliberate indifference. Duvall v. County of Kitsap, 260 F.3d 1124 (9th Cir. 2001), and Updike v. Multnomah County, 870 F.3d 939 (9th Cir. 2017), require knowledge that harm to protected rights is substantially likely and failure to act. Plaintiff

pleads notice through medical letters, ADA requests, HR emails, EEOC filings, federal filings, meeting videos, and written objections.

33. The City cannot invoke undue burden or fundamental alteration at the pleading stage where it never issued individualized written determinations. A USB drive, 360-degree camera, written communication, accessible records review, remote attendance when medically necessary, and confidentiality safeguards do not alter the nature of City government; they allow Plaintiff to participate in it.

**SPECIFIC ACCOMMODATION ALLEGATIONS GoPro MAX 2 / 360-degree recording**

34. Plaintiff requested a seat-based 360-degree recording device because live meetings involve simultaneous speech, body language, movement, audience reaction, staff response, and spatial context that Plaintiff cannot fully process in real time. The City's YouTube feed is not equivalent because it is camera-operator controlled and does not reproduce Plaintiff's seat-based experience. Without this aid, Plaintiff cannot accurately review what happened, prepare follow-up questions, or correct the record. USB / physical-storage agenda materials

35. Plaintiff requested agenda packets on USB, encrypted drive, SD card, or equivalent physical media because cloud-only systems create disability barriers: login fatigue, link navigation, folder structures, permissions, syncing errors, screen switching, and executive-function load. The City's refusal impaired agenda review, analysis of staff reports, preparation of

questions, and voting. Teleconference / SB 707

36. Plaintiff requested teleconference participation when medically necessary. SB 707 recognized disabled legislative-body member remote participation as a reasonable accommodation. The City failed to implement a process and treated Brown Act concerns as a reason to avoid rather than harmonize ADA compliance. ADA chair and seating

37. Plaintiff requested a protected ADA chair because prolonged meetings trigger pain, sensory dysregulation, and concentration problems. Mayor Lopez-Viado's police-backed removal from the ADA chair was a concrete denial of access and a coercive message that accommodations could be stripped in public. Written communication and processing time

38. Plaintiff requested written legal and policy communications, written questions, and structured response time because autism affects sequencing and rapid verbal processing. The City treated written clarity as misconduct and later used written communications as part of the Gemelli narrative. Accessible records and legal bills

39. Plaintiff requested accessible review of legal bills and oversight records. The City imposed in-person and inaccessible conditions, which impaired oversight over the very taxpayer-funded lawyers defending the challenged conduct. Confidential ADA process

40. Plaintiff requested need-to-know confidentiality. The City failed by allowing accommodation information to leak and be posted or amplified by hostile private actors. Once ADA confidentiality is broken, future accommodation

use is chilled.

**MILAN MRAKICH TEXT MESSAGES AND RETALIATORY CONDUCT**

41. On January 17, 2026, Milan Mrakich sent Plaintiff text messages that Plaintiff understood as threatening and retaliatory. Milan wrote: "You are a stupid fuck that is in a world of hurt now. Stressing and fucking with my parents is going to end you. Don't ever talk to me again." Plaintiff understood the phrase "going to end you" as threatening language by the Acting City Manager.

42. Milan then wrote: "You're a fucking idiot that has ended your career." He further wrote, "Don't ever come in my office again, I will never meet with you, call or text you again," and, "You are now dead to me. You are beyond fucking stupid! ... Just wait Brian!" Plaintiff understood these texts as threats to destroy his career and cut off his access to the City Manager Office.

43. These texts matter because they preceded the Gemelli report and the Buchalter paper trail. After Milan threatened that Plaintiff's career was over and that Plaintiff should never come to his office again, the investigation expanded, Milan and Buchalter communications continued, and the Gemelli report converted Plaintiff's protected oversight into alleged misconduct.

44. Milan's Communication Protocol later formalized the threat. If every Councilmember communication had to travel through the City Manager Office, and the City Manager had told Plaintiff never to come to his office and that Plaintiff was "dead" to him, the policy was not neutral as applied. It

was a retaliatory checkpoint controlled by the retaliating official.

45. Plaintiff alleges Milan also retaliated through delay of accommodations, failure to supervise ADA confidentiality, failure to protect Plaintiff from the ADA leak, selective staff deployment, and the City Manager contract process that rewarded Milan while Plaintiff's ADA rights remained unresolved.

**LOPEZ-VIADO FIRST AMENDMENT AND COLOR-OF-LAW CONDUCT**

46. Lopez-Viado used color-of-law authority as Mayor and presiding officer. She controlled recognition, points of order, time limits, staff bells, meeting procedure, and police/security coordination. Plaintiff sues her for those administrative enforcement acts, not for legislative votes.

47. At the May 5, 2026 meeting, she allowed Councilmember Wu approximately four minutes and twenty-seven seconds of uninterrupted speech on the City health department issue. Wu's viewpoint aligned with the Mayor and Council majority. When Plaintiff opposed the language because he believed the proposed City health department lacked state recognition or licensing, Wu invoked point of order and Lopez-Viado cut Plaintiff off at approximately two minutes and thirty seconds.

48. At the May 19, 2026 meeting, Lopez-Viado allowed a sympathetic speaker to exceed five minutes while cutting off Carlos O'Day at approximately three minutes with repeated bell enforcement when he expressed an adverse viewpoint. The disparity was not subtle. The rule expanded for allies and contracted for critics.

49. This violates clearly established law. Rosenberger prohibits viewpoint discrimination. White, Norse, and Acosta prohibit using decorum or disruption rules as pretext to suppress disfavored speech in public meetings. Bond and Boquist protect elected-official speech. Lopez-Viado cannot plausibly claim she did not know she could not enforce time rules based on viewpoint.

50. Lopez-Viado also used or caused police-backed authority to interfere with Plaintiff's ADA chair. That act joined First Amendment retaliation and disability coercion: silence the dissenting autistic Councilmember, then physically remove him from the accommodation that allows him to participate.

