# EXHIBIT A

Docket 27 - Ex Parte Application for Clarification or Limited Reconsideration of Docket 26

JOHN DOE, Pro Se
Protected Party Proceeding Under Pseudonym
P.O. Box 1679, MS 5892
Sacramento, California 95812
Email: JohnDoeCA2025@gmail.com
Plaintiff in Pro Per

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| JOHN DOE, individually and in his official capacity as Councilmember of the City of West Covina,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF WEST COVINA,<br><br>Defendant. | Case No. 2:26-cv-03659-MEMF-MBKx<br><br>EX PARTE APPLICATION FOR CLARIFICATION OR, IN THE ALTERNATIVE, LIMITED RECONSIDERATION OF ORDER DENYING TEMPORARY RESTRAINING ORDER [DKT. NO. 26] |

This ex parte application complies with Local Rule 7-19's requirements. Plaintiff is filing this application publicly and unredacted because he believes emergency proof of ongoing Title II access denial, ADA retaliation/interference, and First Amendment retaliation is necessary for the Court to evaluate the corrected record.

## I. EX PARTE APPLICATION

Plaintiff John Doe respectfully applies for clarification, or in the alternative limited reconsideration, of the Court's May 4, 2026 Order denying Plaintiff's Ex Parte Application for Temporary Restraining Order and Order to Show Cause re Preliminary Injunction. Plaintiff also requests leave to file a renewed, narrowly tailored preliminary-injunction motion limited to prospective ADA implementation, noninterference, City Hall/staff access necessary for official duties, and protection against retaliation.

Plaintiff does not seek to relitigate the same emergency record or ask the Court to stop any legislative proceeding. Plaintiff seeks to correct factual premises and supply the specific access-nexus evidence the Order identified as missing. The corrected record shows: (1) Plaintiff's seating/lighting accommodation was medically supported, City-recognized, and labor-counsel-approved before the threat of removal/arrest; (2) each denied accommodation maps directly to specific Council functions; (3) the Communication Protocol was applied to block official inquiry, records access, City Hall access, staff communication, and accommodation implementation; (4) specific accessibility equipment and supports were withheld/interfered with; and (5) the harm is ongoing and worsening.

Plaintiff apologizes for not presenting the record with sufficient precision in the emergency TRO papers. Plaintiff is autistic, has Asperger's-profile Autism Spectrum Disorder, and is proceeding pro se. For a person without a disability, pro se emergency litigation is difficult. For Plaintiff, whose disability affects auditory processing, executive functioning, working memory, information organization, sensory regulation, and processing speed under pressure, organizing hundreds of pages of medical, ADA, Council, and retaliation evidence into the precise legal format required by the Court was exceptionally difficult.

Plaintiff does not ask the Court to excuse procedural requirements. He asks the Court to consider the corrected record because it directly answers the Court's questions and demonstrates continuing denial of meaningful access to City services, programs, activities, and Council functions.

## II. RELIEF REQUESTED

Clarify that the Order's statement that the City hired a 'neutral, third-party investigator' was not a factual finding that the investigation was actually neutral, independent, conflict-free, or reliable.

Clarify that the Order's statement that the parties did not dispute Plaintiff's status as a qualified individual with a disability addressed only the first Title II element, not the City's disputed position that elected officials receive a different or reduced ADA process.

Clarify or reconsider the conclusion that the seating/arrest theory was unsupported, because the corrected record includes Dr. Chang's medical documentation, the City HR memorandum, LCW attorney Bryant Forster's December 2 email, and HR's notice to Councilmembers showing that the seating/lighting accommodation was recognized and approved or, at minimum, should not have been displaced unless equivalent lighting existed.

Clarify or reconsider the Title II access-nexus issue because Plaintiff now identifies specific Council functions denied by each accommodation failure.

Clarify or reconsider the Communication Protocol issue because Plaintiff challenges the Protocol as applied, not merely as a facial council-manager rule.

Clarify or reconsider the ADA retaliation/interference issue because Plaintiff now identifies the protected activities, adverse/interfering actions, specific equipment/supports, and causal timeline.

Clarify that the TRO denial was based on the incomplete emergency record then presented and does not preclude Plaintiff from filing a renewed, narrowly tailored preliminary-injunction motion.

## III. WHY EX PARTE RELIEF IS JUSTIFIED

The May 4, 2026 Order was entered recently, and Local Rule 7-18 generally requires any motion for reconsideration to be filed no later than 14 days after entry absent good cause. The ongoing access harm also recurs before each Council meeting, agenda review cycle, City Hall access event, staff communication, and accommodation implementation dispute. A regularly noticed motion would not resolve these issues before Plaintiff again must participate in official City functions under the disputed restrictions and incomplete accommodations.

Plaintiff notified opposing counsel as stated in the accompanying Declaration re Ex Parte Notice. Plaintiff seeks clarification and limited reconsideration, not an order halting legislative action.

## IV. LEGAL STANDARD

Local Rule 7-18 allows reconsideration only on limited grounds, including a material difference in fact or law, new material facts or change in law, or a manifest showing that the Court failed to consider material facts presented before the order. The rule also prohibits merely repeating prior arguments. Local Rule 7-19 requires an ex parte application to include the reasons for ex parte relief, points and authorities, notice efforts, and a proposed order.

Because the TRO order is interlocutory, the Court also retains authority under Federal Rule of Civil Procedure 54(b) to revise an order before final judgment when justice requires. Plaintiff frames this filing primarily as a request for clarification and leave to present a corrected record, and only alternatively as limited reconsideration.

Title II provides that no qualified individual with a disability shall, by reason of disability, be excluded from participation in, denied the benefits of, or subjected to discrimination in a public entity's services, programs, or activities. 42 U.S.C. section 12132. Public entities must make reasonable modifications to policies, practices, or procedures when necessary to avoid disability discrimination unless the public entity proves fundamental alteration. 28 C.F.R. section 35.130(b)(7)(i). Public entities must also provide effective communication, considering the nature, length, complexity, and context of the communication. 28 C.F.R. section 35.160.

The ADA also prohibits retaliation and interference. 42 U.S.C. section 12203(a) prohibits discrimination against a person because he opposed an ADA violation or participated in an ADA-related investigation, proceeding, or hearing. Section 12203(b) prohibits coercion, intimidation, threats, or interference with a person's exercise or enjoyment of ADA rights. The Ninth Circuit recognizes that pursuing ADA rights is protected activity. Pardi v. Kaiser Found. Hosps., 389 F.3d 840, 850 (9th Cir. 2004). ADA interference requires showing interference and a causal link between the interference and the exercise of rights. Brown v. City of Tucson, 336 F.3d 1181, 1193 (9th Cir. 2003).

Preliminary injunctive relief is governed by Winter v. Natural Resources Defense Council, 555 U.S. 7 (2008). Plaintiff must show likelihood of success or serious questions plus balance of hardships, likelihood of irreparable harm, balance of equities, and public interest. The loss of First Amendment freedoms for even minimal periods constitutes irreparable injury. Elrod v. Burns, 427 U.S. 347, 373 (1976).

## V. ARGUMENT

### A. The word 'neutral' in the Order should be clarified because neutrality is materially disputed.

Page 3 of the Order states in background that the City hired a 'neutral, third-party investigator.' Plaintiff respectfully requests clarification that this was not a factual finding. The Order itself states that the factual background was not a determination of veracity. Plaintiff's theory is not that merely hiring an outside investigator violated law. The claim is that the investigation was represented as neutral while being structured and later handled as privileged legal work through Buchalter and City counsel.

The corrected record shows material tension. Buchalter's September 9 letter represented that the process would be conducted by an independent third-party investigator to maintain neutrality and avoid appearance of bias. Ex. W. But the September 19 Gemelli engagement letter was addressed to Katie Fox at Buchalter and stated that Gemelli would perform legal services to conduct a personnel investigation as an attorney for the purpose of facilitating legal advice to the City by its counsel, with communications, work product, and the investigative report protected by attorney-client privilege unless waived. Ex. W. Plaintiff also objected during the investigation that coordination through City Attorney Duarte and Buchalter was conflicted. Ex. X.

Plaintiff therefore requests clarification that 'neutral, third-party investigator' was descriptive background only and not a finding that the investigation was neutral, independent, conflict-free, or reliable.

B. The City did not dispute disability status, but it did dispute the scope of its ADA obligations to an elected official.

Plaintiff does not challenge the portion of the Order stating that the parties did not dispute that Plaintiff is a qualified individual with a disability. That statement is favorable as to the first element of Title II. The clarification is that the City did dispute whether it owed Plaintiff full Title II process, investigation, and accommodation protections because he is an elected official.

After Plaintiff filed disability-discrimination and ADA confidentiality complaints, the City responded that the legal framework applicable to elected officials differs from the framework governing City employees

and that neither federal nor state law required the City to initiate a formal Human Resources investigation, issue written findings, adopt a particular investigative structure, implement Plaintiff's requested actions, or adhere to a prescribed timetable. Ex. O. That is the dispute. Plaintiff alleges the City used elected-official status to reduce ADA process and deny prompt/equitable investigation, confidentiality safeguards, and meaningful access.

C. The corrected record shows Plaintiff's seating/lighting accommodation was medically supported, City-recognized, and labor-counsel-approved before the threat of removal or arrest.

The Order found the threat-of-arrest theory unsupported because the emergency record appeared to show Plaintiff's seating was not an approved accommodation when the threat occurred. Plaintiff respectfully submits that the corrected record supplies the exact evidence the Court identified as missing.

Dr. Chang's November 10, 2025 medical note states that Plaintiff has Autism Spectrum Disorder, photophobia/light sensitivity, and chronic low-back pain; that changes in lighting, glare, spatial orientation, and forced postural rotation can precipitate physiological dysregulation, cognitive overload, and loss of focus; and that the medically necessary accommodation was to maintain Plaintiff's present Council Chambers seat, not relocate him to the far-end seat, and not alter existing lighting above him to brighter or higher-intensity fixtures. Ex. C. Dr. Chang states that the current seat is clinically effective and that brighter lighting or relocation are medically ineffective and would exacerbate symptoms. Ex. C.

On December 2, 2025, at 6:52 p.m., LCW attorney Bryant Forster advised HR Director Carmelita Underwood that the City was currently accommodating Plaintiff's sensory disability with a specialized lighting arrangement at his current dais position and advised against moving him if equivalent lighting could not be provided. Ex. E. At 6:53 p.m., HR sent that LCW position to Councilmembers, stating that the City was currently accommodating Plaintiff and advising against moving him until the lighting could be properly corrected. Ex. F.

The City's December 3, 2025 HR memorandum documents the interactive process, identifies the requested accommodation as maintaining Plaintiff's current seating location, states not to relocate him to the opposite end of the dais, and states not to increase lighting intensity or alter the light source above his location. It contains the handwritten notation: 'Accommodation Recommended Approved on 12/2/25 @ 6:52pm by Attorney Bryant Forster, City Labor Lawyer.' Ex. D.

