UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

FILED

CLERK, U.S. DISTRICT COURT

7/15/26

CENTRAL DISTRICT OF CALIFORNIA

BY _____CS_____ DEPUTY

DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

| | |
|---|---|
| JOHN DOE, an individual, <br><br> Plaintiff, <br><br> v. <br><br> CITY OF WEST COVINA; MILAN M. MRAKICH; LETICIA SALAZAR LOPEZ-VIADO; and DOES 1-50, <br><br> Defendants. | Case No. 2:26-cv-03659-MEMF-MBK <br> District Judge: Hon. Maame Ewusi-Mensah Frimpong <br> Magistrate Judge: Hon. Michael B. Kim <br><br> **PLAINTIFF'S NOTICE OF FILING SIGNED MEDICAL DECLARATION / TREATING-PHYSICIAN LETTER OF HENRY CHANG, D.O., M.S., FACOI, IN SUPPORT OF PLAINTIFF'S REPLY RE DOCKETS 98 AND 111** |

**NOTICE OF FILING SIGNED MEDICAL DECLARATION / TREATING-PHYSICIAN LETTER**

Plaintiff John Doe respectfully submits the attached signed medical declaration / treating-physician letter of Henry Chang, D.O., M.S., FACOI, dated July 14, 2026, in support of Plaintiff's Reply in further support of the Ex Parte Application for Temporary Restraining Order at Docket 98 and in response to Defendants' Opposition at Docket 111.

The attached six-page letter addresses the medical necessity and functional requirements of the GoPro MAX 2 / 360-degree recording accommodation, including patient-perspective placement at Plaintiff's Council desk, immediate operational control, take-home access, prompt download and review of native footage, adequate storage and power, and the lack of medical equivalence between the prescribed accommodation and the City's delayed, fixed-angle public recording.

The letter also addresses foreseeable medical harm associated with interruption, confiscation, threatened arrest or removal, police-backed confrontation, delayed implementation, loss of sleep, pain exacerbation, impaired concentration, and continued deterioration. Plaintiff requests that the Court consider the attached signed medical evidence together with the separately filed declaration of Dr. Shahid Z. Lateef, D.C., and Plaintiff's Supplemental Declaration.

Attachment A: Signed Medical Declaration / Treating-Physician Letter of Henry Chang, D.O., M.S., FACOI (6 pages).

Dated: July 15, 2026

/s/ John Doe
John Doe, Plaintiff in Pro Per

1

# STAR HEALTH

2707 E. Valley Blvd., Suite 208 | West Covina, CA 91792-3197
Phone: (626) 581-0486 | Fax: (626) 581-0161
Henry Chang, D.O., M.S., FACOI | Osteopathic Physician & Surgeon | License No. 20A10516

July 14, 2026

Honorable Maame Ewusi-Mensah Frimpong
United States District Court, Central District of California
Western Division

**Re: John Doe v. City of West Covina; Milan M. Mrakich; Leticia Salazar Lopez-Viado; and DOES 1-50, Case No. 2:26-cv-03659-MEMF-MBK**

CONFIDENTIAL | This letter is provided to my patient for filing through CM/ECF. It is not intended as a direct or ex parte communication to chambers.

Dear Judge Frimpong:

I am the treating physician for Brian Gutierrez, who proceeds in this matter as John Doe. I have treated and evaluated him for disability-related conditions that include Autism Spectrum Disorder, clinically significant auditory-processing and working-memory limitations, sensory-integration and executive-functioning limitations, photophobia/light sensitivity, chronic low-back pain, and stress-related symptom exacerbation. I previously issued medical accommodation letters dated January 26, 2026, May 18, 2026, and June 8, 2026.