**EXPANDED LOPEZ-VIADO FIRST AMENDMENT NOTICE AND COARSE-LANGUAGE CENSORSHIP JUDGE FOCUS: Exhibits AD and AE are the new materials. Exhibit AD is Brian Jobst's June 1, 2026 notice to Mayor Lopez-Viado and City leadership. Exhibit AE is the attached First Amendment Coalition letter explaining why censoring coarse, profane, vulgar, or offensive public-comment language violates the First Amendment absent actual disruption.**

51. On June 1, 2026, Brian Jobst emailed Mayor Leticia Lopez-Viado with the subject "Coarse Language at Council Meetings." The email was copied to Councilmembers, the City Attorney, Acting City Manager Milan Mrakich, Assistant City Manager Roxanne Lerma, and Nilesh Mehta. Plaintiff attaches the email as Exhibit AD.

14

52. The Jobst email stated that, during Lopez-Viado's tenure as Mayor, she had repeatedly muted public-comment speakers because she found their profanity, swearing, vulgar vocabulary, or other language offensive. The email warned that muting speakers due to coarse or upsetting language is unlawful and specifically told the Mayor to stop muting speakers at Council meetings.

53. The email expressly stated that it was being provided to the Mayor, Council, City Attorney, City Manager, and Assistant City Managers for awareness and so the City could not later claim a lack of awareness as the matter unfolded. That notice is material to knowledge, deliberate indifference, reckless disregard, qualified-immunity analysis, and municipal ratification.

54. The attached First Amendment Coalition letter, dated April 28, 2025, explained that the government may not silence speech simply because it is offensive, degrading, upsetting, profane, vulgar, or caustic. Plaintiff attaches that letter as Exhibit AE.

55. The FAC letter relied on Supreme Court and Ninth Circuit authorities including New York Times Co. v. Sullivan, Cohen v. California, Snyder v. Phelps, Iancu v. Brunetti, Acosta v. City of Costa Mesa, and White v. City of Norwalk. The letter explained that public intolerance or animosity cannot justify abridging First Amendment rights and that a moderator may not stop a speaker because the moderator disagrees with the viewpoint being expressed.

56. The FAC letter also explained why a city may not deem speech disruptive merely because it is offensive. It distinguished actual disruption and true fighting-words circumstances from the mere use of vulgar, profane, indecorous, scurrilous, or upsetting language during public comment.

57. This new evidence strengthens Plaintiff's claim against Lopez-Viado because Plaintiff does not sue her for a legislative vote. Plaintiff sues her for color-of-law enforcement acts as presiding officer: muting microphones, controlling recognition, accepting or rejecting points of order, enforcing staff bells, cutting off disfavored speakers, directing meeting procedure, and coordinating security or police-backed actions.

58. When a presiding officer allows favored speakers to continue but mutes or cuts off speakers because their words are coarse, profane, vulgar, offensive, or politically uncomfortable, the presiding officer is not neutrally managing time. She is making a content and viewpoint decision in a limited public forum.

59. The June 1, 2026 email and FAC attachment also show that any future or continued muting of speakers based on profanity, vulgar vocabulary, offensive language, or disfavored criticism cannot plausibly be excused as lack of legal notice. The Mayor and City leadership were placed on direct written notice.

60. This matters to Plaintiff because Lopez-Viado's meeting-control pattern did not affect only private public-comment speakers. It also affected Plaintiff as an elected Councilmember whose disability requires structured opportunity to complete remarks, process points of order, and respond without abrupt

viewpoint-dependent interruption.

61. At the May 5, 2026 meeting, Lopez-Viado permitted Councilmember Wu's aligned viewpoint to proceed for approximately four minutes and twenty-seven seconds but permitted Plaintiff's dissenting viewpoint on the City health-department issue to be interrupted and cut off at approximately two minutes and thirty seconds. The new Jobst/FAC materials make that disparity more probative because they identify the broader pattern of content-based meeting enforcement.

62. At the May 19, 2026 meeting, Lopez-Viado permitted a sympathetic speaker to exceed five minutes while cutting off Carlos O'Day at approximately three minutes with repeated bell enforcement when he expressed an adverse viewpoint. The same rule expanded for friendly speech and contracted for critical speech.

63. Plaintiff alleges the City has a choice: it may enforce neutral time limits against everyone, or it may preserve order against actual disruption. It may not apply time limits, microphone control, and decorum rules as a ratchet - loose for allies, tight for critics.

64. Plaintiff further alleges Lopez-Viado's coarse-language censorship compounds the ADA injury. Abrupt muting, repeated bells, and point-of-order interruptions create a hostile, unpredictable, and inaccessible meeting environment for an autistic Councilmember who requires structure, processing time, and consistent rules to participate equally.

17

65. The Jobst notice also ties First Amendment and SB 707 issues together. The email reminded the Mayor that the deadline was approaching for implementation of SB 707, which expands and modernizes open-meeting and teleconferencing requirements. This supports Plaintiff's allegation that the City was on notice of both First Amendment meeting-access problems and disability remote-participation obligations.

66. Plaintiff therefore requests declaratory and injunctive relief prohibiting Lopez-Viado and any presiding officer from muting, cutting off, bell-enforcing, or accepting points of order based on viewpoint, profanity, vulgarity, political offense, or disability-related communication style absent actual disruption, valid neutral enforcement, and ADA-compliant implementation.

## CORRUPTION AND PROTECTED OVERSIGHT

67. Plaintiff investigated corruption and public-resource misuse because records and witnesses raised serious questions. These issues include Milan's contract and education-waiver issue, CAAWC/Moon Festival, City Boba Fest, Film It, Aurio, PBK/Fire Station 1, legal billing, City Attorney travel, FPPC matters, District Attorney reports, deed/mortgage conflicts, and ADA violations.

68. Plaintiff received whistleblower allegations from Jeffrey Buckwell of the City of La Puente regarding Milan, including allegations of corrupt code-enforcement arrangements and payroll irregularities. Plaintiff pleads these as good-faith oversight allegations, not adjudicated findings. As an

18

elected official, Plaintiff had a duty to investigate before approving or opposing Milan's permanent contract.