Despite this, HR later emailed on December 12, 2025 that staff had reviewed and addressed the seating concerns and that the Mayor's new seating arrangement would be implemented. Ex. G. Plaintiff contemporaneously objected before the December 16 meeting that the proposed location did not meet his ADA/FEHA accommodation, that the City had not replicated the relevant conditions, and that he could not safely remain in that location. Ex. H.

This evidence changes the factual premise. Plaintiff was not asserting a personal seat preference. He was attempting to use a medically supported, City-recognized, labor-counsel-approved seating/lighting accommodation that allowed him to remain at the dais, regulate sensory input, read materials, track speakers, avoid glare/pain, and vote accurately. Threatening removal/arrest if Plaintiff did not surrender that accommodation forced him to choose between exercising ADA rights and risking public police removal from an official meeting.

**D. Each denied accommodation maps directly to specific Council functions and City services.**

The missing explanation is this: each denied accommodation maps directly to a Council function. The 360-degree camera affects multi-speaker meeting comprehension and post-meeting review. The USB/flash drive affects agenda-material access and vote preparation. The ergonomic chair affects review of thousands of pages of City materials. Live-meeting processing affects real-time questioning, deliberation,

and voting. Seating/lighting affects remaining at the dais, reading materials, tracking speakers, and voting accurately. The Communication Protocol affects staff communication, City Hall access, finance-record access, accommodation implementation, and official oversight.

1. 360-degree camera / GoPro MAX 2

The City treated public chamber video as enough. It is not. A general YouTube/chamber broadcast is operator-controlled and speaker-focused. It does not continuously preserve the full room from Plaintiff's Council desk. It does not capture simultaneous reactions, staff-table responses, City Attorney reactions, Mayor conduct, security movement, audience reactions, or visual-spatial context outside the active camera frame.

Dr. Chang identifies autism-related auditory processing, working-memory, executive-function, sensory-integration, and information-encoding limitations. Ex. B. Plaintiff's May 1 letter explains that as of that date the City had not provided the GoPro/360 device as an ADA accommodation and was treating it as non-accommodation or discretionary allocation expense. Ex. K. Without the device, Plaintiff cannot reconstruct multi-speaker discussion, associate spoken words with visual cues, or reprocess complex meeting events at a neurologically sustainable speed. That denies equal access to Council meetings and future voting preparation.

**2. USB / flash-drive agenda materials**

Council participation requires review of agenda packets, staff reports, contracts, budgets, invoices, legal memoranda, resolutions, ordinances, exhibits, and correspondence. A complex shared-drive system requires navigating multiple folders, links, permissions, file names, browser windows, downloads, and changing access points. For Plaintiff's autism-related executive-function and working-memory limitations, that structure denies effective access to the materials needed to vote.

A USB/flash-drive format provides one stable, organized, offline format that reduces executive-function burden and allows review with assistive tools. Denial affects agenda review, preparation of questions, comparison of attachments, review of contracts and budgets, and informed voting.

**3. Ergonomic chair for home review**

The City characterized this as a chair for home use. That misses the Council function. Council participation begins before the meeting. Plaintiff must review thousands of pages of City materials to prepare for votes, questions, and oversight. The home office is a disability-accessible location for sustained review because City Hall and Council proceedings have become hostile and medically destabilizing due to disability-based comments, leaks of accommodation information, and threats regarding accommodations.

Dr. Chang explains that chronic musculoskeletal pain, postural intolerance, and sensory overload interfere with concentration, endurance, and executive functioning. Ex. B. Denial of ergonomic support denies sustained agenda preparation, contract review, staff-report review, public-record review, fiscal oversight, and informed voting.

**4. Live-meeting processing**

Live-meeting processing is not duplicative of written review. Written review helps after a meeting or with correspondence. It does not help Plaintiff process a live vote before it happens. Council meetings require immediate listening, questioning, responding, motion-making, seconding, objecting, and voting. Once a vote occurs, the opportunity is gone.

Denial of live processing prevents Plaintiff from asking questions during agenda items, following motions, responding to staff/counsel, participating in debate, requesting clarification, and voting accurately.

**E. The Communication Protocol denies Title II access and violates the First Amendment as applied.**

Plaintiff does not challenge a normal rule preventing individual Councilmembers from giving staff orders. Plaintiff challenges the Protocol as applied. The Protocol states that all inquiries and communications of any kind with staff should be directed through the City Manager's office, and that Councilmembers should contact the City Manager's office before coming to City Hall for any reason. The Acting City Manager then enforced it as mandatory.

On April 20, 2026, Plaintiff requested City-issued credit card statements and transaction-level records from Finance Director Karen Ogawa for oversight before the Acting City Manager's performance review. Ex. L. On April 24, 2026, Acting City Manager Mrakich responded that the email did not comply with his Communication Protocols and stated: 'City staff is following my directives, and they will not respond to demands that do not comply with my Communication Protocols. This includes your demand below to Ms. Ogawa.' Ex. L.

That is the access denial. Plaintiff requested financial records necessary for official oversight. The subject of the oversight-the Acting City Manager-made himself the gatekeeper and blocked Finance from responding. The Protocol therefore denied access to the City's finance-record function, records-review function, oversight function, and Council preparation function.

For Plaintiff's disability, the harm is worse. Plaintiff's approved accommodations include structured/direct communication, written documentation, additional processing time, and context before questions. Autism makes predictable, clear, direct written communication necessary. Routing all communications and City Hall access through the Acting City Manager-who was involved in disputes with Plaintiff and sent hostile text messages-made the accommodation pathway unstable and unsafe. Ex. M.

First Amendment: Levy allowed a neutral line-of-authority rule. Plaintiff's challenge is not facial. As applied, this Protocol blocked protected inquiry, oversight, record access, City Hall access, and petitioning after Plaintiff reported public-fund concerns and asserted ADA rights. Plaintiff's speech concerned public expenditures, City-issued credit cards, nonprofit event financing, alleged misuse of public funds, government contracts, ADA compliance, public records, and law-enforcement referrals-core matters of public concern. A rule used to make the subject of oversight the gatekeeper for oversight records burdens speech and inquiry in a way Levy did not authorize.

F. Plaintiff identifies the specific accessibility equipment and supports interfered with or withheld.

360-degree recording device / GoPro MAX 2 or equivalent;

storage media, mounting equipment, and implementation support for the 360-degree device;

USB / flash-drive agenda-material delivery;

laptop and external monitor used as ADA-supported assistive workflow during meetings;

microphone and audio equipment needed for meeting participation and assistive processing;

projector, screen, remote, and presentation equipment needed for official Council/town-hall functions;

stable seating and lighting at the dais;

ergonomic seating support for prolonged official document review;

printer, copying, and document-review equipment;

City Hall access needed to use official equipment and review materials; and

staff communication channels necessary to implement or troubleshoot accommodations.

The interference was not isolated. It followed Plaintiff's protected ADA requests, complaints, and law-enforcement oversight reports, and affected Plaintiff's ability to read, process, present, communicate, review records, prepare for votes, and participate in Council meetings.

G. The retaliation/interference timeline satisfies protected activity, adverse action/interference, and causal link.

The Order found protected activity satisfied. Plaintiff now clarifies the adverse actions and causal link.

Protected activity included:

requesting ADA accommodations and submitting medical documentation;

objecting to disability-based harassment and disclosure of ADA information;

filing ADA/FEHA and HR complaints;

requesting Title II compliance and grievance procedures;

updating EEOC/CRD/civil-rights authorities;

reporting suspected public-fund misconduct to DA/FBI; and

opposing retaliatory censure, investigation, communication restrictions, and CPRA litigation.

Adverse and interfering actions included:

refusing/delaying accommodations;

changing ADA coordination midstream and attorney-routing the process;

refusing to conduct formal disability-discrimination investigation because Plaintiff is an elected official;

imposing and enforcing the Communication Protocol after protected ADA and oversight activity;

blocking staff responses to official financial-record requests;

denying or withholding the 360-degree camera, USB agenda materials, ergonomic seating support, and live-processing supports;

forcing Plaintiff from accommodation-supported seating and threatening removal/arrest;

publicly mocking accommodations and questioning Plaintiff's autism;

using CPRA litigation to target Plaintiff's disability-related assistive workflow; and

continuing to route accommodation and access issues through officials involved in the dispute.

Causation is shown by timing, knowledge, and escalation. City officials and counsel had actual knowledge of Plaintiff's disability, medical documentation, accommodation requests, ADA complaints, and law-enforcement reports. After those protected activities, the City escalated through seating/lighting interference, CPRA litigation, refusal to investigate disability complaints, public disability-related statements, staff-communication restrictions, City Hall access restrictions, and equipment denials.

The law-enforcement timeline is part of motive. On August 21, 2025, Plaintiff reported to the District Attorney that Acting City Manager Mrakich had reported Mayor Wu threatened he would be fired if he interfered with the Moon Festival. Ex. T. Milan's own email documented the alleged firing threat and his expectation of possible retaliation if he recommended a more fiscally responsible event option. Ex. U. In September 2025, the FBI stated it was aware of some activities and was investigating those and similar allegations. Ex. V.

H. The CPRA lawsuit is an adverse action and ADA interference because it targets Plaintiff's assistive workflow instead of honoring structured communication.

Plaintiff does not ask this Court in this motion to decide the merits of the City CPRA case. Plaintiff raises the lawsuit as evidence of adverse action, causation, and ADA interference. The City's CPRA petition targets Plaintiff's AI prompts, outputs, laptop, phone, and electronic materials used during Council meetings. The petition itself acknowledges that Plaintiff used a laptop and monitor during Council meetings as an ADA accommodation. Ex. R. The City therefore turned Plaintiff's disability-related assistive workflow into the factual predicate for litigation.

Before the City proceeded with litigation, Plaintiff gave written notice to City Attorney Duarte and Buchalter's O'Connell that the City had signed ADA/FEHA accommodations requiring written documentation and structured, direct communication, and that Plaintiff had never been clearly told what specific document, record, or corrective step was allegedly missing. Ex. S. Plaintiff requested written clarification and an opportunity to cure. Instead of honoring that structured-communication accommodation, the City sued. That litigation would reasonably deter a person from using disability-related assistive tools, asserting ADA rights, and continuing protected oversight activity.

**I. The harm is ongoing and worsening, not a completed December 2025 injury.**

The harm is not limited to one past threat of arrest. It recurs every time Plaintiff must review agenda materials, access City Hall, communicate with staff, use accommodations, process a live meeting, ask questions, deliberate, and vote without reliable implementation of disability accommodations.