At my patient's request, I have reviewed the medical issues raised by the City's July 13, 2026 opposition and the declarations of Roxanne Lerma, Milan M. Mrakich, and Leticia Salazar Lopez-Viado concerning the GoPro MAX 2 / 360-degree recording device. I also reviewed the opposition's characterizations of my prior medical opinions and of Mr. Gutierrez's reasons for requesting the device. In addition, I reviewed the April 24, 2026 Initial Qualified Medical Evaluation, Panel No. 7900462, prepared by Mary E. Simone, D.C., Qualified Medical Evaluator, and signed on April 27, 2026. My role is limited to medical necessity, functional equivalency, causation within the scope of my treatment, and foreseeable medical harm. I do not decide legal ownership, the California Public Records Act, alleged theft, witness credibility, perjury, sanctions, or criminal conduct. I do, however, have a professional obligation to correct medical mischaracterizations that minimize a documented disability, misstate the functional purpose of an assistive device, or disregard the foreseeable health consequences of the manner in which an accommodation is administered.

## 1. The medically prescribed accommodation is a patient-perspective recording from Mr. Gutierrez's actual Council desk.

The central medical issue is not whether some recording of the meeting exists. The accommodation I prescribed is a 360-degree recording from at or near Mr. Gutierrez's actual seated position, so he can later reconstruct the visual-spatial and nonverbal context that he cannot reliably encode in real time during rapid, multi-speaker proceedings. That context includes who was speaking, who reacted, where speakers and staff were positioned, simultaneous gestures, eye gaze, interruptions, movement, security positioning, and off-camera conduct.

A centrally located, IT-controlled camera is not medically equivalent because it records a different perspective and may omit the very visual and spatial information Mr. Gutierrez needs to compensate for his disability. The City's proposal removes the patient-specific component that makes the device an accommodation.

## 2. Immediate operational control and take-home access are medically necessary; personal ownership is not.

My prior letters did not require that Mr. Gutierrez personally own City equipment. City ownership, inventory controls, retention rules, cybersecurity safeguards, and a written preservation protocol can coexist with this accommodation. But during an open meeting, Mr. Gutierrez must have reliable and immediate operational control sufficient to position the device at his desk, start and verify recording, confirm that the view is unobstructed, monitor power and storage, and ensure that the recording captures the meeting from his perspective. After the meeting, he must also be permitted to retain the device and recording media long enough to take them home, download the native 360-degree footage, and review that footage in the low-stimulation environment in which he can medically process it. To the extent the City's opposition interprets my prior letter as endorsing a centrally placed or IT-controlled camera that Mr. Gutierrez cannot operate at his seat or take home for prompt review, that interpretation is medically incorrect.

Operational control and take-home access are different from personal ownership or unilateral authority to delete public records. The City may require encryption, inventory tracking, preservation of the native file and metadata, and delivery of an identical copy to a City-approved repository. Those safeguards should be implemented through a simple written workflow that allows Mr. Gutierrez to leave the meeting with the device and storage media, download the footage to a City-issued computer or approved encrypted USB-C drive, review it privately at home, and preserve it without alteration. Exclusive City or IT custody that prevents same-day or prompt home review defeats the medical purpose of the accommodation.

### 3. Prompt home review and downloading are part of the medically necessary accommodation.

Mr. Gutierrez's disability affects real-time auditory processing, working memory, sequencing, and visual-spatial encoding. The therapeutic and compensatory benefit of the recording comes from his ability to review the meeting promptly while his memory of the event is still recent, in a quiet and controlled home environment, and at a pace that permits pausing, rotating the 360-degree view, replaying interactions, and comparing simultaneous verbal and nonverbal information.

Requiring the camera to remain installed in Council Chambers, held by IT, or inaccessible after the meeting would prevent the very review process for which it was prescribed. Mr. Gutierrez therefore must be allowed to take the GoPro MAX 2, its recording media, batteries, and necessary accessories home after each meeting; download and retain an accessible working copy of the native 360-degree footage on a City-approved secure device; and review the footage without waiting for an operator, technician, or later public posting. The City may receive and preserve a duplicate copy, but it should not withhold the device or footage from him during the medically necessary review period.

### 4. The body-camera analogy explains why physical viewpoint matters.

By analogy, a body-worn camera is useful precisely because its physical location preserves the wearer's point of view. Moving that camera across the room would create a different record. The same principle applies here. Mr. Gutierrez's disability-related need is to reconstruct the meeting from the position at which he personally receives and attempts to process auditory, visual, and nonverbal information. A camera controlled from a remote central location does not reproduce that experience.