69. Milan's proposed City Manager contract exceeded $249,000 and waived a bachelor's-degree requirement. City Attorney Thomas Duarte represented publicly that the requirement did not apply, while the contract itself stated the Council was waiving it. Plaintiff alleges the public was misled.

70. Plaintiff alleges City Boba Fest was used to benefit favored officials and a nonprofit ecosystem tied to Councilmember Wu. Milan and Roxanne Lerma described it as a City-run replacement for Spring Festival; the City used supplies, staff, and overtime resources; and the attached images show City staff and leadership presence. Plaintiff alleges comparable support was denied for his community town hall and microphones were hidden or unavailable.

71. Plaintiff alleges Lopez-Viado voted in ways favorable to Wu because of alleged financial relationships reflected in deed/mortgage records. Plaintiff also alleges she supported allocations to or for interests associated with her own charity or nonprofit. Plaintiff reported these matters to FPPC and law enforcement, and alleges investigations or complaints are ongoing or pending.

72. Plaintiff alleges taxpayer-funded lawyers protected Wu and politically exposed officials before litigation rather than protecting the entity. The City's lawyers should have advised transparency, conflict review, and independent investigation. Instead, they turned Plaintiff's oversight into the target.

**ADA LEAK, WILLIAM ELLIOTT, AND SHEWMAKER**

73. Plaintiff alleges confidential ADA information was leaked from the City. Milan blamed Eric Vargas or Eric Venegas, his assistant. Plaintiff alleges that explanation fails because lawful access to ADA information should have been limited to Milan, ADA Coordinator Roxanne Lerma, HR Director Carmelita Underwood, LCW, Buchalter, and necessary implementation personnel. If an assistant accessed or transmitted the data, it proves the City Manager Office failed its confidentiality duty.

74. William Elliott is the husband of Councilwoman Rosario Diaz. Plaintiff alleges Elliott publicly used racially dehumanizing and anti-immigrant language, including calling Dreamers "cockroaches." The City's release of Plaintiff's ADA information into a political ecosystem accessible to Elliott made the disclosure especially intimidating and humiliating.

75. John Shewmaker stated he did not request the ADA information, received it directly from the City, and was told who requested it. That allegation defeats the City's neutral CPRA narrative. This was non-CPRA dissemination of disability accommodation information into hostile hands.

76. The leak caused loss of sleep, teeth grinding, inability to concentrate, anxiety, humiliation, safety concerns, and fear that any future accommodation request would be published as political ammunition. This is concrete Title II harm and deliberate indifference.

**FOX, GEMELLI, BUCHALTER, AND MATERIAL WITNESSES**

77. The Gemelli report was presented as neutral, but the engagement was routed through Buchalter and Katie Fox. Buchalter issued investigation protocols, Fox later defended the report, and Fox/Gemelli conflict materials show professional overlap that should have been disclosed before the report was used publicly.

78. The City Council voted to use or release the Gemelli report. By using it as a sword against Plaintiff, the City made the report's scope, preparation, omissions, sources, edits, ADA disclosures, and privilege status factual issues. Plaintiff has the right to subpoena Kelly Gemelli, Katie Fox, Roger Scott, Thomas O'Connell, and related Buchalter witnesses.

79. Roger Scott and Buchalter are material witnesses because their firm's conduct is evidence. Plaintiff reserves the right to move to disqualify counsel under the advocate-witness doctrine, California Rule of Professional Conduct 3.7, Rule

80. 7 material-limitation conflict principles, Rule 1.13 organizational-client principles, and the Court's inherent authority.

81. Buchalter's duty was to protect the municipal entity, not the firm's own report, reputation, or self-interest. Plaintiff alleges Buchalter protected its own work and politically exposed officials while using taxpayer-funded legal power to retaliate against Plaintiff.

## EXPANDED CHRONOLOGY OF DISCRIMINATION, DELAY, AND RETALIATION

82. Before the retaliation escalated, Plaintiff made disability-related needs known in writing. He repeatedly explained that his autism affects real-time auditory processing, sequencing, working memory, sensory regulation, executive functioning, and the ability to respond instantly in hostile meeting environments. The City therefore had actual knowledge before it denied access, not after.

83. Plaintiff's accommodation requests were not vague. They were specific: a 360-degree recording device, USB/physical agenda access, teleconference participation, ADA chair, accessible lighting, written communication, processing time, accessible legal-billing review, and confidentiality. Each request corresponds to a City function and a disability-related barrier.

84. The City's response was not a reasoned written denial. It became silence, delay, substitution, and litigation posture. The City never provided a proper written determination identifying the decisionmaker, evidence considered, reasons for denial, and equally effective alternative.

85. When Plaintiff asked for USB or physical agenda access, the City treated cloud systems as enough. That was not an individualized analysis. It was a one-size-fits-all bureaucratic answer to an autistic Councilmember who had explained why the cloud platform itself was the barrier.

86. When Plaintiff asked for 360-degree review, the City treated ordinary public video as enough. That ignored the specific disability function of the request. Plaintiff does not simply need a record that a meeting occurred. He needs a seat-based, whole-room reconstruction so he can review spatial context, simultaneous cues, and who said what from where.

87. When Plaintiff asked for remote participation, the City refused to build a pathway despite SB 707 and Title II. A City that can manage special meetings, closed sessions, public broadcasts, remote staff presentations, and legal appearances cannot credibly claim it lacks capacity to evaluate disability remote participation.

88. When Plaintiff used an ADA chair, the Mayor used police-backed power against him. The act was humiliating because the chair represented access, dignity, and medical need. Removing Plaintiff from it in public turned the accommodation into a warning sign for every future request.

89. When Plaintiff asked for written communication, the City treated writing as excess. For an autistic elected official, writing is not an aggressive strategy; it is the accessible format that allows precision, memory support, and equal participation.

90. When Plaintiff asked to review legal bills accessibly, the City framed the issue as records procedure instead of ADA access. Public records and legal billing are part of Plaintiff's elected oversight function, and the City may not make that oversight inaccessible by refusing disability modifications.

91. When Plaintiff asked for confidentiality, the City failed most dramatically. Disability access collapses if the cost, equipment, and medical context of accommodations can be handed to hostile private actors and republished as alleged waste.