A vote cannot be repaired after it happens. A lost chance to ask questions during a live meeting cannot be restored later. A denied opportunity to review agenda materials before a vote cannot be fully compensated by damages. A Councilmember's chilled speech and blocked oversight also cause irreparable constitutional harm.

Dr. Chang's updated medical letter documents permanent neurological and medical conditions limiting learning, reading, concentrating, processing information, executive functioning, auditory integration, sensory regulation, emotional regulation, sleep, and physiological stress response. Ex. B. The denial of accommodations is not only emotional harm. It impairs Plaintiff's ability to remain in meetings, read materials, track speakers, ask questions, vote accurately, and perform elected duties on equal terms.

Plaintiff has also experienced public humiliation, disability-based mocking, demands that he verify his autism, forced seating/lighting changes, threats of police removal, and stress-related symptoms including chest pain. Plaintiff states under oath that the May 2026 events resulted in emergency-room evaluation for chest pain. The ongoing risk remains because the Protocol, seating/lighting dispute, access barriers, equipment denials, and disability-based hostility remain unresolved.

**J. Emergency public filing of unredacted evidence**

Plaintiff previously sought sealing of sensitive ADA, Safe at Home, medical, and law-enforcement-related information. The Court stated that emotional harm from use/disclosure of disability-related information can be addressed by proper sealing. Plaintiff understands that. However, because the City used the absence of precise record evidence to defeat emergency relief, Plaintiff now elects to file this evidence publicly and unredacted for this emergency application.

This election is limited to this emergency filing and does not concede that the City had authority to publicly disclose Plaintiff's disability, medical, Safe at Home, law-enforcement, or accommodation information. Plaintiff is choosing between protecting privacy and proving the emergency to the Court. He chooses to prove the emergency.

## VI. CONCLUSION

Plaintiff respectfully requests clarification or limited reconsideration, and leave to file a renewed, narrow preliminary-injunction motion. Plaintiff asks the Court to consider the corrected record showing that the prior TRO denial was based on an incomplete emergency presentation, not on the full accommodation, retaliation, access, and harm record now lodged publicly.

Dated: May 5, 2026

/s/ John Doe
John Doe, Plaintiff in Pro Per

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on May 5, 2026 to Attorney Roger Scott, who is deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4. Any counsel of record who have not consented to electronic service through the Court's CM/ECF system will be served by electronic mail, first class mail, facsimile and/or overnight delivery.

/s/John Doe

# EXHIBIT B

Docket 26 - Order Denying TRO and Granting Supplemental Declaration

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOHN DOE, an individual,

Plaintiff/ Petitioner,

v.

CITY OF WEST COVINA,

Defendant/ Respondent.

Case No.: 2:26-cv-03659-MEMF-MBK

**ORDER DENYING PETITIONER'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION [DKT. NO. 12], AND ORDER GRANTING PETITIONER'S APPLICATION FOR LEAVE TO FILE SUPPLEMENTAL DECLARATION [DKT. NO. 21]**

Before the Court is Petitioner's Ex Parte Application for Temporary Restraining Order and Order to show Cause re Preliminary Injunction, Dkt. No. 12 ("Application"), and his Application for Leave to File a Supplemental Declaration, Dkt. No. 21. For the reasons stated herein, the Application is DENIED, and the Application for Leave to File a Supplemental Declaration is GRANTED.

/ / /

/ / /

/ / /

1

## SUMMARY OF ORDER FOR PRO SE PLAINTIFF

You filed a first amended petition and complaint on March 24, 2026, against the Defendant/Respondent City of West Covina, alleging a violation of Title II of the ADA, declaratory and injunctive relief, and a petition for mandate. Dkt. No. 1-1. You then filed an Ex Parte Application for Temporary Restraining Order and Order to Show Cause re Preliminary Injunction, Dkt. No. 12, arguing that you are likely to succeed on your claims of disability discrimination, retaliation, and a free speech violation, and face irreparable harm without immediate interim injunctive relief. This Order will explain why this Court finds that you have not shown a likelihood of success on the merits of any of your claims and how you have not suffered irreparable harm for immediate interim relief, so the Court declines the Ex Parte Application for Temporary Restraining Order.

Although you are a *pro se* litigant (meaning you do not have an attorney), you still have to follow Court orders, the Local Rules, and the Federal Rules of Civil Procedure. *See* C.D. Cal. L.R. 83-2.2.3. The Local Rules are available on the Court's website, http://www.cacd.uscourts.gov/court-procedures/local-rules.

The Court cannot provide legal advice to any party, including you. There is a free "*Pro Se* Clinic" that can provide information and guidance about bringing a lawsuit in this Court.

- Public Counsel runs a free Federal *Pro Se* Clinic where *pro se* litigants can get information and guidance. The Clinic is located at the Roybal Federal Building and Courthouse, 255 East Temple Street, Los Angeles, CA 90012. *Pro se* litigants must call or submit an on-line application to request services as follows: on-line applications can be submitted at http://prose.cacd.uscourts.gov/los-angeles, or call (213) 385-2977, ext. 270.

- Public Counsel also has extensive resources for *pro se* litigants at its website located at https://publiccounsel.org/services/federal-court/.

- The Court is also informed that the LA Law Library, located across the street from the First Street Courthouse at 301 W. First Street, Los Angeles, CA 90012, also has extensive resources for *pro se* litigants—including those in federal court. The LA Law Library offers legal research classes, assistance from reference librarians, and free public computers with

2

Internet access. The LA Law Library can be reached via email at reference@lalawlibrary.org, or via telephone at (213) 785-2513.

/ / /

/ / /

/ / /

## I.    Background

### A.  Factual Background

Unless otherwise indicated, the following factual background is derived from Doe's First Amended Complaint, Dkt, No. 1-1 ("1AC"), and Doe's Ex Parte Application for Temporary Restraining Order and Order to Show Cause re Preliminary Injunction, Dkt. No. 12 ("Application"). *This Court is not, at this time, making a determination as to the veracity of the facts stated therein.*

Petitioner John Doe is an elected Councilmember of the City of West Covina. *See* 1AC ¶ 2. Respondent City of West Covina ("the City") is a California municipality and public entity. *Id.* ¶ 14. Petitioner engages in oversight regarding the City. *Id.* ¶ 19. On May 13, 2025, the City "approved [Doe's disability] accommodations in writing, including structured and direct communication, additional time to review and respond, the right to an advocate or legal representative in formal matters, and the ability to briefly provide context before questions during council meetings," *see* Application at 3, and the City also approved more equipment-related accommodations on January 6, 2026, like a Dell laptop and home-office accessibility items, *see id.* at 4. But Doe contends that he still has not received all his requested accommodations and thus does not have meaningful access to the City's services, programs, and activities. *See* 1AC ¶ 106-08, 128.[1]

Moreover, in October 2025, the City hired a neutral, third-party investigator to investigate Doe regarding workplace concerns. *Id.* ¶ 22. Also, Doe made disability-related complaints, and he was treated differently because he was an elected official, where in December 2025, "he was threatened with arrest and physical force if he did not surrender his approved ADA accommodation

---

[1] The Court uses the phrase "reasonable modification" in the Discussion section below to align with the language of Title II of the Americans with Disabilities Act, but it notes that in the context of this Order, Doe's use of the phrase "reasonable accommodation" is interchangeable with "reasonable modification."

3

seating during a public meeting." *See id.*; Application at 6. And on April 15, 2026, the City issued a Policy Memorandum to instate a new City Communication Protocol that states in part: "The City Council shall deal with the administrative services of the City only through the City Manager and cannot give orders, instructions, or directions to any subordinates of the City Manager." *See* Application at 6; Ex. 2, Dkt. No. 15-1.

### B. Procedural History

On March 10, 2026, Petitioner Doe, individually and in his official capacity as Councilmember of the City of West Covina, filed a Petition for Writ of Mandate and Complaint against Defendant City of West Covina in Los Angeles County Superior Court. *See* Dkt. No. 1. On March 24, 2026, Doe filed an Amended Petition for Writ of Mandate and Complaint in Los Angeles County Superior Court, alleging claims of: (1) Petition for Writ of Mandate, Cal. Code Civ. Proc. § 1085; (2) Declaratory Relief; (3) Violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132; and (4) Injunctive Relief. *See generally* 1AC. On April 6, 2026, the City removed this action to federal court. Dkt. No. 1. On April 16, 2026, Doe filed this instant Application. *See* Application. On April 17, 2026, the Court issued an Order setting a briefing schedule. Dkt. No. 14. On April 24, 2026, the City filed an Opposition to the Application. Dkt. No. 15 ("Opposition"). On April 25, 2026, Doe filed a Reply to the Opposition. Dkt. No. 17 ("Reply"). And on that same day, Doe filed an application for leave to file a third amended complaint and multiple applications to seal. Dkt. Nos. 16, 18. On April 27, 2026, Doe filed an application for leave to file a supplemental declaration in support of this Application.[2] Dkt. No. 21.

### II. Applicable Law

#### A. Preliminary Injunctions

The analysis that courts must perform for temporary restraining orders and preliminary injunctions is "substantially identical." *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,* 240 F.3d 832, 839 (9th Cir. 2001). Federal Rule of Civil Procedure 65 sets forth the procedure for issuance of a preliminary injunction. *See* Fed. R. Civ. P. 65(b). "A preliminary injunction is an extraordinary

---

[2] The Court has considered the arguments made in the supplemental declaration and GRANTS the application.

remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To qualify for injunctive relief, Plaintiff must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood that he will suffer irreparable harm without an injunction; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Id.* at 20. This Court cannot grant the preliminary injunction "unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

The Ninth Circuit has held that injunctive relief may issue, even if the moving party cannot show a likelihood of success on the merits, if "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Under either formulation of the principles, preliminary injunctive relief should be denied if the probability of success on the merits is low. *See Martin v. Int'l Olympic Comm.*, 740 F.2d 670, 675 (9th Cir. 1984) ("[E]ven if the balance of hardships tips decidedly in favor of the moving party, it must be shown as an irreducible minimum that there is a fair chance of success on the merits.").

### B. Title II of the ADA

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To prove that a public entity violated Title II of the ADA, a plaintiff must show:

> (1) he is a 'qualified individual with a disability'; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability.

*Duvall v. County of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001), *as amended on denial of reh'g* (Oct. 11, 2001) (quoting *Weinreich v. L.A. Cnty. Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997)). "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the

public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

Moreover, "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 12203(a). And it is "unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, . . . any right granted or protected by this chapter." *Id.* § 12203(b). "Courts that have had occasion to apply [Section 12203(a)] of the ADA have almost uniformly adopted the burden-shifting analysis set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green.*" *Brown v. City of Tucson*, 336 F.3d 1181, 1186 (9th Cir. 2003).