### 5. The City's delayed, fixed-angle public recording is not an equally effective substitute.

I understand from Mr. Gutierrez and the materials provided to me that the City's official meeting recording is ordinarily not posted until approximately 24 hours after the meeting and is not recorded in a continuous 360-degree format from his Council desk. Assuming those operational facts are accurate, the City's recording is not medically equivalent. A delayed posting prevents prompt same-evening review while memory traces remain freshest, and a fixed or operator-selected feed does not capture the whole-room visual-spatial field Mr. Gutierrez needs. Public broadcasts typically follow an active microphone, selected speaker, podium, dais, presentation slide, or operator-selected shot; they do not continuously preserve simultaneous reactions, gestures, movement, security positioning, and off-camera conduct from his seated perspective.

Likewise, describing the camera as a device for the "public benefit" does not eliminate its individual medical necessity. A tool may serve more than one purpose. Even if the recording also promotes transparency or creates a public record, it remains a medically necessary compensatory aid when used from the prescribed perspective.

### 6. Adequate storage, power, mounting, transfer, and home-review capacity are part of a functional accommodation.

The accommodation is not merely the purchase of a camera body. It requires a stable mount at the patient's desk, enough battery capacity, adequate storage to capture the entire open meeting at a medically useful quality, and a simple transfer/review method. A 128GB card may be insufficient under some 360-degree settings and meeting durations. I do not opine that only one exact capacity is always required. I do opine that the City must provide enough storage and power to reliably capture the complete meeting without forcing the patient to discover after the fact that critical footage is missing.

A 512GB card, backup power, a stable desk mount, compatible review software, and a reliable USB-C or other City-approved transfer process are medically reasonable implementation measures because they reduce the risk of failure during long or unusually complex meetings. The transfer process must allow Mr. Gutierrez to take the device home, download the native 360-degree footage promptly, and review it in a controlled environment. Testing must occur before a high-stakes public meeting, not by making the patient serve as the test case while his participation and health are at risk.

**7. The City's characterization of this accommodation as political, personal, or merely preferential is medically incorrect.**

I cannot assess anyone's political motive and do not offer an opinion on that subject. I can state that the need for a patient-perspective 360-degree recording exists independently of any political dispute. The medical need arises from documented neurodevelopmental and cognitive-processing limitations. A patient does not lose the medical benefit of an assistive device because the resulting record may also document matters of public concern.

From a medical standpoint, labeling the device as personal convenience, political surveillance, or ordinary discretionary equipment materially misunderstands the accommodation. The prescribed function is post-event visual-spatial reconstruction to compensate for impaired real-time processing.

**8. The City's continuing pattern of denial, reclassification, public accusation, and police escalation is itself causing cumulative medical injury.**

From a medical standpoint, the harm is not limited to whether a camera was physically purchased or present in a room. The accommodation process itself has become a recurrent source of trauma. Mr. Gutierrez reports repeated delays, shifting explanations, denial of medically recommended implementation, public confrontation, disparaging accusations, threatened removal, and police involvement when he attempts to use accommodations. Each new episode reinforces anticipatory fear before the next meeting and teaches the patient that requesting or using an accommodation may expose him to humiliation, confrontation, or arrest.

For an autistic patient with auditory-processing, working-memory, sensory-integration, and executive-functioning limitations, this pattern has predictable clinical consequences. It increases autonomic arousal and hypervigilance; worsens sleep; reduces concentration, sequencing, and working memory; increases muscle tension and low-back pain; impairs emotional regulation; and makes it more difficult to process rapid speech and multiple simultaneous interactions. The result is a self-reinforcing cycle: the patient needs the accommodation because stress impairs processing, yet the City's handling of the accommodation adds further stress and makes processing even more difficult.

I am deeply troubled that a patient with repeated medical documentation and an independent Qualified Medical Evaluation corroborating work-related physical injury, anxiety/stress, functional limitations, and a need for assistive recording, ergonomic seating, advance materials, and processing time would be subjected to police-backed confrontation rather than a calm, advance, written implementation protocol. An accommodation process should reduce barriers. It should not become an additional source of fear, pain, and neurological or psychological decompensation.