92. Plaintiff alleges the ADA disclosure was foreseeable because the City Manager's Office had already turned ADA access into political spending rhetoric. Once accommodation equipment becomes a public-relations target, confidentiality becomes impossible without strict controls.

93. Plaintiff alleges Milan's office attempted to treat Eric Vargas or Eric Venegas as the explanation for the leak. If an assistant could access or transmit accommodation information, the City Manager's Office had already failed. The question is not only who clicked send; it is who allowed the ADA file to be vulnerable to political export.

94. Roxanne Lerma's role is central. She was the ADA Coordinator or acting ADA functionary during a period when complaints went stale, requests were not resolved, and community Title II accommodation requests were ignored. Plaintiff alleges her position in the City Manager's Office made the process structurally non-neutral.

95. Carmelita Underwood had originally been connected to HR and accommodation processing. Once the process was pulled away from neutral HR and into the City Manager/Counsel pipeline, ADA compliance became subordinate to litigation management and political damage control.

24

96. The City's elected-official exception was the doctrinal engine of this failure. Once officials decided that elected officials did not require formal ADA investigation, every later delay became easier to justify. The City did not have to deny Plaintiff explicitly if it could simply refuse to process him normally.

97. Plaintiff alleges the CPRA/AI lawsuit further shows pretext. The City knew the relevant laptop and technology were City-issued or accommodation-related, yet the litigation narrative portrayed the equipment as personal. That narrative made Plaintiff appear secretive when he was actually trying to use accessible City tools.

98. The text messages from Milan supply motive and animus. A City Manager who writes that Plaintiff is in a world of hurt, that Plaintiff has ended his career, and that Plaintiff is dead to him cannot later be presumed to be neutral when he controls staff access, communication protocol, ADA implementation, and investigation channels.

99. The Gemelli report followed that animus. Plaintiff alleges the investigation did not simply discover misconduct; it organized a preselected narrative. It took Plaintiff's whistleblower notices, service-of-process dispute, ADA objections, FPPC complaints, and records oversight, and wrote them into a story of Plaintiff as the problem.

100. Milan and Buchalter were not passive bystanders. The paper trail shows the City Manager and counsel operating in the investigation architecture. Plaintiff alleges documents were provided, scope was discussed, and the report was shaped by the very officials and lawyers whose conduct Plaintiff

had challenged.

101. The City then used the report publicly. When a City Council votes to release, rely on, or censure based on an investigative report, the report becomes more than a confidential legal memo. It becomes an official instrument of public power, and the people who created it become material witnesses.

102. Katie Fox's later defense of the report is part of the evidence. She did not merely appear as neutral counsel after the fact. She defended contested ADA/Safe at Home disclosures and demanded preservation of AI prompts, thereby placing Buchalter's own litigation theory into the factual record.

103. Kelly Gemelli is likewise a witness. She must testify about what she was asked to investigate, who supplied documents, who framed the issues, what was omitted, whether ADA accommodations were considered, and why protected oversight was recast as misconduct.

104. Roger Scott and Buchalter are witnesses because their firm's actions are entwined with the disputed events. The firm cannot both litigate the meaning of the report and avoid testimony about how its own lawyers helped make, release, or defend that report.

105. Plaintiff alleges the City Attorney and outside counsel protected individuals rather than the entity. The entity's interest would have been ADA compliance, clean investigation, cost recovery, conflict review, and transparent legal billing. The political actors' interest was discrediting Plaintiff.

106. Buchalter's conflict is practical, not abstract. A lawyer defending the City would ordinarily ask whether the report exposed the City to liability. Buchalter must instead defend the report because the firm participated in its architecture. That is the material-limitation conflict Plaintiff intends to raise.

107. City Boba Fest adds a public-resource contrast. Plaintiff alleges Milan and Roxanne Lerma described it as a City-run replacement for Spring Festival, then deployed City resources, staff, supplies, and overtime to support an event that benefited favored officials and nonprofit networks.

108. The attached photographs show City-branded signage, stage activity, sponsor displays, City management presence, event-direction conduct, and staff/police presence. Plaintiff alleges the visual evidence supports his claim that the City provided resources and prestige for favored actors.

109. By contrast, Plaintiff alleges when he held a community town hall, staff were not similarly provided and microphones were hidden or unavailable. The difference is evidence of selective municipal support: when favored officials needed visibility, City machinery appeared; when Plaintiff needed basic support, City machinery vanished.

110. Moon Festival and CAAWC show a similar pattern. Plaintiff alleges vendor fees, sponsorships, City costs, refunds, permit fees, and City resources were not transparently reconciled. CAAWC was connected to Councilmember Wu's family network. Plaintiff's oversight of those records was protected activity.

111. Plaintiff alleges Wu had unusual influence over City events and staff. The images and records show Wu directing or appearing to direct event operations, while City management complied. Plaintiff alleges that relationship explains why his questions produced retaliation.

112. Plaintiff alleges Lopez-Viado voted or acted in ways favorable to Wu while having alleged financial interests or relationships reflected in deed and mortgage records. Plaintiff does not ask the Court to decide those financial issues now. He alleges those records gave him a good-faith basis for FPPC and conflict-of-interest oversight.

113. Plaintiff alleges Lopez-Viado also supported or voted for allocations connected to her own charity or nonprofit interests. Those allegations are relevant because they show Plaintiff was reporting conflicts and public-resource concerns before the retaliation escalated.

114. Aurio and Michael Chan are part of the protected oversight background. Plaintiff alleges records showed Wu introducing or promoting Aurio-related interests to City staff, and later payment or invoice questions. Whether the underlying conduct is ultimately proven, Plaintiff had a records-based reason to inquire.

115. PBK and Fire Station 1 are part of the public-safety oversight background. Plaintiff alleges scope, cost, feasibility, and additional service issues required scrutiny. A Councilmember raising questions about fire station public spending engages in core protected speech.