### C. First Amendment and Legislators

Under the First Amendment, legislators are "'given the widest latitude to express their views' and there are no 'stricter 'free speech' standards on [them] than on the general public.'" *Levy v. City of Santa Monica*, 8 Cal. Rptr. 3d 507, 514 (Cal. Ct. App. 2004) (quoting *Eller Outdoor Advert. Co. v. Bd. of Supervisors*, 152 Cal. Rptr. 358, 360 (Cal. Ct. App. 1979)); *see also Bond v. Floyd*, 385 U.S. 116, 136 (1966). "Laws that restrict that freedom must be narrowly construed." *Levy*, 8 Cal. Rptr. 3d at 514.

### III.  Discussion

#### A. Doe has not demonstrated that he is entitled to a temporary restraining order pursuant to the *Winter* factors.

As discussed above, the standard for granting a temporary restraining order and a preliminary injunction are substantively identical. Given the urgency of this matter, this Court has only considered whether Petitioner is entitled to a temporary restraining order.

Doe argues three grounds upon which a temporary restraining order should be granted. First, he argues that he has been unlawfully denied reasonable modifications and thus meaningful access to the City's programs, services, and activities under Title II of the ADA. Second, he argues he was unlawfully threatened and retaliated against under the ADA for requesting such reasonable

modifications. And third, he argues that the City's new Communication Protocol burdens speech and violates his First Amendment and ADA rights. *See* Application at 7-8; Reply at 3-5, 6.

The Court applies the *Winter* factors to Doe's claims below.

   i. The first *Winter* factor, likelihood of success on the merits, is not met.

    1. *Doe is unlikely to succeed on his Title II discrimination claim.*

Doe contends that the City delayed the implementation of his approved accommodations and "imposed new communication restrictions that interfere[s] with [his] official participation." Application at 7. He specifically contends that the City still has not provided "current live-meeting processing accommodations, flash-drive agenda materials, 360-degree camera access, . . . or ergonomic support," which prevents him from having meaningful access to the City's services, programs, and activities. *See* Reply at 5. The parties do not dispute that Doe is a qualified individual with a disability under the ADA. *See* Application at 7; Opposition at 15-16. The issue is whether Doe was "excluded from participation in or denied the benefits of a public entity's services, programs, or activities," and whether such "exclusion, denial of benefits, or discrimination was by reason of his disability." *Duvall*, 260 F.3d at 1135 (quoting *Weinreich*, 114 F.3d at 978).

For the reasons discussed below, the Court finds that Doe has not shown there is a likelihood of success on the merits of his Title II discrimination claim.

In his Application, Doe does not contend how the denial of his requested reasonable modifications prevent the participation in or the denial of the City's services, programs, or activities. *See* Application at 7-8. In Reply, he contends that he is not being provided with his requested "live-meeting processing accommodations, flash-drive agenda materials, 360-degree camera access, . . . or ergonomic support," and that these requested accommodations are "necessary and effective." Reply at 5-6. But the City provided Doe with a 360-degree camera "for use in public meetings," and Doe does not contest how that is insufficient to provide access to the City's services, programs, or activities. *See* Ex. 18 at 3, Dkt. No. 15-1; Ex. H at 4, Dkt. No. 17-1. And the City denied Doe's requests for an ergonomic chair and to receive agenda material via a flash drive because "a chair for home use [did] not serve to alter or improve [Doe's] meaningful access to City Council meetings," and "it [did] not appear the flash drive will improve [Doe's] meaningful access." Ex. 18 at 3. Doe

7

does not rebut these contentions in his Reply, nor does he provide evidence to show how these denials prevent access to specific "Council functions." *See* Ex. H at 4-5; *see also* Reply at 5-6. Finally, in regard to Doe's "live-meeting processing accommodation[]," the City denied the request as "duplicative," *see* Ex. 18 at 3, and while Doe does explain how this is different from his written review request, *see* Ex. H at 5, he does not explain how this denial impacts his participation in or denies the benefits of the City's services, programs, or activities, *id.*

Moreover, Doe does not explain how the change in "the ADA coordination structure midstream," and the imposition of a "new communication restriction" with the City's new Communication Protocol "interfere[s]" with his "official participation" and denies him participation in the City's services, programs, or activities. *See* Application at 7; Opposition at 16; Reply at 3, 6.

Accordingly, the Court finds that Doe has not satisfied the second prong of a Title II discrimination claim and thus is not likely to succeed on the merits of his Title II discrimination claim. *See* Opposition at 15-16.

### 2. Doe is unlikely to succeed on his Title II retaliation claim.

Doe presents three different theories for how he is likely to succeed on a Title II retaliation claim under Sections 12203(a) and (b). *See* Application at 8. First, he contends that the City altered the chain of command for ADA requests in retaliation for his invoking his ADA rights, making ADA-related complaints, and requesting ADA implementation. *Id.* at 8. Second, he contends that after he invoked his ADA rights, made ADA-related complaints, and requested ADA implementation, the City interfered with or withheld accessibility-related equipment. *Id.* Third, he contends that he was threatened with arrest if he did not surrender his "approved accommodation seating." *Id.*

A prima facie "case of [disability] retaliation requires a plaintiff to show: (1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two."[3]

---

[3] The City contends that regardless of Doe's Title II claims for discrimination, retaliation, and interference, he "was not excluded from participation in or denied access to any of the City's services, programs, or activities, or otherwise discriminated against." *See* Opposition at 15-16. To the extent that the City's position is that this forecloses a retaliation claim, this is incorrect given the legal framework under which this Court is to consider retaliation claims under Section 12203(a) and interference claims under Section 12203(b).

*Alvarado v. Cajun Operating Co.*, 588 F.3d 1261, 1269 (9th Cir. 2009) (internal quotation marks omitted) (quoting *Coons v. Sec'y of U.S. Dep't. of Treasury,* 383 F.3d 879, 887 (9th Cir. 2004)). Here, the Court finds that Doe is unlikely to succeed on his retaliation and interference claim.

### a.  The City's Alteration of the Chain of Command.

First, "[p]ursuing one's rights under the ADA constitutes a protected activity." *Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 850 (9th Cir. 2004). Doe was pursuing his rights when he invoked his ADA rights, made ADA-related complaints, and requested ADA implementation.  Thus, the Court finds that Doe has satisfied the first prong of a retaliation claim.

Second, "[a]n adverse employment action is any action 'reasonably likely to deter employees from engaging in protected activity.'" *Pardi*, 389 F.3d at 850 (quoting *Ray v. Henderson,* 217 F.3d 1234, 1243 (9th Cir. 2000)). For purposes of this analysis, the Court will assume that altering the chain of command constitutes an adverse action. If so, the second prong of a retaliation claim is met.

But Doe's claim under this theory is unlikely to succeed because there is no causal link. Although "[w]hen adverse employment decisions closely follow complaints of discrimination, retaliatory intent may be inferred," *Pardi*, 389 F.3d at 850, the City is likely to succeed in demonstrating that it was required to change the chain of command once Doe named the prior ADA official as a defendant in a lawsuit—eliminating the causal link Doe must show. *See* Opposition at 11.

### b.  The City's Alleged Interference with Accessibility Equipment.

Neither party addresses what the elements of an interference claim are, but the Court is satisfied that to succeed on such a claim, Doe must show interference as well as a causal link between the interference and his exercise of his rights. *See Brown v. City of Tucson*, 336 F.3d 1181, 1193 (9th Cir. 2003). Doe's TRO contains a conclusory assertion that his equipment was withheld or interfered with and does not specify what equipment he is referring to. Under the circumstances, he has failed to show that he is likely to succeed in demonstrating interference or the required causal link.

### c.  The City's Threat of Arrest.

9

Doe is unlikely to succeed on this theory as its factual predicate—that he had ADA-approved seating—appears unsupported. Although Doe states that he was threatened with arrest if he did not surrender his "approved accommodation seating," *see* Application at 8, the record indicates that at the time of the threat of arrest, the seating he declined to surrender was not an approved accommodation, *see* Ex. 18, Dkt. No. 15-1; *see also* Mrakich Decl. ¶¶ 21-22, Dkt. No. 15-1. And the material Doe cites in support of this are merely his statements to this effect, but not a memorandum approving an accommodation request as exists for his other claimed accommodations. *See* Ex. A, Dkt. No. 12. Rather, it appears that the City is likely to succeed in showing that the accommodation requested concerning his seating in the Council chamber was made the same day as the alleged threat of arrest and not resolved until later.

In sum, Doe has failed to satisfy the requirements for a retaliation claim under Section 12203(a) and an interference claim for Section 12203(b). Accordingly, the Court finds there is not a likelihood of success on Doe's retaliation and interference claim under Sections 12203(a) and (b).

### 3. Doe is not likely to succeed on his challenge to the City's Communication Protocol.

Doe contends that the City's new Communication Protocol "imposes operational restrictions on how [he] may communicate with staff, access City Hall, and perform oversight functions," and imposes "an added barrier to participation and to the effective use of accommodations," so it violates the ADA and the Constitution. *See* Application at 8. Here, the Court finds that Doe is not likely to succeed on this claim.

First, as discussed above, the City's Communication Protocol does not violate Title II because Doe has not alleged how the Communication Protocol denies participation in or access to the City's services, programs, or activities and that such denial was because of his disability.

Second, the Communication Protocol is consistent with the First Amendment. In *Levy*, the California Court of Appeals held a city ordinance that stated: "Except for the purpose of inquiry, the City Council and its members shall deal with the administrative service under the City Manager solely through the City Manager and neither the City Council nor any member shall give orders to any subordinates of the City Manager, either publicly or privately" did not violate the First

Amendment. *See Levy*, 8 Cal. Rptr. 3d at 510-11, 515-16. The California Court of Appeals held that the purpose of the ordinance was "to define the lines of authority within City government, not to prohibit protected speech. Interpreting this section to prohibit 'orders' to City staff is a bright line consistent with the purpose of [the ordinance] and the First Amendment." *Id.* at 515.

Here, the Court finds that the City's new Communication Protocol is permissible under the First Amendment. The Communication Protocol states:

> The City Council shall deal with the administrative services of the City only through the City Manager and cannot give orders, instructions, or directions to any subordinates of the City Manager. City Staff are not required to conduct research, generate new analysis or reports, reprioritize assigned work, or take action at the direction of, or in response to an inquiry from, individual councilmembers without authorization from the City Manager.
> . . .
> City Staff may exercise professional judgment in determining how to respond to individual Councilmember inquiries, consistent with administrative direction and workload considerations.
> . . .
> All City Councilmembers should direct all inquiries and all other communications of any kind with City Staff members through the City Manager's office. . . .
>
> [And] All City Councilmembers should contact the City Manager's office prior to coming to City Hall for any reason.