Mr. Gutierrez reports crying, chest discomfort, severe emotional distress, loss of sleep, fear of arrest, worsening pain, impaired concentration, and diminished ability to safely function after these events. These symptoms are medically plausible and consistent with his documented conditions. They are not negated by the fact that he is an elected official, speaks forcefully, files legal papers, or has previously managed to remain in meetings despite pain. The ability to endure a barrier does not establish equal access, medical safety, or absence of injury.

The City's continued refusal to implement a predictable and respectful protocol also impairs his official functioning. When he is forced to devote cognitive and emotional resources to anticipating confiscation, police involvement, or public confrontation, fewer resources remain for reviewing agenda materials, deliberating, listening, recalling facts, evaluating motions, and voting accurately. In medical terms, the City's method of administration is worsening the very functional impairments that the accommodation was intended to mitigate.

**9. Counsel's dismissive characterizations of the medical need are medically unsupported and foreseeably harmful.**

I reviewed the opposition's statement that my June 8 letter 'reads like legal advocacy rather than medical opinion.' I respectfully but firmly reject that characterization. Prescribing an assistive device necessarily includes explaining how, where, and when it must be used to be effective. A physician who prescribes oxygen must specify flow and access; a physician who prescribes an ergonomic device must address positioning; and a physician who recommends assistive recording for neurocognitive processing must explain viewpoint, timing, storage, transfer, and review. These are functional medical requirements, not legal advocacy.

I am also troubled by the opposition's repeated use of adversarial and demeaning labels - including characterizing the medically supported request as political, personal, theft, seizure, or a self-inflicted problem - while minimizing the documented disability-related purpose. I do not decide the legal dispute over property or custody. But those labels are not medical findings, and they do not rebut the clinical need. Repeating such accusations in a public and litigation setting foreseeably intensifies shame, fear, hypervigilance, sleep disruption, and autistic burnout in a patient who already reports that his disability has been mocked, politicized, and used against him.

Counsel also appears to reason that because Mr. Gutierrez attended prior meetings without this device, the device cannot be medically necessary. That reasoning is clinically unsound. Patients with disabilities often participate by overexerting themselves, masking symptoms, accepting incomplete comprehension, relying on others, or suffering significant pain and post-event decompensation. Prior attendance does not prove effective communication, equivalent access, or medical safety. It may instead document how long the patient has been forced to function without adequate support.

Similarly, the existence of a City recording does not answer the medical question. The issue is not whether a generic record eventually exists; it is whether the patient has a timely, patient-perspective, 360-degree compensatory tool that he can operate and review while memory is recent. Dismissing that distinction disregards the disability rather than analyzing it.

I cannot reconcile the City's and counsel's minimizing characterizations with the extensive medical record before them. They have received multiple treating-physician letters and now have an independent QME report that documents objective musculoskeletal findings, work-related anxiety/stress, functional impairment, and the need for accommodations. From a medical standpoint, continuing to demean or trivialize the requests after receiving that information is alarming and places the patient at foreseeable risk of further deterioration.

I do not offer an opinion about whether any attorney or City official has violated the ADA or any rule of professional conduct. I can state, however, that a disability-informed process must treat documented limitations with seriousness, dignity, and consistency. A process that responds to a medically prescribed aid with accusations, shifting rationales, public confrontation, and police pressure is medically harmful and incompatible with the goal of preserving the patient's health and functional participation.

### 10. Police-backed interruption or threatened confiscation can itself defeat the accommodation and cause acute medical harm.

Mr. Gutierrez reports that on July 7, 2026, after the City provided the device and accessories, City officials and police personnel required him to stop using it at his Council desk and threatened confiscation, removal, or arrest. I do not offer an opinion as to the legal characterization of that incident. Medically, however, a disability accommodation is not meaningfully available when using it exposes the patient to public confrontation, police escalation, threatened removal, or arrest.

For this patient, repeated public confrontation over accommodations foreseeably causes acute autonomic arousal, severe anxiety, sleep disruption, hypervigilance, autistic shutdown or burnout, impaired concentration, cognitive fatigue, worsening low-back and neck pain through muscle guarding, and reduced next-day functioning. The threat is especially harmful when it comes from senior City officials and is reinforced by uniformed police officers, because the patient reasonably perceives that he may lose his accommodation, be physically removed, or be arrested in public. These effects are cumulative because this is not the first occasion on which he reports threatened removal or police-backed interference with an accommodation. Each recurrence increases anticipatory anxiety before future meetings and makes a subsequent stress reaction more likely and more severe.