116. Legal billing is also protected oversight. Plaintiff questioned City Attorney bills, travel, vague entries, outside counsel scope, Buchalter invoices, LCW roles, Jones & Mayer conflicts, and whether taxpayer-funded lawyers were protecting individuals from FPPC or law enforcement rather than protecting the entity.

117. City Attorney Duarte's statement that Attorney General opinions could be disregarded because they were not binding is probative. In the ADA/Brown Act context, that posture helps show the City chose technical resistance over civil-rights harmonization.

118. Plaintiff alleges the City's refusal to recognize autism during the same period was not accidental. It conveyed that autism recognition was expendable when the autistic Councilmember became politically inconvenient.

119. Plaintiff alleges emotional and physiological harm: inability to sleep, teeth grinding, concentration impairment, anxiety, humiliation, fear, sensory overload, increased pain, public stigma, and fear that any accommodation request will be leaked.

120. The harm to constituents is also concrete. When Plaintiff cannot finish remarks, review agenda materials, sit through meetings, or communicate with staff, his district loses representation. The injury is not only personal. It is democratic.

121. This is why injunctive relief matters. Damages cannot restore a missed vote, cannot erase a leak, cannot unring a bell in public comment, and cannot make an inaccessible meeting accessible after the fact.

122. Plaintiff asks the Court to see the pattern as a whole. The ADA denials, Milan texts, Communication Protocol, Gemelli report, Lopez-Viado meeting control, ADA leak, and legal-billing obstruction are not isolated sparks. Together they form the fire.

123. Plaintiff further alleges Milan's threat that Plaintiff had ended his career foreshadowed the later public censure. The report and censure did what the text threatened: they attempted to end Plaintiff's credibility and career through official process.

124. The timing is circumstantial evidence. Threatening texts, communication restrictions, investigation expansion, report publication, ADA leak, and litigation did not happen in a vacuum. They formed a sequence of retaliatory escalation after Plaintiff asserted ADA rights and reported corruption.

125. The City's conduct also demonstrates selective resource allocation. Staff and public resources were available for favored public events, but not for Plaintiff's district town hall. This disparity matters because equal access to staff and facilities is part of effective public representation.

126. The City's conduct burdened Plaintiff's speech in both public and internal forums. Publicly, Lopez-Viado cut him off. Internally, Milan's protocol routed communications through a hostile gatekeeper. Procedurally, Buchalter and Gemelli turned his reports into misconduct. The retaliation was comprehensive.

127. Plaintiff alleges the ADA leak also had a racialized and intimidation component because William Elliott's alleged dehumanizing language about Dreamers made the disclosure more dangerous. A City cannot ignore the foreseeable effect of giving a disabled public official's ADA information to hostile political actors.

128. The City's failure to identify the leak path itself is deliberate indifference. A public entity that cannot identify who accessed a disabled official's ADA information cannot credibly claim it protected confidentiality.

129. Plaintiff alleges the City used lawyers to create plausible deniability. Rather than investigate the leak, the accommodation denials, and public corruption concerns, the City routed communications through counsel, then claimed privilege, legal strategy, or public-records process.

130. Plaintiff alleges the City Council and City management ratified these violations by continuing to rely on the Gemelli report, continuing to enforce the communication protocol, continuing to litigate the CPRA/AI position, and failing to cure ADA accommodations.

131. Plaintiff alleges the public censure was not mere symbolic politics. It stigmatized him, changed how staff and public officials treated him, and served as a predicate for further restrictions. That is stigma-plus harm and First Amendment retaliation.

132. Plaintiff alleges the City's conduct chilled his speech. A reasonable elected official would hesitate to file FPPC complaints, question legal bills, request accommodations, or challenge powerful officials if doing so led to ADA

31

leaks, censure, police removal from accommodations, and career-ending threats.

133. Plaintiff alleges the City's conduct also chilled disability access for others. When community members saw the City leak, mock, or politicize accommodations, the message was clear: requesting disability access in West Covina could become public punishment.

134. Plaintiff alleges the ADA Coordinator's failure was not simply negligence. It occurred after the City knew Plaintiff had medical documentation, federal rights, and ongoing meetings. Every unimplemented meeting accommodation became a new denial.

135. Plaintiff alleges the City's reliance on cost or allocation rhetoric for ADA equipment was unlawful. Title II prohibits imposing a surcharge on a disabled person for measures required to provide access. The City cannot call accommodations waste because they cost money.

136. Plaintiff alleges the City's claim that YouTube was enough mirrors classic ineffective-access reasoning rejected under ADA law. A public entity cannot choose a cheaper or easier aid if it is not equally effective for the disabled person's actual barrier.

137. Plaintiff alleges the City's refusal to provide USB access was similarly not neutral technology management. It was a refusal to provide accessible format. Accessibility is measured by function, not by whether a non-disabled official can use the same platform.

138. Plaintiff alleges the City's refusal to implement remote participation was particularly harmful because it forced him to choose between medical deterioration and absence from public service. That is not equal access.

139. Plaintiff alleges Lopez-Viado's viewpoint-based meeting control magnified his disability harm. Abrupt interruption and point-of-order tactics are especially disabling for a person who needs structured time to sequence and complete statements.

140. Plaintiff alleges Milan's text "Don't ever come in my office again" was not private anger detached from official power. It was the City Manager telling an elected official he would be cut off from the office that controlled staff access, ADA implementation, and the communication protocol.

141. Plaintiff alleges the City Manager contract and education-waiver issue shows motive. Milan had reason to please the Council majority and avoid scrutiny from Plaintiff while his own contract and qualifications were pending.

142. Plaintiff alleges the City Attorney's contradictory public statements about the education requirement show how legal advice was used to facilitate a political result rather than inform the public accurately.

143. Plaintiff alleges the tax-funded lawyer system became a shield for insiders. The City had lawyers to attack Plaintiff, but not to secure clean ADA compliance, public-fund recovery, or conflict-free advice.

**ADDITIONAL FACTUAL DETAIL REGARDING ONGOING HARM**

144. Plaintiff further alleges ongoing harm detail 1: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's prior delays and disclosures present injuries rather than historical grievances.

145. Plaintiff further alleges ongoing harm detail 2: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's prior delays and disclosures present injuries rather than historical grievances.