*See* Ex. 2 at 1-2, Dkt. No. 15-1. Like the ordinance in *Levy*, the City's Communication Protocol does not violate Doe's First Amendment rights because it only "define[s] the lines of authority within City government." *Levy*, 8 Cal. Rptr. 3d at 515. Doe even admits that "[i]n a council-manager system, a rule may prevent Councilmembers from giving orders to staff." Reply at 4. To that end, Doe is not likely to succeed on the merits of his claim regarding the Communication Protocol.

Doe's arguments in Reply are unavailing. First, Doe does not explain how making "the City Manager the gatekeeper of elected-official inquiry" is unconstitutional. *See* Reply at 3. And second, Doe contends that this ordinance prohibits his "right to ask questions, seek information, communicate regarding oversight, and obtain records necessary to perform legislative and fiduciary duties," and it is "read so broadly that virtually all inquiries become suspect." Reply at 4. But this ordinance does not limit Doe's speech or have any of his "inquiries become suspect," rather, it only

"define[s] the lines of authority within City government." *Levy*, 8 Cal. Rptr. 3d at 515. Doe is still permitted to speak, ask questions, seek information, and communicate, and the only change is that his administrative "orders, instructions, or directions to any subordinates" must go to the City Manager instead of City Staff. *See* Ex. 2 at 1-2. Thus, the Court finds the ordinance is constitutional and Doe has not shown a likelihood of success on this claim.

Because Doe has not shown a likelihood of success on any of his claims, the first *Winter* factor is not met.

        ii.   The second *Winter* factor, a demonstrated likelihood of irreparable harm absent an injunction, is not met.

To establish the second *Winter* factor, Doe must demonstrate a likelihood that he will suffer irreparable harm without a temporary restraining order. This Court finds that the second *Winter* factor is not met.

A "'long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm,' but '[d]elay by itself is not a determinative factor in whether the grant of interim relief is just and proper.'" *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019) (first quoting *Oakland Trib., Inc. v. Chron. Publishing Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985); and then quoting *Aguayo for & on Behalf of N.L.R.B. v. Tomco Carburetor Co.*, 853 F.2d 744, 750 (9th Cir. 1988), *overruled on other grounds by Miller for & on Behalf of N.L.R.B. v. Cal. Pac. Med. Ctr.*, 19 F.3d 449 (9th Cir. 1994)). Moreover, "[u]sually, delay is but a single factor to consider in evaluating irreparable injury; courts are 'loath to withhold relief solely on that ground.'" *Arc of Cal. v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014) (quoting *Lydo Enters., Inc. v. City of Las Vegas,* 745 F.2d 1211, 1214 (9th Cir. 1984)).

Doe contends that he faces immediate and irreparable harm because he "has already attended multiple Council meetings without all medically supported accommodations in place." Application at 9. And the City's threat to arrest him "amplifies the immediacy of the harm." *Id.* But his "accommodation issues . . . have been ongoing for months," where the "purported threat of arrest . . . occurred in December 2025." Opposition at 12; *see also* Ex. F, Dkt. No. 12 (noting alleged accommodation delay since February 2026); Ex. I, Dkt. No. 12 (noting the threatened arrest

12

happened in December 2025). Doe does not rebut this argument in his Reply. *See generally* Reply. Moreover, even if this Court does not consider the delay in its irreparable harm analysis and is "generous in the assumptions we draw about [Doe's] litigation of the case" because Doe is pro se, *see Cuviello*, 944 F.3d at 833, there are no "ongoing, worsening injuries" to warrant immediate interim relief, *id*. The Court found there is no likelihood of success on any of Doe's claims, and Doe has not alleged any facts to show that there is an ongoing risk of an arrest or any other retaliation or interference. *Arc of Cal.*, 757 F.3d at 990; *see also* Application at 9; Reply at 6.

Finally, the case Doe cites for irreparable harm is distinguishable. *See* Application at 9 (citing *Chalk v. U.S. Dist. Ct. Cent. Dist. of Cal.*, 840 F.2d 701, 709-10 (9th Cir. 1988)). In *Chalk*, the petitioner was reassigned from his teaching job to a more "distasteful" administrative position because of his disability, and the Ninth Circuit held that he faced immediate and irreparable emotional and psychological harm, because he could not have the "tremendous personal satisfaction and joy" he had while teaching, and his injury was similar to the injuries that involved a "'reduced sense of well-being'" and "'discrimination based on the irrational fear that [he] might be contagious [due to his disability].'" *See id.* at 703, 709-10 (first quoting *E. E. O. C. v. Chrysler Corp.*, 546 F. Supp. 54, 70 (E.D. Mich. 1982), *opinion modified and reinstated*, No. 81-72347, 1982 WL 406 (E.D. Mich. Sept. 3, 1982), *and aff'd*, 733 F.2d 1183 (6th Cir. 1984); and then quoting *Sch. Bd. of Nassau Cnty., Fla. v. Arline*, 480 U.S. 273, 284 (1987)). Also, the petitioner had a virus "fatal in all recorded cases," where "[a] delay, even if only a few months, . . . represent[ed] precious, productive time irretrievably lost to him." *See id.* at 10.

Unlike the petitioner in *Chalk*, Doe does not have a fatal disease, where he would lose out on time while waiting for the resolution of his ADA claims. *See* Opposition at 17. And although Doe contends that he has suffered emotional "severe stress, anxiety, humiliation, and emotional pain" from this Application, *see* Reply at 8, Doe does not allege the type of injury stemming from a "'reduced sense of well-being'" or "'discrimination based on the irrational fear that [he] might be contagious'" that warrants immediate and irreparable emotional and psychological harm. *Chalk*, 840 F.2d at 709-10. Doe's emotional harm from "the use and disclosure of his disability-related

13

information" can be addressed with a proper sealing of such documents. *See* Reply at 6.[4]

Accordingly, the Court finds that Doe has not met his burden to establish irreparable harm. Thus, the Application is denied.

Because the Court finds Doe cannot satisfy the first and second *Winter* factors, the Court need not address the third and fourth *Winter* factors.

## IV.    Conclusion

For the foregoing reasons, the Application, Dkt. No. 12, is DENIED, and the Application for Leave to file a Supplemental Declaration, Dkt. No. 21, is GRANTED.

IT IS SO ORDERED.

Dated: May 4, 2026

_____

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge

---

[4] To properly seal a document, Doe must comply with Local Civil Rule 79.5.2.2, which requires that a party seeking to file such an application must file an unredacted version of the document to be sealed "with any proposed redactions highlighted." The Court will separately issue an Order regarding Doe's applications to seal. *See* Dkt. Nos. 16, 18, 21.

14

# EXHIBIT C

April 7, 2026 City Manager letter reassigning Plaintiff's ADA/Section 504 requests to Roxanne Lerma and removing Carmelita Underwood from Plaintiff's requests



*City Manager's
Office*

April 7, 2026

Dear Mr. Gutierrez:

We are writing to notify you that, effective immediately, the City is designating Assistant City Manager, Roxanne Lerma, as its ADA/Section 504 Coordinator. The City's prior ADA/Section 504 Coordinator, Carmelita Underwood, will no longer be responsible for receiving, responding to, or evaluating any of your requests. Ms. Lerma is now your point of contact for requesting accommodations from the City from this point forward. Ms. Lerma may be contacted at RLerma@westcovina.org or 626-939-8401.

Sincerely,

Milan Mrakich
Acting City Manager

1444 West Garvey Avenue • P.O. Box 1440 • West Covina • CA 91793 • Phone (626) 939-8401 • Fax (626) 939-8406

# EXHIBIT D

July 1, 2026 email showing Carmelita Underwood scheduling an interactive-process meeting for a member of the public's ADA accommodation request

# Re: ADA Accommodation Request – Equal Access to Public Comment at City Council Meeting-Confirmation of Interactive Process Meeting – July 2, 2026

---

**From:** **Carmelita Underwood** CUnderwood@westcovina.org

**To:** **agibbsdesign** agibbsdesign@gmail.com, **City Clerk** City_Clerk@westcovina.org, **Oscar Herrera** OHerrera@westcovina.org

**Cc:** **Letty.Lopez-Viado@westcovina.org** , **Olegario D. Cantos VII** ollie.cantos@westcovina.org, **Brian Gutierrez** Brian.Gutierrez@westcovina.org, **Nilesh Mehta** NMehta@westcovina.org, **Roxanne E. Lerma** RLerma@westcovina.org, **Rosario Diaz** Rosario.Diaz@westcovina.org, **Tony Wu** Tony.Wu@westcovina.org

**Date:** **Wed, Jul 1, 2026, 8:08 PM**

---

Hello Mr. Gibbs,

Thank you for taking the time to speak with me today regarding scheduling an Interactive Process Meeting to discuss your ADA accommodation request.

This email confirms that the meeting has been scheduled for Thursday, July 2, 2026, at 11:00 a.m. If anything changes and you need to reschedule, please contact me at (626) 510-4854 as soon as possible.

Best regards,

**Carmelita Underwood**

Director Human Resources/Risk Management

City of West Covina | Human Resources/Risk Management Department

1444 W. Garvey Avenue South | West Covina, CA 91790

Cunderwood@westcovina.org (Email)

626.939.8450 (Main)

626.939.8476 (Direct)

626.510.4854 (Cell)

626.939.8606 (Fax)

**1 / 2**



---

**From:** Andrew Gibbs agibbsdesign@gmail.com

**To:** Carmelita Underwood CUnderwood@westcovina.org

**Cc:** City Clerk City_Clerk@westcovina.org, Oscar Herrera OHerrera@westcovina.org, Letty.Lopez-Viado@westcovina.org , Olegario D. Cantos VII ollie.cantos@westcovina.org, Brian Gutierrez Brian.Gutierrez@westcovina.org, Nilesh Mehta NMehta@westcovina.org, Roxanne E. Lerma RLerma@westcovina.org, Rosario Diaz Rosario.Diaz@westcovina.org, Tony Wu Tony.Wu@westcovina.org

**Date:** Wed, Jul 1, 2026, 8:20 PM

---

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Hi Carmelita,

It was nice speaking with you today. Thank you for reaching out to schedule an interactive process meeting regarding my ADA accommodation request.

Just to confirm, my request is regarding safe wheelchair/mobility access through the public right-of-way from my home area to the existing public sidewalk and pedestrian network on Hollenbeck.

Thank you again,

Andrew Gibbs

---

2 Emails

# EXHIBIT E

April 15, 2026 Communication Protocol issued by Milan Mrakich



# *Memorandum*

## CITY MANAGERS OFFICE

**DATE:**        April 15, 2026

**TO:**          All Councilmembers for the City of West Covina
                 All City Staff for the City of West Covina

**FROM:**        Milan M. Mrakich, Acting City Manager

**SUBJECT:**     **POLICY MEMORANDUM – COMMUNICATION PROTOCOLS**

---

### I.        Purpose of Memorandum

The purpose of this memorandum is to ensure that communications between Councilmembers and City Staff are at all times respectful and professional.  Specifically, it is to (a) set forth communication protocols to assist Councilmembers in making and receiving responses to their reasonable inquiries, and (b) to protect City Staff from unprofessional conduct that they may reasonably perceive as intimidating or retaliatory.