### 11. The acute harassment-related stress response materially contributed to the motor-vehicle accident.

Mr. Gutierrez reports that after the July 7 confrontation and the reported police-backed threats of confiscation, removal, and arrest, he experienced intense fear, crying, chest discomfort, hypervigilance, emotional dysregulation, and substantial loss of sleep. He was involved in a motor-vehicle accident the following day. Based on my treating relationship with him, the close temporal relationship, the symptom pattern he reported, and the independent Qualified Medical Evaluator's findings that psychological issues arose from his work environment and that stress and harassment required further evaluation, it is my medical opinion, within a reasonable degree of medical probability, that the acute harassment-related stress response materially contributed to the accident. The stress response impaired sleep, concentration, sustained attention, reaction time, judgment, and safe functioning. I do not opine that stress was necessarily the sole mechanical cause of the collision; I opine that it was a substantial contributing factor to the circumstances in which the collision occurred. The fact that the accident occurred after Mr. Gutierrez left City Hall does not make the acute physiological and cognitive effects of the confrontation medically unrelated, because those effects can persist for hours or longer after the triggering event.

### 12. Corroborating findings from the California workers' compensation Qualified Medical Evaluation.

I reviewed the April 24, 2026 Initial Qualified Medical Evaluation prepared by Mary E. Simone, D.C., QME. Dr. Simone documented that Mr. Gutierrez's Council work is approximately 70 to 80 percent sedentary, requires extensive document review and approximately seven hours per day of typing, and that he has special itemized needs that should be accommodated so he can function at full capacity. She specifically recorded his visual

requirements and concluded that a lumbar-support chair would be ergonomically appropriate to support his low back.

Dr. Simone's physical examination documented objective abnormalities, including cervical paraspinal and occipital tenderness, positive cervical compression and right shoulder-depression testing, materially restricted cervical range of motion, right shoulder tenderness with restricted rotation, reduced right-hand grip strength, lumbar paraspinal hypertrophy, tenderness, spasm and swelling, pain at L4-L5, and materially restricted lumbar motion. She diagnosed cervical spine sprain/strain with possible internal derangement, right shoulder strain with possible internal derangement, lumbar spine sprain/strain, and anxiety/stress.

Dr. Simone further stated that there is evidence that psychological issues arose from the work-related environment and its complexities, with documented incidents during Council meetings. She recommended a psychological evaluation to address issues related to stress and harassment, together with cervical and lumbar MRI studies, a right-shoulder MRI, conservative treatment, pain-management evaluation, and a 30-pound lifting/carrying restriction. She found that Mr. Gutierrez had not reached maximum medical improvement.

Most importantly for the accommodation questions before the Court, Dr. Simone reviewed my January 26, 2026 medical letter and specifically recorded the medically necessary measures as an assistive recording device, ergonomic seating, advance access to materials, and processing time during meetings. She also recorded my opinion that failure to implement these accommodations creates foreseeable medical harm. Dr. Simone concluded, within reasonable medical probability, that Mr. Gutierrez sustained injury to his cervical spine, right shoulder, and low back as a result of his job duties. Her report was signed under penalty of perjury.

These independent QME findings are medically consistent with my clinical observations: Mr. Gutierrez has documented physical injury, work-related stress and anxiety, objective functional limitations, and a need for effective accommodations to prevent worsening pain, sensory overload, sleep disturbance, stress-related symptoms, and functional decompensation. Dr. Simone did not make a legal determination of discrimination, and I do not rely on her report for such a legal conclusion. Her report independently corroborates the medical injury, work-related psychological stress, functional limitations, and medical need for effective accommodation.