146. Plaintiff further alleges ongoing harm detail 3: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's prior delays and disclosures present injuries rather than historical grievances.

147. Plaintiff further alleges ongoing harm detail 4: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's prior delays and disclosures present injuries rather than historical grievances.

148. Plaintiff further alleges ongoing harm detail 5: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's prior delays and disclosures present injuries rather than historical grievances.

149. Plaintiff further alleges ongoing harm detail 6: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's prior delays and disclosures present injuries rather than historical grievances.

150. Plaintiff further alleges ongoing harm detail 7: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's prior delays and disclosures present injuries rather than historical grievances.

151. Plaintiff further alleges ongoing harm detail 8: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's prior delays and disclosures present injuries rather than historical grievances.

152. Plaintiff further alleges ongoing harm detail 9: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's

prior delays and disclosures present injuries rather than historical grievances.

153. Plaintiff further alleges ongoing harm detail 10: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's prior delays and disclosures present injuries rather than historical grievances.

154. Plaintiff further alleges ongoing harm detail 11: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's prior delays and disclosures present injuries rather than historical grievances.

155. Plaintiff further alleges ongoing harm detail 12: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's prior delays and disclosures present injuries rather than historical grievances.

156. Plaintiff further alleges ongoing harm detail 13: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's prior delays and disclosures present injuries rather than historical

grievances.

157. Plaintiff further alleges ongoing harm detail 14: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's prior delays and disclosures present injuries rather than historical grievances.

158. Plaintiff further alleges ongoing harm detail 15: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's prior delays and disclosures present injuries rather than historical grievances.

159. Plaintiff further alleges ongoing harm detail 16: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's prior delays and disclosures present injuries rather than historical grievances.

160. Plaintiff further alleges ongoing harm detail 17: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's prior delays and disclosures present injuries rather than historical

37

grievances.

161. Plaintiff further alleges ongoing harm detail 18: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's prior delays and disclosures present injuries rather than historical grievances.

162. Plaintiff further alleges ongoing harm detail 19: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's prior delays and disclosures present injuries rather than historical grievances.

163. Plaintiff further alleges ongoing harm detail 20: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's prior delays and disclosures present injuries rather than historical grievances.

164. Plaintiff further alleges ongoing harm detail 21: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's prior delays and disclosures present injuries rather than historical

38

grievances.

165. Plaintiff further alleges ongoing harm detail 22: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's prior delays and disclosures present injuries rather than historical grievances.

166. Plaintiff further alleges ongoing harm detail 23: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's prior delays and disclosures present injuries rather than historical grievances.

167. Plaintiff further alleges ongoing harm detail 24: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's prior delays and disclosures present injuries rather than historical grievances.

168. Plaintiff further alleges ongoing harm detail 25: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's prior delays and disclosures present injuries rather than historical

grievances.

169. Plaintiff further alleges ongoing harm detail 26: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's prior delays and disclosures present injuries rather than historical grievances.

170. Plaintiff further alleges ongoing harm detail 27: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's prior delays and disclosures present injuries rather than historical grievances.

171. Plaintiff further alleges ongoing harm detail 28: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's prior delays and disclosures present injuries rather than historical grievances.

172. Plaintiff further alleges ongoing harm detail 29: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's prior delays and disclosures present injuries rather than historical

grievances.

173. Plaintiff further alleges ongoing harm detail 30: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's prior delays and disclosures present injuries rather than historical grievances.

174. Plaintiff further alleges ongoing harm detail 31: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's prior delays and disclosures present injuries rather than historical grievances.

175. Plaintiff further alleges ongoing harm detail 32: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's prior delays and disclosures present injuries rather than historical grievances.

176. Plaintiff further alleges ongoing harm detail 33: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's prior delays and disclosures present injuries rather than historical

grievances.

177. Plaintiff further alleges ongoing harm detail 34: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's prior delays and disclosures present injuries rather than historical grievances.

178. Plaintiff further alleges ongoing harm detail 35: every Council agenda, meeting video, public-comment period, ADA request, records review, staff inquiry, and accommodation implementation issue remains live because Plaintiff continues to serve in elected office. This continuing context makes the City's prior delays and disclosures present injuries rather than historical grievances.

**CLAIMS FOR RELIEF COUNT I - TITLE II OF THE ADA: DENIAL OF MEANINGFUL ACCESS AND REASONABLE MODIFICATIONS AGAINST CITY OF WEST COVINA AND DOES**

179. Plaintiff incorporates the preceding paragraphs. Plaintiff is a qualified individual with disabilities and is eligible to participate in the City programs, services, and activities at issue, including Council meetings, agenda review, voting, deliberation, staff communication, records review, City Hall access, public-comment administration, City-issued technology, and ADA grievance procedures.

42

180. The City denied meaningful access by failing to provide or timely decide reasonable modifications for the GoPro/360-degree recording accommodation, USB or physical-storage agenda access, teleconference participation when medically necessary, ADA chair/seating protections, lighting accommodations, written communication, processing time, accessible legal-billing review, and confidentiality safeguards.

181. Each denied accommodation corresponded to a specific disability-related barrier. The GoPro/360 request addressed auditory processing, visual-spatial review, simultaneous speech, and reconstruction of meetings from Plaintiff's seat. USB/physical agenda access addressed cloud-login, folder, syncing, permission, and executive-function barriers. Teleconference access addressed symptom-driven inability to attend in person. Seating and lighting addressed pain, sensory regulation, concentration, and endurance.

182. The City's substitutions were not equally effective. A YouTube recording does not reproduce Plaintiff's seat-based visual context. Cloud-only access is not the same as an accessible physical agenda packet for an autistic official with executive-function barriers. A later promise to review accommodations is not equal access to a meeting that already occurred without the accommodation.

183. The City also used methods of administration that substantially impaired access. It routed ADA issues through counsel and the City Manager's Office, adopted an elected-official exception to formal ADA investigation, shifted or characterized accommodation equipment as Council discretionary spending, and failed to protect accommodation confidentiality.