### II.       Overview of the Council-Manager Form of Government

The City of West Covina operates as a general law city under the council-manager form of government. Under this structure, the City Council serves as the legislative body responsible for establishing municipal policy, adopting ordinances and resolutions, approving the budget, and setting overall strategic direction. The City Manager serves as the City's chief administrative officer and is responsible for the day-to-day administration of City operations and the supervision of City Staff.

In a council-manager form of government, administrative authority flows from the City Council to the City Manager, and from the City Manager to heads of departments, subordinate officers, and City employees.

Individual City Councilmembers do not have the independent authority to direct City Staff. The City Manager establishes organizational priorities, assigns work, and allocates staff resources. Department heads and supervisory personnel implement those objectives within their respective departments.

The City Council shall deal with the administrative services of the City only through the City Manager and cannot give orders, instructions, or directions to any subordinates of the City Manager. City Staff are not required to conduct research, generate new analysis or reports,

Page 1 of 3

reprioritize assigned work, or take action at the direction of, or in response to an inquiry from, individual councilmembers without authorization from the City Manager.

### III.    General Staff Response to Councilmember Directives or Inquiries

City Staff may exercise professional judgment in determining how to respond to individual Councilmember inquiries, consistent with administrative direction and workload considerations. The guidelines outlined herein are intended to clarify Staff members' obligations, the limits of those obligations, and to assist Staff in exercising sound judgment when distinguishing between informational inquiries and directives that may only be issued through the proper channels.

City Staff may respond to an inquiry by providing information or clarification when:

- The request involves readily available information;
- Responding does not interfere with assigned duties;
- The request is informational, not commanding in nature; or
- The response does not compromise neutrality or obligations to the City.

City Staff may decline or redirect an inquiry to the City Manager when responding would:

- Interfere with assigned workload or established priorities;
- Require significant new research or analysis;
- Implicate pending litigation, investigations, or confidential matters;
- Raise concerns regarding impartiality or favoritism;
- Conflicts with the staff member's ethical obligations to the City; or
- Involve policy direction outside the scope of administrative authority.

**If a City Staff member decides, through their professional judgment, to decline or redirect a Councilmember's inquiry, they should respectfully inform the Councilmember that the matter should be directed to the City Manager.  A respectful declination of a Councilmember's inquiry may include language such as "*Councilmember, I am not able to respond to your inquiry at this time, please contact the City Manager's office so that someone can assist you*."**

### IV.    Guidelines to Councilmember for Interactions with City Staff

To ensure that interactions between Councilmembers and City Staff remain consistently respectful and professional, and to safeguard City Staff from any conduct, they might reasonably view as intimidating or retaliatory, the following communication protocols shall be observed:

- City Councilmembers are entitled to make inquiries of City Staff to better understand City operations, policies, and issues within their districts.

- City Councilmembers may not give orders, instructions, or directions to City Staff. Examples of inappropriate orders, instructions, or directions include instructing, or purporting to instruct City Staff regarding the Councilmember's understanding or interpretation of the law, or making express or implied statements that a staff members' compliance is legally required, or that noncompliance may result in legal claims.
- All City Councilmembers should direct all inquiries and all other communications of any kind with City Staff members through the City Manager's office.  To the extent a Councilmember believes direct communication with staff is required, the Councilmember should direct the inquiry to the appropriate department head and not to subordinate staff.
- All City Councilmembers should contact the City Manager's office prior to coming to City Hall for any reason.
  - Requests for in-person visits to City Hall should be made as far in advance as possible, but at least one business day in advance of the requested visit.
  - No prior requests are needed to visit City Hall up to 30-minutes before regularly-scheduled and posted City Council and Committee meetings.
  - The City Manager's office reserves the right to determine whether an in-person visit is necessary or whether it can be handled via email, via video conference, or via another method.
- A member of the City Manager's office may attend all meetings between a City Councilmember and City Staff, to ensure that both the Councilmember and Staff act in a respectful and professional manner.

Thank you for your ongoing professionalism and dedication to the city. I look forward to continuing our collaborative efforts to provide the best for our City Council and Staff.

If you have any questions or concerns, please don't hesitate to contact me.

# EXHIBIT F

West Covina Police Department report documenting Plaintiff's report of a shooting threat by the acting City Manager (redacted for personal identifiers only)



### West Covina Police Department
1444 W GARVEY AVE S | WEST COVINA, CA 91790 | P: 626.939.8500

---

## DR # 26-01032 - Crime/Incident Report Report Cover Sheet

| REPORT DATE / TIME | REPORTING DISTRICT / BEAT / SUBDIVISION 4 / SUBDIVISION 5 | OCCURENCE START DATE / TIME - OCCURENCE END DATE / TIME |
|---|---|---|
| Feb 18, 2026 19:02 | SA 3 / Beat 3 / RD 52 | Feb 17, 2026 16:00 - 16:30 |

### OFFENSE-1

**OFFENSE CODE**

PC 422(A) THREATEN CRIME WITH INTENT TO TERRORIZE F - 13C Intimidation

| OFFENSE LOCATION | OFFENSE START DATE | OFFENSE END DATE |
|---|---|---|
| CITY HALL, 1444 W GARVEY AVE S, at S SUNSET AVE, 305, WEST COVINA, CA 91790 | Feb 17, 2026 16:00 | Feb 17, 2026 16:30 |

### INVOLVED PERSONS

| INVOLVEMENT | NAME | | | | |
|---|---|---|---|---|---|
| V-1, R-1, P-1 | Brian ▮▮▮▮▮ Gutierrez | ▮▮▮▮▮▮▮▮▮▮ | ▮▮▮▮▮▮▮▮▮▮▮ | | |

| INVOLVEMENT | NAME | | DOB / ESTIMATED AGE RANGE | RACE | SEX |
|---|---|---|---|---|---|
| S-1, P-2 | ▮▮▮▮▮ ▮▮▮▮▮ | CITY HALL 1444 W GARVEY AVE S at S SUNSET AVE WEST COVINA, CA 91790 | 54 - 64 years old | White | Male |

---

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| T Rodgers #350   Apr 1, 2026 06:50 (e-signature) | B Karmann #378   Apr 9, 2026 08:26 (e-signature) |
| **PRINT NAME** | **PRINT NAME** |
| T Rodgers #350 | B Karmann #378 |

**West Covina Police Department**
1444 W GARVEY AVE S | WEST COVINA, CA 91790 | P: 626.939.8500
NOTE: Summarized report. More data regarding this report may exist in the RMS.
Mark43 RMS Form v2.0 generated by Z. Truong #891 on Apr 10, 2026 14:03.

## DR # 26-01032 - Crime/Incident Report Report

| REPORT DATE / TIME | REPORTING DISTRICT / BEAT / SUBDIVISION 4 / SUBDIVISION 5 | OCCURENCE START DATE / TIME - OCCURENCE END DATE / TIME |
|---|---|---|
| Feb 18, 2026 19:02 | SA 3 / Beat 3 / RD 52 | Feb 17, 2026 16:00 - 16:30 |

| PRIMARY REPORTER | PERSONNEL UNIT |
|---|---|
| T Rodgers #350 | Patrol |

**ASSISTING PERSONNEL / TYPE(S)**

B Karmann #378 (Victim Interview)

**REPORT TAKEN LOCATION**

PD, 1444 W GARVEY AVE S, at S SUNSET AVE, WEST COVINA, CA 91790

CITY HALL, 1444 W GARVEY AVE S, at S SUNSET AVE, WEST COVINA, CA 91790

**STAT REPORTING**

- ☐ Alcohol
- ☐ Confidential Victim (PC 293)
- ☐ DB Notification
- ☐ Drone Deployed
- ☐ Ghost Gun
- ☐ Hate Crime
- ☐ K-9 Deployed
- ☐ Mental Health Related
- ☐ No Prosecution Desired
- ☐ Taser Deployed
- ☐ Use of Force
- ☒ BWC Recording
- ☐ Courtesy Report
- ☐ Domestic Violence
- ☐ Gang
- ☐ Graffiti
- ☐ Juvenile
- ☐ MAV Recording
- ☐ Narcotics
- ☐ Pursuit
- ☐ Transient Related

## SUMMARY NARRATIVE

The victim reported that the suspect threatened to shoot the victim if anything happened to the suspect's father.

## NARRATIVE

On February 18, 2026, I responded to the West Covina Police Department front desk and met with Brian Gutierrez (the victim). Present with me was Captain Brandon Karmann. Both Captain Karmann and I were wearing our department-issued Axon body-worn cameras at the time of the contact. We met with Gutierrez and escorted him into a private interview room just inside the detective bureau.

**Interview with Victim Brian Gutierrez:**

Once in the interview room, I asked Gutierrez to describe the incident he wished to report. The victim is a current West Covina council member, and the suspect is the current acting city manager of West Covina.

Gutierrez told us that on February 17, 2026, at approximately 1600 hours, he stopped by the city manager's office, the office of ██████ ████████ (suspect), located at 1444 W. Garvey Ave. S., 305, West Covina. Gutierrez went to █████████'s office regarding a town hall meeting he was holding on February 19, 2026. Gutierrez wanted to know which city staff members would be at the meeting. According to Gutierrez, █████████ responded by saying that Gutierrez was on his bad list. Gutierrez asked █████████ what he meant by that. Gutierrez explained that he needed someone from the city staff to attend the meeting so community concerns could be addressed. █████████ told Gutierrez that █████████'s father had just returned home from the hospital, after recovering from a heart attack, and that █████████ was not happy about having a process server respond to his parents' house.

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| T Rodgers #350   Apr 1, 2026 06:50 (e-signature) | B Karmann #378   Apr 9, 2026 08:26 (e-signature) |
| PRINT NAME | PRINT NAME |
| T Rodgers #350 | B Karmann #378 |

At this point, Gutierrez said ▮▮▮▮▮▮▮ stated, "I told you not to mess with my family." Gutierrez said that he had no intention of sending the process server to his family's house. ▮▮▮▮▮▮▮ then stated, "If anything happens to my father, I will shoot you." Gutierrez said he was taken aback by the statement and told ▮▮▮▮▮▮▮ he hoped ▮▮▮▮▮▮▮ was joking. ▮▮▮▮▮▮▮ then replied, "You know I do not give a shit, I'll shoot you." I asked Gutierrez how he felt after ▮▮▮▮▮▮▮ made the statement. Gutierrez said he hoped it was a joke and that he did not know how to feel about the comment because at no point in the conversation did he ever say he was joking. The conversation concluded, and he exited ▮▮▮▮▮▮▮'s office.