## 13. Medical recommendations for immediate implementation.

Within a reasonable degree of medical probability, I recommend the following:

- Permit Mr. Gutierrez to use the GoPro MAX 2 or equivalent 360-degree device at or immediately adjacent to his actual Council desk during all open public meetings.
- Permit Mr. Gutierrez to maintain immediate operational control during the meeting, including positioning, starting, stopping, verifying, and monitoring the recording.
- Allow the City to retain legal ownership and reasonable inventory controls, provided those controls do not prevent Mr. Gutierrez from possessing the device during the meeting, taking it home afterward, downloading the footage, and reviewing it promptly for disability-related processing.
- Adopt a written post-meeting preservation protocol under which Mr. Gutierrez may take the camera and recording media home, download the native 360-degree footage to a City-issued computer or approved encrypted USB-C drive, retain an accessible working copy for review, and provide or synchronize an identical preserved copy, including metadata, to a City-approved repository.
- Provide a stable desk mount, adequate memory, backup power/batteries, necessary accessories, compatible viewing software, and a simple local download method sufficient for the full meeting and prompt home review.
- Do not replace the accommodation with a centrally located IT camera or the City's later-posted public video. The City's recording is not 360-degree, does not preserve Mr. Gutierrez's patient-specific viewpoint, and, as represented to me, is ordinarily unavailable until approximately 24 hours later. Those limitations prevent it from providing equally effective access.
- Avoid police-backed confrontation, public confiscation demands, threatened arrest, or removal based solely on use of the medically supported device. Any administrative concern should be addressed through a written, advance, disability-informed protocol rather than a live public confrontation.
- Implement these measures before the next Council meeting because repeated delay and threatened recurrence are medically harmful.

## 14. Final medical opinion and urgent concern regarding continued deterioration.

The medically relevant distinction is simple: City ownership is compatible with the accommodation; exclusive City or IT control that removes the camera from Mr. Gutierrez's perspective, prevents him from operating it during the meeting, or prevents him from taking it home to download and review the footage is not. A centrally positioned, remotely controlled camera is not medically equivalent to a patient-perspective 360-degree recording from his Council desk.

The assertion that the device is unnecessary because public recordings exist is medically incorrect. A fixed-angle recording that is not posted until approximately 24 hours later does not provide the immediate, interactive, patient-perspective review required by his disability. The assertion that patient operational control and take-home review are merely personal preferences is also medically incorrect; both are part of the compensatory function of the accommodation.

Continued interruption, public confrontation, police-backed interference, disparaging accusations, or withholding of the device or footage after the meeting places Mr. Gutierrez at foreseeable risk of worsening neurological, psychological, sleep-related, pain, and cardiovascular-stress symptoms, together with impaired concentration, impaired safe functioning, and an increased risk of additional accidents. The cumulative effect is already evident in his reports of crying, chest discomfort, severe fear, loss of sleep, worsening pain, cognitive exhaustion, and the next-day motor-vehicle accident to which the acute stress response materially contributed. Prompt, consistent, respectful implementation - including the ability to operate the camera at his desk, take it home, download the native footage, and review it without delay - is medically necessary.

As his treating physician, I am frankly alarmed that medically documented needs have repeatedly been met with shifting explanations, public accusations, threats of removal, and police involvement. I cannot determine the parties' legal rights, but I can state that this pattern is harming my patient. It is worsening his symptoms, undermining his ability to function safely, and making the accommodation process itself a source of illness and trauma. The medically appropriate response is not further confrontation; it is a clear, written, advance protocol that protects his dignity, privacy, physical safety, and meaningful ability to participate.

I respectfully urge that all participants - including City officials, counsel, staff, and law enforcement - stop characterizing the medical need in demeaning or punitive terms and address operational concerns in writing, in advance, and without public escalation. Whatever the Court ultimately decides about the legal claims, the patient's health should not continue to deteriorate while the parties dispute implementation.

Please contact my office if the Court requires clarification limited to the medical necessity and functional requirements of the accommodation.

Sincerely,

**Henry Chang, D.O., M.S., FACOI**
Osteopathic Physician & Surgeon
License No. 20A10516 - Osteopathic Medical Board of California

**Star Health Medical**
Henry Chang, DO, MS, FACOI
2707 E Valley Blvd, Suite 208
West Covina, CA 97192
Office: 626.581.0486 Fax: 626.581.0161