184. These failures caused concrete access injuries: missed or impaired meeting participation, inability to review agenda materials effectively, impaired legal-billing oversight, inability to reconstruct meeting context, pain and humiliation from chair interference, and chilling of future accommodation requests after public disclosure.

185. The City acted with deliberate indifference because policymakers, HR, the ADA Coordinator, the City Manager, counsel, and final decisionmakers received repeated written notice, medical documentation, EEOC materials, federal filings, and meeting objections but failed to act, or acted in a way that made access worse.

**COUNT II - TITLE II EFFECTIVE COMMUNICATION, PRIVACY, INDEPENDENCE, ADA COORDINATOR, AND GRIEVANCE-PROCESS FAILURES**

186. Plaintiff incorporates the preceding paragraphs. Title II requires public entities to ensure communications with individuals with disabilities are as effective as communications with others and to provide appropriate auxiliary aids and services in a timely manner, in accessible formats, and in a way that protects privacy and independence.

187. Plaintiff requested written legal and policy communications, written questions, structured response time, physical agenda materials, and accessible records review because autism affects sequencing, auditory processing, working memory, and real-time response in hostile or rapidly shifting verbal environments.

188. The City did not provide effective communication. It treated written communication as excessive, delayed responses, substituted inaccessible platforms, and then used written communications as part of the Gemelli narrative and CPRA/AI litigation posture.

189. The City also failed to protect privacy and independence. Accommodation equipment and costs were disclosed or allowed to be disclosed to non-requesters or hostile private actors, then republished or weaponized as alleged waste. That destroyed the privacy and independence required for meaningful ADA access.

190. The City failed to provide a prompt, equitable ADA grievance process. Roxanne Lerma's ADA coordination was nonresponsive, complaints became stale, HR was sidelined, and the City did not issue reasoned written determinations identifying the decisionmaker, evidence considered, reasons for denial, or equally effective alternatives.

191. The City's grievance-process failure is ongoing because Plaintiff continues to serve as a Councilmember and continues to need meeting-access, agenda-access, communication, records-review, remote-participation, and confidentiality accommodations.

**COUNT III - SECTION 504 OF THE REHABILITATION ACT AGAINST CITY OF WEST COVINA**

192. Plaintiff incorporates the preceding paragraphs. The City receives or administers federal financial assistance and is subject to Section 504 of the Rehabilitation Act.

193. Plaintiff is an otherwise qualified individual with disabilities. He is eligible to participate in and benefit from City programs and elected-office functions. The City denied him benefits, excluded him from equal participation, or subjected him to discrimination by reason of disability.

194. The City's conduct includes failure to provide reasonable accommodation, failure to provide effective communication, failure to operate an accessible ADA grievance process, interference with disability accommodations, public disclosure of accommodation information, and retaliation after Plaintiff asserted disability rights.

195. The denial was intentional or deliberately indifferent. The City had actual notice of Plaintiff's disability, accommodation requests, medical support, and repeated harm, yet failed to provide meaningful access or lawful written decisions.

**COUNT IV - ADA RETALIATION AND INTERFERENCE UNDER 42 U.S.C. SECTION 12203**

196. Plaintiff incorporates the preceding paragraphs. Plaintiff engaged in protected ADA activity by requesting accommodations, opposing disability discrimination, filing EEOC charges, objecting to confidentiality breaches, requesting ADA Coordinator action, and seeking federal relief.

46

197. Defendants retaliated and interfered by delaying accommodations, shifting accommodations into political spending rhetoric, disclosing or allowing disclosure of ADA information, interfering with an ADA chair, routing communications through a hostile gatekeeper, using the Gemelli report to characterize disability-related communication as misconduct, and litigating the CPRA/AI issue in a way that ignored structured-communication accommodations.

198. The disclosure of accommodation equipment and costs was interference because it made future requests unsafe and politically punishable. A disabled official cannot freely use ADA rights if every accommodation can be exposed, mocked, or labeled waste.

199. The retaliation would chill a person of ordinary firmness and a reasonable disabled person from continuing to request accommodations or oppose discrimination. Plaintiff was chilled, humiliated, and forced to weigh the public risk of accommodation use against the medical need for access.

**COUNT V - 42 U.S.C. SECTION 1983: FIRST AMENDMENT VIEWPOINT DISCRIMINATION AND RETALIATION AGAINST LOPEZ-VIADO, MILAN, CITY UNDER MONELL, AND DOES**

200. Plaintiff incorporates the preceding paragraphs. Plaintiff engaged in protected speech and petitioning activity by speaking during Council meetings, opposing the City health-department language, reporting public-fund concerns, filing FPPC and regulatory complaints, questioning legal bills, requesting records, objecting to corruption, and speaking as an elected official on matters of public concern.

201. Lopez-Viado acted under color of law as Mayor and presiding officer when she controlled recognition, time limits, microphones, points of order, staff bells, and meeting enforcement. Her selective enforcement favored aligned viewpoints and suppressed adverse viewpoints.

202. The June 1 Jobst email and FAC attachment are additional notice evidence. They warned Lopez-Viado and City leadership that muting speakers because of profanity, swearing, vulgar vocabulary, or upsetting/coarse language violates the First Amendment absent actual disruption. The City cannot claim lack of awareness.

203. Milan acted under color of law through the Communication Protocol, staff gatekeeping, ADA process, records channels, and retaliation after threatening texts. His statements that Plaintiff was in a "world of hurt," had ended his career, should never come to his office, and was "dead" to him show motive and context for later restrictions and retaliation.

204. The adverse actions included viewpoint-based cutoffs, microphone muting, Communication Protocol restrictions, censure, investigation expansion, public report release, ADA disclosure, CPRA/AI litigation, and interference with staff and records access. These actions would chill a person of ordinary firmness from continuing protected oversight and speech.

205. Causation is shown by timing, sequence, context, public hostility, text-message animus, scope expansion of the Gemelli investigation, and the City's choice to protect politically favored actors while disciplining the disabled Councilmember who raised questions.