I asked Gutierrez if he was scared once ▮▮▮▮▮▮▮ made the statement. He paused for several seconds and repeated that he did not know whether he was joking. Gutierrez further stated that he did not know whether ▮▮▮▮▮▮▮ was capable of doing it. He continued, saying he did not know whether he felt fearful, but that the comment was alarming and inappropriate. Gutierrez said he felt the text messages in the Irwindale case were threatening. He then began discussing an investigation the Irwindale Police Department is conducting into threatening text messages that ▮▮▮▮▮▮▮ sent him.

I asked Gutierrez again whether he felt fearful about this incident, and he said, "I think I was more in shock that he made the comment." I asked Gutierrez if he had encountered ▮▮▮▮▮▮▮ since the incident. He mentioned he had seen him on a few occasions, and no other inappropriate comments were made during those interactions.

Captain Karmann asked a few follow-up questions. He asked Gutierrez whether he wanted us to speak with ▮▮▮▮▮▮▮ about the incident. Gutierrez said that he believes that ▮▮▮▮▮▮▮ is capable of retaliating against him and sabotaging the town hall meeting. Captain Karmann asked Gutierrez if he wanted us to follow up with ▮▮▮▮▮▮▮ and to seek prosecution. Gutierrez stated, "Yes, even though he may sabotage my town hall." Captain Karmann asked Gutierrez whether he was aware of whether ▮▮▮▮▮▮▮ owned guns. Gutierrez said he was unaware of whether ▮▮▮▮▮▮▮ owned guns. Captain Karmann asked Gutierrez if he believed ▮▮▮▮▮▮▮ was capable of shooting him. Gutierrez said ▮▮▮▮▮▮▮ has been unsteady in front of him, Roxanne (one of the city's assistant city managers), and Karen (the city's finance director), and stated that he was stressed and takes a lot of Tylenol. With all those factors in mind, including the possibility that something might happen to ▮▮▮▮▮▮▮'s father, Gutierrez believed ▮▮▮▮▮▮▮ could shoot him.

Gutierrez stated that the previous investigation into the text messages, along with ▮▮▮▮▮▮▮'s new statements, made him so concerned that he wanted to file the report and that he believes the Irwindale Police Department should investigate it. Captain Karmann again asked whether ▮▮▮▮▮▮▮'s statement yesterday created a lot of fear or, rather, concern. Gutierrez said he was more shocked that ▮▮▮▮▮▮▮ would make that comment. Gutierrez said he asked ▮▮▮▮▮▮▮ whether he was joking, but ▮▮▮▮▮▮▮ did not answer. Gutierrez then read the text messages from the Irwindale investigation to us.

According to Gutierrez, he and ▮▮▮▮▮▮▮ were the only two people in the office. The door to his office was open during the meeting. Gutierrez told me that Diana Campos (an executive assistant to the city manager) was in her office, which is across the hallway with her door open. Eric Vargas (a senior administrative assistant for the city) was walking around the office. Vargas' desk is in the open, around the corner from ▮▮▮▮▮▮▮'s office.

This concluded the interview.

### **Email from Victim Gutierrez Gutierrez:**

That evening (February 18, 2026), I received an email from Gutierrez stating he wanted to clarify his statement. His email stated,

"Dear Captain Karman and Daniels,

Thank you again for taking the time to meet with me today and for taking my report. After reflecting on our conversation, I would like to clarify how I felt when ▮▮▮▮▮▮▮ stated that he would shoot me if something happened

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| T Rodgers #350   Apr 1, 2026 06:50 (e-signature) | B Karmann #378   Apr 9, 2026 08:26 (e-signature) |
| PRINT NAME | PRINT NAME |
| T Rodgers #350 | B Karmann #378 |

**West Covina Police Department**
  1444 W GARVEY AVE S I WEST COVINA, CA 91790 I P: 626.939.8500
*Mark43 RMS Form v2.0 generated by Z. Truong #891 on Apr 10, 2026 14:03.*

Pg 2 of 4

to his father. During the meeting, I described myself as being in shock and unsure of what to think in that moment. However, I want to more clearly express that I felt alarmed and genuinely scared by that statement.

When someone tells you they would shoot you, I interpreted that as a direct threat to my life. Regardless of the context in which it was said, I perceived it as a serious and credible threat. I was so unsettled by the comment that I left the office shortly afterward because I did not feel comfortable remaining there.

It is important to me that my reaction and perception of the situation are fully understood. I took the statement seriously and felt concerned for my safety.

Thank you again for your time and attention to this matter."

### Evidence:

I uploaded the BWC footage of Gutierrez's interview to Evidence.com. Gutierrez's email was also attached to this report.

---

*REPORTING PARTY-1*

REPORTING PARTY-1 (PERSON)

R-1 Gutierrez, Brian Anthony

REPORTING PARTY SIGNATURE

---

## OFFENSE-1

OFFENSE CODE

PC 422(A) THREATEN CRIME WITH INTENT TO TERRORIZE F - 13C Intimidation

| OFFENSE START DATE | OFFENSE END DATE | OFFENSE COMPLETION | SUSPECTED HATE CRIME |
|---|---|---|---|
| Feb 17, 2026 16:00 | Feb 17, 2026 16:30 | ■ COMPLETED<br>☐ ATTEMPTED | ☐ YES ■ NO |

| SUSPECTED COMPUTER/ HANDHELD DEVICE USE | SUSPECTED ALCOHOL CONSUMPTION | OTHER SUSPECTED DRUG USE | DOMESTIC VIOLENCE |
|---|---|---|---|
| ☐ YES ■ NO | ☐ YES ■ NO | ☐ YES ■ NO | ☐ YES ■ NO |

GANG INFORMATION

None/Unknown

| MODUS OPERANDI | IS ANTI-REPRODUCTIVE RIGHTS CRIME? |
|---|---|
| Accomplices - None | ☐ YES ■ NO |

*OFFENSE LOCATION*

LOCATION NAME / STREET ADDRESS/LOCATION NAME / APT, UNIT, STE / DESCRIPTION

CITY HALL, 1444 W GARVEY AVE S, 305

| CITY | STATE | ZIP | COUNTRY CODE |
|---|---|---|---|
| WEST COVINA | CA | 91790 | US |

| INTERSECTION STREET 1 | LOCATION CATEGORY |
|---|---|
| S SUNSET AVE | Commercial/ Office Building |

| REPORTING DISTRICT / BEAT / SUBDIVISION 4 / SUBDIVISION 5 | PUBLIC / PRIVATE |
|---|---|
| SA 3 / Beat 3 / RD 52 | Public |

*VICTIMS-1*

---

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| T Rodgers #350   Apr 1, 2026 06:50 (e-signature) | B Karmann #378   Apr 9, 2026 08:26 (e-signature) |
| PRINT NAME | PRINT NAME |
| T Rodgers #350 | B Karmann #378 |

Case 2:26-cv-03659-MEMF-MBK   Document 92-4   Filed 07/02/26   Page 41 of 48   Page ID #:4566

| VICTIMS-1 NAME (LAST, FIRST MIDDLE) | DOB / ESTIMATED AGE RANGE |
|---|---|
| V-1 Gutierrez, Brian Anthony | ███████ |

| SEX | RACE / ETHNICITY | PHONE NUMBER |
|---|---|---|
| Male | Hispanic / Hispanic Or Latino | ██████████ (Mobile Phone) |

**HOME ADDRESS**

██████████████ WEST COVINA, CA 91790

**VICTIM IS OFFICER**

☐ YES ■ NO

### SUSPECTS-1

| SUSPECTS-1 NAME (LAST, FIRST MIDDLE) | DOB / ESTIMATED AGE RANGE |
|---|---|
| S-1 ███████, █████ | 54 - 64 years old |

| SEX | RACE / ETHNICITY | PHONE NUMBER |
|---|---|---|
| Male | White / Not Hispanic Or Latino | ████████████ (primary, Work Phone) |

**HOME ADDRESS**

CITY HALL, 1444 W GARVEY AVE S, at S SUNSET AVE, WEST COVINA, CA 91790

## INVOLVED PERSONS

**INVOLVED PERSON-1 NAME** ████████████

P-1 Gutierrez, Brian ████████████

███████████████████████

███████████████████████

███████████████████████

███████████████████████

| INVOLVED PERSON-2 NAME (LAST, FIRST MIDDLE) | DOB / ESTIMATED AGE RANGE |
|---|---|
| P-2 ███████, █████ | 54 - 64 years old |

| SEX | RACE / ETHNICITY | PHONE NUMBER |
|---|---|---|
| Male | White / Not Hispanic Or Latino | ████████████ (primary, Work Phone) |

**HOME ADDRESS**

CITY HALL, 1444 W GARVEY AVE S, at S SUNSET AVE, WEST COVINA, CA 91790

**INVOLVEMENT TYPE**

Suspect

## INVOLVED LOCATIONS

**LOCATION**

CITY HALL, 1444 W GARVEY AVE S, at S SUNSET AVE, WEST COVINA, CA 91790

## RELATIONSHIPS ADDENDUM

| NAME | RELATIONSHIP | SUBJECT |
|---|---|---|
| ███████ ███████ | EMPLOYEE OF | Brian ███████ Gutierrez |

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| T Rodgers #350   Apr 1, 2026 06:50 (e-signature) | B Karmann #378   Apr 9, 2026 08:26 (e-signature) |
| **PRINT NAME** | **PRINT NAME** |
| T Rodgers #350 | B Karmann #378 |

**West Covina Police Department**
  1444 W GARVEY AVE S | WEST COVINA, CA 91790 | P: 626.939.8500
*Mark43 RMS Form v2.0 generated by Z. Truong #891 on Apr 10, 2026 14:03.*

Pg 4 of 4

# EXHIBIT G

June 23, 2026 accommodation determination signed by Milan Mrakich
denying or narrowing multiple accommodations



**City Manager's Office**

June 23, 2026

Dear Councilmember Gutierrez,

This letter serves as the City of West Covina's ("the City") response to Dr. Chang's June 8 letter ("Dr. Chang's June 8 letter"), which we understand to constitute an appeal of the City's decision concerning your accommodations. This letter also responds to any other accommodation requests that remain pending before the City.

### 1.    Request for 360-degree camera

In January 2026, you requested, and the City approved, a 360-degree camera during Council meetings to promote public transparency and accountability. The City purchased the 360-degree camera and related accessories, including a 128-gigabyte memory card, and it is available for your use. The City's IT team has confirmed that the memory card can record approximately seven and a half hours, which is sufficient to record Council meetings.

You have also requested to have the 360-degree camera as a personal accommodation. As previously explained, it is the City's position that the 360-degree camera is not a necessary accommodation to ensure your meaningful access under Title II because Council meetings are already recorded and available for public review and, more significantly, the 360-degree camera with sufficient storage is available for use. You have refused to use the 360-degree camera, summarily asserting that the 128-gigabyte memory card is insufficient without even attempting to use the device. The City is not obligated to provide you with accommodations that you prefer, only those that provide you with meaningful access.