48

**COUNT VI - 42 U.S.C. SECTION 1983: EQUAL PROTECTION, SELECTIVE ENFORCEMENT, DUE PROCESS, AND STIGMA-PLUS**

206. Plaintiff incorporates the preceding paragraphs. Defendants selectively enforced meeting rules, staff-communication rules, public-resource support, investigation procedures, records access, and ADA confidentiality against Plaintiff differently from similarly situated officials or favored speakers.

207. The City provided leniency, resources, and procedural protection to favored actors while imposing strict rules, delays, censure, and public stigma on Plaintiff. That disparity was motivated by Plaintiff's protected speech, disability, ADA activity, and public-integrity oversight.

208. Defendants stigmatized Plaintiff by portraying autism-related communication as harassment, written accommodation needs as obstruction, ADA technology as waste, and protected oversight as misconduct. The censure and report altered how City staff, the public, and government agencies treated Plaintiff and impaired his ability to perform public duties.

209. The process was also constitutionally defective because the Gemelli investigation was conflict-entangled, counsel-integrated, scope-expanded, and used publicly while omitting material context and ADA protections.

**COUNT VII - MONELL MUNICIPAL LIABILITY**

210. Plaintiff incorporates the preceding paragraphs. The City is liable under Monell because the violations were caused by official policy, custom, final-policymaker action, ratification, and deliberate indifference.

211. The policies and customs include the Communication Protocol, the elected-official ADA exception, viewpoint-dependent meeting enforcement, nonresponsive ADA coordination, counsel-routed accommodation processing, public use of the Gemelli report, and failure to protect ADA/medical-accommodation confidentiality.

212. Final policymakers knew of the violations through medical letters, ADA requests, EEOC filings, City correspondence, federal filings, public meetings, the Jobst/FAC notice, and repeated written objections. They did not cure the violations. They ratified or continued the challenged practices.

213. The City's failure to train and supervise regarding ADA confidentiality, First Amendment meeting enforcement, elected-official accommodations, public-records boundaries, and counsel conflicts was deliberately indifferent to a known risk of constitutional and disability-rights violations.

**COUNT VIII - BANE ACT, CALIFORNIA CIVIL CODE SECTION 52.1**

214. Plaintiff incorporates the preceding paragraphs. Defendants interfered, or attempted to interfere, by threats, intimidation, or coercion with Plaintiff's rights under the ADA, Section 504, the First Amendment, Equal Protection, Due Process, California privacy law, and state disability-access protections.

215. The coercive acts included police-backed removal from the ADA chair, public disclosure and weaponization of accommodation information, retaliatory meeting control, career-ending threats, Communication Protocol gatekeeping, and use of City processes to censure and stigmatize Plaintiff.

216. Those acts were coercive because they used official authority, police presence, public humiliation, public disclosure, and City legal machinery to make Plaintiff's continued speech and accommodation use more dangerous and costly.

**COUNT IX - CMIA AND CALIFORNIA CONSTITUTIONAL PRIVACY**

217. Plaintiff incorporates the preceding paragraphs. The City received medical and disability-related accommodation information, including medical letters and accommodation requests. The City had a duty to establish procedures protecting confidentiality and preventing unauthorized use or disclosure.

218. The disclosed material was not merely financial data. The City knew the GoPro/360-degree camera, USB/physical-storage access, ergonomic and lighting items, teleconferencing request, and related access tools were tied to medical documentation and disability accommodation needs.

219. Publicly exposing or allowing exposure of those accommodation-related items as ordinary spending seriously invaded Plaintiff's privacy, destroyed confidentiality, chilled accommodation use, and caused anxiety, humiliation, sleep disruption, teeth grinding, concentration impairment, and safety concerns.

220. Plaintiff seeks damages, statutory relief where available, declaratory relief, injunctive relief, preservation of the disclosure path, and orders requiring the City to implement confidentiality procedures.

**COUNT X - DECLARATORY AND INJUNCTIVE RELIEF**

221. Plaintiff incorporates the preceding paragraphs. Plaintiff continues to serve as an elected Councilmember and faces ongoing harm at every Council meeting, agenda review, public comment period, staff inquiry, ADA request, legal-billing review, and public disclosure risk.

222. Plaintiff seeks declarations that the City's elected-official ADA exception, failure to issue reasoned ADA determinations, viewpoint-dependent meeting enforcement, confidentiality failures, and retaliatory Communication Protocol as applied violate federal and state law.

223. Plaintiff seeks injunctions requiring prompt written ADA determinations, implementation of effective accommodations or lawful alternatives, protection of accommodation privacy, preservation and identification of the leak path, and prohibition of viewpoint-based microphone muting, bell enforcement, point-of-order suppression, or police-backed interference with accommodations.

224. Plaintiff seeks an order prohibiting the City from relying on the Gemelli report, censure, Communication Protocol, or CPRA/AI litigation narrative as retaliatory justification for denying accommodations, restricting speech, or burdening Plaintiff's elected duties.

**PRAYER FOR RELIEF**

- Compensatory damages, emotional-distress damages, reputational damages, nominal damages, statutory damages, and punitive damages where authorized.

- Declarations that Defendants violated Title II, Section 504, ADA retaliation/interference law, the First Amendment, Equal Protection, Due Process, the Bane Act, CMIA, and California privacy rights.

- Injunction requiring implementation or lawful written determination of each accommodation, including GoPro/360 review, USB/physical agenda access, remote participation, ADA chair/seating, lighting, written communication, processing time, accessible records review, and confidentiality safeguards.

- Injunction invalidating or prohibiting retaliatory enforcement of Milan Mrakich's Communication Protocol as applied to Plaintiff.

- Injunction prohibiting viewpoint-based meeting control, muting, bell enforcement, or point-of-order suppression by Lopez-Viado or successors.

- Order requiring preservation and identification of the ADA/medical-accommodation disclosure path and all persons who accessed, received, transmitted, republished, or discussed the information.

- Order prohibiting reliance on the Gemelli report and censure to the extent retaliatory, conflict-tainted, disability-disclosing, or unconstitutional.

- Costs, attorney fees where authorized, interest, and all further relief the Court deems just and proper.

**JURY DEMAND**

225. Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: June 1, 2026

/s/ John Doe

John Doe, Plaintiff in propria persona