Dr. Chang's June 8 letter does not alter the City's assessment. Based on the information currently available, the City believes that the 360-degree camera, with the currently provided storage capacity sufficiently allows you to access meetings and City business. Dr. Chang's letter does not establish that additional storage or a separate personal device is presently necessary to address your disability-related limitations. Nevertheless, in a continued effort to address your concerns about storage capacity, the City will acquire a 512-gigabyte memory card.  By your own arguments about storage capacity, this will provide an estimated storage of eight (8) hours even at the highest bitrate and 8K settings.

### 2.    USB device to receive council materials

You have requested that the City provide you a USB or local transfer device to deliver your Council agenda and materials. It is the City's position that a USB or local transfer device for City Council agendas and materials is not necessary to provide you with meaningful access under

1

1444 West Garvey Avenue • P.O. Box 1440 • West Covina • CA 91793 • Phone (626) 939-8401 • Fax (626) 939-8406

Title II. Historically, you have been able to use shared drives to send and receive materials, including transmitting materials to the City Clerk's office and using shared drive links during litigation. Additionally, the City already provides Council agendas and materials in a variety of ways, including email attachments for smaller documents, links to online versions available to the public, and hard-copy binders. In addition to these processes, as an accommodation, the City has used a USB or local transfer device to provide you with Council materials too large to attach to an email.

Dr. Chang's June 8 letter does not change the City's assessment. Based on the information available, the available means and current accommodations to provide you materials are sufficient to allow for your effective review and participation, and therefore the USB or local transfer device for all materials is not required under the ADA. The City will continue providing you a USB or local transfer device only for meetings where the materials are too voluminous to send via an email attachment.

**3.    Requests for the use written materials and prohibition on**

**interruptions**

You have requested that the City recognize your use of written materials as an accommodation and prohibit interruptions while you are relying on those materials during Council meetings. As noted in the City's previous correspondence, there is no policy prohibiting Councilmembers from using notes, outlines, prepared statements, electronic documents, or similar materials during meetings, and you are permitted to use those materials, subject to the Brown Act.

As has been previously stated, your request to not be interrupted while using written materials cannot be provided. As an initial matter, it is unclear from Dr. Chang's letter what is considered an "interruption" or when the accommodation would be necessary. Moreover, Section 2.42 of the City's Municipal Code already protects a Councilmember's right to speak without interruption, and the City continues to apply these rules in a neutral and nondiscriminatory manner. While the City seeks to maintain orderly and harmonious meetings, it cannot reasonably be expected or is it required under Title II to prevent every interruption that may occur during a meeting. Moreover, requiring the City to guarantee that no interruption will occur while you are consulting written materials would fundamentally alter the City's meeting procedures and is not necessary to provide meaningful access under Title II.

Accordingly, the City will continue to permit your use of written materials during meetings as articulated in the City's June 3, 2026 letter, but declines your request to use written materials as an accommodation, or for an accommodation to prevent all interruptions while you are using those materials.

**4.    Requests for Additional Time and Procedures Related to Voting**

As an accommodation, you have requested additional time to vote during City Council meetings. As articulated in the City's previous correspondence, you have already been granted

2

accommodations for the discussion period prior to voting designed to address your disability-related limitations, including the ability to provide brief contextual explanations before asking questions and additional time for review and response to questions. Additionally, on June 3, 2026, the City agreed to provide you with an additional one minute to cast your vote when needed so you can meaningfully participate in Council meetings and City business. While you are permitted an additional one minute to vote, you are still required to comply with the City's ordinances and meeting procedures, requiring voting in a specific order and prohibiting Councilmembers from delaying, interrupting, or otherwise disrupting proceedings or the Council's ability to efficiently and harmoniously conduct City business.

Dr. Chang's June 8 letter appears to expand your original request for additional time to vote to include a request to allow you to ask questions before voting, provide a brief comment or explanation, and to resume speaking if interrupted. This request poses an undue administrative burden and fundamental alteration to the nature of Council meetings. The voting portion of Council meetings serves a distinct procedural purpose, marking the conclusion of discussion and deliberation and the point at which official action is taken. Allowing additional questions, comments, explanations, or reopening discussion during the voting process would alter the City's established meeting procedures by extending deliberations beyond the point at which the matter has been called for a vote. Likewise, requiring the City to return you to the speaking queue whenever you determine additional analysis or clarification is necessary would interfere with the orderly administration of Council meetings and the City's ability to efficiently conduct public business.

It is the City's position that these additional requests do not provide you with meaningful access, as you are able to sufficiently participate in discussion, ask questions, seek clarification, receive responses, and utilize your previously approved accommodations before a vote is called. Additionally, permitting unlimited comments, questions, explanations, or renewed participation in deliberations during the voting process would fundamentally alter the structure and operation of Council meetings and would create an undue administrative burden and fundamental alteration. Therefore, your request is denied.

### 5.    Request for Ergonomic Chairs for Council Desk and Home Office

Dr. Chang's June 8 letter appears to expand your request for an ergonomic chair to include not only a chair for your home office, but also a chair for the council dais. The City does not dispute that an ergonomic chair may be more comfortable, however, Dr. Chang's opinion that a particular item would be beneficial does not establish that the item is required as an accommodation under Title II.

For the reasons stated in prior correspondence and as detailed below, the City does not find that either the requested chamber chair or the home-office chair is necessary to enable you to access, attend, participate in, deliberate during, or vote at Council meetings. As noted in previous correspondence, the City has already approved numerous accommodations to ensure your meaningful participation in Council activities, including accommodations relating to seating and lighting, extended access to City Hall, and equipment for your home office. Likewise, last year, the City purchased new chairs for all Councilmembers.

3

Dr. Chang's letter does not explain why those accommodations are ineffective or why the chairs requested are necessary, instead focusing on how the selected chairs improve your comfort and endurance while working. Moreover, the specific chairs recommended retail for approximately $2,400 each according to the manufacturer's website. While costs alone are not dispositive, the City is not obligated to provide your preferred accommodation.

Accordingly, the City concludes that the requested ergonomic chairs are not necessary accommodations under Title II. They are not required for you to meaningfully access or participate in Council meetings or other City activities. Because the City has already provided accommodations that enable your effective participation, and the request is denied.

### 6.    Request for Remote Participation in Council Meetings

You have also requested to participate in Council meetings remotely as an accommodation. Currently, however, the City does not believe this accommodation is necessary because you are able to attend Council meetings in-person.

The Attorney General's June 2022 guidance indicating telephonic or virtual participation may be required when someone's disability prevents them from attending public meetings in-person, citing as examples individuals with compromised immune systems or mobility disabilities that prevent travel to meeting locations.[1] The guidance specifically contemplates remote participation when a disability impairs or prevents in-person attendance, not merely when remote participation is preferred or may be more convenient.

Based on the information provided, the City has not received sufficient documentation demonstrating that remote participation is necessary to afford you meaningful access to City Council meetings. Dr. Chang's June 8 letter does not establish that your disabilities prevent or substantially limit your ability to attend meetings in person, nor does it adequately explain the frequency, severity, duration, or predictability of any limitations that would necessitate remote participation. Because you are able to attend Council meetings in person and therefore have meaningful access to the meetings through the City's existing procedures, the City concludes that remote participation is not a necessary accommodation under Title II. Accordingly, the request for remote participation is denied.

### 7.    Request for Additional Processing Time During Meetings

In a May 19, 2026 email, you reiterated your January 27 and February 27, 2026 request for additional processing time during Council meetings. As explained in the City's February 23, 2026 response, the City has already provided an accommodation addressing cognitive processing needs, such as permitting you to make clarifying statements prior to asking questions during Council meetings.

In addition, Section 2-30(b) of the West Covina Municipal Code provides that the Mayor, as the presiding officer, votes after the other Councilmembers have voted.[2] As a result, the City

---

[1] Letter from Rob Bonta, Cal. Att'y Gen., to All Cities and Counties in California, Ensuring Access for People with Disabilities to Public Meetings of Local Agencies 4 (June 14, 2022).

[2] West Covina Municipal Code § 2-30(b): "[. . .] the presiding officer shall be entitled to vote last on all questions."

4

understands that you already receive additional time to consider matters before casting your vote during Council meetings. Accordingly, the City does not presently find that any further accommodation relating to voting order is required under Title II.

If you believe the existing accommodation and voting procedures are insufficient to address your disability-related limitations, please explain why and identify the specific barriers. Please also explain how the requested accommodation would improve your ability to meaningfully participate in Council meetings.

### 8.    Request for One-Question-at-a-Time and Clarification/Repetition for Complex, Compound, or Ambiguous Questions

Pursuant to Dr. Chang's June 8 letter, you request that questions during Council meetings be presented one at a time and that clarification or repetition be provided when needed for complex, compound, or ambiguous questions. Although Dr. Chang indicates that these measures may facilitate information processing and reduce cognitive burden, the letter does not sufficiently explain why they are necessary to provide meaningful access to Council meetings, as opposed to improving convenience or communication preferences. Further, the request would require a fundamental alteration to the nature of Council meetings, which inherently involve the discussions of complex issues by multiple participants.

Nevertheless, in an effort to support effective communication and engage in the interactive process, the City is willing to implement the following measures during Council meetings: when City officials, Councilmembers, or staff direct questions to you, upon a good-faith request, they will make reasonable efforts to repeat, rephrase, or clarify a question when it is reasonably apparent that the question is complex, compound, or ambiguous.

These measures will be administered consistent with the City's neutral meeting procedures and time-management rules and will not be implemented in a manner that disrupts meetings, prevents completion of the agenda, or fundamentally alters Council proceedings. Further, please note that, in order to administer this accommodation, the City is required to inform all meeting participants, including the other Councilmembers of your accommodation, so that they may respond appropriately if and when you request that a question be repeated, rephrased, or clarified.

### 9.    Request to Modify Speaker Bell

You have requested that the City cease or reduce the sound of the timer bell used during the public comment portion of Council meetings. Specifically, you state that the bell sound is causing migraines and that the timer alarm may disrupt your thought processes.

The City understands that you are requesting a modification to the volume, tone, or operation of the timer bell as an accommodation. The City notes that the current bell sound is the default setting of the timer system and has been in use since approximately April 2024. The City has

5

confirmed with its IT staff that modifications to the bell's sound settings are possible. Effective as of the June 16, 2026 City Council meeting, the tone of the bell was modified to issue a single tone instead of multiple tones.

The City remains committed to ensuring your meaningful access to City programs, services, and activities under Title II of the ADA. If you have questions regarding any of the determinations set forth above or believe that additional information may be relevant to the City's assessment, please contact Ms. Roxanne Lerma.


Milan Mrakich
City Manager

6

13433413.1 WE020-094